## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> MYLAN N.V., HEATHER BRESCH, RAJIV MALIK, ANTHONY MAURO, and KENNETH PARKS, <br><br> Defendants. | Civ. A. No.    2:20-cv-955 <br><br> <u>CLASS ACTION</u> <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>JURY TRIAL DEMANDED</u> <br><br> **ECF CASE** |

Plaintiff Public Employees' Retirement System of Mississippi ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of (i) regulatory filings made by Mylan N.V. ("Mylan" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases and media reports issued and disseminated by the Company; (iii) analyst reports concerning the Company; (iv) transcripts of Mylan's investor conference calls; and (v) other public information regarding the Company.

## I.    INTRODUCTION

1.    Plaintiff brings this securities class action (the "Action") against Mylan and certain of the Company's senior executives under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 on behalf of all investors who purchased Mylan's common stock between February 16, 2016, and May 7, 2019, inclusive (the "Class Period").

2.      Mylan is the second largest generic drug manufacturer in the world with roughly 55 manufacturing and R&D facilities globally.  Mylan's largest U.S. manufacturing facility is located in Morgantown, West Virginia.  At the start of the Class Period, the facility manufactured approximately 17 billion doses of medication every year, comprising 85% of all medicine Mylan sold in the United States in 2016.

3.      In September 2015, a former Mylan employee turned whistleblower disclosed to the Food and Drug Administration ("FDA") that, under the direct leadership of Mylan President Rajiv Malik ("Malik"), Mylan employees had been manipulating drug test results to achieve passing quality control results, and deliberately corrupting testing data by, among other techniques, intentionally crashing Mylan testing computers to evade FDA detection.

4.      On November 7, 2016, after receiving the whistleblower complaint, inspectors arrived unannounced at Mylan's Morgantown facility to conduct an 11-day investigation.  Upon investigating, the FDA discovered thousands of random files containing what appeared to be forbidden exploratory tests, a tactic some drug-makers have used to prevent quality failures from coming to light.  The FDA also found bins full of shredded documents, including quality-control records, in parts of the facility where such documentation is supposed to be preserved.  The FDA suspected Mylan laboratory staff had recorded passing scores on drugs that originally fell short of U.S. quality standards.  As a result, on November 18, 2016, the FDA privately issued to Mylan a 23-page citation detailing these findings and putting Mylan on notice that remediation efforts were to begin promptly.

5.      On April 3, 2017, Mylan received an official warning letter from the FDA concerning its flagship India plant, detailing nearly identical data corruption issues and other violations that paralleled those described in the FDA's November 2016 citation of Mylan's

Morgantown plant.  A full month later, on May 10, 2017, during Mylan's first quarter 2017 earnings conference call, President Malik claimed that the Company was "dedicated to continually enhancing our systems and processes, with a deliberate and thorough approach to ensure sustainable quality across our entire network of facilities, working closely with FDA to resolve any issues that come our way" and that Mylan "anticipate[s] no material impact to [its] overall business as a result of this warning letter."  In discussing the investigation of the India plant, Mylan did not disclose the FDA's concurrent investigation into the Morgantown plant.

6.      On April 20, 2018, Mylan announced it would be restructuring its Morgantown plant, including by terminating 500 employees.  In a statement issued by Mylan, the Company claimed that the "Morgantown plant needed to be right-sized to be less complex" due to general "industry" changes.  While the release stated these changes are "consistent with discussions we are having with the [FDA]," Mylan did not elaborate on the contents of those discussions or indicate that the restructuring was related to significant violations identified by the FDA.

7.      On June 28, 2018, Mylan disclosed that the FDA had conducted a four-week investigation into the Morgantown facility in the spring of 2018, which culminated in the FDA's issuance of its second citation in less than two years.  The FDA's investigation detailed 13 significant deficiencies in Mylan's operations and found that, among other violations, Mylan's attempts to remedy its previous deficiencies identified during the FDA's November 2016 inspection were "inadequate," and that Mylan exhibited poor quality control oversight, major lapses in equipment cleaning, and ineffective controls.  On this news, Mylan's share price fell $1.12 per share, or approximately 3%, from $37.45 per share to $36.33 per share.

8.      Next, on August 8, 2018, during Mylan's first earnings conference call since announcing the FDA's Morgantown investigation, President Malik explained that Mylan had

"undertaken a restructuring and remediation program in Morgantown" that included a "discontinuation of a number of products" and would have a "negative impact on production levels, product supply and operations." On this news, Mylan's share price fell $2.62 per share, or approximately 7%, falling from $39.23 per share to $36.61 per share. Nevertheless, Mylan executives assured investors that the Morgantown restructuring "impact is temporary" and that Mylan's "profitability levels are sustainable."

9.      Then, on November 9, 2018, the FDA issued a formal warning letter concerning "significant violations of current good manufacturing practice[s]" at Mylan's Morgantown plant, and reporting that products at the plant were "adulterated." On this news, Mylan's share price fell $1.01 per share, or approximately 3%, from $36.95 per share to $35.94 per share.

