# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE MYLAN N.V. SECURITIES LITIGATION | Master File No. 2:20-cv-00955-NR |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

Nina F. Locker (*pro hac vice*)
Evan L. Seite (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI, P.C.
650 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 493-9300
Facsimile: (650) 493-6811

Michael S. Sommer (*pro hac vice*)
Sheryl Shapiro Bassin (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5899

William Pietragallo, II (PA I.D. # 16413)
Eric G. Soller (PA I.D. # 65560)
PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP
One Oxford Centre, 38th Floor
Pittsburgh, Pennsylvania 15219
Telephone: (412) 263-1818
Facsimile: (412) 263-4200

*Counsel for Defendants Mylan N.V., Heather Bresch, Rajiv Malik, and Kenneth Parks*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................... 1

RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ............................................ 2

    A.    Mylan and the FDA Regulatory Environment ........................................................ 2

    B.    Mylan's Nashik Facility and the January 31, 2019 *Bloomberg* Article ................. 2

    C.    Mylan's Morgantown Restructuring and Remediation ........................................... 3

    D.    This Litigation and the Court's Order on Defendants' Motion to Dismiss ............ 4

ARGUMENT .................................................................................................................. 6

I.    PLAINTIFF FAILS TO PLEAD LOSS CAUSATION FOR THE SOLE
REMAINING CHALLENGED STATEMENT .................................................................. 6

    A.    The Applicable Pleading Standard for Loss Causation ......................................... 6

    B.    Plaintiff Does Not Plead a Corrective Disclosure for the *Bloomberg*
Statement .............................................................................................................. 8

II.    PLAINTIFF'S SCHEME CLAIM FAILS AS A MATTER OF LAW ........................... 14

    A.    The Court's Limitation of the Scheme Claim to the Sole Remaining
Challenged Statement Was Correct ..................................................................... 16

    B.    Plaintiff Cannot Invoke Scheme Liability to Bypass Rule 10b-5(b) .................... 19

CONCLUSION ............................................................................................................. 20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berckeley Inv. Group, Ltd. v. Colkitt*,
    455 F.3d 195 (3d Cir. 2006)..............................................................................................8

*Brown v. Ambow Educ. Holding Ltd.*,
    2014 WL 523166 (C.D. Cal. Feb. 6, 2014)................................................................10, 12

*Cent. States v. Fed. Home Loan Mortg. Corp.*,
    543 F. App'x 72 (2d Cir. 2013) ................................................................................10, 14

*City of Edinburgh Council v. Pfizer, Inc.*,
    754 F.3d 159 (3d Cir. 2014)..........................................................................................20

*Dalberth v. Xerox Corp.*,
    766 F.3d 172 (2d Cir. 2014)....................................................................................13, 14

*De Vito v. Liquid Holdings Grp., Inc.*,
    2018 WL 6891832 (D.N.J. Dec. 31, 2018) ..........................................................................19

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005).......................................................................................................7, 8

*In re Boston Sci. Corp. Sec. Litig.*,
    708 F. Supp. 2d 110 (D. Mass. 2010),
    *aff'd on other grounds*, 649 F.3d 5 (1st Cir. 2011)............................................................14

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)........................................................................................11

*In re DVI, Inc. Sec. Litig.*,
    639 F.3d 623 (3d Cir. 2011), *abrogated on other grounds*, *Amgen Inc. v.*
    *Conn. Ret. Plans and Tr. Funds*, 133 S. Ct. 1184 (2013) ..................................................17

*In re Eastman Kodak Co. Sec. Litig.*,
    2022 WL 4473629 (W.D.N.Y. Sept. 27, 2022) ....................................................16, 19, 20

*In re Francesca's Holdings Corp. Sec. Litig.*,
    2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015) ..............................................................10

*In re Merck & Co., Inc. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005)..........................................................................................20

*In re Mindbody, Inc. Sec. Litig.*,
    489 F. Supp. 3d 188 (S.D.N.Y. 2020)............................................................................19

*In re Ocugen, Inc. Sec. Litig.*,
   2023 WL 2351695 (E.D. Pa. March 3, 2023),
   *appeal docketed*, No. 23-1570 (3d Cir. April 3, 2023) ......................................................20

*In re Oracle Corp. Sec. Litig.*,
   627 F.3d 376 (9th Cir. 2010) .......................................................................................11

*In re Teva Sec. Litig.*,
   512 F. Supp. 3d 321 (D. Conn. 2021).................................................................15, 19, 20

*In re Tupperware Brands Corp. Sec. Litig.*,
   2021 WL 247870 (M.D. Fla. Jan. 25, 2021)....................................................................18

*In re Tupperware Brands Corp. Sec. Litig.*,
   2021 WL 6755476 (M.D. Fla. Aug. 9, 2021) ...................................................................16

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
   625 F. Supp. 3d 164 (S.D.N.Y. 2022)........................................................................17, 19

*Katyle v. Penn Nat'l Gaming, Inc.*,
   637 F.3d 462 (4th Cir. 2011) ................................................................................7, 10, 13

*Kolominsky v. Root, Inc.*,
   2023 WL 3215056 (S.D. Ohio Mar. 31, 2023),
   *appeal docketed*, No. 23-3392 (6th Cir. May 2, 2023) .....................................................20

*Lopes v. Fitbit, Inc.*,
   2020 WL 1465932 (N.D. Cal. Mar. 23, 2020),
   *aff'd on other grounds*, 848 F. App'x 278 (9th Cir. 2021) ................................................14

*Lorenzo v. SEC*,
   139 S. Ct. 1094 (2019)...............................................................................................19

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ..........................................................................................7

*McCabe v. Ernst & Young, LLP*,
   494 F.3d 418 (3d Cir. 2007)............................................................................................8

*Mele v. FRB*,
   359 F.3d 251 (3d Cir. 2004)............................................................................................6

*Meyer v. Greene*,
   710 F.3d 1189 (11th Cir. 2013) ................................................................................12, 13

*Morrow v. Balaski*,
   719 F.3d 160 (3d Cir. 2013).............................................................................................6

*Nat'l Junior Baseball League v. PharmaNet Dev. Grp. Inc.*,
   720 F. Supp. 2d 517 (D.N.J. 2010) ..............................................................................7, 11

*Noto v. 22nd Century Group, Inc.*,
   35 F.4th 95 (2d Cir. 2022) ............................................................................................16

*Oran v. Stafford*,
     226 F.3d 275 (3d Cir. 2000)..................................................................................................6

*Oregon Pub. Emps. Ret. Fund v. Apollo Group Inc.*,
     774 F.3d 598 (9th Cir. 2014) .............................................................................................7

*Payne v. DeLuca*,
     433 F. Supp. 2d 547 (W.D. Pa. 2006).......................................................................8, 10, 11

