# Exhibit 16

EXHIBIT

16

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


PUBLIC EMPLOYEES' RETIREMENT
SYSTEM OF MISSISSIPPI,
                    Plaintiff
     vs.                              Civil Action No.
                                      20-955
MYLAN N.V., et al.,
                    Defendants.


                              - - -


     Transcript of proceedings on March 14, 2023
United States District Court, Pittsburgh, PA,
before Judge J. Nicholas Ranjan.


APPEARANCES:

  For the Plaintiff:        Salvatore J. Graziano, Esquire
                            Katherine M. Sinderson, Esquire
                            Andrew L. Zivitz, Esquire
                            Colin J. Callahan, Esquire
                            Tricia Beale, Plaintiff Representative
                            (By Phone)


  For the Defendant:        Nina Fran Locker, Esquire
                            Sheryl S. Bassin, Esquire
                            Evan L. Seite, Esquire
                            Eric G. Soller, Esquire
                            Brian Cuthbertson, Mylan Counsel
                            Bradley Matta, Mylan Counsel
                            Doug Miner, Mylan Counsel

  Court Reporter:           Barbara Metz Loch, RMR, CRR
                            700 Grant Street
                            Suite 6260
                            Pittsburgh, Pennsylvania 15219




     Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

2

P R O C E E D I N G S

- - -

(10:00 a.m.)

THE COURT:  Morning.  We are here today in the case of Public Employees' Retirement System of Mississippi versus Mylan, et al. at case 20-955.  Why don't we start by having counsel enter their appearances?

I'd also note, I'm not sure who all will be addressing the court today, if you could let me know who might be speaking.  I'm fine if multiple lawyers would like to speak.  I would ask that you identify yourselves for the record when speaking, and also, my understanding is that there is a representative on behalf of the plaintiff on the phone, so just keep your voice up, if you can, so that person can hear us.

Let's start for plaintiff's counsel.

MR. GRAZIANO:  Good morning, Your Honor.  It's Salvatore Graziano from Bernstein Litowitz.  I will primarily be addressing the court.  The representative from the named plaintiff is Tricia Beale, and she is listening on the telephone.

THE COURT:  Morning.

MS. SINDERSON:  Morning, Your Honor.  Katie Sinderson on behalf of the plaintiff from Bernstein Litowitz Berger & Grossmann.

3

MR. ZIVITZ:  Morning, Your Honor.  Andrew Zivitz from Kessler Topaz Meltzer & Check also on behalf of the plaintiff.

MR. CALLAHAN:  Good morning, Your Honor.  Colin Callahan, counsel for the plaintiff.

THE COURT:  Morning.  For the defendants?

MR. SOLLER:  Morning, Your Honor.  Eric Soller from the Pietragallo firm.  I'll introduce Nina Locker who is going to be speaking on behalf of the Mylan defendants today.

MS. LOCKER:  Morning, Your Honor.  Also Ms. Shapiro Bassin will be addressing a discrete issue and speaking as well, but I'm going to be doing most of the speaking.

THE COURT:  Morning.  Morning.

MR. SEITE:  Evan Seite, Wilson Sonsini for the Mylan defendants.

THE COURT:  Great.

MS. LOCKER:  Your Honor, I'd like to introduce to you members of the legal team of Viatris, which is Mylan's successor.  We have Doug Miner, who is general counsel of North America.  We have Brian Cuthbertson, who is head of commercial litigation for North America, and we have Bradley Matta, who is also senior litigation counsel.

Thank you, Your Honor.

THE COURT:  Welcome, everyone.  We saved one of the worst weather days for all of you in Pittsburgh.  I was chipping golf balls in my yard two days ago and now there's

4

snow on the ground.

I'll hear from the defendants first, since it's their motion. I'll note, I think obviously, there are a couple of key issues in this case. One is the materiality of the statements at issue and the other is the issue of scienter.

With respect to the materiality of the statements, just to let counsel know, and again, I'm fine if you want to address -- whatever you want to address, feel free to address it, but I will say I've been mostly focused on the statements pertaining to or coming after the second notice 483 that was submitted pertaining to Morgantown. It's sort of Morgantown-related statements, as I think as being particularly important. It's one of the several categories of statements in this case, and so I just wanted to let you know that that's certainly an area of focus.

To the extent counsel can address that, I would appreciate it.

With that, Ms. Locker, feel free to proceed.

MS. LOCKER: When you say the second notice, are you talking about the 2016 Form 483 regarding Morgantown or the 2018 Form 483 regarding Morgantown?

THE COURT: The 2018 Form 483. My understanding of the timeline and the facts, it struck me, counsel can correct me if I am wrong, that there were some more specific statements made by Mylan subsequent to the 2018 Form 483

5

pertaining to the remediation and the right sizing of Morgantown and when the Bloomberg article came out, similar statements pertaining to the notice itself.  That's the notice I was referring to.

MS. LOCKER:  Thank you for that clarification, Your Honor.  If you need a timeline, we actually have one for plaintiff's counsel and the court because we know there are a lot of events, and we are happy to pass it up.  It sounds like the court has a good handle on it.

THE COURT:  I have my own timeline.  I have so many charts, but if you have others, I'm fine looking at those as well.  I do have a timeline here.

MS. LOCKER:  Thank you, Your Honor.  I will address those statements.  May it please the court?  The amended complaint should be dismissed both because it fails to adequately allege a false or misleading statement and because it fails to adequately allege a strong inference of scienter, as required under the heightened pleading standards of the PSLRA.

Your Honor, it falsely provides a basis for dismissal of the complaint, but I'd like to start with scienter because that is the clearest path to dismissal.  The Third Circuit requires that scienter be evaluated on an individual-by-individual basis, and since the third circuit's rejection of the Group Pleading Doctrine in 2007 in the Winer

6

decision, an individual defendant can only be liable for statements that he or she made.

If a plaintiff has failed to raise a cogent, compelling and strong inference of scienter as to a particular defendant, that defendant must be dismissed.

As we explained, the relevant scienter inquiry is whether the individual defendants knew or recklessly disregarded that their public statements would mislead investors.

I'd like to start with Mr. Parks, Your Honor. Mr. Parks, Mylan's former CFO, is alleged to have made just four of the challenged statements.  All of the statements are about Mylan's operations.  Not one is about quality or compliance.  That's paragraphs 308, 309, 316 and 321.

The complaint does not allege Mr. Parks played any role, any role in the company's regulatory compliance process, and the complaint does not contain a single individualized allegation regarding quality or compliance-related information conveyed to Mr. Parks.  Not one.

So we would submit, Your Honor, that the conclusion that the complaint fails to allege a strong inference of scienter as to Mr. Parks is straightforward, and I would refer the court to the Third Circuit's decisions in Rahman and GNC and the District Court decision in Johnson & Johnson as just examples supporting that conclusion.

7

Ms. Bresch was Mylan's former CEO.  The complaint likewise does not allege that Ms. Bresch played any role in the FDA regulatory process.  There is one individualized allegation in the entire complaint of quality or compliance-related information being conveyed to Ms. Bresch, and that's paragraph 195, Your Honor.

Paragraph 195 alleges that Ms. Bresch received the November 9, 2018 Morgantown warning letter, which of course Mylan promptly disclosed, but November 9, 2018, which is near the end of the class period, postdates all of the challenged statements.  Postdates all of the challenged statements.

So in other words, the only allegation specific to Ms. Bresch relates to an event that occurred after all the challenged statements were made and therefore has no bearing on her scienter when she made her challenged statement, and I would refer the court to the Third Circuit decision in GNC at 154 to 155 for that proposition.

So again, we would submit, Your Honor, that the conclusion that the complaint fails to allege a strong inference of scienter as to Ms. Bresch is also straightforward.

That leaves us with Mr. Malik, Mylan's president.  To establish Mr. Malik's scienter, plaintiff relies on FDA correspondence, the FE allegations and Ms. Eban's book "Bottle of Lies."  I'm now going to explain why that is not enough.

8

As I mentioned again the scienter inquiry is whether Mr. Malik knew or recklessly disregarded that his quality and compliance-related statements would mislead investors.

Plaintiff provides no facts that speak to Mr. Malik's state of mind regarding his public disclosures. No e-mails. No documents. No witness accounts. No meetings that speak to his public disclosure decisions. Plaintiffs do not dispute this.

And significantly, the complaint notably lacks any meaningful allegation of motive. The complaint does not allege that Mr. Malik, indeed that any individual defendant, sold stock, and it's clear in the Third Circuit the absence of stock sale allegations undermines an inference of scienter.

As the Third Circuit said in Rahman: Fraud without a motive makes little economic sense.

That was followed in Digital Island Securities Litigation case and PharmaNet. As a result, whereas here, there's no allegation of motive, the factual allegation supporting scienter need to be even stronger. I would refer the court to both the PharmaNet case at 448 to 553 and the GSX case most recently submitted at 12 and note 11.

So here, plaintiff needs to allege not just particularized facts but strong particularized facts showing that Mr. Malik knew that information that was inconsistent with his public statement, information that was either

directly contradictory of statements rendering them false or information that was not disclosed rendering them misleading, and here, it's not enough for plaintiff to simply allege that Mr. Malik was aware that there was a risk of noncompliance in one or more of Mylan's 50 plants, that the company had received Form 483s or that the company had received two warning letters during the class period.