10.     Next, on February 26, 2019 during Mylan's fourth quarter and fiscal year 2018 earnings conference call, Mylan stunned investors when the Company announced an 18% decrease in net sales from the prior year, attributing this shortfall, in part, to its Morgantown restructuring, which included the discontinuation of almost 250 products. On this news, Mylan's share price fell $4.61 per share, or approximately 15%, from $30.62 per share to $26.01 per share.

11.     Finally, on May 7, 2019, Mylan reported a surprise loss for the first quarter of 2019 due, in part, to additional costs associated with the Morgantown restructuring. Mylan reported that its revenues and earnings-per-share were down year-over-year by 7% and 15%, respectively, as Mylan discontinued manufacturing certain products in the Morgantown facility, and that its quarterly adjusted free cash flow was severely lacking, now matching its 2015 levels. Mylan Chief Executive Officer ("CEO"), Heather Bresch ("Bresch"), attributed the cash flow swing to, among other factors, "the Morgantown remediation" and disclosed an additional $70 million in expenses

tied to the facility's restructuring.  On this news, Mylan's share price fell $6.73 per share, or approximately 24%, from $28.26 per share to $21.53 per share.

## II.    JURISDICTION AND VENUE

12.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

13.    This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14.    Venue is proper in this District under 28 U.S.C. § 1391(b), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because Mylan maintains its headquarters in this District and many of the acts giving rise to the violations complained of in this Action, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.

15.    In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   PARTIES

16.    Plaintiff is a pension fund established for the benefit of the current and retired public employees of the State of Mississippi.  Plaintiff is responsible for the retirement income of employees of the State, including current and retired employees of the State's public-school districts, municipalities, counties, community colleges, state universities, libraries and water districts.  Plaintiff provides benefits to over 75,000 retirees, manages over $28 billion in assets for its beneficiaries, and is responsible for providing retirement benefits to more than 250,000 current

public employees.  As indicated on the certification submitted herewith, Plaintiff purchased Mylan common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the securities laws alleged herein.

17.     Defendant Mylan is a Netherlands corporation, headquartered at 1000 Mylan Boulevard, Canonsburg, Pennsylvania, that claims to be one of the largest pharmaceutical companies in the world.

18.     Defendant Bresch joined Mylan in 1992 and has been Mylan's CEO since January 1, 2012.  Bresch has been a member of Mylan's Board of Directors (the "Board") since 2011.

19.     Defendant Malik joined Mylan in July 2005 and has been Mylan's President since January 1, 2012.  Malik has been a member of the Board since 2013.

20.     Defendant Anthony "Tony" Mauro ("Mauro") joined Mylan in 1996.  Mauro served as Mylan's President of North America from January 1, 2012 to January 2016.  Mauro was appointed as Mylan's Chief Commercial Officer in February 2016, and continues to occupy that role.

21.     Defendant Kenneth "Ken" Parks ("Parks") joined Mylan in June 2016 as the Company's Chief Financial Officer ("CFO").

22.     Defendants Bresch, Malik, Mauro, and Parks are collectively referred to in this complaint as the "Officer Defendants."  The Officer Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Mylan's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  The Officer Defendants were provided with copies of the Company's reports and press releases alleged in this complaint to be misleading before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

Because of their position and access to material non-public information available to them, the Officer Defendants knew that the adverse facts and omissions specified in this complaint had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and misleading.

## IV.   DEFENDANTS' MATERIAL MISSTATEMENTS AND OMISSIONS ABOUT MYLAN'S MORGANTOWN MANUFACTURING PLANT

23.     In September 2015, a former Mylan employee turned whistleblower sat down with a group of senior FDA officials and made specific allegations that, under the direct leadership of President Malik, Mylan's flagship manufacturing plant, and research and development center, became a hub for data fraud and had disseminated specific methods of falsifying data throughout Mylan's Indian manufacturing plants.  The whistleblower alleged that, in order to achieve passing results for certain drugs, Mylan employees were instructed to switch samples from larger "commercial" batches, which tended to be less stable, with samples from smaller "pilot" batches that tended to be easier to control for variables.  In addition, when Mylan employees encountered failing quality control test scores for their drugs, Mylan plant managers and Mylan leadership developed a technique to intentionally corrupt the unwanted data files without tipping the FDA off to explicit data manipulation.  Instead of simply deleting manipulated or failing data from Mylan's plant software, Mylan employees were intentionally crashing their computers and software by, among other techniques, cutting power to their computers.

24.     The Class Period begins on February 16, 2016, when Mylan filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2015.  In the 10-K, Mylan touted its Morgantown facility as being a "significant production and distribution site[]" and a "center[] of excellence."  Moreover, Mylan asserted that "all of our facilities are in good operating

condition, the machinery and equipment are well-maintained, the facilities are suitable for their intended purposes and they have capacities adequate for the current operations."