*Revell v. Port Auth.*,
     598 F.3d 128 (3d Cir. 2010)................................................................................................6

*SEC v. Lucent Techs., Inc.*,
     610 F. Supp. 2d 342 (D.N.J. 2009) ...................................................................................18

*SEC v. Rio Tinto plc*,
     41 F.4th 47 (2d Cir. 2022) ................................................................................................19

*SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*,
     499 F. Supp. 3d 49 (D. Del. 2020),
     *aff'd on other grounds*, 2022 WL 3442353 (3d Cir. 2022) ................................................14

*Smith v. Antares Pharma, Inc.*,
     2020 WL 2041752 (D.N.J. Apr. 28, 2020) .......................................................................10

*Stichting Pensioenfonds ABP v. Merck & Co.*,
     2012 WL 3235783 (D.N.J. Aug. 1, 2012) ........................................................................18

*Stoneridge Inv. Partners, LLC v. Sci. Atlanta*,
     552 U.S. 148 (2008)..........................................................................................16, 17, 18

*Takata v. Riot Blockchain, Inc.*,
     2020 WL 2079375 (D.N.J. Apr. 30, 2020) .................................................................16, 18

*Teamsters Local 237 Welfare Fund v. ServiceMaster Glob. Holds., Inc.*,
     2022 WL 5236833 (W.D. Tenn. Oct. 5, 2022),
     *appeal docketed*, No. 22-5981 (6th Cir. Nov. 4, 2022) .......................................17, 18, 20

*Trustcash Holdings, Inc. v. Moss*,
     668 F. Supp. 2d 650 (D.N.J. 2009) ............................................................................17, 18

**Statutes**

15 U.S.C. § 78j(b)................................................................................................................18

15 U.S.C. § 78u–4(b)(4) .......................................................................................................7

**Rules**

Fed. R. Civ. P. 12(c) ............................................................................................................6

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| "¶" or "Complaint" | Consolidated Class Action Complaint, filed November 13, 2020, ECF No. 39 |
| "Seite Declaration" | Declaration of Evan L. Seite in Support of Defendants' Motion for Judgment on the Pleadings, filed contemporaneously herewith |
| CGMP | Current Good Manufacturing Practices |
| "Company" or "Mylan" | Mylan N.V. |
| "Defendants" | Collectively, Mylan N.V., Heather Bresch, Rajiv Malik, and Kenneth Parks |
| "Ex." or "Exs." | Exhibit(s) attached to the Seite Declaration |
| "FDA" | U.S. Food & Drug Administration |
| "Individual Defendants" | Collectively, Heather Bresch, Rajiv Malik, and Kenneth Parks |
| "Motion to Dismiss Opinion" or "Op." | This Court's opinion granting in part and denying in part Defendants' motion to dismiss the Complaint for failure to state a claim, ECF No. 88 |
| Plaintiff | The Public Employees' Retirement System of Mississippi |

**INTRODUCTION**

This Court's Motion to Dismiss Opinion "narrowed the claims at issue to . . . one actionable misrepresentation" (Op. at 40):  a statement in a January 2019 *Bloomberg* article citing a Mylan spokesperson's denial that any "employees circumvented data and quality systems" at Mylan's Nashik, India facility.  Plaintiff's claim for securities fraud based on this statement fails because it cannot allege the required element of loss causation, *i.e.*, that any subsequent disclosure revealed the purported "truth" regarding the statement and resulted in an injury to Plaintiff.  The alleged "corrective disclosures" on which Plaintiff's loss causation theory is premised deal solely with the progress of Mylan's ongoing remediation and restructuring efforts at its Morgantown, West Virginia facility and Mylan's financial performance overall.  The disclosures provide no information whatsoever regarding purported "circumvent[ion of] data and quality systems" at Nashik or any other Mylan facility.  Plaintiff's securities fraud claim should be dismissed.

Plaintiff's scheme liability claim likewise fails as a matter of law.  Plaintiff asserts that its scheme liability claim has survived in its entirety based on Mylan's purportedly fraudulent interactions with the FDA.  But this is a securities fraud action:  Plaintiff does not have the free-standing ability to police Mylan's FDA interactions in the absence of a ***fraud on the investing market and a resulting injury***.  Reliance and loss causation are, thus, essential elements of scheme liability, and both require that inaccurate information based on the purported scheme be disclosed to investors.  That is why the Court's narrowing of Plaintiff's scheme claim to the single remaining challenged statement was correct.  Plaintiff's failure to plead loss causation for the sole remaining statement dooms its attempt to allege scheme liability.  Without the remaining challenged statement, Plaintiff has no basis to claim that Mylan's investors were defrauded by a purported scheme.

## RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.    Mylan and the FDA Regulatory Environment

During the Class Period, Mylan was one of the world's largest generic drug manufacturers, with 50 manufacturing facilities worldwide, including in Morgantown and Nashik.  ¶¶ 1, 2, 70. As with all drug manufacturers, Mylan was required to comply with FDA quality control regulations, including CGMP.  To monitor CGMP compliance, the FDA periodically inspects drug manufacturing facilities.  Such inspections often result in the issuance of Form 483s, which are interim, observational reports that set forth "conditions that in the FDA inspector's judgment *may* constitute violations of the Food Drug and Cosmetic (FD&C) Act."  Op. at 2.[1]  The FDA may follow up on Form 483s with untitled letters, which document less significant issues, or warning letters, which are reserved for "'significant violations'" that "'may lead to an enforcement action if not promptly and adequately corrected.'"  Op. at 2.  During all periods relevant to this action, Mylan repeatedly advised investors that it had already received, and would continue to receive, notices of non-compliance.  Op. at 22.

### B.    Mylan's Nashik Facility and the January 31, 2019 *Bloomberg* Article

In September 2016, the FDA inspected Mylan's facility in Nashik.  Op. at 3.  After the inspection, the FDA issued a Form 483.  *Id.*  Later, the FDA issued a warning letter.  *Id.*  Mylan publicly acknowledged the warning letter and Form 483 in April 2017.  ¶ 277.  In July 2018, after a reinspection, the FDA issued a Closeout Letter, confirming that Mylan had "addressed the violations contained in the Nashik Warning Letter."  Op. at 3 (quoting Ex. 2 at 1).

In late January and early February 2019, *Bloomberg* published a series of four articles regarding the generic drug industry.  The third article, published on January 31, 2019, was titled

---

[1] All emphasis is added unless otherwise noted.

2

"Culture of 'Bending Rules' in India Challenges U.S. Drug Agency," and discussed the generic drug manufacturing industry in India with a focus on Mylan's Nashik facility. Ex. 11 at 1, 5-6. The article reported that (i) the FDA's 2018 inspection of Nashik did not result in any observations regarding invalidated test results; and (ii) a January 2019 inspection found the Nashik plant was compliant with no repeat observations. *Id.* at 6.