This is because Mylan told investors in its SEC filings over and over and over again, press releases, et cetera, that it faced significant uncertainties with its efforts to comply with FDA regulations and that, despite those efforts, there was no guarantee that it would be able to prevent instances of noncompliance.

Mylan also told investors that, following inspections, it sometimes had received and would receive Form 483s, and Mylan promptly, there's no dispute here, promptly disclosed the two warning letters it received during the class period, the one in April of 2017 regarding Nashik and the one in November of 2018 regarding Morgantown.

So in light of these disclosures, allegations that the company received Form 483s or warning letters is not enough.

So what has plaintiff alleged for scienter?  Nothing that passes muster under the heightened pleading standards of the PSLRA.

10

With respect to FE allegations, plaintiff fundamentally concedes this. Plaintiff admits, this is very significant, it is not relying on the FEs to show what any of the individual defendants learned firsthand.

Rather, it is relying on the FEs to show that the compliance issues were so widespread that the defendants could not have missed it, and I refer the court to page 54 note 21 of plaintiff's opposition.

The court will also see at that page the following sentence:  Several of the FEs provide firsthand information on the CGMP violations Mylan management, undefined, management, undefined, knew and/or directed.  Not the individual defendants.

So when the court looks at this concession at page 54 note 21, it's fatal to plaintiff's reliance on the FE allegations to support scienter.

Numerous cases within the Third Circuit have underscored the importance that scienter be supported by FE allegations based on personal knowledge of what the individual defendants were told, what they said, what they did, what they thought.

Just to mention a few, Your Honor, we have the Third Circuit decision in Rahman, we have the Third Circuit decision in Chubb, and we have PharmaNet which is a district court decision.

Here, plaintiff concedes it doesn't have any such FE allegations, so that leaves them with nothing more than the must have known -- widespread must have known argument.

THE COURT:  What about -- I'm sorry.  Maybe you are getting here, but what about the "Bottle of Lies" allegations?  I think as the complaint pleads, and I'm talking about Mr. Malik in particular, he was in meetings, and FDA said this is some of the most stunning and egregious violations, so maybe you can address that.

I guess, another way of putting it, would I have to -- what if I reject your argument that I must disregard the book as being noncredible?  What if I say I find the book to be credible?  Does that then establish scienter as against Mr. Malik?

MS. LOCKER:  Thank you for that question, Your Honor.  The answer is no.  I'll first answer your question and then go to why the court should not credit, not with the pleading requirement in the Third Circuit.  The answer is no.

The reason is, even if the court were to credit the passages in Ms. Eban's book based on undescribed anonymous sources, with no detail that allows the court to assess its credibility, but I'll get there, it is not enough for scienter.

Let me take first the Mylan chemist who talks about -- forgive me -- Malik's, quote, people, Malik's, quote,

12

team under Malik's leadership.  I don't know if I should use my fingers, forgive me, because I know can't put it on the transcript.

THE COURT:  We'll let the record reflect the air quotes.

MS. LOCKER:  That of course is not enough.  You can't -- I mean, given that Mr. Malik was the president in charge of global operations, the phrase under Malik's leadership or Malik's team or Malik's people can mean anyone within the organization, no matter how far removed.

Now, let's move to the April 2017 meeting and assume that the court credits the passages.  The answer is of course not.  We have no idea who at the FDA said that.  We have no idea whether anyone else at the FDA agreed with that statement, and we certainly do not have any suggestion that Mr. Malik agreed with that, and indeed, what we do have is no allegations.

I mean, we have anonymous sources from Ms. Eban's book saying Mylan lobbied the FDA for an untitled letter.  Of course it did.  There's nothing untoward or wrong with that.

In fact, Your Honor, if you look at the face of the Form 483, Exhibit 1, right on its face, Exhibit 1.  What Exhibit 1 says is these are observation -- inspectional observations, but importantly, Your Honor they are not final FDA findings.

13

If you look at the very face, it invites a dialogue between the FDA and the company.  What does it say the dialogue is intended to include?  Discussions about whether the inspectional observations are objectionable, without merit, discussions about whether inspectional observations do not reach the threshold of regulatory significance.

The question of whether or not some of the inspectional observations can be remedied easily.  There's nothing, no allegation that there was anything untoward in those discussions, and the outcome was the agency's decision that it was an untitled letter, voluntary action indicated.  The observations did not reach the threshold of regulatory significance, and Mylan could voluntarily on its own remediate.

So it does not establish a scienter, even if you credit it, but should the court credit it, and the answer to that is also no.

Let me explain why.  So the Third Circuit is clear -- well, I shouldn't say the Third Circuit.  Forgive me.  Let me correct that.  The District Courts in the Third Circuit are clear that anonymous allegations and secondhand sources need to satisfy at least two.  I'm going to talk about two of the three requirements.

Number one, that the witness be described in sufficient detail that the anonymous source and the secondhand

14

source be reliable.  How does the Third Circuit say you judge the reliability?  There's enough detail to allow the court to assess the credibility of the anonymous source and how that source came to the knowledge is what the source is purportedly describing.  Is it firsthand or is it pure rumor?

Number two, that the plaintiff's counsel corroborate the information that's being conveyed by these anonymous sources and secondhand sources like Ms. Eban's book.  So it's not only the courts in the Third Circuit but all the other cases that we described, for example, from the Southern District of New York, because there's not a plethora of these cases.

Let me address that issue.  What we have is -- let's take the April 2017 meeting that the court mentioned.  So someone at the FDA said that the observations were stunning and egregious, and of course plaintiff relies heavily on this, including with respect to inspections that postdate the 2017 meeting.

But it's impossible to determine whether the source of this account, which is not described at all, even attended the meeting.  Did the source attend the meeting, or did the source hear about the meeting after the fact?

In addition, Ms. Eban says she reconstructs quotes.  She reconstructs quotes based on dialogue.  That's Exhibit 33 at Roman XVII.  We don't even know if Ms. Eban accurately

15

characterized what was said, again, going to that second requirement, so it doesn't satisfy the first requirement of reliability, credibility, allow the court to assess whether this anonymous source is providing information based on firsthand knowledge or rumor, and it doesn't satisfy the second requirement, corroboration.

Why, Your Honor?  Not a single FE speaks to that April 2017 meeting.  Not one purports to.  Plaintiff does not, at least in their papers, claim that any of them do.

And the rest of the passages, the passage on the whistle-blower is the same.  The passage on the Mylan in India, the Mylan chemist is all the same.  The court cannot assess credibility, reliability and there is certainly no corroboration.

The FEs, the plaintiffs do not claim that they spoke to the whistle-blower, and none of the FEs speak to -- they speak to Morgantown.  They don't speak to India, so there's no corroboration.  There's two requirements from the test used by the courts in the Third Circuit missing.

So I want to turn for a moment, if I may, I got a little bit off track, to the Tellabs' holistic analysis, because what we have here is no particularized facts that the court can credit, FEs or "Bottle of Lies" that support scienter.

The question is are there any nonculpable and

16

compelling explanations for Mylan's disclosure decisions? Your Honor, we would submit there are many.

First, it's entirely plausible and reasonable that Mylan believed that disclosure of the Form 483s, including the 2018 Form 483, was not necessary because it never represented it was CGMP compliant, never, and had repeatedly told investors that it had received Form 483s in the past and could receive additional ones in the future.

Why is the fact that Mylan never represented it was CGMP compliant important? Because it distinguishes every single one of the cases upon which plaintiff relies. Just to name a few, Dr. Reddy's, Able Labs, Odeh, Teligent, KD Pharma.

Indeed, there's a quote from plaintiff's opposition brief that is quite telling, Your Honor. At page 22 of plaintiff's opposition brief, they say: Defendant's assertion that the Form 483 is not per se material is incorrect, and then they cite the Eighth Circuit decision in KV Pharma. What's the quote say? But the issuance of a Form 483 may render a defendant's statement about its compliance with FDA regulations or CGMP false or misleading depending on a number of factors.

But the factors are not even relevant here, because Mylan never represented it was CGMP compliant. You might ask why not. The answer to that question is it had 50 plants. Not one, not two, like many of the cases that plaintiffs have

cited to the court.  50 plants.  So of course it didn't.  Not only did it not, it said we have tremendous uncertainty, tremendous uncertainty, about achieving compliance across our 50 plants, and despite our efforts, we cannot guarantee we'll not have instances of noncompliance.

So when you think about scienter, the individual defendants could certainly have reasonably believed that the nondisclosure of Form 483, given that they never represented that they were compliant, was not misleading and certainly in light of their warnings.

Second and very much along the same lines, Mylan, the individual defendants, could have reasonably believed that disclosure was not necessary because the Form 483s are observational in nature reflecting interim feedback, not final findings.

It is important to keep in mind the context in which the Form 483s were issued.  During the class period, Mylan was one of the world's largest generics manufacturers in the world.  It had 50 plants, and it was subject to more than 100 regulatory investigations a year.  More than 100, and that's Exhibit 28, Your Honor.  It's also paragraph 2, paragraph 281 and Exhibit 18 at 5.