25.     While the FDA did not act immediately on the whistleblower's complaint, in July 2016, the whistleblower sent the FDA an email expressing dismay over the FDA's inaction, and making clear that drugs manufactured in these plants were indeed being shipped and distributed throughout the United States.  Two months later, on September 5, 2016, FDA inspectors arrived unannounced at Mylan's Nishik, India plant.  Over the course of the FDA's nine-day investigation, FDA inspectors confirmed the whistleblower's complaints, finding the plant's software system riddled with error messages showing "instrument malfunction," "power loss," and "connection to chromatography system lost."  FDA inspectors were appalled to learn that Mylan plant managers had conducted no investigations into these repeated crashes, leading the FDA to conclude that the system crashes were the result of intentional conduct.  In fact, the technique was so notable that the FDA inspectors named it "crashing files."

26.     Two months later, on November 7, 2016, FDA inspectors arrived unannounced at Mylan's flagship U.S. plant in Morgantown to conduct an 11-day investigation.  As with Mylan's Nashik plant, FDA inspectors at Morgantown discovered thousands of files containing what appeared to be forbidden exploratory tests, and suspected Mylan employees were recorded passing scores on drugs that originally fell short of U.S. quality standards, just like in Nashik.  FDA inspectors also found bins full of shredded documents, including quality-control records, in parts of the factory where such documents are required to be preserved.  Finally, FDA inspectors found evidence of numerous instances where, after a drug batch had received a failing quality control result, Mylan employees and managers would retest the batch until passing results were obtained,

all without investigating the cause of the aberrant or failing results, and all in stark violation of the FDA's Current Good Manufacturing Practices ("CGMP").

27.     On November 9, 2016, during Mylan's third quarter 2016 earnings conference call, Mylan CEO Bresch touted the Company's strong quarterly performance, and attributed these results to the launch of "new products."

> On the top line, we generated total revenues of nearly $3.1 billion, a year-over-year increase of 13%. This result was fueled by strong performance across our Europe and rest of world regions, as well as solid performance across our North America region. On the bottom line, we delivered adjusted net earnings of $726 million, for $1.38 per adjusted diluted share, a year-over-year decline of about 3%, which was ***primarily driven by the significant contribution in the prior-year period of new products***.

28.     Mylan's then President of North America (now Chief Commercial Officer), Mauro, had also claimed that sales in North America had grown due to Mylan's "broad[] portfolios, consistent execution of new product launches, and being able to reliably supply significant volumes to our customers." The North American sales growth was dependent upon the manufacturing output of the Morgantown facility.

29.     Mylan executives did not disclose to investors that the FDA had recently conducted two unannounced investigations into Mylan's two largest manufacturing plants as the result of stark accusations from a former Mylan employee turned whistleblower.

30.     On November 18, 2016, upon consideration of the FDA's findings at Mylan's Morgantown plant, the FDA privately issued Mylan a 23-page Form FDA 483 citation detailing Mylan's serious violations of the FDA's CGMPs and put Mylan on notice that remediation efforts were to begin promptly. Mylan failed to disclose the existence of, or the findings found in, FDA's report to investors.

31.     On March 1, 2017, Mylan held its investor day and fourth quarter and fiscal year 2016 earnings conference call.  On this call, CEO Bresch touted Mylan's profitability in North America, claiming:

> And I think if you take this look, again I think this picture says 1,000 words.  When you look at from North America starting there, obviously we know North America, the United States is one of the most profitable countries.  And you look at our CAGR both on top line as well as our profitability and it has been steady at around 50% and we have continued to grow very nicely throughout North America and our profit has kept pace.

32.     Mylan CFO Parks reiterated the Company's strong performance, touting that North America had grown its revenues by 10% year-over-year, and claiming that:

> You see in North America that we've had expanded profit.  We have been able to maintain stability levels at over 50% through that period.  That's benefits of new product launches, volume expansion and offsetting pricing erosion, and we have said it again in each one of our previous calls, as well in the previous discussions.  What we see in the North America generics business is similar to what we see around the world, which is mid-single-digit generics pricing erosion.

33.     On April 3, 2017, Mylan received an official warning letter from the FDA concerning its flagship Nashik plant and detailing data corruption issues and other CGMP violations.  The FDA published the letter on its website on April 10, 2017.

34.     One month later, on May 10, 2017, during the Company's first quarter 2017 earnings conference call, President Malik commented on the FDA's April 2017 warning letter, claiming:

> With regards to our operating platform, ***Mylan has always had a deep and unwavering commitment to quality everywhere we operate***.  FDA standards for our industry continue to evolve, and this continues to raise the bar for every player in our industry, which is something we very much welcome.
>
> For Mylan's part, ***we are dedicated to continually enhancing our systems and processes, with a deliberate and thorough approach to ensure sustainable quality across our entire network of facilities***, working closely with FDA to resolve any issues that come our way.  As you are aware, we recently received a warning letter at our Nashik site in India.  We are working closely with the FDA to respond to and

address the issues raised in the letter as comprehensively and expeditiously as possible. Production from Nashik site continues uninterrupted, and we anticipate no material impact to Mylan's overall business as a result of this warning letter.