The article also reported on interviews with nine anonymous current and former employees at the Nashik plant, who purportedly provided "explanations" for what contributed to the observation in the 2016 warning letter regarding invalidated test results. *Id.* at 5. Although the employees stated that Nashik plant managers were already undertaking training to improve quality control at the time of the 2016 inspection, they purportedly claimed that technicians had failed to follow quality check rules due to, for example, the time pressures of manufacturing, language difficulties in completing required forms, and simple lack of diligence. *Id.* at 5-6.

When asked by *Bloomberg* to respond to the Nashik plant workers' comments, a Mylan spokesperson commented, in relevant part, that "[a]ny explicit or implicit suggestion that Mylan employees circumvented data and quality systems that jeopardized the quality of the medications we manufacture—for time pressures or any other reason—is simply false." *Id.* at 6. This was the only statement that survived Defendants' motion to dismiss. *E.g.*, Op. at 40.

### C.   Mylan's Morgantown Restructuring and Remediation

In November 2016, the FDA inspected Mylan's facility in Morgantown. Op. at 3. The FDA issued a Form 483 to Mylan after the inspection. *Id.* In July 2017, the FDA sent Mylan an untitled letter, ¶ 152, classifying the Morgantown facility as "'Voluntary Action Indicated.'" Op. at 3. In March and April 2018, the FDA again inspected Morgantown, and issued a Form 483. *Id.* Unlike the 2016 Form 483, the 2018 Form 483 primarily focused on manufacturing operations, including the processes for cleaning manufacturing equipment and utensils. *Id.*

On April 20, 2018, Mylan announced that it was "right-siz[ing]" the Morgantown plant to make it "less complex."   ¶¶ 11, 179, 290; Op. at 4.   At the time, Mylan explained that the restructuring tracked its discussions with the FDA.  Op. at 4.  Importantly, throughout Mylan's restructuring efforts, Mylan provided regular updates to investors and the public.  *E.g.*, Op. at 4, 27-29.  For example, in June 2018, Mylan disclosed the 2018 Form 483 and noted that it had "submitted a comprehensive response to the [FDA] and committed to a robust improvement plan." Ex. 1 at 1; *see also* ¶¶ 181, 184-185.

In August 2018, Mylan disclosed that the restructuring and remediation at Morgantown would include the discontinuation of a number of products, had significantly negatively impacted operations due to lower production levels and increased expenses, and would continue to do so through the end of 2018.  Op. at 28-29 (citing Ex. 3 at 3); Ex. 4 at 7; Ex. 6 at 2.  Additionally, Mylan disclosed that it had incurred approximately $87 million in expenses for the Morgantown restructuring and remediation.  Ex. 4 at 7; Op. at 28.

In November 2018, Mylan updated investors again, disclosing that it had incurred "approximately $98 million of expenses related to the Morgantown restructuring and remediation program" in the quarter.  Ex. 7 at 6.  Mylan explained that the program would continue into 2019 and that it could not reasonably estimate the expenses that would be incurred for the ongoing restructuring activities.  Op. at 5; ¶ 194; Ex. 7 at 9; Ex. 8 at 71.  In addition, the FDA issued a warning letter in November 2018 (Ex. 9), which Mylan promptly disclosed and explained that "the issues raised in the Warning Letter are being addressed within the context of" Mylan's "comprehensive restructuring and remediation plan at [its] Morgantown facility."  Ex. 10.

**D.      This Litigation and the Court's Order on Defendants' Motion to Dismiss**

The Complaint alleges violations of Sections 10(b) and 20(a) of the Exchange Act.  ¶¶ 344-354.  The crux of Plaintiff's allegations was that Mylan had "repeatedly assured investors that the

Company implemented 'advanced' product quality control processes that met or exceeded regulatory requirements" and had, in response to analyst questions, "distinguished Mylan from its competitors based on the Company's ability to produce an enormous volume of drugs, all while 'meeting or exceeding' 'stringent' quality standards.'" *E.g.*, ¶ 1

Based on that theory, Plaintiff alleged that 46 statements that Defendants made to the public were false or misleading (¶¶ 252-327) because "Mylan's manufacturing facilities, including its flagship Morgantown facility—the cornerstone of its North American business—were rife with systemic, egregious, and long-standing CGMP and data integrity failures." ¶ 5. Plaintiff alleged that, as a result of Defendants' purported false and misleading statements, "Mylan's common stock traded at artificially inflated prices" such that "when the relevant truth regarding Defendants' prior misrepresentations and omissions of material fact were disclosed to the market" over time, "the price of Mylan's stock fell." *E.g.*, ¶¶ 328-329.

Defendants moved to dismiss the Complaint in full. ECF Nos. 45-46. On May 18, 2023, the Court issued its Opinion and Order on Defendants' motion, which "narrowed the claims at issue to the one actionable misrepresentation"—*i.e.*, the portion of the statement from the January 31, 2019 *Bloomberg* article summarized above. *See* Op. at 30, 36, 40.[2] Accordingly, the Court allowed "[t]he claims related to that statement in Count I of the amended complaint [*i.e.*, the Section 10(b) claims] [to] proceed, but only against Defendant Mylan." Op. at 40. The derivative control-person liability claims under Section 20(a) were permitted to proceed against the

---

[2] Specifically, the Court held that Plaintiff adequately alleged the elements of falsity and Mylan's corporate scienter with respect to the challenged statement in the January 31, 2019 *Bloomberg* article. *See* Op. at 30, 36. Defendants did not challenge loss causation with respect to that, or any, challenged statement on the motion to dismiss, as it was not a basis to seek dismissal of all of the 46 challenged statements in the Complaint.

Individual Defendants, but only "as they relate to the actionable misrepresentation." *Id.*[3]

## ARGUMENT

A party may move for judgment on the pleadings any time after the pleadings are closed, so long as the motion is early enough not to delay trial. Fed. R. Civ. P. 12(c). "A motion for judgment on the pleadings based on the defense that the plaintiff has failed to state a claim is analyzed under the same standards that apply to a Rule 12(b)(6) motion." *Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010). Thus, "[a]lthough [the Court] must accept the allegations in the complaint as true, '[the Court is] not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation.'" *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013).[4]

Plaintiff fails to carry its pleading burden because (1) it fails to plead loss causation for the sole remaining challenged statement; and (2) its scheme liability claim fails as a matter of law.