And as we showed in our papers, and I'm going a little bit to materiality here just for a moment, the law recognizes that large manufacturers like Mylan are subject to

18

a repeating cycle of inspections, negotiation, resolution.

In that context, Form 483, even, quote, ominous ones, say the courts, even ominous sounding ones are part of the normal back and forth of the regulatory process.  I would refer the court to Genzyme, Abiomed and Abbott.

Third, Mylan also reasonably believed that disclosure was not necessary with respect to the 2016 Form 483 because it could remediate the observations to the FDA's satisfaction. With respect to Nashik, that certainly would have been true. Of course they got a closeout letter, as the court knows, in 2018, and that's Exhibit 4.

With respect to Morgantown, again, they got an untitled letter after discussion in which there's no allegations that Mylan did anything untoward during those discussions, and that untitled letter reflected the FDA's view that the observations did not reach the level -- sorry, the threshold level of regulatory significance and that Mylan can voluntarily itself remediate.

Yes, ultimately, there was another inspection, but there was one repeat violation based on one testing, one testing incident in the warning letter and that's Exhibit 6 -- sorry, that's Exhibit 6 at 3.

And then also, I'd like to also mention a few other things that are relevant to the defendant's scienter.  In 2017, the Irish equivalent of the FDA certified Morgantown as

19

CGMP compliant.  That's Exhibit 5.  Now, we are not asking the court to take judicial notice of that certificate of compliance for the truth of the matter asserted.  We are talking about scienter now.  This certificate was given to the company, given to the individuals saying you are compliant, so we are not asking the court for the truth of the matter asserted.

And then also with respect to whether or not the defendants believed the remediation was successful and ongoing, plaintiff's FEs claim that some of the practices after issuance of the 2016 Form 483 continued.  They do allege that.

But FE1 plaintiff's star witness, and this is paragraph 116, Your Honor, says that the practices became, quote, covert.  Well, somehow Mylan's CEO, CFO and president were supposed to have known or known about the hidden practices.  That doesn't make any sense.

So they certainly couldn't believe that remediation was ongoing and successful and didn't know about these hidden and covert practices.

And then finally, Your Honor, with respect to the 2018 Form 483, it was perfectly reasonable, absolutely reasonable for Mylan to not immediately disclose the Form 483 giving it the opportunity to engage in that dialogue that the Form 483 invites to serve both -- to crystallize the FDA's

20

concerns and to crystallize the company's own remediation plan.

As the First Circuit said in Abiomed, there must be some room for give and take between a regulated entity and its regulator, which is exactly what happened here in the interim feedback in the Form 483.

All of the explanations, nonculpable explanations I've just discussed have been recognized in all of the -- not all -- the cases that we cited in our brief regarding -- by courts involving alleged nondisclosure of Form 483s.  Genzyme, NVIDIA, Stryker, Abbott Labs, just to mention a few.  All of these --

THE COURT:  I had a question.  I can't remember the case.  I know it's an argument at least made in the briefs that the disclosure of the Form 483s becomes either a material omission or goes to scienter in the context of a small company that has a few major drugs and the Form 483 might impact their one new drug application or something along those lines.

Here, could this undermine the competing, compelling, nonculpable inference that the 2018 Form 483 comes out and then Mylan announces the restructuring, resizing.  In other words, is it analogous to a situation of pulling a new drug application or an impact on a certain drug because notice not disclosed and then massive volume reduction would be the inference.  I don't know if you could maybe speak to that.

MS. LOCKER:  Yes, I can, Your Honor.

Let me address those cases that the court is referring to.  In each of those cases, there was of course a statement that the nondisclosure rendered misleading.  So you either have a statement that says there are no review issues prior to approval and you are sitting on a Form 483, or we expect approval is not an issue and you are sitting on a Form 483 that turns into a warning letter that then turns into an injunction against production of the product, and it's one site.

So the question is here, given the company's disclosures that or -- forgive me -- in some of those cases, let me add, as the court knows, in some of those cases, the company said we have not received Form 483s, or we are CGMP compliant or the third example is we have corrected -- we have taken action and corrected deficiencies previously identified by the FDA and they are sitting on a Form 483.

Those representations distinguish Mylan.  You have to find a false and misleading statement first.  Here, there is no such representation.  We are CGMP compliant.  We have no Form 483s.  We have corrected prior deficiencies that the FDA identified.

We have none of those statements, so the answer is and of course the falsity or misleading nature of the statement is what gives rise to scienter.  Not just the mere

22

existence of a Form 483, Your Honor.

THE COURT:  Could the plaintiffs point to the one statement in the complaint?  It's like the MetroNews article.  This is the statement that, I think the second notice letter, I'll refer to it as.  The 2018 483 notice comes out in early April or mid April, and then April 20, there's a statement made, I don't think -- I think it's not attributed.  I don't think there's a particular speaker, but the statement is from -- is alleged to be from Mylan that says we realize the plant needs to be right-sized, and this is consistent with discussions we are having with the U.S. Food and Drug Administration.

So, you know, as I understand the plaintiff's argument here would be that could be the statement in the sense of it's downplaying the impact and so that triggers some obligation to disclose.

MS. LOCKER:  Thank you, Your Honor, for asking that question, and I do have a clarification.  I have one question of clarification of where the court would like me to focus my comments.  When the court said -- and I'm going to address your question.

THE COURT:  Sure.

MS. LOCKER:  When the court said that you would like to hear with respect to statements following the second Form 483, was the court not only including the April 2018 statement

23

but as well the forward-looking statements regarding the impact of the remediation on expenses and products? I wasn't sure if that was included.

THE COURT: Yes. I mean, I think really, in my mind, sort of everything after that 2018 letter, and so as I'm recalling, there were a few statements -- well, there was, I think, in August 2018, an SEC filing and then in August 2018 earnings call and then, I want to say like a November statement by Ms. Bresch.

MS. LOCKER: Thank you for that clarification. With respect to Mylan's April 2018 statement, plaintiff claims this announcement was misleading because Mylan didn't disclose the Form 483. The District Court of New Jersey's decisions in Becton I and Becton II are directly on point. Both were submitted with supplemental authority.

The lesson from those decisions is that plaintiff must have reliable allegations, CW, FE or other, that the FDA mandated the Morgantown right sizing. As the court said, such allegations are necessary to show that the FDA did not merely provide interim feedback, but rather issued an adverse and inflexible determination that required disclosure.

I specifically would refer the court to Becton -- well, both decisions, but Becton II at 5 to 6, 11 and note 8.

Here, the complaint does not allege that the FDA mandated that Mylan right-size Morgantown and nor could it.

24

There are no allegations to suggest that Mylan's decision to right-size the Morgantown plant was not voluntary.  Mylan did not receive an adverse, an inflexible determination until it received the warning letter in 2018, which it promptly disclosed.

That's the lesson of Becton I and Becton II.  You have, yes, the Form 483, but its interim feedback, no allegation that the decision to right-size was not voluntary and no adverse and final FDA action until a warning letter, which Mylan promptly disclosed.

Your Honor, I'm going to turn to, and I'm also happy to discuss any of the what I would call puffery or aspirational statements, but let me address the court's question about the statements that followed regarding the right-sizing and the remediation, August, November.

So plaintiff claims that these updates were misleading because Mylan failed to disclose the remediation and right-sizing.  Three omissions.  One, that it was driven in large part by the 2018 Form 483, two, that it entailed a significant and permanent reduction in Morgantown's production levels and generics portfolio, and three, caused significant increases in operating costs.  Those are the alleged omissions.

The claim fails with two separate and independent reasons.  First, I'm going to walk the court through it.  All

of the information plaintiff claims was allegedly admitted was in fact disclosed, and second, these are forward-looking statements, protected under the safe harbor of the PSLRA, surrounded by cautionary risks with no allegations that the projections were false.

Let me start with the information was disclosed. First the Form 483 was a factor. In the August 8, 2018 earnings call, Mr. Malik said that the FDA inspection was a factor in the decision to right-size. It just wasn't the only factor. What he said, and I would refer the court to Exhibit 32 at 9. This is the August 8, 2018 earnings call. The right-sizing was not just triggered -- I'm sorry. I misspoke -- was not triggered by this FDA inspection. It was part of this year's plan actually to right-size.

What's so interesting is plaintiff's allegation in paragraph 321, Your Honor, on the very same day, the very same day, August 8, 2018, Mylan issued a press release about the re -- about many things, including about the remediation and right-sizing, and this is how plaintiffs themselves describe the press release: Mylan's press release of the same day said as follows, the press release was, quote, an announcement that the 2018 Form 483 had forced Mylan to undertake a remediation and restructuring at Morgantown.

Paragraph 321, how could they say that the company didn't disclose that the Form 483 was a factor when it was

26

talking about the remediation and right-sizing?  That's not possible.  So now let's turn to whether or not the company disclosed that the right-sizing and remediation resulted in significant and permanent reduction in Morgantown's production levels and an increase in expenses.

Well, let's turn to the August 2018 press release, Exhibit 26 at 3.  When I say at 3, it's the number of the document, the accompanying document, because we didn't have the numbers on top when we filed.