35.     Mylan again failed to disclose to investors the existence of, or the findings found in, FDA's recent investigation into its Morgantown plant.

36.     Then, after the markets had closed on April 20, 2018, Mylan announced that it would be restructuring its Morgantown plant, including by terminating 500 employees, or approximately 14% of the workforce. In the Company's announcement, Mylan claimed that the "Morgantown plant needed to be right-sized to be less complex" due to general "industry" changes. While the release stated these changes are "consistent with discussions we are having with the [FDA]," Mylan failed to disclose to investors what these "discussions" entailed or why they concerned the Morgantown plant, causing many to speculate as to the cause for Mylan's drastic move. Indeed, one analyst at Wells Fargo discussed that Mylan's recent announcement raised questions about "what Mylan means about the need to make the Morgantown plant less complex" and "what sort of discussions with the FDA are consistent with Mylan's need to right size."

37.     The statements quoted above in ¶¶ 24-36 were materially false and misleading because Mylan's revenue increases and profitability were being artificially buoyed by the Company's unscrupulous and illegal conduct of intentionally skirting and ignoring FDA CGMPs. Through Mylan's scheme to corrupt quality control data files, Mylan bypassed countless expensive and time-consuming quality control tests, allowing the Company to increase its output and decrease costs.

38.     In early 2018, a second Mylan whistleblower approached the FDA to report serious concerns with Mylan's Morgantown plant. Specifically, the whistleblower alleged that conditions at the Morgantown plant were deteriorating, and, according to an FDA memo detailing the

allegations, "*Mylan's management, instead of working proactively to remedy problems, was more focused on creating a 'façade of documents' to fend off the FDA*."  The whistleblower described how a "team of employees from India" had been "brought in to rapidly close a backlog of company investigations at Morgantown, and employees there were instructed not to question their work."  Moreover, Mylan executives, under the leadership of President Malik, had "developed an 'embedded culture' that permitted fraud."

## V.    THE TRUTH ABOUT THE MORGANTOWN PLANT IS REVEALED

39.    The truth about Mylan's illegal and corrupt practices at its Morgantown plant was revealed through a series of disclosures beginning on June 27, 2018, when *Bloomberg* reported that the FDA had conducted a four-week investigation into the Morgantown facility in the Spring of 2018.  This investigation culminated in the FDA's issuance of its second FDA Form 483 citation in less than two years.  The FDA's investigation detailed 13 significant deficiencies in Mylan's operations and found that, among other violations, Mylan's attempts to remedy its previous deficiencies identified during the FDA's November 2016 inspection were "inadequate," and that Mylan exhibited poor quality control oversight, major lapses in equipment cleaning, and ineffective controls.

40.    On this news, Mylan's share price fell $1.12 per share, or approximately 3%, from $37.45 per share to $36.33 per share.

41.    The next day, June 28, 2018, in an attempt to assuage investors' fears over the potential repercussions of the FDA's investigation and citation, Mylan issued a press release minimizing the disclosure of the recent investigation:

> *Mylan is committed to maintaining the highest quality manufacturing standards at its facilities around the world*.  In support of this commitment, Mylan's plants are regularly inspected by health authorities to ensure compliance for the various markets we serve.  The U.S. Food and Drug Administration (FDA) recently

completed an inspection at Mylan's plant in Morgantown and made observations through a Form 483. The company has submitted a comprehensive response to the Agency and committed to a robust improvement plan.

***We remain confident in the quality, safety and efficacy of our drug products***, including those in distribution, and we continue to manufacture and ship product from the site. Mylan will continue to maintain a close dialogue with the Agency and is fully committed to working with FDA to address its observations.

42.    The statements quoted above in ¶ 41 were materially false and misleading because, instead of working to remedy the FDA's concerns, insiders reported that Mylan was actively trying to deceive the FDA and by creating a "façade of documents."

43.    On August 8, 2018, during Mylan's second quarter 2018 earnings conference call, its first investor conference call since announcing the FDA's Morgantown investigation, President Malik explained that Mylan had "undertaken a restructuring and remediation program in Morgantown" that included a "discontinuation of a number of products" and would have a "negative impact on production levels, product supply and operations." Specifically, Malik announced:

As a result of FDA's evolving regulatory expectations, our commitment to maintain high-quality standards as well as changing industry dynamics, we have undertaken a restructuring and remediation program in Morgantown during the second quarter of 2018. That program, which includes a discontinuation of a number of products, is aimed at reducing complexity at the facility. These actions have temporarily had a negative impact on production levels, product supply and operations. However, long term, these actions will only further strengthen our Morgantown site.