## I. PLAINTIFF FAILS TO PLEAD LOSS CAUSATION FOR THE SOLE REMAINING CHALLENGED STATEMENT

### A. The Applicable Pleading Standard for Loss Causation

To adequately plead a securities fraud action under Section 10(b), the Complaint must

---

[3] On June 20, 2023, Plaintiff filed a motion styled as a "Motion to Clarify the Court's May 18, 2023 Opinion on Defendants' Motion to Dismiss," which focused on Plaintiff's view of the surviving scheme liability claim brought pursuant to Count I of the Complaint. ECF No. 95. The Court permitted Defendants to address Plaintiff's scheme liability cause of action in this submission (ECF No. 98), and they do so in Section II, seeking dismissal of that claim in full.

[4] As on a Rule 12(b)(6) motion, the Court may consider on a Rule 12(c) motion public records, judicially noticeable documents, and documents integral to or explicitly relied upon in the Complaint. *E.g.*, *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) ("tak[ing] judicial notice of properly-authenticated public disclosure documents filed with the SEC" in securities fraud case); *Mele v. FRB*, 359 F.3d 251, 256 n.5 (3d Cir. 2004) (considering document integral to or explicitly relied upon in complaint). The Seite Declaration attaches exhibits that are incorporated by reference in the Complaint (*e.g.*, Exs. 1, 4, 7, 9-15) and/or are judicially noticeable (*e.g.*, Exs. 2-3, 5-6, 8, 16), which the Court may consider on this motion.

allege, among other elements, "'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005); *see also* 15 U.S.C. § 78u–4(b)(4).   The loss causation requirement serves "an important securities law objective" by ensuring that federal securities actions do "***not*** . . . provide investors with broad insurance against market losses." *Dura*, 544 U.S. at 345.   Declines in stock price are common and are not indicative of fraud.   A "lower [stock] price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events." *Id.* at 343.   Thus, loss causation serves as a bulwark to safeguard 10(b) actions from becoming investor insurance. *See id.* at 347-48 (warning that allowing a plaintiff to forego loss causation "would tend to transform a private securities action into a partial downside insurance policy").[5]

In this action, Plaintiff attempts to establish loss causation in the typical manner:   by pleading a corrective disclosure theory. *E.g.*, ¶ 331 (identifying "[t]he disclosures that partially corrected the market price of Mylan's common stock and reduced the artificial inflation caused by" the challenged statements); *see also* ¶¶ 328-332.[6]   To proceed on that theory, Plaintiff "must

---

[5] There is a circuit split regarding whether the more stringent pleading requirement of Rule 9(b) or the less stringent pleading requirement of Rule 8(a) applies to loss causation, with the majority of circuits concluding that Rule 9(b) applies. *Compare, e.g.*, *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 & n.5 (4th Cir. 2011) (applying Rule 9(b) to loss causation element) and *Oregon Pub. Emps. Ret. Fund v. Apollo Group Inc.*, 774 F.3d 598, 604-05 (9th Cir. 2014) (same), *with Lormand v. US Unwired, Inc.*, 565 F.3d 228, 255-58 (5th Cir. 2009) (applying Rule 8(a)). Although some district courts in the Third Circuit have applied Rule 8(a), *e.g.*, *Nat'l Junior Baseball League v. PharmaNet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 558 (D.N.J. 2010), Defendants respectfully submit that this Court should adopt the majority view and apply Rule 9(b).   The majority view is more sensible because loss causation is an element of securities fraud, which is itself a species of fraud, and Rule 9(b) clearly applies to fraud. *See Apollo*, 774 F.3d at 605.   But whether the Court applies Rule 9(b) or Rule 8(a), this Complaint fails as explained herein.

[6] The other method to allege loss causation is typically referred to as the "materialization-of-the-risk" theory.   Such a theory of loss causation has not been endorsed by the Third Circuit. *PharmaNet*, 720 F. Supp. 2d at 563 n.35.   Nor is it relevant here, as Plaintiff did not plead it and

show that the ***revelation*** of [the alleged] misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425-26 (3d Cir. 2007); *see also, e.g.*, *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 222 (3d Cir. 2006) (loss causation "requires the plaintiff to prove 'that it was the very facts about which the defendant lied which caused its injuries'"); *Payne v. DeLuca*, 433 F. Supp. 2d 547, 607 (W.D. Pa. 2006) ("[T]o successfully allege a cause of action, a plaintiff must allege that the share price fell significantly after the truth about the misstatement or omission became known.").

### B.     Plaintiff Does Not Plead a Corrective Disclosure for the *Bloomberg* Statement

The sole remaining challenged statement is the statement attributed to a Mylan spokesperson in the January 31, 2019 *Bloomberg* article that "any explicit or implicit suggestion that Mylan employees circumvented data and quality systems that jeopardized the quality of the medications we manufacture—for time pressures or any other reason—is simply false." Op. at 30 (quoting Ex. 11 at 6). The Complaint alleges two corrective disclosures following this statement: (1) the February 26, 2019 disclosure of financial results for the fourth quarter and full year of 2018; and (2) the May 7, 2019 disclosure of first quarter 2019 financial results. *E.g.*, ¶ 329; *see also* Exs. 12-15.[7] The Complaint sets forth the purportedly "corrective" nature of these disclosures in a chart (¶ 331) excerpted below:[8]

---

instead pled loss causation based solely on a corrective disclosure theory. *See, e.g.*, ¶¶ 329, 331.

[7] The Complaint also alleges corrective disclosures on June 28, 2018 and August 8, 2018. *E.g.*, ¶¶ 329, 331. Although these disclosures all fail for the same reasons outlined herein—namely, that they reveal no new information regarding the purported "truth" concealed by the sole remaining challenged statement—they also fail for a more fundamental reason: because the disclosures pre-date the remaining challenged statement, they are irrelevant. *See Dura*, 544 U.S. at 343 (requiring that an alleged misstatement "***cause*** a loss").

[8] Although not relevant to this Motion, Defendants note that the Morgantown remediation and restructuring was just one of many factors cited as contributing to the financial results in the alleged

| Date | Corrective Event | Closing Stock Price | Change from Previous Day's Close |
|------|-----------------|---------------------|--------------------------------|
| February 26, 2019 | Mylan disclosed a 5% and 4% decline of total quarterly and yearly revenues; a 16% decline in North American segment net sales, driven by the Morgantown remediation; the discontinuation of 250 products; and $258 million in remediation costs. | $26.01 | -$4.61 |
| May 7, 2019 | Mylan disclosed losses for the first quarter of 2019 due to costs associated with the Morgantown remediation, including 7% and 15% declines in revenue and earnings-per-share. | $21.53 | -$6.73 |

Plaintiff cannot plead loss causation for the sole remaining statement based on these alleged corrective disclosures for several independent reasons, each of which requires dismissal.