This is what the company said during the second quarter of 2018:  The company commenced a restructuring and remediation program at the Morgantown manufacturing facility. The program includes the discontinuation of a number of products.  These actions have had a significantly negative impact on production levels, product supply and operations. Also, the company has incurred significant expenses for incremental manufacturing variances, site remediation, restructuring charges.  The company expects that remediation activities, lower production levels, the negative impact on operations or related expenses to continue through the end of 2018.

And then, in November of 2018, the company updated the market and said at this time, and that is -- forgive me, Your Honor -- Exhibit 22 at 70, November 5, 2018.  At this time, the expenses related to the additional restructuring

activities cannot be reasonably estimated, and it says it's going to continue into 2019.

Indeed, I would refer the court to -- forgive me -- the November 2018 that it's going to continue would be the Exhibit 31 at 9 and Exhibit 22 at 71.

So they clearly disclosed discontinuation of our products, significant expenses, significant impact on production levels.  This is going to continue.  Now, they did say ultimately at the end of the remediation and right-sizing, we expect profitability levels to rise again because we are transferring certain products, we are discontinuing certain low margin products, but that of course is a forward-looking statement, as is all the statements projecting the continued expenses.

I would refer the court to the following just for an example of robust risk factors.  So in Exhibit 32 at 4 and Exhibit 26 at 9 to 10, the company said Mylan might be unable -- this is talking about will the company ever return to its prior profitability levels.  Mylan might be unable to achieve expected synergies and operating expenses in connection -- sorry.  Forgive me, I misspoke.

Mylan might be unable to achieve expected synergies and operating expenses in connection with restructuring programs within the expected timeframes or at all.  These are projections of what's going to happen after a right-sizing and

28

remediation.

We have both, it was disclosed and these are forward-looking statements, which under the OFI Asset Management case, which is a Third Circuit case, is protected if either it's accompanied by cautionary language or disjunctive plaintiff has failed to allege actual knowledge of falsehood, and nowhere does plaintiff say that the company -- there's nothing in the complaint that says that the company's projections as to how long these remediation and restructuring expenses would continue or whether and when profitability after the restructuring would come back to the prior levels, not a single allegation in the complaint as to whether or not Mr. Parks, Mr. Malik or Ms. Bresch knew was false.

That's the post, what I call, remediation right-sizing statements.

Your Honor, I can address the aspirational and puffery statements. I can address corporate scienter, and Ms. Bassin would, for a moment, like to address the in-connection-with requirement of the securities laws for the website statements, but I realize -- I'm happy to stay up here as long as the court would like, I really am, much to, I'm sure, my counsel's displeasure, but I don't know whether the court is interested in hearing about corporate scienter or the quality and compliance-related statements or both.

THE COURT: I think the only -- I think corporate

29

scienter. I don't need to hear about the other statements. I think I understand the argument there.

MS. LOCKER: Thank you, Your Honor. Yes, I will not be that long. So the Third Circuit, as the court knows, has never adopted the corporate scienter. It's never upheld the scienter of a corporation. In the absence of scienter on the part of an individual defendant, it has, in the Roseville decision, postulated that the doctrine might be permitted in extraordinary circumstances involving pervasive corporate misconduct and dramatic and blatantly false statements.

Well, this case is a far cry from such extraordinary circumstances. I'm going to talk for a moment about the three District Court decisions in the Third Circuit that have actually invoked corporate scienter, but let me first point the court to plaintiff's allegation supporting their attempt to invoke corporate scienter. That's paragraphs 240 to 244 of the complaint.

240 to 244, it's the only allegations plaintiff has pointed to in arguing that this is an appropriate case for corporate scienter. That's their opposition at page 57 to 58 and docket No. 58 which is supplemental briefing regarding Arconic 2 at page 5.

The allegations at 240 to 244, Your Honor, are woefully insufficient. Plaintiff claims they have identified high ranking executives, but in fact, they have identified two

30

local plant managers, two.  That's paragraph 241.

There are no allegations of where these local plant managers fit within the organizational structure of Mylan. There's not even an allegation as to what their responsibilities were.

And while plaintiff does allege, Your Honor, that these plant managers were aware of CGMP challenges at the Morgantown plant, there are no allegations that these plant managers, Morgantown plant managers, engaged in misconduct.

And very significantly, Your Honor, because we are talking about scienter with respect to statements to the market.  It's a securities fraud case.  It's not an FDA regulatory case.

There's no attempt, none, to tie these plant managers to the statements that plaintiff challenges.  There's no allegations that they supplied misinformation to Mylan regarding quality or compliance, and there's no allegation that they reviewed, approved, tolerated the challenged statements.

As a result, the allegations in 240 to 244 don't come close to satisfying the requirements for invoking the Corporate Scienter Doctrine as articulated by the courts in Cognizant, Allegheny, Arconic 2.  In each of those cases, Your Honor, the court found that plaintiff had satisfied each of the following requirements:  One, plaintiffs identified

individuals whose rank, role and responsibility, rank, role and responsibility, allow the corporation, I mean, were such that their scienter could be imputed to the corporation.

Two, plaintiffs had alleged particularized facts showing that these individuals were involved in the alleged misconduct.

And three, plaintiff had alleged particularized facts tying the individuals, tying the individuals, to the alleged false statements. That is the individuals either knowingly supplied misinformation to the corporation or knowingly participated in making false statements, in preparing them or disregarded or tolerated the statements, and none of these requirements are met here, so it's not an appropriate case for corporate scienter.

Just to give the court an example from one of the cases, I won't go through all three, although I can, Your Honor. Just take, for example, take Arconic 2 which is really, because you know, forgive me, in Allegheny, corporate scienter was based on the four individual defendants, the chairman of the board, CEO, the COO, the CFO and the president. They were four individual defendants, and it was their scienter that was used for corporate scienter.

I'm having a senior moment, forgive me. That was Allegheny?

THE COURT: Arconic 2.

32

MS. LOCKER:  No.  Sorry.  I really do apologize. That was Allegheny.  In Cognizant, it was the president, the president of the company, an individual defendant who was involved and facilitated the admitted six year bribery scheme. It was his scienter that was used for corporate scienter.

In Arconic 2, Judge Hornak, I guess our neighbor's decision, what we had was the two managers, senior managers of the subsidiary.  Their roles and responsibilities were sufficiently detailed, quite detailed that the court was able to basically say they were essentially deputized by Arconic to be in charge of the products at issue.  They intentionally concealed the products' downgraded safety ratings.  They intentionally lied to the regulators and they knowingly supplied and furnished misinformation to the company, Arconic, and recklessly disregarded or tolerated Arconic's false representations about its products, that is, false safety ratings that were put out.

So what you have is those three requirements that I mentioned in each one of these cases that are absent here.

So thank you, Your Honor.  I'm happy to address anything you have, and if you have just a little bit of patience, I don't know if you are interested, it's the website statements and it's an alternative grounds because it fails to meet the in-connection-with requirement.

THE COURT:  That's fine.  If you would like to

address it.  Thank you, Ms. Locker.  Is it Ms. Bassin?

MS. BASSIN:  Yes.  Your Honor, to be actionable under Section 10b-5, a challenged statement must be made in connection with the purchase or sale of securities, in connection with the purchase or sale of any security, is a statutory requirement of Section 10b of the exchange act and Rule 10b-5.  This requires that the challenged statement must reach investors and be geared towards investors in a corporation and not to consumers of a product.

It is generally met only where the challenged statements are disseminated in a press release, annual report, investment prospectus or any such document on which an investor would presumably rely.

The in-connection-with requirement is a separate and independent basis for dismissing the statements on Mylan's website that plaintiff challenges, and these are the first six statements listed in Defendant's Appendix A.

In Arconic 1, Judge Hornak analyzed the relevant cases and concluded that the statements on Arconic's website did not satisfy the in-connection-with requirement because the challenged statements were geared to customers of Arconic's products and not its stock.

In particular, the court found that the website statements were not directed at the financial community.  They were neither directly communicated to nor designed to

34

communicate with investors.  He, therefore, held that those statements were not actionable.

In Arconic 2, Judge Hornak modified his ruling but only because plaintiffs allege that on Arconic's conference calls and in their SEC filings, Arconic directed investors to its website in its entirety.

Here, by contrast, Mylan only directed investors to the investor relations portion of its website which does not contain any of the challenged statements.  For example, Exhibit 25 and 26 are Mylan Form 8K filings both which state we routinely post information that may be important to investors on our website at investor.Mylan.com.  This same language is in Exhibit 28, a Mylan press release.

The challenged statements here are on web pages entitled quality and how we make generic medicines on Mylan.  They are not on Mylan's investor web page.

Thus, Judge Hornak's discussion of the case law, his rationale and his conclusion he reached on Arconic 1 is directly on point here.  For this reason, the challenged statements from Mylan's website should be dismissed both because they fail to satisfy the in-connection-with requirement and they are nonactionable aspirational statements.

THE COURT:  Does that argument only apply to the statements on the website, or would it apply to, for example,

35

things like ESG statements, you know, which I find to be just interesting statements, ESG statements, and I think the ones here have the disclaimer that they are not a report, and at least a couple of the statements at issue in this case are pulled from ESG statements.