44.    On this news, Mylan's share price fell $2.62 per share, or approximately 7%, falling from $39.23 per share to $36.61 per share.

45.    That same day, in a press release announcing the Company's second quarter 2018 earnings, Mylan executives again falsely assured investors that the Company was committed to resolving this problem expeditiously:

*Mylan is committed to maintaining the highest quality manufacturing standards at its facilities around the world*.  In support of this commitment, Mylan's plants are regularly inspected by health authorities to ensure compliance for the various markets we serve.  The U.S. Food and Drug Administration ("FDA") recently completed an inspection at Mylan's plant in *Morgantown, West Virginia* and made observations through a Form 483.  The Company has submitted a comprehensive response to the FDA and committed to a robust improvement plan.  In addition, the Company has recognized that the industry dynamics and regulatory expectations have continued to evolve.  Based upon these factors and the Company's commitment, during the second quarter of 2018, the Company commenced a restructuring and remediation program at the Morgantown manufacturing facility.  The program, which includes a reduction of the workforce and the discontinuation of a number of products, is aimed at reducing complexity at the facility.  These actions have had a significantly negative impact on production levels, product supply and operations.  Also, the Company has incurred significant expenses for incremental manufacturing variances, site remediation and restructuring charges.  *The Company expects that remediation activities, lower production levels, the negative impact on operations and related expenses to continue through the end of 2018*.

46.    On November 5, 2018, during the Company's third quarter 2018 earnings conference call, President Malik discussed the Morgantown restructuring and assuaged investors' concerns over the magnitude of the Morgantown restructuring.  Specifically, Malik claimed that the investors' reaction to its Morgantown restructuring was "misunderstood by the investment community" as "[c]urrently, only one of our top 10 and 8 of our top 50 gross margin-generating products for North America are manufactured in Morgantown."

47.    The statements quoted above in ¶¶ 45-46 were materially false and misleading for the same reasons stated above in ¶ 42.  In addition, the statements were false and misleading because Mylan failed to disclose that the FDA's investigation into the Morgantown plant was the result of whistleblower allegations, and not, as Mylan insinuated, the result of a "regular" inspection.  Moreover, these statements were false and misleading as Defendants knew, or were reckless in not knowing that, as a result of Mylan's continued efforts to remain uncooperative with the FDA, the Morgantown plant would continue to incur substantial setbacks.

48.     Then, on November 9, 2018, the FDA issued a formal warning letter to Mylan concerning its Morgantown plant, citing "significant violations of current good manufacturing practice[s]" and finding products at Morgantown were "adulterated."

49.     On this news, Mylan's share price fell $1.01 per share, or approximately 3%, from $36.95 per share to $35.94 per share.

50.     On February 26, 2019, during Mylan's fourth quarter and fiscal year 2018 earnings conference call, Mylan stunned investors when the Company announced an 18% decrease in net sales from the prior year.  The Company attributed this shortfall, in part, to its Morgantown restructuring, which included the discontinuation of almost 250 products.  In addition, Mylan announced that investors should expect "no significant new product revenue" from the Morgantown plant in 2019.  This new disclosure starkly contrasted Mylan's assurances two quarters prior that the Morgantown issues would last only through the end of 2018.

51.     On this news, Mylan's share price fell $4.61 per share, or approximately 15%, from $30.62 per share to $26.01 per share.

52.     Finally, on May 7, 2019, Mylan reported a surprise loss for the first quarter of 2019 due, in part, to additional costs associated with the Morgantown restructuring.  Mylan reported that its revenues and earnings-per-share were down year-over-year by 7% and 15%, respectively, as Mylan discontinued manufacturing certain products in the Morgantown facility, and that its quarterly adjusted free cash flow was severely lacking, now matching its 2015 levels.  CEO Bresch attributed the cash flow swing to, among other factors, "the Morgantown remediation" and disclosed an additional $70 million in expenses tied to the facility's restructuring.

53.     Analysts quickly identified that Mylan's earnings miss was, in part, caused by continued issues with Mylan's Morgantown plant.  Indeed, an analyst from Morgan Stanley

identified that the "Morgantown facility issues are more problematic than Mylan has disclosed to date."

54.     On this news, Mylan's share price fell $6.73 per share, or approximately 24%, from $28.26 per share to $21.53 per share.

## VI.     LOSS CAUSATION

55.     During the Class Period, as detailed in this complaint, Defendants made materially false and misleading statements and omissions, including statements regarding Mylan's Morgantown plant, and engaged in a scheme to deceive the market.  This artificially inflated the price of Mylan common stock and operated as a fraud or deceit on the Class.  Later, when Defendants' prior misrepresentations and risks concealed by the fraudulent conduct, alleged in this complaint, materialized and were disclosed to the market, the price of Mylan common stock fell precipitously.  As a result of their acquisition of Mylan common stock during the Class Period—and Defendants' material misstatements and omissions—Plaintiff and other members of the Class (defined below) suffered economic loss, *i.e.*, damages, under the federal securities laws.