***First***, on their face, the alleged corrective disclosures reveal ***nothing***—either expressly or impliedly—regarding "'circumvented data and quality systems that jeopardized the quality of [Mylan's] medications.'" Op. at 30. Instead, according to Plaintiff's own allegations, the February and May 2019 disclosures primarily focused on developments regarding Mylan's ongoing remediation efforts and expenses, purportedly revealing that Mylan "rationalized the significant portion of [its] commodity generics business" (¶¶ 208, 217) and experienced increased costs associated with remediation and restructuring (¶¶ 211, 218). Plaintiff has offered no allegation to suggest that the market interpreted these disclosures regarding Mylan's ongoing remediation efforts as revealing purported circumvention—which refers to the act of avoiding something, typically through surreptitious means or deceit.[9]  Remediation can occur wherever there is

___

corrective disclosures, such as, for example, the loss of exclusivity of certain products, implementation of new accounting standards, impact of foreign currency translation, and price declines. *See, e.g.*, Ex. 12 at 1, 3, 5; Ex. 14 at 2-3.

[9] *See, e.g.*, Black's Law Dictionary (11th ed. 2019) (defining "circumvent" as "[t]o avoid (a restrictive problem, rule, etc.), esp. by clever and sometimes dishonest means"); Oxford English Dictionary (Ex. 17) (defining "circumvention" as "overreaching, outwitting, or getting the better

something to address for any reason; there is no requirement that circumvention of data and quality systems (or anything else) occur in order to undertake efforts to remediate.

Accordingly, as numerous decisions recognize, because "there is nothing in [the February and May 2019 alleged corrective disclosures] which disclosed any part of [the] allegedly fraudulent activities"—*i.e.*, circumvention of quality and data systems—there is no loss causation. *See Payne*, 433 F. Supp. 2d at 609-10 (finding announcement that company "would close facilities, cut jobs, and attempt to sell all or part of its assets" was not a corrective disclosure because it did not reveal the misstatements "about the Company's liquidity problems, accounting manipulations, backlog overstatement, or other frauds"); *Smith v. Antares Pharma, Inc.*, 2020 WL 2041752, at *10 (D.N.J. Apr. 28, 2020) (dismissing complaint because alleged corrective disclosure did not provide "the reasons for delaying review of the [new drug application]" and therefore did not disclose "the FDA's safety concerns" about which defendants had allegedly misled investors).[10] Nor can Plaintiff rely on negative financial results—such as declines in various financial metrics like revenue, EPS, and North American net sales as alleged here (¶¶ 207, 217)—to establish loss causation in the absence of any suggestion that the alleged fraud has been revealed to the market.

---

of any one by craft or artifice"); Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/circumvent (defining "circumvent" as "to manage to get around especially by ingenuity or stratagem").

[10] *See also, e.g.*, *Cent. States v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 77 (2d Cir. 2013) (no loss causation where alleged corrective disclosures concerned "the federal government's takeover of Freddie, and [plaintiff] does not connect this takeover to Freddie's subprime holdings, let alone to any misrepresentations about that subject"); *Katyle*, 637 F.3d at 475 (alleged corrective disclosures "did not 'relate back' to . . . earlier omissions of the alleged truth because they did not even inferentially suggest that [challenged statements] were fraudulent"); *In re Francesca's Holdings Corp. Sec. Litig.*, 2015 WL 1600464, at *19-20 (S.D.N.Y. Mar. 31, 2015) (dismissing complaint for failure to plead loss causation because "[i]nvestors simply could not have inferred the falsity of the prior statements regarding the Company's vendors from the" alleged corrective disclosures); *Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166, at *8 (C.D. Cal. Feb. 6, 2014) (ruling that "announcement that [company] would change its revenue recognition method" was not a corrective because it "was not accompanied by an admission of an accounting error").

*See, e.g.*, *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010) (rejecting argument that plaintiff can claim "loss causation by showing that the market reacted to the purported 'impact' of the alleged fraud—the earnings miss—rather than to the fraudulent acts themselves"); *PharmaNet*, 720 F. Supp. 2d at 561-62 (no loss causation where "Plaintiff improperly relies on negative financial results after each of the quarterly public disclosures" in the absence of allegations that the market recognized the alleged fraud) (citing authorities); *Payne*, 433 F. Supp. 2d at 610 (no loss causation because, "[w]hile the precarious financial condition of the Company was publicly acknowledged . . . , nothing indicated that the cause of its demise was the result of Defendants' fraudulent activities").

*Second*, the challenged statements must be "examined in the full context of the document," *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997), and any reasonable investor reading the sole remaining challenged statement in context in the January 31, 2019 *Bloomberg* article would understand that it expressly commented on Mylan's ***Nashik*** facility, whereas each of the corrective disclosures specifically referred to ***Morgantown***.

Specifically, the January 31, 2019 *Bloomberg* article was titled "Culture of 'Bending Rules' in India Challenges U.S. Drug Agency" and discussed the historical development and state of the generic drug manufacturing industry in India. The challenged statement is in a part of the article that specifically discusses the Nashik plant, beginning with a summary of the 2016 Nashik warning letter and then focusing on the FDA's observation that quality-control technicians in Nashik had disregarded quality checks. Ex. 11 at 5-6. The article states that *Bloomberg* interviewed nine anonymous current and former employees at the Nashik plant, who purportedly provided "explanations" for what contributed to the observations in the 2016 warning letter. *Id.* at 5. According to *Bloomberg*, the employees claimed that circumvention of quality controls had

11

occurred due to, for example, the time pressures of manufacturing, language difficulties in completing required forms, and simple lack of diligence. *Id.* at 5-6.

The challenged statement, which immediately follows this passage, is a direct response to the employees' purported claims. Specifically, the article states that when "***[a]sked about the workers' comments***" the Mylan spokesperson responded in relevant part that "[a]ny explicit or implicit suggestion that Mylan employees circumvented data and quality systems that jeopardized the quality of the medications we manufacture—for time pressures or any other reason—is simply false." *Id.* at 6. This important context, which is notably omitted from the Complaint (¶ 299), demonstrates that the only reasonable reading of the challenged statement is that it responds to the issues that the purported anonymous current and former employees expressed regarding Nashik. The alleged corrective disclosures, in stark contrast, are expressly about remediation at Mylan's Morgantown plant—there's nothing about Nashik to be found in them. *E.g.*, ¶¶ 207-210, 213, 217.

Thus, the alleged corrective disclosures say nothing about the alleged misstatement because they are about entirely different facilities. *See, e.g.*, *Brown*, 2014 WL 523166, at *9 (no loss causation where former employee "'made allegations of financial impropriety and wrongful conduct in connection with the Company's acquisition of a training school'" because the allegations did not "'clearly' refer to the Changsha Tutoring acquisition—one of the predicates of Defendants' purported fraud").