Would that argument apply to those as well? I've heard of certain processes being regulated and maybe the law is a little bit in flux, but it's a thought that occurred to me, and maybe your argument doesn't go that far.

MS. BASSIN: I think that it can. That argument is applicable to the ESG statements as well or can be. Judge Hornak's analysis where he found that the website statements at issue in that case were geared toward customers and not to investors could apply to ESG statements that are geared toward customers and not to investors.

THE COURT: Okay. Thank you.

MS. BASSIN: Thank you.

THE COURT: Why don't we do this? We have been going for about an hour. We can take a quick break for five or ten minutes and then I'll hear from Mr. Graziano.

MR. GRAZIANO: Thank you, Your Honor.

(Recess taken.)

THE COURT: You may be seated. Mr. Graziano?

MR. GRAZIANO: Thank you, Your Honor. Salvatore Graziano for the plaintiff. Your Honor, given that this is a

36

securities fraud case alleging false and misleading statements, my intent was to begin with the statements that I think may be the most important statements. I think they actually go back earlier before the second Morgantown Form 483, but I want to start with the ones at that point in time to address Your Honor's questions.

Then I want to go back in time to something that I think is just as significant, material and false, which goes back to an earlier time.

Let's start after Mylan receives the second Form 483 concerning Morgantown. The first thing I want to highlight to Your Honor is the one that happened on April 20, 2018. This is when the company issues a press release, and it says: As the industry has changed and regulatory expectations have continued to evolve.

Now, that's an interesting choice of words, and they use a phrase about a year earlier I'm going to go back to, but nothing has changed or evolved. The things that Mylan is doing wrong in this case have been prohibited for over a decade.

They are repeatedly testing products until they pass. They are playing with power cords to hide failed tests. They are destroying records. They are doing things that have nothing to do with regulatory expectations continuing to evolve.

37

Then they go in the same April 20, 2018 press release, and they say we realize that our Morgantown plant needed to be right-sized to be less complex. The right size is consistent with discussions we were having with the U.S. Food and Drug Administration, et cetera. This is paragraph 290 of the complaint.

This is a complete false spin as to what is going on at this time. There are no evolving regulatory expectations. What has happened is eight days earlier on April 12, 2018, Morgantown has received its second Form 483 in two years from a second surprise literal FDA raid in this case, a raid.

These visits are not usually a surprise. They are not usually as serious as this one was because the violations here were not run-of-the-mill CGMP violations. They were egregious, falsity kind of things they were doing.

THE COURT: Can I ask you -- maybe you are going to get to this. I suspect the defendants here argue while we have -- these are misleading and there's no requirement that we say things in the most -- in a particular way or in the most negative way, and so you look at a statement like this from a regulated company that says we are having discussions with the U.S. FDA, that's, to a reasonable investor, bad news.

As I was thinking about it, it reminds me of, you go to my favorite pizza joint here downtown to get a slice of pizza, and there's a sign on the window that says we are

38

temporarily closed.  We'll reopen in a week, and it's consistent with discussions we have had with the local county health inspectors.  To me, that's not a good sign as a customer.  It sort of signals that these are the regulators are here.  At least that's how I understand their argument that, it's not misleading.  We disclosed we are having these discussions and there's no requirement to paint them in as negative of a picture as possible.

Maybe you can address that, and I think that's one of the arguments that they make.

MR. GRAZIANO:  Sure.  And I want to break those in two, because I agree with Your Honor.  There may not be a requirement -- a duty absent a voluntary statement.  So in this instance, we do have a company speaking on April 20 of 2018, so that statement requires them to be complete and accurate, so that addresses the requirement to speak on the second Form 483, but the pizza analogy is quite alarming to me.  That's a really serious thing.

If I went to my local food shop and it was closed for a week, if the company here left out the fact that there was a 32 page Form 483 causing them to do what they were doing, but they said things like we are shutting down Morgantown for a week to address some important items, that might have been something that would have caused the market to realize what was going on.  You would have probably a significant market

39

reaction, and I think they would be on much more solid footing saying we made disclosure here.  It may not be the one you phrased it, but we did it.

This statement on April 20 talks about things that are just not true.  There are no evolving regulatory expectations at play.  There is no discussion at all as to what is causing this, and the context matters.

This is not the first instance at Morgantown, right?  This is the second Form 483.  The first one was not disclosed.  The promises made to the FDA at the April meeting were not disclosed.  The FDA's seriousness in viewing this situation was not disclosed, so by April 20 of 2018, this company is in a far worse position, so they chose to speak.

They had a duty under extensive law that we have in our papers to be complete and accurate.  This statement is false and misleading and it's done so with scienter.

Now, they speak a couple more times after this second Form 483, and I will highlight.  For example, they issue a Form 10-Q on May 10 of 2018 and they say there are no material changes in the company's risk factors.  That's in paragraph 295 of the complaint, and the risk factors talk about how there is no guarantee that the company will meet regulatory agency standards or will prevent instances of noncompliance with applicable laws and regulations.

Here, they now have the second Form 483.  They have

had the meeting with the FDA where they try to appease them. They know that's failed. They are not permitted to issue a misleading disclosure just because of the risk disclosure, and we have extensive cases we cite on that as well.

Then they go on and they minimize the impact, because what happens next is Bloomberg leaks the second Form 483 in June of 2018, so they have a few statements in August of '18 and November of '18 where they describe what's happening as a temporary impact, and that profitability will be sustainable, but in February of 2019, the investors learn something far different, and the market reaction demonstrates their new knowledge and their disappointment because over 250 SKUs or lines have to be discontinued at Morgantown. The remediation costs go up to over 300 million by May of '19.

So those are the statements that I would highlight after the second Morgantown Form 483, but I think there's a critical one earlier in time and --

THE COURT: Before you move on to that, the first one -- I'm sorry. I didn't want you to leave those ones. Maybe you can address the argument that some of the language, including with respect to future costs and temporary disruption are more forward looking. I assume plaintiff's argument is no, they are not, but maybe you can elaborate on that.

MR. GRAZIANO: Sure. I think the issue there is the

41

company is continuing to minimize the extent of changes that have to happen at Morgantown. Those are not being disclosed, and there's no information provided to the market as to how much Morgantown has to change at this point in time.

That is why the statements about how this is just going to be temporary and they were going to return to profitability are very misleading, and investors, when they realize, wait a minute, you are shutting down 250 SKUs, it's a different realization when the reality comes out as to what exactly the company has to do to address the problems here.

THE COURT: Can I ask you this? You talk about context, and I think one statement was mentioned -- Ms. Locker mentioned one statement, which is the August 2018 8-K, I want to say, and it's about as negative of a statement, I think, as you can make. Something like -- let me see if I can find it. Something about a significant disruption.

These actions have had a significantly negative impact on production levels, products, supply and operations. Also, the company has incurred significant expenses for incremental manufacturing variances, site remediation and restructuring charges.

I would view that as a pretty bold summary in leak disclosure. Does that alter the context by which I view some of these other statements, like the earnings call statements that you mentioned?

42

MR. GRAZIANO:  I believe, Your Honor is referring to the August 8, 2018 statement.

THE COURT:  Yes.

MR. GRAZIANO:  So the way we would describe that statement is it was followed by an immediate seven percent stock price decline.  We view that as a corrected disclosure in this case.  We view that as a partial disclosure.  We are not saying that none of that put the market on notice as to what was going on.  In fact, we are saying the opposite.

We are saying this is the beginning of the truth coming out.  Our position is that was not enough, but clearly, we will rely on the seven percent stock drop to say that is loss causation, which is something they don't challenge in this case.  We see that as the beginnings of the truth coming out, and to be more precise, the very beginning is when Bloomberg leaks the second Morgantown Form 483, and there's a three percent stock drop there too, so we are counting four different disclosures, and August 8 happens to be one of them.

But we also simultaneously allege, and this happens quite often, that the disclosure didn't go far enough.  It was a partial disclosure, and it was followed by a 15 percent stock price decline in February when they mentioned a dropping of 250 SKUs, and a 24 percent decline in May 2019 when they mentioned the continued extensive costs for what has to happen here and at this point, it's over $300 million, as I said.

43

THE COURT:  Just so I understand the argument.  It's post Bloomberg leaking the Form 483 number of statements and disclosures that are made.  Your case here is in part based on those, but is the theory that they don't go far enough and they are being downplayed, or are you saying some of those statements, including the Form 8-K in August 2018, that's something I don't have to consider and it's off the table with respect to how I analyze whether or not the complaint pleads material misrepresentations.

MR. GRAZIANO:  Well, I think it depends on what you are looking at.  Clearly, earlier in time, the misrepresentations have no partial disclosures, but I think Your Honor should look at August 8 and see if Your Honor agrees with us that, by that point in time, the disclosure didn't go far enough.  It doesn't mean it's not partially correct is my point, if that helps.

THE COURT:  Okay.

MR. GRAZIANO:  I do want to point out one more statement in this post second 483 world, which is what the company says as late as January 13 of 2019.  So that is in paragraph 299 of the complaint.