## VII.    CLASS ACTION ALLEGATIONS

56.     Plaintiff brings this Action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Mylan stock during the Class Period (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Mylan and their families and affiliates.

57.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to

the parties and the Court.  Mylan has over 500 million shares of stock outstanding, owned by at least hundreds or thousands of investors.

58.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact are common to the members of the Class, which predominate over questions which may affect individual Class members, include:

(a)     Whether Defendants violated the Exchange Act;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)     Whether Defendants' misconduct impacted the price of Mylan stock;

(f)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)     The extent of damages sustained by Class members and the appropriate measure of damages.

59.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

60.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

61.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VIII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR

62.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements described in this complaint.  Many of the specific statements described in this complaint were not identified as "forward-looking" when made.  To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described in this complaint, Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Mylan who knew that the statement was false or misleading when made.

## IX.   PRESUMPTION OF RELIANCE

63.     At all relevant times, the market for Mylan's common stock was an efficient market for the following reasons, among others:

(a)     Mylan stock met the requirements for listing and was listed and actively traded on the NASDAQ stock market, a highly efficient and automated market;

(b)     Mylan filed periodic public reports with the SEC and NASDAQ;

(c)     Mylan regularly and publicly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on

the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Mylan was followed by securities analysts employed by numerous major brokerage firms, who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

64.     As a result of the foregoing, the market for Mylan securities promptly digested current information regarding Mylan from all publicly available sources and reflected that information in the price of Mylan stock.  Under these circumstances, all purchasers of Mylan common stock during the Class Period suffered similar injury through their purchase of Mylan common stock at artificially inflated prices, and the presumption of reliance applies.

65.     A Class-wide presumption of reliance is also appropriate in this Action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this Action involves Defendants' failure to disclose material adverse information regarding Mylan's business operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Mylan's Morgantown plant, as alleged above, that requirement is satisfied here.

**X.     CAUSES OF ACTION**

**COUNT I**

**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against Mylan and the Officer Defendants (Bresch, Malik, Mauro, and Parks)**

66.     Plaintiff repeats, incorporates, and realleges every allegation above as if fully alleged in this count.

67.     During the Class Period, Mylan and the Officer Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did (i) deceive the investing public, including Plaintiff and other Class members, as alleged in this complaint; and (ii) cause Plaintiff and other members of the Class to purchase Mylan common stock at artificially inflated prices.

68.     Mylan and the Officer Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts and omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Mylan common stock in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

69.     Mylan and the Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

70.     During the Class Period, Mylan and the Officer Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that, in light of the circumstances under which they were made, the statements contained

misrepresentations and failed to disclose material facts necessary in order to make the statements not misleading.

71.     Mylan and the Officer Defendants had actual knowledge of the misrepresentations and omissions of material facts alleged in this complaint, or recklessly disregarded the true facts that were available to them.  Mylan and the Officer Defendants engaged in this misconduct to conceal Mylan's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

72.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Mylan common stock.  Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Mylan common stock had been artificially inflated by Mylan and the Officer Defendants' fraudulent course of conduct.

73.     As a direct and proximate result of Mylan and the Officer Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

74.     By virtue of the foregoing, Mylan and the Officer Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against the Officer Defendants (Bresch, Malik, Mauro, and Parks)

75.     Plaintiff repeats, incorporates, and realleges every allegation above as if fully alleged in this count.

76.     The Officer Defendants acted as controlling persons of Mylan within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  By virtue of their high-level positions,

participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, and their power to control public statements about Mylan, the Officer Defendants had the power and ability to control the actions of Mylan and its employees.  By reason of this conduct, the Officer Defendants are liable under Section 20(a) of the Exchange Act.

## XI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.  Determining that this Action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.  Awarding compensatory damages in favor of Plaintiff and other Class members against Mylan and the Officer Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

C.  Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this Action, including attorneys' fees and expert fees; and

D.  Awarding any equitable, injunctive, or other further relief that the Court may deem just and proper.

## XII.  JURY DEMAND

Plaintiff demands a trial by jury.

Dated: June 26, 2020

**WEISS BURKARDT KRAMER LLC**

*/s/ M. Janet Burkardt*
M. Janet Burkardt (PA. I.D. #85582)
445 Fort Pitt Boulevard, Suite 503
Pittsburgh, PA 15219

Telephone: (412) 391-9890
Facsimile: (412) 391-9685
jburkardt@wbklegal.com

*Liaison Counsel for Plaintiff Public
Employees' Retirement System of Mississippi*

**BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP**

Gerald H. Silk
Avi Josefson
Michael D. Blatchley
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jerry@blbglaw.com
avi@blbglaw.com
michaelb@blbglaw.com

*Counsel for Plaintiff Public Employees'
Retirement System of Mississippi*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Ta'Shia S. Gordon, on behalf of Public Employees' Retirement System of Mississippi ("Mississippi"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am a Special Assistant Attorney General in the Office of the Attorney General of the State of Mississippi. I am fully authorized to enter into and execute this Certification on behalf of Mississippi. I have reviewed the complaint and authorize its filing.