***Third***, and finally, even if Plaintiff could establish that the alleged February and May 2019 corrective disclosures about remediation efforts in Morgantown revealed the "truth" about purported circumvention of quality and data systems at Nashik (and they cannot), the disclosures ***still*** cannot establish loss causation because they ***revealed no new information*** regarding the Morgantown remediation as a matter of law. *E.g.*, *Meyer v. Greene*, 710 F.3d 1189, 1197-98 (11th

Cir. 2013) ("'[C]orrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time.'") (quoting *Katyle*, 637 F.3d at 473).

Specifically, as the Court observed, Mylan had "be[en] forthright about the challenges facing the Morgantown facility" (Op. at 28) long before the February and May 2019 disclosures were made.  Indeed, before 2019, Mylan had disclosed the Form 483 and its extensive remediation and restructuring in conjunction with discussions with the FDA (Ex. 1); that those efforts involved a "discontinuation of a number of products" and had a "significantly negative impact on production levels, product supply and operations" (Ex. 3 at 3; *see also* Ex. 6 at 2); that Mylan received a warning letter and was addressing the issues therein through the restructuring and remediation plan (Ex. 10); and that, since it began in April 2018, remediation and restructuring cost $185 million (Ex. 4 at 7; Ex. 7 at 6), was expected to continue into 2019, and that the future expense of remediation and restructuring ***could not be reasonably estimated***.  Ex. 5 at 70; Ex. 8 at 71; Ex. 7 at 9.  As the Court observed, these disclosures "did not downplay anything" about the Morgantown remediation and restructuring but, instead, "painted a grim picture of the circumstances" well before the February and May 2019 disclosures.  Op. at 27.

Against this backdrop, the only purportedly "new" information Plaintiff can claim was "revealed" by the February and May 2019 disclosures was the ***continued impact*** of remediation and restructuring at Morgantown, *i.e.*, ***additional*** product discontinuations, expenses, and financial impacts in the form of revenue and net sales declines.  *E.g.*, ¶¶ 18, 19.  ***That is not enough***:  the law is clear that the disclosure of the ongoing impacts resulting from already-disclosed issues cannot establish loss causation.  *See, e.g.*, *Dalberth v. Xerox Corp.*, 766 F.3d 172, 181, 188 (2d Cir. 2014) (earnings miss attributed to restructuring was not a corrective disclosure because "the market had access to numerous disclosures about sales disruptions and operational difficulties

suffered as a result of the U.S. restructuring throughout the class period"); *SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, 499 F. Supp. 3d 49, 70-71 (D. Del. 2020) (no loss causation where the alleged corrective "disclosures did not reveal any new facts regarding the alleged omissions" and "the structure of the arrangements and the associated risks had been disclosed" previously), *aff'd on other grounds*, 2022 WL 3442353 (3d Cir. 2022); *Lopes v. Fitbit, Inc.*, 2020 WL 1465932, at *12 (N.D. Cal. Mar. 23, 2020) (ruling that lowered guidance caused by weak demand could not be a corrective disclosure "[b]ecause Defendants had already disclosed the flattening demand which served as the basis for these results"), *aff'd on other grounds*, 848 F. App'x 278 (9th Cir. 2021).[11]

## II.    PLAINTIFF'S SCHEME CLAIM FAILS AS A MATTER OF LAW

With respect to Plaintiff's scheme liability claim, which is found in Count I of the Complaint alongside Plaintiff's Rule 10b-5(b) claim, a brief discussion of the background of the parties' dispute will frame the remaining issues.

Specifically, as the Court recognized during the hearing on the motion to dismiss, the issue of scheme liability was not briefed extensively by either side. Ex. 16 at 59. Defendants argued that Plaintiff's scheme claim was predicated on the alleged false and misleading statements and, because Plaintiff failed to plead a false or misleading statement or scienter, the claim should be dismissed. ECF No. 54 at 40. At oral argument, counsel for Plaintiff acknowledged that "very little attention completely was paid to [scheme liability] in the papers" and invoked decisions that were admittedly uncited, offering to submit additional briefing on the topic. Ex. 16 at 60-61.[12] At

---

[11] *See also, e.g.*, *Cent. States*, 543 F. App'x at 74-75 (no loss causation because plaintiffs were "on notice of the true gravity of Freddie's situation" due to disclosures that occurred before the alleged corrective disclosures); *In re Boston Sci. Corp. Sec. Litig.*, 708 F. Supp. 2d 110, 129 (D. Mass. 2010) (no loss causation where "the market was aware, before the July 16 recall, that no-deflate complaints existed"), *aff'd on other grounds*, 649 F.3d 5 (1st Cir. 2011).

[12] Although Plaintiff accuses Defendants of making a strategic choice in failing to address its scheme claim point-by-point in the parties' motion to dismiss briefing (*e.g.*, ECF No. 95 at 15),

the conclusion of argument, the Court indicated it would further consider whether additional briefing on scheme liability was required. *Id.* at 69.

The Court issued its Opinion on May 18, 2023 without further briefing on Plaintiff's scheme claim.   The Court held that, because Plaintiff pled at least one actionable misrepresentation—the sole remaining statement in the January 31, 2019 *Bloomberg* article— Defendants' argument was not a basis to dismiss the scheme claim.  Op. at 38.  The Court concluded that it had "narrowed the claims at issue to the one actionable misrepresentation" and that "[t]he claims related to that statement in Count I of the [Complaint] may proceed, but only against Defendant Mylan."  *Id.* at 40.  Despite this language, Plaintiff argued in its "Motion to Clarify" that the Court did not narrow the scheme claim in any way.  *E.g.*, ECF No. 95 at 6.

As Defendants explain below, the Court's limitation of Count I of the Complaint to the sole remaining challenged statement requires no further clarification and is supported by the law. Further, because Defendants have shown that the sole remaining challenged statement is not actionable as a matter of law for failure to plead loss causation (Section I, above), Plaintiff's scheme claim fails as a matter of law for that reason as well.  In addition, and as an alternative basis for dismissal, Plaintiff's scheme claim impermissibly seeks to use Rules 10b-5(a) and (c) as

---

Plaintiff's scheme claim was far from obvious from the face of the Complaint.  For example, although the Complaint spends over a ***hundred*** paragraphs setting forth the alleged false and misleading statements forming the basis of Plaintiff's Rule 10b-5(b) claim (*e.g.*, ¶¶ 1, 3, 4, 10, 11, 66-84, 185-187, 252-327), the word "scheme" appears just five times in the Complaint, in three paragraphs and a heading, with a ***single*** reference to Rules 10b-5(a) and (c) in a rote recitation in Count I of the Complaint, folded in alongside Plaintiff's Rule 10b-5(b) claim.  ¶¶ 328, 345, 346; *cf. In re Teva Sec. Litig.*, 512 F. Supp. 3d 321, 337 (D. Conn. 2021) ("Courts rightly insist that a plaintiff who intends to bring a Rule 10b-5 claim based on both misstatement and scheme liability must do so clearly and specifically" and "plaintiffs [intending to allege scheme] routinely proceed by alleging Rule 10b-5 claims in two separate counts") (citing authorities).  Given the Complaint's lack of clarity with respect to the scheme claim under Rules 10b-5(a) and (c), Defendants focused on the crux of the Complaint, *i.e.*, the claim based on false and misleading statements.