Here, Mylan offers what I would call a complete denial.  They say:  Any explicit or implicit suggestion that Mylan employees circumvented data and quality systems that jeopardized the quality of the medications we manufacture for

44

time pressures or any other reason is simply false.  That's what they say in paragraph 299.

And here, I would say issue is completely joined. This statement denying what we alleged is either completely false or we shouldn't even be here because everything we have alleged in the complaint is directly contrary to that statement.  It's not forward looking.  It's not an opinion. It just this didn't happen.

At that point in time, in our well-pled allegations it did, and we are now going to have to go into discovery to fight over if this is true or false, but there's nothing about this is a matter of pleading.  It is a blanket strong denial that basically says the Form 483s are wrong, the book is wrong, the four employees are wrong, and we are beyond a matter of pleading at this point, and that's an issue for discovery.

But as I said, Your Honor, I wanted to go backwards in time, because I think there's a very important statement that happens much earlier than Your Honor has been asking about until now.

So the one I want to specifically start with is after the company receives a public warning letter from the Nashik facility, and they make a statement on April 11, 2017.

First of all, it's not correct that Mylan disclosed the warning letters.  The warning letters are public.  The FDA

45

made the letter public.  After that public letter, what does Mylan say?  Just from context, at this point in time, April 11, 2017, Mylan has received not just a warning letter and a Form 483 about really significant violations in their Nashik facility, including turning off the power and retesting products, but they have already had an unusual surprise 11-day FDA visit to Morgantown.  They have already had a 23 page Form 483 concerning Morgantown.

The Form 483 concerning Morgantown at this point in time talks about retesting, talks about improper trial injections, talks about shredding documents.  It's a very serious Form 483.

Now, April 11, the Nashik facility warning letter is public, and they began with:  As FDA standards for our industry have continued to evolve.

Your Honor, nothing has evolved.  The FDA regulations prohibiting what this company has done go back to 2006, and that's in paragraph 50 of our complaint.

Retesting failed products is completely a problem in this industry and extremely frowned upon by the FDA, but if a product fails, whether it's for potency or cleanliness, a thorough investigation is required by the FDA.  Records are required to be kept of that investigation.

Here, there was no investigation.  Records were destroyed.  So the company says:  As FDA standards for our

46

industry continue to evolve, we are dedicated to continually enhancing our systems and processes with a deliberate, thorough approach to assure sustainable quality over our entire network of facilities. The Nashik, India facility is just one of Mylan's 50 manufacturing sites across the globe.

Now, Mylan says we said it was just one of 50 sites to assure our customers that there would be no supply disruption, but I've read and reread paragraph 277, and I just don't see that. I see a strong implication in what they are saying that not only are FDA standards evolving, which they are not, but this is one of their 50 facilities so investors should not be concerned about this warning letter.

Your Honor, after -- before this warning letter, the FDA already had issued the Form 483 concerning Morgantown. They then had a meeting which Defendant Malik personally attended in April. The meeting is incredibly detailed on page 332 of the book. It talks about the number of Mylan people attended, the number of FDA people who attended. It has verbatim quotes of what happened at the meeting.

The verbatim quotes include the FDA telling the defendants that they were stunned with Mylan's egregious violations at this company. So for the company to come out and say this is evolving regulations and just one of 50, that's really where the deception takes place in this case.

That's where they are letting investors know, fine,

47

there's a public warning letter, it's just one facility in India.  That is absolutely not what happened here.

This --

THE COURT:  Does it matter that this statement that's made -- I think this is from that Investor's Business Daily article, as part of that article, they do disclose the warning letter.  Obviously the warning letter had been publicly disclosed anyway a week prior, but in terms of the context of this statement, does that undermine your argument on materiality, where I think elsewhere in the article, they do expressly mention the warning letter was issued.

MR. GRAZIANO:  No.  I think it's quite the contrary.  The warning letter comes out April 3.  This statement is all about putting a false spin on the warning letter.  That's precisely what they were doing.

They are minimizing the warning letter as if it was caused by something new that's happened in FDA regulations that one of their 50 facilities has to catch up with.  The warning letters, the violations, the Form 483 from Morgantown do not concern new or evolving regulations.  They do not concern problems that are limited to India.

They also have this spin on things that, you know, this is something we are working on addressing, and I think importantly for context, both of the Form 483s that I've been talking about with regard to Morgantown, both the one in 2016

48

and the one in 2018 were unusual.  They were caused by a whistle-blower.

In the complaint, you see one of the analysts say, gee, this is quite an FDA action.  I wonder if there's a whistle-blower.  The analyst sees, when the truth starts coming out, this is pretty serious.  The problem the company is having is we can't just dismiss away everything all of the four employees are telling us, because what they are telling us is this is a systemic pattern of abuse at this company.

This is not a company trying to get a drug on the market that has some issues spotted by the FDA and then is attempting to address them.  These issues here in this case are all about hiding facts from the FDA.  They are all about, instead of thoroughly investigating failed products or failed tests, covering those up, unplugging the computer, shredding records.

It's quite a different case and it's much closer to some of the other cases we have in our brief like the Dr. Reddy case and some of the others.  Dr. Reddy, in particular, is one of the companies that were under tremendous pressure to keep up growth.

That's what we see happening at Mylan.  That is in fact the motive for all the steps they are taking.  The industry, at this point, is vigorously competitive.  The pressure to continue to pump out the products is very strong.

49

Besides the statement in April of '17, there are more that follow in '17 after the India warning letter, after the Morgantown Form 483. There's a statement that President Malik makes on May 10 of 2017. He talks about Mylan's deep and unwavering commitment to quality everywhere. We operate FDA standards, but then he says -- excuse me, I should be a little bit slower here.

He talks about Mylan's deep and unwavering commitment to quality everywhere. Then he says FDA standards for our industry continue to evolve. Again, he's playing up the false spin as to what's going on. That's on May 10. They don't use this evolving language once. They use it in April of '17, May of '17. They use it again in April of '18.

THE COURT: I'm sorry to interrupt. Can I ask you what makes that statement -- let's assume it's a false statement. What makes that material to investors that FDA regulations are evolving or really that that is the cause of the warning letter? To me, it strikes me as what's really material is the warning letter, the contents of the warning letter, not whether or not it's in response to changing regulation. So what if the regulations change? Mylan has to comply with them. What makes that statement material?

MR. GRAZIANO: Why it matters is, yeah, there is a warning letter that's public for one facility at this point, but there's nothing public at this time regarding Morgantown,

and why it matters is from the investor's point of view, if the regulations are in fact evolving and the company has to take steps to keep up with them, that is a far less significant problem or egregious violation using the FDA's language rather than this company is doing something that's been banned for over ten years.

They are exactly in the place that has been strictly prohibited for a long time.  That's the difference.  I think that's the message this company is trying to craft.  They continue to downplay what is really going on in a way that's very deceptive.

You see the market reactions when the truth comes out.  The reactions here, all told, are more than 50 percent decline in the price of this company's stock.  It's quite a strong investor reaction.

Now, the company goes on in 2017, such as on May 23rd, talking about how every one of their sites adheres to stringent quality standards.  There are a number of cases that we cite, including Dr. Reddy, including Hall versus Johnson & Johnson that cite when you say things like that, you adhere to strict quality standards, you are putting in play and requiring disclosure of the fact that you have received a Form 483.

So Form 483s in and of themselves we can debate when or how they should be disclosed, but when a company is saying

51

things like this company, we have cases showing that those kinds of statements do trigger a duty to disclose.

Another example of that is the ESG report which comes out on May 22nd of 2017, and in connection with that report, the CEO of the company talks about how we are able to manufacture tens of billions of doses of medicine annually all to stringent quality standards.

Now, I have heard my adversary say we didn't say we were FDA GMP compliant, but that, I think, is just too clever of a position for the company to be taking, because they are just saying the same thing using different words in their 10-K that they filed on March 1 of 2017, so this is in paragraph 273 of the complaint.  They now have the Form 483 for Morgantown because that came out in November of '16, so March of 2017, they say we believe that all of our facilities are in good operating condition.  The machinery and equipment are all well maintained.  The facilities are suitable for their intended purposes, and they have the capabilities adequate for current operations.

In the same document, they give a risk disclosure that there's no guarantee they will meet regulatory agency standards.

Here, they already have the Morgantown Form 483.  We have a number of cases, such as the Teligent case, the Todd v. STAAR case, where statements exactly of this nature would give

52

rise to a duty to disclose a Form 483 to avoid being incomplete or misleading when made.

THE COURT:  Do you know for that last statement, the 10-K from fiscal year 2018, so this is in paragraph 273 in reference to all of our facilities are in good operating condition, do you recall where that statement is made?

I don't know if -- sometimes in these disclosures, there's references to assets, you know, to put on the balance -- that apply to the balance sheet, and obviously with a pharmaceutical company, there's a separate section pertaining to regulatory action.  I'm curious where that statement is, if you have it.  I might have it.

MR. GRAZIANO:  I know the defendants had put it as Exhibit 20 of their brief, and I don't know if I have it specifically flagged.

THE COURT:  That's fine.  Don't feel you have to pore over the statement.  I was wondering if you knew off the top of your head.