2. Mississippi did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Mississippi is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Mississippi's transactions in the Mylan N.V. securities that are the subject of this action are set forth in the chart attached hereto.

5. Mississippi has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

*In re Dr. Reddy's Laboratories Limited Securities Litigation,* No. 17-cv-6436 (D.N.J.)
*In re Acuity Brands, Inc. Securities Litigation,* No. 18-cv-2140 (N.D. Ga.)
*Wigginton v. Advance Auto Parts, Inc.,* No. 18-cv-212 (D. Del.)
*In re Wageworks, Inc. Securities Litigation,* No. 18-cv-1523 (N.D. Cal.)
*In re Facebook, Inc. Securities Litigation,* No. 18-cv-1725 (N.D. Cal.)
*Gordon v. Nielsen Holdings plc,* No. 18-cv-7143 (S.D.N.Y.)
*Edwards v. McDermott International,* No. 18-cv-4330 (S.D. Tex.)
*Seeks v. The Boeing Company,* No. 19-cv-2394 (N.D. Ill.)
*Public Employees' Retirement System of Mississippi v. Mohawk Industries, Inc.,*
No. 20-cv-00005 (N.D. Ga.)
*Cambridge Retirement System v. JELD-WEN Holding, Inc.,* No. 20-cv-112 (E.D. Va.)

6. Mississippi has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motions for lead plaintiff or was not appointed lead plaintiff:

*Public Employees' Retirement System of Mississippi v. Sprouts Farmers Market Incorporated,*
No. 18-cv-695 (D. Ariz.)
*Cambridge Retirement System v. Mednax, Inc.,* No. 18-cv-61572 (S.D. Fla.)
*Jansen v. International Flavors & Fragrances Inc.*, No. 19-cv-7536 (S.D.N.Y.)

7. Mississippi will not accept any payment for serving as a representative party on behalf of the Class beyond Mississippi's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.


I declare under penalty of perjury that the foregoing is true and correct.  Executed this 24 day of June, 2020.


Ta'Shia S. Gordon
*Special Assistant Attorney General in the Office of the Attorney General of the State of Mississippi on behalf of the Public Employees' Retirement System of Mississippi*

**Public Employees' Retirement System of Mississippi**
**Transactions in Mylan N.V**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 6/3/2016 | 1,112 | 44.3800 |
| Purchase | 6/6/2016 | 75,723 | 46.2314 |
| Purchase | 6/6/2016 | 891 | 45.5750 |
| Purchase | 6/6/2016 | 5,433 | 46.1063 |
| Purchase | 6/7/2016 | 5,316 | 46.5808 |
| Purchase | 6/7/2016 | 48,505 | 46.1500 |
| Purchase | 6/8/2016 | 34,190 | 46.4805 |
| Purchase | 6/8/2016 | 13,360 | 46.5567 |
| Purchase | 6/9/2016 | 5,567 | 46.3014 |
| Purchase | 6/9/2016 | 31,474 | 45.9718 |
| Purchase | 6/17/2016 | 3,004 | 45.0040 |
| Purchase | 6/24/2016 | 15,900 | 43.5600 |
| Purchase | 8/4/2016 | 4,461 | 48.5400 |
| Purchase | 9/16/2016 | 2,567 | 41.7814 |
| Purchase | 2/24/2017 | 500 | 42.1600 |
| Purchase | 6/16/2017 | 1,060 | 36.7110 |
| Purchase | 6/20/2017 | 9,300 | 37.4663 |
| Purchase | 6/23/2017 | 3,035 | 39.0300 |
| Purchase | 9/15/2017 | 11,533 | 32.0205 |
| Purchase | 10/25/2017 | 461 | 38.8901 |
| Purchase | 12/15/2017 | 509 | 40.5100 |
| Purchase | 2/13/2018 | 87,531 | 40.4207 |
| Purchase | 2/13/2018 | 8,723 | 40.3095 |
| Purchase | 2/14/2018 | 66,664 | 41.1549 |
| Purchase | 2/15/2018 | 5,691 | 41.4609 |
| Purchase | 3/13/2018 | 91 | 42.8300 |
| Purchase | 3/16/2018 | 347 | 41.7212 |
| Purchase | 3/26/2018 | 34,244 | 39.5063 |
| Purchase | 6/13/2018 | 59,682 | 42.0698 |
| Purchase | 6/14/2018 | 40,476 | 39.4719 |
| Purchase | 6/15/2018 | 22,642 | 39.2780 |
| Purchase | 6/15/2018 | 674 | 38.9904 |
| Purchase | 6/19/2018 | 1,015 | 38.0800 |
| Purchase | 6/19/2018 | 13,947 | 38.5482 |
| Purchase | 6/19/2018 | 1,401 | 38.6400 |
| Purchase | 6/19/2018 | 6,551 | 38.5835 |
| Purchase | 6/19/2018 | 154 | 38.5500 |
| Purchase | 6/20/2018 | 10,807 | 38.7479 |