15

a "back door" to bypass the elements of liability under Rule 10b-5(b) and should be dismissed.

> **A.    The Court's Limitation of the Scheme Claim to the Sole Remaining Challenged Statement Was Correct**

To state a claim under Rules 10b-5(a) and (c), Plaintiff must allege that Defendants engaged in deceptive or manipulative ***conduct***, as opposed to a deceptive ***statement***, in connection with the purchase or sale of securities in addition to the other standard elements of Section 10(b)— *i.e.*, scienter, reliance, economic loss, and loss causation.  *E.g.*, *Takata v. Riot Blockchain, Inc.*, 2020 WL 2079375, at *14 (D.N.J. Apr. 30, 2020); *see also Stoneridge Inv. Partners, LLC v. Sci. Atlanta*, 552 U.S. 148, 158 (2008).  Although "[c]onduct itself can be deceptive," *Stoneridge*, 552 U.S. at 158, it must be "***willful*** conduct ***designed to deceive or defraud investors*** by ***controlling or artificially affecting the price of securities***."  *In re Eastman Kodak Co. Sec. Litig.*, 2022 WL 4473629, at *13 (W.D.N.Y. Sept. 27, 2022) (quoting *Noto v. 22nd Century Group, Inc.*, 35 F.4th 95, 106 (2d Cir. 2022)).  The "critical question," then, "[is] what activity 'artificially' affects a security's price in a deceptive manner" and the "court must ask whether a defendant injected inaccurate information into the marketplace."  *Id.*; *see also In re Tupperware Brands Corp. Sec. Litig.*, 2021 WL 6755476, at *4 (M.D. Fla. Aug. 9, 2021) (similar).  Scheme claims are subject to the heightened pleading standards of both the PSLRA and Rule 9(b).[13]

Here, an analysis of the required element of "reliance" shows that, based on the arguments before it, the Court correctly limited Plaintiff's claim to the sole remaining challenged statement. As the Supreme Court explained, "[r]eliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action" because it ensures that "for liability

---

[13] Specifically, a "'strong inference'" of scienter must be pled with "'particularity.'"  *Takata*, 2020 WL 2079375, at *14.  Under Rule 9(b), "Plaintiff must set forth 'what manipulative or deceptive acts were performed, which defendants performed them, when the manipulative or deceptive acts were performed and what effect the scheme had on the securities at issue.'"  *Id.* (citation omitted).

to arise, the 'requisite causal connection between a defendant's misrepresentation and a plaintiff's injury' exists." *Stoneridge*, 552 U.S. at 159; *see also In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 253 (S.D.N.Y. 2022) (similar).   Where, as here, a plaintiff seeks to invoke the fraud-on-the-market presumption of reliance in connection with Rule 10b-5(a) and (c) claims (¶¶ 339-340), the plaintiff must show that the purportedly deceptive acts underlying the scheme ***were communicated to the public*** such that Plaintiff could have relied on that conduct in purchasing shares.  *Stoneridge*, 552 U.S. at 159; *see also In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 648-49 (3d Cir. 2011) (analyzing *Stoneridge*; "[w]e hold that a plaintiff cannot invoke the fraud-on-the-market presumption of reliance in a private action under Rule 10b-5(a) and (c) unless the deceptive conduct has been publicly disclosed and attributed to the actor"), *abrogated on other grounds*, *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 133 S. Ct. 1184 (2013); *Turquoise Hill*, 625 F. Supp. 3d at 254 (scheme claim dismissed where "Plaintiffs do not allege that any product of [the alleged scheme] was made known to or relied upon by investors").

Thus, Plaintiff cannot claim reliance for its scheme claim by pointing to purported deceptive acts in connection with Mylan's interactions with the FDA—after all, Plaintiff is alleging ***securities fraud*** and otherwise lacks standing to police Mylan's FDA interactions. *Trustcash Holdings, Inc. v. Moss*, 668 F. Supp. 2d 650, 662 (D.N.J. 2009) (rejecting scheme claim where "the alleged deception is a regulatory violation [of SEC regulations] that Plaintiffs do not have standing to enforce"; "even if there was impropriety in Defendant's activities, the impropriety involved evading the registration requirements and reselling limitations of the securities laws, and was not an inherent deception perpetrated on . . . then-existing shareholders"); *see also, e.g.*, *Teamsters Local 237 Welfare Fund v. ServiceMaster Glob. Holds., Inc.*, 2022 WL 5236833, at *5 (W.D. Tenn. Oct. 5, 2022) (rejecting scheme claim; "Lead Plaintiff has not shown why [deceptive

practices directed at customers] would prove violations of federal securities regulations"), *appeal docketed*, No. 22-5981 (6th Cir. Nov. 4, 2022).[14]  Instead, Plaintiff must identify a public statement on which it could rely that purportedly inflated Mylan's stock price.  And, after extensive analysis, this Court held that only one challenged statement could "serve as the basis for [a] Rule 10b-5 claim" (Op. at 30)—the statement in the January 31, 2019 *Bloomberg* article.  Because that statement provides the only basis to plead reliance, the Court appropriately limited Count I.

* * *

As explained above, Plaintiff cannot plead loss causation from the sole remaining statement.  *See* Section I.  Because that statement was the only basis on which Plaintiff's scheme claim survived dismissal, Plaintiff's scheme claim is likewise fatally flawed because Plaintiff cannot plead reliance or loss causation.  *E.g.*, *Takata*, 2020 WL 2079375, at *17 (no loss causation for scheme claim "in the absence of any allegation of a causal link" between an alleged corrective disclosure "and an economic loss"); *Trustcash*, 668 F. Supp. 2d at 662 n.5 ("lack of a direct causal connection between the alleged inherently deceptive conduct and Plaintiffs' alleged injuries can alternatively be framed as a defect in reliance").