MR. GRAZIANO:  Right.  I did ironically flag where the risk disclosure occurs.  That's on page 36 of Exhibit 20, and that is the one where they talk about there is no guarantee that they will meet regulatory agency standards in the future or prevent instances of noncompliance.

There, clearly, they can be talking about nothing other than CGMP compliance which is in the paragraph above

53

where I'm reading.

But I think that it is true the paragraph 273 is accurately put into the context of the complaint, and it is not pulled out of context, as Your Honor was asking.

Now, in terms of this company's -- well, I'll just briefly, I guess, touch on the website statements because I think Chief Judge Hornak has it right.

I think in his second decision Howard v. Arconic, which is from 2021 year, I think we are talking in this case about an alleged fraud on the market.  It's a highly efficient market.

The investors, the institutional investors, the hedge funds, the analysts, they are not going to -- I think Chief Judge Hornak says the first thing you do is start with the company's website, but in particular in this environment, these investors, sort of like a hard-working federal judge, they are going to read every word this company puts out.

They are not going to not pay attention to something on the website.  I think that argument is completely false, and on these website statements, one of the ones I would call out, they are all in the complaint, is the one in paragraph 258, because Mylan talks about using advance testing and monitoring to ensure its products meet testing acceptance criteria that are in alignment with the requirements established by the standards setting organizations around the

54

world.  That's a reference, among others, to the FDA.

Again, that statement, it's sort of one of these statements that's made continuously, because it's on the company's website, and it doesn't change after the warning letters.  It doesn't change after the first Form 483.  It doesn't change after the second Form 483.

I think when the court looks at the alleged statements in the context in which they were made, I think the material falsity of these statements starts far earlier than the second Morgantown warning letter.  I think the spin this company starts putting on in its public statements as soon as the Nashik warning letter goes public is really where the false spin starts in this case.

Now, in terms of the scienter of the executives and Mylan, very little briefing was, in terms of just pages, was focused on scienter in this case.  I think there's a good reason for that.

I think the defendants will have to concede that all three of their senior executives knew about the Form 483s.  I think they will have to concede that President Malik knows what he was told by the FDA in April of 2017.  I think they will have to concede that they read the warning letters when they came out.

So the first one was addressed to Defendant Malik.  The Morgantown was addressed to the CEO Defendant Bresch.

55

This is one -- I don't say this lightly, but this is one of these cases where once the court sees that falsity is established, scienter readily falls into place.

This is not a case where we say the company has a problem known by lower level employees and there's a real question as to whether or not that information filtered out to the top of the company.

This is a case where the company is hearing directly from the FDA at its executive level, and then, as I've been trying to show the court, going on and putting a false spin on what's actually going on.

Knowledge in this case, I frankly don't think there should be any question about it. I mean, certainly we are talking about strong inference. We don't have to prove knowledge today, and I think we have many compelling facts showing there's a strong inference of all of the defendants' knowledge, and in particular, besides their direct correspondence with the FDA, we are talking about serious violations of longstanding FDA norms.

We are talking about repeated violations. We are talking about repeated Form 483s. We are talking about a company that has recalled at least 15 different drugs as a result of all of this. We are talking about basically, you know, actions designed to hide the truth from the FDA.

It is quite an egregious set of facts, and also of

56

course, it's taking place at the time at their most important core facility, which is Morgantown.  Morgantown no longer exists.  It was shut down after all this story is said and told.  That postdates the papers before Your Honor.

THE COURT:  With respect to the former employee or FE statements, and the -- it appears there's a lack of connection between the FEs and the individual defendants here.  Just so I understand the allegations and the relevance of the allegations of the FE statements, are you relying on those FE statements to establish individual scienter, or I think it was argued before that, you may be limiting why you put those in the complaint.

MR. GRAZIANO:  Sure.  And the way the court undertakes its scienter analysis is the collective view of all of the facts.  It goes too far to say we are not relying on the four employees at all with regard to the defendants' scienter, but the reality is they are there for a specific purpose.  That purpose is not for employees numbers 1 through 8 spoke to the executive defendants.  We are not alleging that, but they are there, among other facts, and I'll just highlight a couple of them, to point out what is really happening in this company, how widespread these unlawful practices are across the company.

That's why they are there.  They have personal knowledge as to those facts.  They are only speaking as to

57

what they themselves observed, but what did they observe? They observed testing to compliance, preinjections to avoid failing results, crashing computer files. So they are part of the collective facts as to what is happening.

The Form 483s themselves, all they say -- all of them say they are not intended to capture everything, so they too are just part of what is happening in this company. They are observations made by the FDA on surprise 11, 15 day visits, but what's happening at this company is they are making every effort to hide the truth from the FDA.

So the fact that the FDA found what they did is quite remarkable given what's going on here. You can take the Form 483s. You look at the four employees who say nothing changed. After all the promises were made to the FDA in April 2017, behavior continued.

You look at the "Bottle of Lies" and you see how the FDA was prompted in this case not once but twice by whistle-blowers calling the FDA -- actually three times, because it was twice before the first surprise visit and one more time before the 2018 visit, alerting the FDA that this company is up to no good.

So all of that collectively gives you the context as to what is happening, but with regard to the individual defendants themselves, we have them making statements that we say are false and misleading because of facts they personally

58

knew.  There is no question that they knew about the Form 483s when they failed to disclose them.

There is no question that President Malik knew about his meeting with the FDA in April 2017 when he starts to downplay what is going on.

And in terms of the reliance on the "Bottle of Lies" sources, so many of our cases in this arena are typically first broken by publications by the Wall Street Journal or Bloomberg.  They report facts.  We are taught to rely on those facts.

This author here, Eban, has a specific description of what she did to make her facts available in the book.  She talks about how many people she interviewed, which is over 240 people, multiple times.  She is traveled to India.  She looked at 20,000 internal FDA documents, including emails, memos, minutes.  She FOIAed the FDA.

When she has quotes, and there are important quotes, as I mentioned, about the April meeting on page 332 in her book, she says she got those quotes from the recollections of the people who were present.  She is not reconstructing them in the sense that she is writing a Hollywood script.

She is talking to people, saying tell me exactly what was said, and she puts quotes around them.  She says she quotes any email or documents verbatim.

We are completely permitted to rely on her extensive

59

reporting, but also, you know, we have Bloomberg during what they refer to as a one year investigation, and they too, in paragraph 144 of the complaint, say this problem of testing and compliance was widespread at this company.

We cited a few cases where we can rely on media sources, and I would just call out one, the Loewen Group from 2004 from the Eastern District of Pennsylvania, but this is typically -- this is how the Theranos blood testing fraud was first revealed.  It was in the Wall Street Journal.  It was followed by a book by the same author who wrote the stories in the Wall Street Journal.

I think once we go through the challenging exercise of asking ourselves which statements are false, why are they material, scienter readily falls into place in this case.

With that, absent any questions from the court, I'll rest on our papers.

THE COURT:  Can I ask you a question about the scheme liability claim here.  It wasn't really briefed by both sides really all that extensively.  I forgot to ask Ms. Locker before.  Maybe you can address that and help me understand maybe the difference between your quintessential sort of securities fraud claim and the scheme liability claim.

MR. GRAZIANO:  Sure.  Your Honor will have to forgive me, I'm about to cite two cases that are nowhere, and there are 190 cases cited in the papers.

60

Recently, United States Supreme Court in Lorenzo had to decide the parameters of scheme liability under 10b-5(a) and (c) versus 10b-5(b).  In Lorenzo, the court noted how there is so much overlap, but it's by design in the law.  So you can violate 10b-5(b), which is when the false statements were made, but also (a) and (c) at the same time.

And then the Second Circuit in another uncited case SEC versus Rio followed up and looked at Lorenzo after the SEC appealed the issue to the Second Circuit.

I think those two cases combined, plus we do cite the Able Labs case at 2008 Westlaw in briefs from the District of New Jersey.  I'd say those trilogy of cases show that not only do we have, in this case, actionable false statements and omissions made on specific dates, but we do have a course of conduct of fraudulent acts, and I think what particularly brings this case into it as opposed to your typical case where a company is making a false statement with scienter is the pattern of behavior here.  That's what the Able case has as well.

You have a pattern of fraud.  The fraud is designed not just to deceive investors but the FDA as well.  That's where the destruction and shredding of documents comes into play.  That's where the retesting without records comes into play by pulling out power cords, so I think, even though very little attention completely was paid to this issue in the

61

papers, I agree, I think this happens to be a pretty strong case for scheme liability, and I would be happy to brief it further if Your Honor needs it, but I think those three cases say it all.

THE COURT:  Thank you.  Ms. Locker, any final word?

MS. LOCKER:  Thank you, Your Honor.  Let me start, Your Honor, by saying that with almost the last, which is any assertion that the FDA made findings that Mylan engaged in unlawful practices, including testing into compliance, crashing files, pulling plugs comes from Eban's book.

It's inconsistent with the FDA's words in the Form 483 and the warning letters.  That's Exhibits 1 through 3 and 6.  I want to put that to bed and I'll start from the beginning.

With respect to the April 2018 statement, Your Honor, Mr. Graziano said that it has to be accurate and complete. No, that's not the law.  It doesn't need to be complete.  It needs to be not misleading.  The omission needs to be not misleading.  The law is not that a statement needs to be complete.  That's clear.