**Public Employees' Retirement System of Mississippi**
**Transactions in Mylan N.V**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 6/20/2018 | 4,549 | 38.7603 |
| Purchase | 6/20/2018 | 7,051 | 38.8050 |
| Purchase | 6/21/2018 | 10,051 | 38.5998 |
| Purchase | 6/22/2018 | 14,809 | 38.2797 |
| Purchase | 7/17/2018 | 275 | 36.2700 |
| Purchase | 8/2/2018 | 88 | 36.4900 |
| Purchase | 9/13/2018 | 80 | 37.9700 |
| Purchase | 9/21/2018 | 78 | 38.9900 |
| Purchase | 10/23/2018 | 95 | 31.6800 |
| Purchase | 11/16/2018 | 8,153 | 34.8673 |
| Purchase | 11/19/2018 | 9,962 | 34.6657 |
| Purchase | 11/19/2018 | 3,057 | 34.8000 |
| Purchase | 11/19/2018 | 3,702 | 34.5503 |
| Purchase | 11/20/2018 | 17,273 | 34.9100 |
| Purchase | 11/20/2018 | 21,051 | 34.1176 |
| Purchase | 11/29/2018 | 88 | 33.7800 |
| Purchase | 12/11/2018 | 101 | 30.3500 |
| Purchase | 12/21/2018 | 194 | 26.4600 |
| Purchase | 12/21/2018 | 42,700 | 26.4570 |
| Purchase | 12/21/2018 | 1,387 | 26.4573 |
| Purchase | 1/2/2019 | 110 | 27.9200 |
| Purchase | 3/15/2019 | 235 | 28.0900 |
| Purchase | 4/8/2019 | 109 | 27.4700 |
| | | | |
| Sale | 11/10/2016 | (2,277) | 38.2800 |
| Sale | 11/10/2016 | (6,658) | 38.2800 |
| Sale | 11/11/2016 | (16,914) | 37.6555 |
| Sale | 11/11/2016 | (1,900) | 37.9300 |
| Sale | 1/23/2017 | (14,984) | 36.3086 |
| Sale | 1/23/2017 | (2,882) | 36.5650 |
| Sale | 1/24/2017 | (8,647) | 35.4633 |
| Sale | 1/24/2017 | (42,390) | 35.6846 |
| Sale | 1/25/2017 | (17,593) | 36.4585 |
| Sale | 1/25/2017 | (6,634) | 36.5285 |
| Sale | 1/25/2017 | (1,713) | 36.4073 |
| Sale | 2/2/2017 | (30,446) | 38.8250 |
| Sale | 2/2/2017 | (9,085) | 38.9582 |
| Sale | 2/2/2017 | (10,352) | 38.8421 |

**Public Employees' Retirement System of Mississippi**
**Transactions in Mylan N.V**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Sale | 2/2/2017 | (18,268) | 38.8650 |
| Sale | 2/3/2017 | (1,997) | 39.1450 |
| Sale | 2/3/2017 | (10,791) | 39.1894 |
| Sale | 2/6/2017 | (3,919) | 39.9800 |
| Sale | 2/9/2017 | (10,963) | 39.2906 |
| Sale | 2/9/2017 | (23,781) | 39.2148 |
| Sale | 2/9/2017 | (13,648) | 39.2148 |
| Sale | 2/9/2017 | (26,189) | 39.3033 |
| Sale | 2/17/2017 | (71,955) | 42.0367 |
| Sale | 3/6/2017 | (556) | 44.0400 |
| Sale | 3/6/2017 | (1,630) | 44.0400 |
| Sale | 8/11/2017 | (4,800) | 30.8800 |
| Sale | 8/11/2017 | (4,246) | 30.8800 |
| Sale | 8/25/2017 | (2,171) | 30.5300 |
| Sale | 9/25/2017 | (2,430) | 31.4800 |
| Sale | 12/13/2017 | (2,200) | 39.5300 |
| Sale | 12/13/2017 | (2,109) | 39.5300 |
| Sale | 12/13/2017 | (416) | 39.5300 |
| Sale | 2/8/2018 | (4,206) | 39.2500 |
| Sale | 2/20/2018 | (4,132) | 41.3400 |
| Sale | 3/16/2018 | (2,425) | 41.7380 |
| Sale | 6/22/2018 | (2,634) | 38.3102 |
| Sale | 10/23/2018 | (2,610) | 32.1100 |
| Sale | 10/26/2018 | (98) | 31.2910 |