---

[14] Indeed, without a public statement on which to rely, Plaintiff at most alleges that Mylan deceived the **FDA**—not investors—and therefore does not allege a scheme "in connection with the purchase or sale of any security."  15 U.S.C. § 78j(b); *Stoneridge*, 552 U.S. at 162 (Section 10(b) "does not reach all commercial transactions that are fraudulent"); *see also, e.g.*, *In re Tupperware Brands Corp. Sec. Litig.*¸ 2021 WL 247870, at *5 (M.D. Fla. Jan. 25, 2021) (scheme claim dismissed where the complaint did "not contain any factual allegations supporting an inference that the fraudulent sales practice was 'designed to deceive or defraud investors'"); *Stichting Pensioenfonds ABP v. Merck & Co.*, 2012 WL 3235783, at *10 (D.N.J. Aug. 1, 2012) (rejecting scheme claim where "[t]he Complaint fails to allege that [defendants] engaged in artifices or devices to defraud, distinct from the charged campaign of misinformation and suppression of data regarding the safety profile of Vioxx"); *SEC v. Lucent Techs., Inc.*, 610 F. Supp. 2d 342, 360 (D.N.J. 2009) ("deception, at a minimum, has to involve an act that gives the victims a false impression"; "[i]f the investing public has no knowledge that an issuer committed an act because the entity has not conveyed any information about that act . . . there has been no deception").

### B.    Plaintiff Cannot Invoke Scheme Liability to Bypass Rule 10b-5(b)

Although the Court need not reach it to properly dismiss this action, there is an alternative ground on which to dismiss Plaintiff's scheme claim. Courts prohibit plaintiffs from simply "repackag[ing]" allegations of misstatements and omissions under Rule 10b-5(b) as scheme liability claims under Rules 10b-5(a) and (c). *Turquoise Hill*, 625 F. Supp. 3d at 249. Thus, numerous decisions—both before and after the Supreme Court's decision in *Lorenzo v. SEC*, 139 S. Ct. 1094 (2019)[15]—dismiss scheme liability claims based on allegations of misstatements and omissions. *E.g.*, *Eastman Kodak*, 2022 WL 4473629, at *14; *Turquoise Hill*, 625 F. Supp. 3d at 251-53; *Teva*, 512 F. Supp. 3d at 336; *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216-17 (S.D.N.Y. 2020); *De Vito v. Liquid Holdings Grp., Inc.*, 2018 WL 6891832, at *42-43 (D.N.J. Dec. 31, 2018).

Here, Plaintiff's Complaint unmistakably and exclusively alleges a misstatement/omissions theory. Indeed, Plaintiff's only effort to plead "economic loss"—which is an essential element of any Rule 10b-5 claim, including scheme claims—makes this explicit:

> [T]he economic losses (i.e., damages suffered by [Plaintiff] and other members of the Class) were a direct, proximate, and foreseeable ***result of Defendants' materially false and misleading statements and omissions of material fact***, which artificially inflated the price of the Company's common stock, and the subsequent significant decline in the value of the Company's common stock when the relevant truth was revealed.[16]

---

[15] In *Lorenzo*, the Court held that an individual who is not subject to primary liability under Rule 10b-5(b) because he disseminated, but did not "make," admittedly false statements could be held primarily liable under Rule 10b-5(a) and (c). *Id.* at 1100-02; *see SEC v. Rio Tinto plc*, 41 F.4th 47, 53-54 (2d Cir. 2022) (Misstatements "alone are not enough for scheme liability, and *Lorenzo* tells us that dissemination is one example of something extra that makes a violation a scheme.").

[16] ¶ 332; *see also, e.g.*, ¶¶ 328-330 (alleging that "Defendants made materially false and misleading statements" that "misrepresented Mylan's compliance with FDA regulations" thereby "inflat[ing] the price of Mylan stock" such that "[w]hen the relevant truth regarding Defendants' prior misrepresentations and omissions of material fact were disclosed to investors, the price of Mylan securities fell significantly").

19

Thus, although Plaintiff now points to its allegations of purportedly fraudulent interactions with the FDA to argue that its scheme claim is distinct from its Rule 10b-5(b) claim, the ***only*** mechanism Plaintiff has identified—or ***could*** identify[17]—through which those actions could have caused the alleged stock price inflation, and thereby harmed Plaintiff, is the challenged statements. "'Where the primary purpose and effect of a purported scheme is to make a public misrepresentation or omission,'" Plaintiff cannot simply "'label[] the alleged misconduct a scheme rather than a misstatement.'" *Teva*, 512 F. Supp. 3d at 336; *see also, e.g.*, *In re Ocugen, Inc. Sec. Litig.*, 2023 WL 2351695, at *14 (E.D. Pa. March 3, 2023), *appeal docketed*, No. 23-1570 (3d Cir. April 3, 2023); *Kolominsky v. Root, Inc.*, 2023 WL 3215056, at *18 (S.D. Ohio Mar. 31, 2023) (where scheme consisted of "purported misstatements and omissions [that] served to deceive the market in order to artificially balloon the price of [stock]" there was "no meaningful distinction between Plaintiff's misrepresentation theory under 10b-5(b) and its scheme liability theory"), *appeal docketed*, No. 23-3392 (6th Cir. May 2, 2023); *ServiceMaster*, 2022 WL 5236833, at *5 (similar). This, too, requires dismissal.

## CONCLUSION

For the foregoing reasons, the Court should grant this motion for judgment on the pleadings and dismiss the remaining claims in the Complaint.[18]

---

[17] Specifically, Plaintiff claims that Defendants' scheme to defraud the FDA entailed "'manipulating drug test results,' improperly 'testing into compliance,' 'falsifying root cause reports, crashing computer systems, and altering drug sample sets[.]'" ECF No. 95 at 9. The fundamental and fatal flaw in these allegations is that, without corresponding public statements that are false or misleading, none of this conduct can be said to be "'designed to deceive or defraud investors by controlling or artificially affecting the price of securities.'" *E.g.*, *Eastman Kodak*, 2022 WL 4473629, at *13; *see also* note 14 (citing authorities).

[18] Because the Complaint does not adequately plead a Section 10(b) violation, Plaintiff's Section 20(a) claim against the Individual Defendants should also be dismissed. *See City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 177 (3d Cir. 2014); *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 276 (3d Cir. 2005).

Dated: July 17, 2023

Respectfully submitted,

By: /s/ *Nina F. Locker*
Nina F. Locker (*pro hac vice*)
Evan L. Seite (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI, P.C.
650 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 493-9300
Facsimile: (650) 493-6811
nlocker@wsgr.com
eseite@wsgr.com

Michael S. Sommer (*pro hac vice*)
Sheryl Shapiro Bassin (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5899
msommer@wsgr.com
sbassin@wsgr.com

William Pietragallo, II (PA I.D. # 16413)
Eric G. Soller (PA I.D. # 65560)
PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP
One Oxford Centre, 38th Floor
Pittsburgh, Pennsylvania 15219
Telephone: (412) 263-1818
Facsimile: (412) 263-4200
wp@pietragallo.com
egs@pietragallo.com

*Counsel for Defendants Mylan N.V., Heather Bresch, Rajiv Malik, and Kenneth Parks*

21