The statement said that Mylan was in discussions with the FDA, and Mylan was in discussions with the FDA and disclosed that as part of the announcement.  Nothing more needed to be disclosed.  The Form 483 was observational only. It did not constitute a final agency determination, and the

62

purpose of the Form 483 expressly on its face is to begin a discussion with the FDA regarding remedial efforts, and that discussion was disclosed.

So the omission of the Form 483 is not a misleading material omission.

With respect to the comment that there were no evolving regulatory expectations, the FDA's standards are always evolving. They evolve all the time, and there's no allegation that they don't, and I would say that, especially with respect to the Nashik warning letter, there was no spin. This is paragraph 279. We set it forth in Appendix A. The warning letter at that point is public.

The violations that plaintiffs are saying were always prohibited are public. They are publicly available, and Mr. Malik's statement, I think it's Mr. Malik's statement of a deep unwavering commitment to quality is made in the context of disclosing the warning letter to say we are in discussions with the FDA and we are going to fix it, and in fact it was.

Two years later, the FDA inspected and provided a closeout letter.

With respect to the issue of -- I'm trying to organize my thoughts. The FDA did not disclose the warning letters. Mylan did. That's incorrect. That's Exhibit 34 and Exhibit 28. Yes, the FDA did ultimately post them on their website, but Mylan disclosed them, Exhibit 28 and Exhibit 24.

63

With respect to the January 2019 Bloomberg article in paragraph 299 which Mr. Graziano described as a denial that the company ever tested into compliance, let's put aside the phrase testing in compliance. There's no evidence that the company, in January of 2019, January of 2019, was quote testing into compliance. By then, the warning letters had been disclosed. Nashik had already had a closeout, and Morgantown was being remediated on its way to its closeout letter, which was issued in -- forgive me, Your Honor. I have that. That closeout letter was issued in 2020 and that is Exhibit 7. So in January of 2019, there's no allegations that that denial was false.

Let me go back -- and forgive me, Your Honor -- to the evolving standards. Not only is the FDA standards always evolving, but that's exactly why, as Mr. Malik said, in April and again in August why the right-sizing was already under consideration, and the Form 483 served to accelerate it and enhance it, no question, but there's no allegation that a right-sizing of Morgantown, given the evolving and complexity of the FDA standards, was not under consideration. There's no allegation that it wasn't as part of the 2018 plan.

With respect to Mr. Graziano's comment that the August and November statements that this was simply just a temporary disruption -- forgive me, Your Honor for one second. I forgot to bring this up. I would refer the court to

64

Appendix C in the reply papers and in particular slide 7.

There, Your Honor, we urge the court to be very careful about characterizations about the company's statement.

What plaintiff is referring to is their allegation in paragraph 187 that Mylan -- everything was temporary.  Mylan would rebring the volume back up following the remediation.  Paragraph 187.  Well, what slide 7 in Appendix C shows that actually what the statement says is:  Rebring volume back up to where we said we were bringing it back up to, which is obviously streamlined from where the facility has been historically.

There is no question but that the company said we are discontinuing product, we are bringing the volume down, we are right-sizing the facility.  It wasn't a temporary reduction in drugs.  The company could not have been clearer.  This is a mischaracterization of the company's statement.  There's many of them, and they are not all in Appendix C, but a number of them are in Appendix C.

If I may just talk about Reddy's, I think Reddy's is a very interesting decision.  So in Reddy's, where the conduct was extraordinary and quite different than Mylan, where at every turn, Mylan engaged with the FDA and remediated and remediated successfully.

That is not Dr. Reddy.  In Reddy's, what's interesting is the defendants represented falsely that their

compliance issues were limited to one facility, despite having received Form 483s at three different facilities.  The company represented that they were CGMP compliant, despite having received multiple Form 483s and a warning letter covering multiple facilities, and represented that they had completed all remediation violations noted in the warning letter, although the reinspection resulted in an inspection report saying they knew they hadn't taken any corrective action.

What's really interesting in Reddy's is of course the court found false and misleading statements.  That's not really surprising.  However, what's very interesting is that plaintiffs, in their opposition papers at 24, quote a number of aspirational statements and say these are aspirational statements that the court found misleading.  Not so.

Quote:  We are fully dedicated to quality and have robust quality processes.  We maintain consistent global quality.

Well, these are statements -- I'm going to be specific now, Your Honor -- statements in the opinion 7 and 9, 6 and 12.  The court did not find these actionable.  In fact, the court never addressed the falsity of these statements because the court found that the plaintiff lacked standing to pursue claims on these statements, so we don't know what the court would have done with respect to these statements.

Now, in contrast, I'd like to refer the court to GNC,

which is a really interesting case in certain respects.

Because GNC, which of course, was affirmed by the Third Circuit, I'm talking about the District Court decision now, Your Honor. There were quality failures resulting in adulterated product, multiple recalls and regulatory enforcement actions. What the District Court said, did, was it distinguished puffery and aspirational statements from representations of compliance, fact, and what it held was, quote: We are an industry leader who sets high standards with respect to quality control and product quality, and our number one priority is to protect the customer.

Court held those were immaterial as a matter of law, aspirational, puffery.

However, it said the statement which says the company statement that its products are fully compliant with all applicable requirements, it said, no, that's not immaterial as a matter of law which is exactly the distinction we are asking this court to make.

It was affirmed by the Third Circuit. The Third Circuit addressed scienter. I don't believe the Third Circuit actually addressed this portion of the case.

Finally, I would just say with respect to -- I only have two other quick comments, and Ms. Bassin can discuss scheme liability, but what underlying misconduct is there that the individual defendants engaged in. They engaged with the

FDA. They corrected. They got closeout letters. That's exactly what the regulatory process expects.

So we -- and the law is very unsettled on scheme liability. The Third Circuit doesn't have a scheme liability decision. It's all over the place all over the country as to whether what exactly scheme liability is, whether it's different than 10b which is on a false statement, so it's not a settled area of the law.

The only other thing I would like to say, Your Honor, is stringent. I want to talk about stringent for one moment. Stringent is an interesting statement. We have two cases -- plaintiffs didn't address them -- that held that stringent -- how much stringent makes something stringent. It's not objective or objectively verifiable.

We have the SEPTA Orrstown case in the Middle District of Pennsylvania underwriting standards described as stringent, immaterial puffery as a matter of law. It's not objectively verifiable.

Southern District of New York, AstraZeneca, FDA submission described as meeting stringent safety and efficacy requirements, immaterial as a matter of law. It is not objectively verifiable.

Simply on the recall, very quickly on the recall comment is somehow supporting scienter. Plaintiff alleges, and this is paragraph -- around paragraph 162, that these were

68

out of Morgantown and as a result of the second Form 483. Well, plaintiff admits that it cannot link the recalls to any CGMP violations at Morgantown.  That's footnote 5 at paragraph 162.

And 15 drugs, Your Honor, 15 drugs recalled over a three year class period constitutes .2 percent.  .2 percent of the 7,500 drugs that Mylan manufactured.  That's paragraph 283 and Exhibit 27 at 36.  I don't think a recall on .2 percent of drugs tells the individual defendants that you are a Reddy's. I don't know how else to put it.  If the court would like to hear scheme liability?

THE COURT:  Sure.

MS. LOCKER:  Thank you, Your Honor.  Thank you for your patience.

MS. BASSIN:  Thank you, Your Honor.  I would refer the court to defendant's reply brief at page 30.  You know, there we argue that plaintiff's scheme liability claim as pled was predicated on the same false and misleading statement as its Rule 10b-5(b) claim, and for the reasons in our briefs and described here, plaintiffs have failed to allege an actionable misrepresentation or scienter, and therefore, has not alleged any deceptive conduct as required.  They just haven't pled the predicate misconduct.

Plaintiff's counsel also referenced, I believe, a Second Circuit case that was not before the court in its

69

briefing, and should Your Honor wish for additional briefing, we would be happy to provide additional briefing on that newly-raised case or on the topic of scheme liability as a whole.

THE COURT:  All right.  Thank you.  Thank you, everyone.  I appreciate it.  Well briefed and well argued.

I'm going to order a copy of this transcript with the cost to be split between the parties so I can take a look at it.  I'm going to defer on whether I need additional briefing on the scheme liability issue.  If anyone really wants to address that, they can file a motion for leave.  Otherwise, I'll just sort of chew on whether I feel like I need an additional supplemental brief on that issue and issue an order requesting it and then take the motion under advisement.

Anything else we should discuss while I have everyone here today?

MR. GRAZIANO:  We have nothing else.

MS. LOCKER:  Nothing, Your Honor.

THE DEPUTY CLERK:  All rise.  This court is now adjourned.

(At 12:11 p.m., the proceedings were adjourned.)

70

                          C E R T I F I C A T E

              I, BARBARA METZ LEO, RMR, CRR, certify that the
foregoing is a correct transcript from the record of
proceedings in the above-entitled case.


_\s\ Barbara Metz Leo__              ___03/15/2023___
BARBARA METZ LEO, RMR, CRR             Date of Certification
Official Court Reporter