**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| IN RE MYLAN N.V. SECURITIES LITIGATION | Master File No. 2:20-CV-00955-NR |

**LEAD PLAINTIFF'S OMNIBUS BRIEF IN FURTHER SUPPORT OF ITS MOTION
FOR CLARIFICATION AND IN OPPOSITION TO
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

RELEVANT BACKGROUND ................................................................................2

ARGUMENT............................................................................................................6

    I.      THE COMPLAINT STATES A MISREPRESENTATION CLAIM.........6

          A.      The Complaint Adequately Alleges Loss Causation .......................7

          B.      Defendants' Loss Causation Arguments Should Be Rejected.......10

               1.      The Complaint Adequately Alleges the Meaning of the January 31, 2019, Statement ...............................................11

               2.      The Complaint Adequately Alleges a "Causal Nexus" .....13

               3.      The Complaint Alleges the February and May 2019 Corrective Events Revealed New News ...........................15

    II.     THE COMPLAINT ADEQUATELY ALLEGES A SCHEME CLAIM..17

          A.      Defendants Ignore Decades of Precedent, Including from the Supreme Court, Holding that No Misstatement Is Required to Allege Scheme Liability Under Rule 10b-5(a) or (c) ....................18

               1.      The Complaint Adequately Alleges Reliance for the Scheme Claim ..................................................................20

                2.      The Complaint Adequately Alleges Loss Causation for the Scheme Claim ..................................................................24

           B.      The Scheme Claim Does Not "Bypass" the Requirements of Rule 10b-5(b)..................................................................................25

CONCLUSION.......................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Able Lab'ys Sec. Litig.*,
  2008 WL 1967509 (D.N.J. Mar. 24, 2008)..................................................................................24

*Affiliated Ute Citizens v. United States*,
  406 U.S. 128 (1972).................................................................................18, 20, 21, 22

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)..................................................................................................16

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)....................................................................................................6

*Basic, Inc. v. Levinson*,
  485 U.S. 224 (1988).........................................................................................18, 20, 22

*Bell Atl. v. Twombley*
  550 U.S. 544, 570 (2007)...........................................................................................6

*In re Boeing Co. Aircraft Sec. Litig.*,
  2022 WL 3595058 (N.D. Ill. Aug. 23, 2022) .............................................................16

*In re Bradley Pharms., Inc. Sec. Litig.*,
  421 F. Supp.2d 822 (D.N.J. 2006) ...............................................................................8

*Central States v. Federal Home Loan Mortgage. Corp.*,
  543 F. App'x 72 (2d Cir. 2013) ..................................................................................15

*City of Sterling Heights Gen. Emps. Ret. Sys. v. Prudential Fin., Inc.*,
  2015 WL 5097883 (D.N.J. Aug. 31, 2015) .................................................................23

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
  2020 WL 3026564 (D.N.J. June 5, 2020)....................................................................18

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005)................................................................................................7, 8

*In re DVI, Inc. Sec. Litig.*,
  2010 WL 3522090 (E.D. Pa. Sept. 3, 2010) ................................................................8

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
  235 F. Supp. 2d 549 (S.D. Tex. 2002) ............................................................17, 18, 19

*EP Medsys., Inc. v. EchoCath, Inc.*,
　235 F.3d 865 (3d Cir. 2000)................................................................6, 7

*In re EQT Corp. Sec. Litig.*,
　504 F. Supp. 3d 474 (W.D. Pa. 2020)................................................9, 16

*In re FirstEnergy Sec. Litig.*,
　2022 WL 681320 (S.D. Ohio, Mar. 7, 2022)....................................21, 22

*In re Galena Biopharma, Inc. Sec. Litig.*,
　117 F. Supp. 3d 1145 (D. Or. 2015) ........................................................18

*In re Gilead Sec. Litig.*,
　536 F.3d 1049 (9th Cir. 2008) ..................................................9, 14, 16

*Glickenhaus & Co. v. Household Int'l, Inc.*,
　787 F.3d 408 (7th Cir. 2015) .................................................................23

*Gov't of Guam Ret. Fund v. Invacare Corp.*,
　2014 WL 4064256 (N.D. Ohio Aug. 18, 2014)...............................9, 15, 16

*Hall v. Johnson & Johnson*,
　2019 WL 7207491 (D.N.J. Dec. 27, 2019).....................................6, 7, 17

*Hassel v. Centric Bank*,
　2021 WL 84281 (M.D. Pa. Jan. 11, 2021)................................................11

*Howard v. Arconic, Inc.*,
　2021 WL 2561895 (W.D. Pa. June 23, 2021)..........................................7

*Huddleston v. Herman & MacLean.*,
　640 F.2d 534 (5th Cir. 1981), *aff'd in part and rev'd in part on other grounds*,
　459 U.S. 325 (1983).................................................................................8

*Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*,
　2023 WL 2592134 (M.D. Tenn. Feb. 24, 2023)....................................22

*Katyle v. Penn National Gaming Inc.*,
　637 F.3d 462 (4th Cir. 2011) ...................................................................8

*McCabe v. Ernst & Young, LLP*,
　494 F.3d 418 (3d Cir. 2007)............................................................6, 7, 8

*McDermid v. Inovio Pharms., Inc.*,
　520 F. Supp. 3d 652 (E.D. Pa. 2021) ...............................................11, 13

*In re Merck & Co. Sec., Derivs. & "ERISA" Litig.*,
　2011 WL 3444199 (D.N.J. Aug. 8, 2011) ...............................................8

iii

*Mineworkers' Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018) ..................................................................................8, 16

*Nat'l Junior Baseball League v. PharmaNet Dev. Grp. Inc.*,
   720 F. Supp. 2d 517 (D.N.J. 2010) ..............................................................................15

*Noto v. 22nd Century Grp., Inc* ,
   35 F. 4th 95 (2d Cir. 2022) ..........................................................................................20

*Payne v. DeLuca*,
   433 F. Supp. 2d 547 (W.D. Pa. 2006)...........................................................................15

*Pirnik v. Fiat Chrysler Autos., N.V.*,
   2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ..................................................................12

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
   2013 WL 1831427 (E.D. Mo. Apr. 30, 2013)............................................................10, 14

*Pub. Pension Fund Grp. v. KV Pharm. Co.*,
   705 F. Supp. 2d 1088 (E.D. Mo. 2010), *aff'd in part, rev'd in part and
   remanded*, 679 F.3d 972 (8th Cir. 2012) ...................................................................10

*Revell v. Port Auth. of N.Y. & N.J.*,
   598 F.3d 128 (3d Cir. 2010).............................................................................................6

*Rocks v. City of Phila.*,
   868 F.2d 644 (3d Cir. 1989).............................................................................................6

*Ruggiero v. Mount Nittany Med. Ctr.*,
   736 F. App'x 35 (3d Cir. 2018) .......................................................................................7

*SEC v. Zandford*,
   535 U.S. 813 (2002).................................................................................................18, 19

*Shapiro v. UJB Fin. Corp.*,
   964 F.2d 272 (3d Cir. 1992).............................................................................................11

*Skiadas v. Acer Therapeutics Inc.*,
   2020 WL 3268495 (S.D.N.Y. June 16, 2020) ...............................................................12

*Smith v. Antares Pharma, Inc.*,
   2020 WL 2041752 (D.N.J. Apr. 28, 2020) .....................................................................15

*In re Splunk Inc. Sec. Litig.*,
   592 F. Supp. 3d 919 (N.D. Cal. 2022) ...........................................................................10

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*,
   552 U.S. 148 (2008)...........................................................................................17, 19, 23

*In re Urb. Outfitters, Inc. Sec. Litig.*,
    103 F. Supp. 3d 635 (E.D. Pa. 2015) .................................................................................13

*Utesch v. Lannett Co.*,
    385 F. Supp. 3d 408 (E.D. Pa. 2019) ...................................................................................7

*Vanderhoef v. China Auto Logistics Inc.*,
    2020 WL 5105243 (D.N.J. Aug. 31, 2020) .........................................................10, 13, 15, 16

*Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*,
    2019 WL 4597518 (N.D. Ill. Sept. 23, 2019) .............................................................10, 11, 16

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
    2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) ........................................................................23

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
    325 F.R.D. 280 (D. Minn. 2018)........................................................................................21

*Wilson v. Comtech Telecomms. Corp.*,
    648 F.2d 88 (2d Cir. 1981)................................................................................................21

**INTRODUCTION**

Defendants' Rule 12(c) Motion (ECF No. 106) mounts another challenge to the misrepresentation and wide-ranging scheme claims that this Court already has sustained. The Complaint (ECF No. 39) states *two* claims under Rule 10b-5: a misrepresentation claim based on Defendants' materially false and misleading statement published in *Bloomberg* on January 31, 2019, and a scheme claim based on Defendants' deceptive conduct, which included, among other things, directing Mylan employees to alter datasets and intentionally crash computers to create the false appearance of compliance with FDA safety and quality regulations.

Defendants' misrepresentation and scheme came to light through a series of corrective disclosures, which, together, caused the price of Mylan's common stock to fall by over 50%. The Complaint alleges that the relevant truth about Defendants' deceptive conduct began to come to light through disclosures in June and August 2018, and that additional disclosures in February and May 2019 corrected Defendants' January 31, 2019, misrepresentation and further revealed the scope of their deceptive conduct. As a direct result of these corrective disclosures, investors suffered significant losses. These allegations plainly satisfy the Rule 8(a) standard for pleading loss causation. Defendants' arguments challenging loss causation should be rejected because they ask the Court to resolve disputes regarding the meaning of Mylan's January 31, 2019, statement and subsequent disclosures, *see* ECF No. 106 at 11-14, both of which require fact-intensive inquiries that are not appropriate at this stage of the litigation, *see infra* Section II.

Defendants' arguments challenging reliance as to Plaintiff's scheme claim are equally unavailing. Under long-standing Supreme Court precedent, the market is presumed to rely not only on Defendants' statements, but also on undisclosed material information that Defendants had a duty to disclose but concealed. *See infra* Section III. Mylan's investors relied on the integrity of Defendants' manufacturing processes and adherence to regulatory standards. Defendants were able

1

to induce this reliance because they concealed their "pervasive, top-down scheme to dupe the FDA and ignore regulatory compliance best practices in the name of juicing manufacturing output and increasing corporate profits." ECF No. 88 at 35. But as the relevant truth emerged, investors suffered tremendous losses, giving rise to claims under Rule 10b-5.

Because the Complaint adequately alleges violations of both the misrepresentation and scheme liability subsections of Rule 10b-5, Plaintiff respectfully submits that the Clarification Motion (ECF No. 99) should be granted, and the Rule 12(c) Motion should be denied.

## RELEVANT BACKGROUND

The Court already has determined that the Complaint adequately alleges "a pervasive, top-down scheme . . . to dupe the FDA and ignore regulatory compliance best practices in the name of juicing manufacturing output and increasing corporate profits." ECF No. 88 at 30-38; *see also* ECF No. 95 at 2-3; ¶¶ 13, 66, 82, 86, 93, 118, 120.[1]

More specifically, and as is pertinent to arguments set forth below, the Complaint alleges that prior to the start of the Class Period, Mylan's Indian operations were rife with egregious violations of current good manufacturing practices ("CGMP") and its research and development center in Hyderabad "had become a hub for data fraud that had disseminated its methods of falsification throughout Mylan's Indian operations." *E.g.*, ¶ 85. According to the Complaint, Defendants implemented the very same data fraud practices at its flagship U.S. facility in Morgantown, West Virginia, in response to low-quality competitors entering the marketplace and undercutting Mylan's generic drug prices and market share in the United States *E.g.*, ¶¶ 62-65, 85-88.

The Complaint alleges that Defendants took steps to conceal from investors Mylan's repeated violations of the FDA's quality and safety regulations and pervasive data fraud practices

---

[1] References to "¶___" are to the Complaint. All emphasis is added unless otherwise noted.

at its manufacturing facilities, including Morgantown, by "carefully curat[ing] the Company's public image as a leader in product quality and safety." *E.g.*, ¶¶ 66, 72, 74. Indeed, because Defendants continued to manufacture and sell drugs in the United States throughout the Class Period, investors had no reason to know that Mylan had long abandoned any pretense of CGMP compliance "in the name of juicing manufacturing output and increasing corporate profits." *E.g.*, ¶¶ 73, 83, 147-48; ECF No. 88 at 35.

However, in 2016, the FDA discovered that violations of its quality and safety regulations pervaded Mylan's Nashik and Morgantown facilities. *E.g.*, ¶¶ 91-106. After the FDA publicly issued a warning letter concerning the Nashik facility in April 2017, *e.g.*, ¶ 146, Defendants took steps to conceal from investors what had prompted the Nashik investigation—i.e., a whistleblower report detailing systemic CGMP and data integrity violations throughout Mylan— and what the FDA already had discovered at Morgantown. *E.g.*, ¶¶ 147-48.

In particular, Defendants actively sought to dissuade the FDA from publicly issuing a Morgantown warning letter because it "would severely undermine" investors' belief that the Company was quickly manufacturing generic drugs at competitive profit margins while complying with FDA regulations. *E.g.*, ¶¶ 148, 150-52. Defendants likewise generated a "façade of documents" to create the appearance of reform at Morgantown, thus enabling Mylan to fend off the FDA and avoid "[a] public acknowledgement" that the Company's "regulatory obligations made it difficult or impossible to maintain the[] competitive advantages" Defendants had achieved by circumventing quality and safety regulations. *E.g.*, ¶¶ 153-54. Defendants lied to the FDA to prevent the agency from publicly disclosing their fraudulent scheme to investors. *E.g.*, ¶ 161.

Despite Defendants' efforts to conceal their fraudulent conduct from investors, the relevant truth about Defendants' scheme began to emerge on June 27, 2018, when *Bloomberg* leaked the

3

results of the FDA's 2016 Morgantown investigation. ¶ 16. On this news, Mylan's share price fell $1.12 per share, or approximately 3%. *Id.* Then, on August 8, 2018, Defendants acknowledged that Mylan had been forced to undertake "a restructuring and remediation program in Morgantown" that included a "discontinuation of a number of products" and would have a temporary but "negative impact on production levels, product supply and operations." ¶ 17. This disclosure caused Mylan's share price to fall $2.62 per share, or approximately 7%. *Id.*

Defendants tried to mitigate the impact of these disclosures and the FDA's then-public Morgantown warning letter, and otherwise prevent investors from learning of their fraudulent scheme. To that end, Defendants issued a materially false and misleading denial, which was published in *Bloomberg* on January 31, 2019, and stated, "Any explicit or implicit suggestion that Mylan employees circumvented data and quality systems that jeopardized the quality of the medications we manufacture—for time pressures or any other reason—is simply false." ¶ 299 (quoting *Bloomberg* article); ECF No. 88 at 30 ("find[ing] that this statement by Mylan . . . was a material misrepresentation"). The Complaint alleges that Mylan issued this materially false and misleading denial with respect to manufacturing "***all*** of its products at ***all*** of its facilities." ¶ 299.

Next, on February 26, 2019, during Mylan's fourth quarter and fiscal year 2018 earnings conference call, Mylan stunned investors when it announced an 18% decrease in North American net sales from the prior year, attributing this shortfall, in part, to its required Morgantown restructuring, which included the discontinuation of almost 250 products. On this news, Mylan's share price fell $4.61 per share, or approximately 15%. ¶ 18. The full extent of Defendants' scheme finally came to light on May 7, 2019, when Mylan reported a surprise loss due, in part, to additional costs associated with the extensive required remediation efforts at the Morgantown facility. ¶ 19. As a result, Mylan's share price fell $6.73 per share, or approximately 24%. *Id.* Together, these

disclosures exposed the relevant truth about Defendants' fraudulent scheme by revealing negative regulatory and financial impacts associated with the discovery and remediation of Mylan's pervasive CGMP violations, thereby causing the price of Mylan's common stock to fall by over 50% and erasing billions in shareholder value. ¶¶ 16-19, 330.

This Court already has held that, these allegations adequately state two claims under Rule 10b-5: (i) a misrepresentation claim based on the January 31, 2019 statement (Rule 10b-5(b)), ECF No. 88 at 30, and (ii) a scheme claim based on Defendants' deceptive conduct throughout the Class Period outlined above, which concealed from investors Mylan's repeated and pervasive violations of FDA regulations (Rule 10b-5(a) and (c)), *id.* at 38. Defendants continue to incorrectly conflate these two claims, but they are distinct and arise under different subsections of Rule 10b-5. Defendants' deceptive conduct and misrepresentations concealed material facts from investors and thereby caused significant investor losses.

The Clarification Motion and the Rule 12(c) Motion are currently pending before the Court. Plaintiff filed the Clarification Motion on June 20, 2023, after Defendants notified Plaintiff of their position that the Court's MTD Order "narrowed" the scheme claim "to [a] single statement." ECF No. 99 at 5. As explained in the Clarification Motion, Defendants' position as to the scope of Plaintiff's claims ignores the Complaint's well-pled allegations and contravenes precedent from the United States Supreme Court. ECF No. 95 at 4-10. The Court granted Defendants' request to respond to the Clarification Motion in connection with their Rule 12(c) Motion. ECF No. 98.

Defendants' Rule 12(c) Motion mounts various challenges to Plaintiff's already-sustained claims based principally on loss causation. In response to the Clarification Motion, Defendants conflate the misrepresentation and scheme claims and incorrectly contend that Plaintiffs cannot allege reliance without a misrepresentation. As explained below, these challenges fail.

5

## ARGUMENT

### I.     THE COMPLAINT STATES A MISREPRESENTATION CLAIM

Defendants seek judgment on the pleadings under Rule 12(c) as to Plaintiff's misrepresentation claim, arguing that the Complaint fails to allege loss causation. A Rule 12(c) motion "based on the defense that the plaintiff has failed to state a claim is analyzed under the same standards that apply to a Rule 12(b)(6) motion." *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010). As such, a court must accept as true all reasonable inferences that may be drawn from the allegations, and view those facts and inferences in the light most favorable to the non-moving party. *Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir. 1989). A court must deny a Rule 12(c) motion if "a complaint [] contain[s] sufficient factual matter, accepted as true, [that] 'state[s] a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Defendants do not challenge any element of Plaintiff's claims that is subject to the heightened pleading standards set forth in Rule 9(b) or the PSLRA. Thus, the Court need not consider the particularity of the Complaint's allegations, any competing inferences that Defendants seek to draw from the Complaint, nor materials attached to Defendants' request for judicial notice. *See, e.g.*, ECF No. 106 at 11-12; *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 427 n.4 (3d Cir. 2007) (when analyzing loss causation, courts "draw all inferences in plaintiff's favor") (quoting *EP Medsys., Inc. v. EchoCath, Inc.*, 235 F.3d 865, 885 (3d Cir. 2000)). Defendants' request for judicial notice, ECF No. 106 at 6 n.4, is "inappropriate . . . at this juncture" because they "attempt to rely on [their exhibits] to create a defense to the Complaint's otherwise well-pled allegations,

6

and suggest that th[e] Court should assume the factual assertions in those documents to be true." *Hall v. Johnson & Johnson*, 2019 WL 7207491, at \*10 (D.N.J. Dec. 27, 2019).

### A.    The Complaint Adequately Alleges Loss Causation

Loss causation refers to the "causal connection between the material misrepresentation and the loss [suffered]." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Loss causation is a "highly factual" inquiry that requires expert testimony to resolve and "frequently preclud[es] judgment on the pleadings." *McCabe*, 494 F.3d at 427 n.4; *see also EP Medsys.*, 235 F.3d at 884 (reversing dismissal because loss causation improperly assessed at pleading stage); *Howard v. Arconic, Inc.*, 2021 WL 2561895, at \*17 (W.D. Pa. June 23, 2021) (stating that "loss causation is a fact intensive inquiry which is best resolved by the trier of fact."). Pleading loss causation is "not meant to impose a great burden upon a plaintiff." *Dura Pharms.*, 544 U.S. at 346-47. Rather, a complaint need only provide a "short and plain" statement to give "some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* If the inference of a causal connection is at least plausible, then the court should deny a Rule 12(c) motion. *See, e.g.*, *McCabe*, 494 F.3d at 427 n.4; *Ruggiero v. Mount Nittany Med. Ctr.*, 736 F. App'x 35, 41 (3d Cir. 2018) (complaint that raised "plausible inferences" is "sufficient").

Courts in this Circuit have "consistently analyzed loss causation under Rule 8(a), rather than the more stringent requirements of Rule 9(b)," *Hall*, 2019 WL 7207491, at \*27 (collecting cases), and Defendants cite no Third Circuit authority to the contrary, *see* ECF No. 106 at 7 n.5. Consistent with this liberal pleading standard, the Third Circuit has adopted "a practical approach [to loss causation], in effect applying general causation principles.'" *Arconic Inc.*, 2021 WL 2561895, at \*17 (quoting *McCabe*, 494 F.3d at 426). A plaintiff pleads loss causation by alleging a "sufficient causal nexus between the loss and the alleged misrepresentation." *Utesch v. Lannett Co.*, 385 F. Supp. 3d 408, 424 (E.D. Pa. 2019) (quoting *EP Medsys.*, 235 F.3d at 883); *see also*

7

*McCabe*, 494 F.3d at 430 (quoting *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir. 1981), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 325 (1983)) ("the misrepresentation" need only "**touch[] upon** the reasons for the investment's decline in value").[2]

Courts in this Circuit have recognized that "*Dura* did not impose any rigid form on the nature of a corrective disclosure but rather allowed a pragmatic approach to loss causation." *In re Merck & Co. Sec., Derivs. & "ERISA" Litig.*, 2011 WL 3444199, at *30-31 (D.N.J. Aug. 8, 2011). "*Dura* [also] did not address what type of events or disclosures may reveal the truth. . . . Nor did *Dura* explain how specific such disclosure must be." *In re Bradley Pharms., Inc. Sec. Litig.*, 421 F. Supp.2d 822, 828 (D.N.J. 2006). A plaintiff thus may plead loss causation "through a series of disclosing events," *id.*, or "indirect[ly] through disclosure of another event," *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *6 (E.D. Pa. Sept. 3, 2010), even if they are not "the 'mirror image' of the alleged fraud," *Merck*, 2011 WL 3444199, at *32. Plaintiff easily meets this standard.

The Complaint alleges two corrective events following the January 31, 2019 statement as to "**all** medications at the Company's **facilities**," that "[a]ny explicit or implicit suggestion that Mylan employees circumvented data and quality systems . . . is simply false." ¶ 299.

**First**, the Complaint alleges that the February 26, 2019, disclosure partially revealed the relevant truth regarding the scope and impact of Mylan's data integrity issues. For instance, investors learned for the first time about the financial consequences of Mylan's receipt of a

---

[2] To the extent that *Katyle v. Penn National Gaming Inc.*, 637 F.3d 462 (4th Cir. 2011) (cited in ECF No. 106 at 10, n.10), requires the corrective event to reveal the "fraud" as opposed to the relevant truth, that case is inconsistent with Third Circuit precedent, as well as the Ninth Circuit's seminal decision on loss causation. *See Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018) (causation can be demonstrated where "the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss"). As explained below, the Complaint sufficiently alleges the linkage between the omitted material information and the relevant truth disclosed in February and May 2019.

November 2018 FDA Warning Letter, which included increased remediation costs and the "rationaliz[ation]" of a "significant portion of [Mylan's] commodity generics business," encompassing three of the Company's highest margin products, as well as the "discontinu[ation]" of "250 SKUs of highly commoditized oral solid products," leading Mylan to forecast "[n]o significant new product revenue is forecasted from the Morgantown plant in 2019." ¶¶ 208, 210. As a result, Mylan disclosed unexpectedly negative results for 4Q18 and FY18 and surprising underwhelming revenue projections for FY19, leading to a 15% stock price decline on the news. ¶¶ 207-12. Analysts confirmed that the February 26 disclosures contained new material information about Mylan's Morgantown remediation efforts, and news reports attributed the stock price decline to the disclosure of this information. ¶ 215.

*Second*, with respect to the May 7, 2019, disclosure, the Complaint alleges that Defendants' announcement of a surprise loss for 1Q19 and significant erosion of Mylan's adjusted free cash flow. This surprise loss resulted, in significant part, from additional Morgantown restructuring costs "shocked" analysts given the already lowered FY19 expectations and Defendants' previous reassurances and caused a 24% stock price decline. ¶¶ 213-14, 216-20.

These allegations easily plead loss causation under Rule 8(a). *See, e.g.*, *Gov't of Guam Ret. Fund v. Invacare Corp.*, 2014 WL 4064256, at *8 (N.D. Ohio Aug. 18, 2014) (loss causation alleged where investors did not known "full extent and severity of [] FDA's issues" until "disclosure of system-wide improvements to quality and regulatory segments"); *see also In re Gilead Sec. Litig.*, 536 F.3d 1049, 1054 (9th Cir. 2008) (loss causation alleged where investors did not know "impact of the off-label marketing and the [FDA] Warning Letter [until] Gilead issued a press release detailing third quarter financial results"); *In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474, 502 (W.D. Pa. 2020) (loss causation alleged where stock fell 13% following disclosure of

negative financial results that "tend[ed] to contradict EQT's statements").[3] Indeed, the corrective disclosures sustained in *KV Pharmaceutical Co.* closely resemble those alleged by Plaintiff, including revelations that the company (i) "admitted that the scope and seriousness of the [FDA] investigation had expanded" and (ii) "was suspending the manufacture and distribution of its pharmaceutical products in tablet form," which represented "$159 million of its net revenues" for FY18. *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 705 F. Supp. 2d 1088, 1094-95 (E.D. Mo. 2010), *aff'd in part, rev'd in part and remanded*, 679 F.3d 972 (8th Cir. 2012); *Pub. Pension Fund Grp. v. KV Pharm. Co.*, 2013 WL 1831427, at *4 (E.D. Mo. Apr. 30, 2013).

### B.    Defendants' Loss Causation Arguments Should Be Rejected

In support of the Rule 12(c) Motion, Defendants make three unavailing arguments. ***First***, Defendants claim that a "reasonable investor" would have understood Mylan's January 31, 2019, statement denying circumvention of data and quality systems for "***all*** medications at the company's ***facilities***" to refer only to the Nashik plant. ECF No. 106 at 11-12. ***Second***, Defendants claim that the Complaint does not allege a causal nexus between the January 31, 2019, statement and the February and May 2019 corrective disclosures. *Id.* at 9-11. ***Finally***, Defendants claim that the February and May 2019 disclosures did not reveal any new news about the scope and impact of the Morgantown remediation efforts. *Id.* at 12-14. None of these arguments pass muster.

---

[3] *See also In re Splunk Inc. Sec. Litig.*, 592 F. Supp. 3d 919, 951 (N.D. Cal. 2022) (holding that complaint "raise[d] [a] reasonable inference that" material omitted information was "a significant cause of the earnings miss" lead to a stock price decline); *Vanderhoef v. China Auto Logistics Inc.*, 2020 WL 5105243, at *1 (D.N.J. Aug. 31, 2020) (related-party transaction statements corrected by disclosures "identif[ying] material weakness in internal controls and procedures over determining and reporting certain relationships and related transactions"); *Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*, 2019 WL 4597518, at *8 (N.D. Ill. Sept. 23, 2019) (loss causation met when disclosure revealed "the true magnitude of the FY16 EBIT target shortfall, along with generic price inflation and unfavorable reimbursement contracts" which was "further supported by analysts' reactions").

### 1. The Complaint Adequately Alleges the Meaning of the January 31, 2019, Statement

Defendants offer various contentions regarding how a "reasonable investor" would have interpreted the January 31, 2019, statement (ECF No. 106 at 11-12), but those contentions already have been rejected and, moreover, are premature at this stage. And, regardless, the Complaint adequately alleges that a reasonable investor would have interpreted the January 31, 2019 statement to refer to *all* of Mylan's plants, including Morgantown.

To start, the Court's MTD Order already rejected Defendants' attempt to limit the January 31, 2019, statement to the Nashik plant. According to the Court, this statement was a "respon[se] to allegations of CGMP and data integrity failures at Mylan's *plants*," ECF No. 88 at 30, rejecting Defendants' argument that "the *Bloomberg* article relates solely to the Nashik plant," ECF No. 46 at 23 n.9. The Court thus already has issued a pleading-stage finding as to the scope of the statement, and Defendants' attempt to re-litigate this issue is improper. *See Hassel v. Centric Bank*, 2021 WL 84281, at *4 (M.D. Pa. Jan. 11, 2021) (declining "to consider the same issue using the same standard of review and [to] reach a different conclusion").

Furthermore, Defendants' interpretation of the January 31, 2019, statement presents a factual dispute that cannot be resolved through a Rule 12 motion. *See, e.g.*, *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 280 n.11 (3d Cir. 1992); *McDermid v. Inovio Pharms., Inc.*, 520 F. Supp. 3d 652, 662 (E.D. Pa. 2021) ("how investors and analysts interpreted [the defendant's] statements are questions of fact inappropriate for resolution at the motion to dismiss stage of the litigation."); *Walgreen*, 2019 WL 4597518, at *6 ("reasonable investor . . . interpret[ation]" of "reimbursement pressure" statement "is a question of fact"). As such, even if the Court had not already ruled on this issue, Defendants' arguments as to what a reasonable investor understood nevertheless should be rejected as premature.

11

In any event, the Complaint sufficiently establishes that a reasonable investor would view the January 31, 2019 statement to refer to *all* of Mylan's plants, rather than the Nashik plant alone. By its express terms, the January 31, 2019, statement is not limited to any particular time period, plant, employees, data and quality systems, medications, or potential reasons for circumventing data and quality systems. Indeed, although the statement purportedly was made with regard to comments from Nashik plant employees, Mylan's spokeswoman *expanded* the scope of her response to address "*all* medications at the company's *facilities*."[4] Accordingly, a reasonable investor would have understood the statement to refer to all of Mylan's plants, including Morgantown. *See Pirnik v. Fiat Chrysler Autos., N.V.*, 2016 WL 5818590, at *5 (S.D.N.Y. Oct. 5, 2016) (rejecting defendants' preferred interpretation because it "is not what [the statement] said, nor how it would be interpreted by a reasonable investor, let alone the only interpretation").

The context and broad focus of the January 31, 2019, *Bloomberg* article further undercuts Defendants' interpretation of Mylan's statement. The article contains an extensive discussion of the illegal and unethical data practices employed by Indian generic drug makers, including Defendant Malik's previous employer, Ranbaxy. The Complaint alleges that, unbeknownst to investors, Mylan implemented such practices at plants in the United States, including Morgantown. Mylan's use of these practices—which are described at length in the Complaint and in the January 31, 2019, *Bloomberg* article—left Mylan's manufacturing facilities, including Morgantown, "rife with systemic egregious, and long-standing CGMP and data integrity failures." ¶ 82. Thus, it was materially misleading for Mylan to unequivocally deny the use of these practices at any facility,

---

[4] Even if the Company's intent was solely to respond to allegations concerning the Nashik plant, "the subjective intent of the person or entity making the statement is irrelevant; what matters is how a reasonable investor would have interpreted the statement." *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *7 (S.D.N.Y. June 16, 2020).

by any employee, with respect to any medication, given the widespread dependence on such practices at Morgantown.

Likewise, *Bloomberg*'s yearlong investigation into and reporting about Mylan encompassed its Morgantown facility, which further undermines Defendants' already-rejected interpretation of the January 31, 2019, statement. Indeed, as reflected in the January 31, 2019, article, during its investigation, *Bloomberg* observed that "FDA inspections at factories from ***West Virginia*** [i.e., Morgantown] to China have found reason to doubt the data meant to prove that drugs made there are safe and effective." ECF No. 107-11 at 3.

Thus, notwithstanding that the Court already rejected this argument, Defendants' contention that "no reasonable investor" could have interpreted the January 31, 2019, statement to concern Morgantown defies both the plain language and context of the statement, and hinges on a premature fact-sensitive inquiry reserved for the jury. *McDermid*, 520 F. Supp. 3d at 662.[5]

### 2. The Complaint Adequately Alleges a "Causal Nexus"

Defendants contend that the Complaint fails to adequately allege a "causal nexus" between the January 31, 2019, statement and the February and May 2019 corrective disclosures because the former addresses the Nashik plant, while the latter concern remediation at Morgantown and purportedly "reveal nothing . . . regarding 'circumvented data and quality systems.'" ECF No. 106 at 9. The specificity demanded by Defendants is contrary to law. *See supra* § II.A. A corrective disclosure need only "be related to the same subject as the misrepresentation, and not some other adverse facts about the company." *In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 655 (E.D. Pa. 2015); *Vanderhoef*, 2020 WL 5105243, at *4.

---

[5] Defendants cite *Brown*, 2014 WL 523166, at *9 (C.D. Cal. Feb. 6, 2014) (cited in ECF No. 106 at 12), which is inapposite because there, unlike here, an ambiguity existed with respect to the training school to which the corrective disclosure referred. *Id.*; *see* ECF No. 88 at 30.

The Complaint plainly meets this standard. *First*, even if Defendants' proffered interpretation of the January 31, 2019, statement is credited (it should not be, *see supra* § I.B.1), the Complaint alleges the necessary linkage between Mylan's use of data manipulation tactics, including at the Company's Nashik facility and the Morgantown facility's implementation of those same tactics. *E.g.*, ¶ 147 ("Morgantown was rife with the same profound product quality failures cited in the Nashik warning letter, including widespread 'testing into compliance.'"). Indeed, the Complaint alleges that Defendants engaged in many of the same fraudulent data practices denied by the Company in the January 31, 2019, statement simultaneously at Nashik and Morgantown. *See, e.g.*, ¶¶ 115, 146. Accordingly, the only plausible inference is that the revelation of the scope and impact of Mylan's efforts to remediate these practices at its Morgantown facility corrected Mylan's January 31, 2019, statement which had denied that such practices occurred. *See, e.g.*, *KV Pharm. Co.*, 2013 WL 1831427, at *4; *Gilead*, 536 F.3d at 1054.

*Second*, the Complaint alleges the requisite linkage between the February 26 and May 7, 2019, disclosures concerning fallout from the Morgantown remediation and Mylan's practice of circumventing data quality controls at that facility. Indeed, Mylan was forced to implement the Morgantown remediation program precisely because of the existence of the data integrity issues at the facility, all of which the Complaint alleges in detail. *See, e.g.*, ¶¶ 106-44, 163-77. The Complaint further alleges that the scope and impact of these undisclosed data integrity issues at Morgantown lead to an additional FDA Warning Letter in 4Q18, increased remediation costs, and a permanent reduction in available products and revenues. *See, e.g.*, ¶¶ 178-205. In fact, the new negative financial information disclosed on February 26 and May 7 resulted largely from the expanded scope and impact of the Morgantown remediation. *See, e.g.*, ¶¶ 207-10, 217-18. Thus, there is a sufficient causal nexus between Mylan's denial of data integrity issues at its

14

manufacturing facilities and Defendants' disclosures in February and May 2019 about the Morgantown remediation program's negative impacts on Mylan financial results. *See, e.g.*, *Invacare*, 2014 WL 4064256, at \*8; *Vanderhoef*, 2020 WL 5105243, at \*4.

Because Defendants ignore these allegations and the plausible inferences they support, the case law cited in the Rule 12(c) Motion is factually inapposite. For example, in *Smith v. Antares Pharma, Inc.*, 2020 WL 2041752 (D.N.J. Apr. 28, 2020) (cited in ECF No. 106 at 10) unlike here, the plaintiff failed to connect the FDA's eventual refusal to approve a drug to the undisclosed safety risks that rendered defendants' statements materially false and misleading. Likewise, the plaintiffs in both *Payne v. DeLuca*, 433 F. Supp. 2d 547 (W.D. Pa. 2006), and *Nat'l Junior Baseball League v. PharmaNet Dev. Grp. Inc.*, 720 F. Supp. 2d 517, 558 (D.N.J. 2010) (cited in ECF No. 106 at 10-11), failed to allege sufficient facts to reasonably infer a link between the undisclosed material information and the subsequently disclosed "precarious financial condition" or the "negative financial results," respectively.[6] Moreover, at this stage of the litigation, the Court cannot credit Defendants' unsupported hypotheticals about **why** Mylan implemented a remediation program at Morgantown. The Complaint pleads that the remediation program was necessitated by unscrupulous data practices at Morgantown, and that is enough at this stage.

### 3. The Complaint Alleges the February and May 2019 Corrective Events Revealed New News

Defendants argue the corrective disclosures "still cannot establish loss causation because they revealed no new information regarding the Morgantown remediation as a matter of law." ECF No. 106 at 12 (emphasis omitted). In support of this argument, Defendants purport to summarize

---

[6] *Central States v. Federal Home Loan Mortgage. Corp.*, 543 F. App'x 72 (2d Cir. 2013) (cited in ECF 106 at 10) is inapposite because there, unlike here, "**all** relevant information was already available" and the stock price declined 40% **before** any of the alleged corrective events. *Id.* at 77.

disclosures they made on August 8, 2018, and November 5, 2018. *Id.* at 11-12. However, Defendants' arguments ignore the Complaint's extensive allegations about these disclosures, *see e.g.*, ¶¶ 187-90, 193-94, and the relevant truth, which remained concealed until February 26 and May 7, 2019, *see, e.g.*, ¶¶ 207-10, 217-18, creating factual disputes that cannot be resolved at the pleading stage. *See, e.g.*, *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 482 (2013) (whether "news of the [truth] credibly entered the market and dissipated the effects of [prior] misstatements . . . is a matter for trial"); *EQT*, 504 F. Supp. 3d at 492.

Defendants' motion also ignores the stock price declines following the February 26 and May 7, 2019, disclosures. *See, e.g.*, ¶¶ 212, 219; *First Solar*, 881 F.3d at 754 (noting "[t]hat a stock price drop comes immediately *after* the revelation of fraud can help to rule out alternative causes") (emphasis in original); *Vanderhoef*, 2020 WL 5105243, at *4. Likewise, Defendants ignore the analyst commentary quoted in the Complaint, which demonstrates that the information disclosed on February 26 and May 7 was new negative news, *see, e.g.*, ¶¶ 215-16, 220; *Gilead*, 536 F.3d at 1054; *In re Boeing Co. Aircraft Sec. Litig.*, 2022 WL 3595058, at *29 (N.D. Ill. Aug. 23, 2022) (finding loss causation met when "analyst statements show[ed] concern about this revelation"); *Walgreen*, 2019 WL 4597518 *8 (loss causation allegations plausible given analyst report supporting proposed causal connection).

Defendants contend that disclosures of "ongoing impacts" from "already disclosed issues cannot establish loss causation." ECF No. 106 at 13-14. However, this argument presumes that ongoing impacts can never be new news, which is incorrect, *see Invacare*, 2014 WL 4064256, at *7 (rejecting argument that disclosures relating to regulatory noncompliance "were simply confirmatory of what was already known in the market"), and is not supported by Defendants' cited authorities. Here, the Complaint alleges that these disclosures revealed for the first time that

16

the reduction in volume and products at Morgantown was permanent and had resulted in previously undisclosed negative financial results. ¶¶ 207-21. This was all "new information," *Hall*, 2019 WL 7207491, at *27, making Defendants cited authority, ECF No. 106 at 13-14, inapposite.[7]

## II.    THE COMPLAINT ADEQUATELY ALLEGES A SCHEME CLAIM

As this Court already held, the Complaint adequately alleges that Defendants violated Section 10(b) and Rule 10b-5(a) and (c) by engaging in a scheme through which Defendants concealed from investors Mylan's systemic and repeated violations of key FDA safety and quality regulations. *See, e.g.*, ¶¶ 1, 13, 82, 86, 93, 119, 120, 155-56. Defendants seek to dismiss the scheme claim on the grounds that (i) the MTD Order ***must*** limit the scheme claim to the sole sustained misrepresentation in this case because there can be no reliance otherwise as a matter of law; and (ii) when limited to the single misrepresentation, the scheme claim should be dismissed on the same loss causation grounds as the misrepresentation claim, notwithstanding the liberal notice pleading requirements that apply. Defendants are wrong.

As explained in the Clarification Motion, which Defendants largely fail to address, Defendants' core premise—that a misrepresentation is required to allege a scheme claim—flies in the face of Supreme Court precedent. The Supreme Court has made clear that scheme liability does not require "a specific oral or written statement" *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 158 (2008); *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 235 F. Supp. 2d 549, 585 (S.D. Tex. 2002). Because Defendants' fraudulent conduct prevented Mylan's egregious regulatory violations from entering the public sphere, as the Complaint alleges, reliance may be presumed under either the "fraud-on-the-market" theory of reliance the Supreme Court

---

[7] Whether Plaintiff has (or can) "establish," ECF No. 106 at 13, that the alleged corrective disclosures contained new news cannot be decided under Rule 12, which Defendants necessarily concede by relying on a Second Circuit summary judgment decision. ECF No. 106 at 13.

17

articulated in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988), or the presumption of reliance "involving primarily a failure to disclose," which the Supreme Court articulated in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972). "Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Affiliated Ute,* 406 U.S. at 153-54.[8]

**A.  Defendants Ignore Decades of Precedent, Including from the Supreme Court, Holding that No Misstatement Is Required to Allege Scheme Liability Under Rule 10b-5(a) or (c)**

Defendants' arguments contravene Supreme Court precedent, which has "made crystal clear that a misrepresentation need not be involved and that a suit could be based on Rule 10b-5(a) or (c)." *Enron*, 235 F. Supp. 2d at 585 (citing *SEC v. Zandford*, 535 U.S. 813 (2002)). "To state a valid claim for 'scheme liability' under Rule 10b-5(a) or (c)," a complaint need only "allege (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, 2020 WL 3026564, at *16 (D.N.J. June 5, 2020). While Rule 10b-5(b) claims are predicated on deceptive statements or material omissions, "[s]cheme liability is not contingent upon the defendant making a specific misrepresentation or public statement." *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1197 (D. Or. 2015). In fact, as discussed in the Clarification Motion, ECF No. 95 at 4-5, 8, the Supreme Court has, repeatedly explained that scheme liability

---

[8] In *Affiliated Ute*, the Supreme Court held that the Court of Appeals "erred" when it found "no violation of [] Rule [10b-5] unless the record disclosed evidence of reliance on material fact misrepresentations by" certain individual defendants. 406 U.S. at 152-53. By undertaking "a 'course of business' or a 'device, scheme, or artifice' that operated as a fraud upon the [] sellers," "the individual defendants engaged in "activities" foreclosed by Rule 10b-5(a) or (c), ***regardless of whether they made misrepresentations***. *Id.* ("It is no answer to urge that . . . these defendants may have made no positive representation or recommendation.").

does not require "a specific oral or written statement," *Stoneridge*, 552 U.S. at 158; *Enron*, 235 F. Supp. 2d at 585 (citing *Zandford*, 535 U.S. 813).

As the Court has held, the Complaint adequately alleges the required elements of a scheme claim. The Complaint's allegations describe "pervasive" and "top-down" misconduct designed "to dupe the FDA and ignore regulatory compliance best practices in the name of juicing manufacturing output and increasing corporate profits." ECF No. 88 at 35. More specifically, the Complaint alleges that by the start of the Class Period, i.e., February 16, 2016, Defendants had implemented a fraudulent scheme to conceal from the FDA, and thus from investors, material violations of the FDA's quality and safety regulations in an effort to maximize output at its manufacturing plants, and inflate Mylan's revenues and profits. ¶¶ 106-44. Their deceptive conduct included, but was not limited to, covering up egregious CGMP violations through widespread acts of data fraud, such as (i) retesting out-of-specification drug products and equipment until passing results were obtained, ¶¶ 109-15, (ii) pre-injecting drug samples to avoid recording failed results, ¶¶ 116-19, (iii) manipulating test reports, ¶ 120, and (iv) bypassing required quality risk assessments, ¶¶ 121-25. Further, the Complaint alleges that Mylan continued to conceal its regulatory violations from the FDA, and thus from the public, by creating a "façade of documents" designed to create the illusion of compliance. ¶¶ 150-62.

In this case, of course, Mylan's required compliance with CGMP was well-known to investors and the subject of numerous risk disclosures issued by the Company. *See, e.g.*, ¶¶ 43-61, 269, 274. Thus, Mylan's scheme to conceal its lack of compliance from investors clearly was "in connection with" transactions in Mylan's common stock; the market relied on Defendants' unlawful material omissions; and when the relevant truth came out, Mylan's stock price

19

plummeted. *See* ECF No. 106 at 18, n.14 & 20.[9] Indeed, Defendants' fraudulent scheme had the intended effect of keeping Mylan's regulatory non-compliance out of the public sphere. When the FDA publicly revealed Mylan's regulatory violations and data fraud, Defendants' were finally forced to disclose the negative financial consequences of Mylan's violations and thereby caused investors to suffer massive losses. ¶¶ 19-20. Thus, Defendants' fraudulent and deceptive misconduct is actionable under Rule 10b-5(a) and (c).[10]

### 1.  The Complaint Adequately Alleges Reliance for the Scheme Claim

Defendants argue that their reading of the MTD Order, under which they contend that the Court limited the scheme claim to the January 31, 2019, statement, must be correct because an affirmative misrepresentation is the only way to establish reliance for deceptive conduct.[11] Not so. The Supreme Court has articulated two means for invoking a presumption of class-wide investor reliance in cases arising under Section 10(b): one under *Affiliated Ute* and another under *Basic*. Neither requires an affirmative misrepresentation., and Plaintiff's scheme claim satisfies both.

---

[9] Requiring Plaintiff to allege a "challenged statement" in order to establish reliance, loss causation, or the "in connection with" requirement under Section 10(b) and Rule 10b-5 is contrary to the Exchange Act and Supreme Court precedent and none of Defendants' authority (where any authority is cited) supports this view of scheme claims. *See* ECF No. 106 at 18, n.14, 20. In any event, because the Complaint adequately alleges that Defendants' deceptive conduct deceived ***investors***, Defendants' arguments fall flat.

[10] Defendants claim that Plaintiff must show they "injected inaccurate information into the marketplace," ECF No. 106 at 16 (quoting *Noto v. 22nd Century Grp., Inc.*, 35 F. 4th 95, 1-6 (2d Cir. 2022)), but they cite a standard that applies to scheme claims challenging market manipulation—i.e., conduct designed to affect the supply or demand for a security. That standard is inapplicable here, as the Complaint does not allege market manipulation.

[11] Defendants have ***not*** moved for judgment on the pleadings on the issue of reliance. *E.g.*, ECF No. 106 at 18. Nevertheless, this brief explains how the Complaint sufficiently pleads reliance so that the issue is fully briefed should the Court reach it.

In *Affiliated Ute*, which notably involved petitioners to whom "defendants may have made ***no positive representation or representation***," the Supreme Court "conclude[d]" that "the Court of Appeals erred when it held that there was no violation of" Rule 10b-5 "unless the record disclosed evidence of reliance on material fact misrepresentations" because the language of Rule 10b-5(a) and (c) "[is] not so restricted." 406 U.S. at 152-53. Accordingly, where a plaintiff alleges Section 10(b) claims "involving primarily a failure to disclose" material information, like the Rule 10b-5(a) and (c) claims at issue in *Affiliated Ute* and here, "positive proof of reliance is not a prerequisite to recovery." *Id.* at 153. Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Id.* at 153-54 ("[t]his obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact") *Id.* at 154; *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 289 (D. Minn. 2018) (applying *Affiliated Ute* absent an affirmative misrepresentation); *see also Wilson v. Comtech Telecomms. Corp.*, 648 F.2d 88, 93 (2d Cir. 1981) (reliance "may be established" where "nondisclosure of the information withheld is found to be material"). Thus, the reliance presumption applied to a class of investors to whom *"**no positive representation**"* had been made. *Affiliated Ute*, 406 U.S. at 154.

The Complaint properly invokes the *Affiliated Ute* reliance presumption, alleging that Defendants engaged in a multi-year scheme to defraud investors by concealing its egregious and pervasive non-compliance with FDA safety and quality regulations. In furtherance of this scheme, Defendants directed Mylan employees to destroy test data and commit various other acts of data fraud—facts that were plainly material to investors, as evidenced by, among other things, the substantial declines in Mylan stock when the truth was disclosed. ¶¶ 85-177, 341. Nothing more is required at the pleading stage. *See, e.g., In re FirstEnergy Sec. Litig.*, 2022 WL 681320, at *26

21

(S.D. Ohio, Mar. 7, 2022) (holding that "[a]ll that is necessary" to create a presumption of reliance "is that the facts withheld be material"). Indeed, Defendants fail to argue that the *Affiliated Ute* presumption is inapplicable or insufficiently pled.

The Complaint also pleads class-wide reliance by means of the fraud-on-the-market presumption articulated in *Basic*. To invoke the *Basic* presumption for a Rule 10b-5(a) and (c) scheme liability, a plaintiff need only allege that defendants "presented a deceptive public-facing 'cover' that would be reflected in share prices and relied upon by investors." *Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2023 WL 2592134, at *20 (M.D. Tenn. Feb. 24, 2023) (quoting *FirstEnergy*, 2022 WL 681320, at *27). Here, the Complaint alleges that Defendants engaged in a fraudulent scheme to conceal Mylan's egregious violations of FDA regulations from the public. The Complaint further alleges that, as a result of this fraudulent scheme, Mylan's common stock traded at artificially inflated prices that failed to reflect the relevant truth concealed by Defendants' misconduct. Finally, the Complaint alleges that when the FDA uncovered Defendants' scheme, Defendants were forced to disclose the relevant truth about the ongoing regulatory violations at key Mylan plants, causing Mylan's common stock to decline as the artificial inflation in the stock's price dissipated. These allegations more than adequately plead reliance under *Basic*.

Contrary to Defendants' arguments, a plaintiff is ***not*** required to show that the "***deceptive acts*** underlying the scheme were communicated to the public." ECF No. 106 at 17. *See AAC Holdings*, 2023 WL 2592134, at *20. Indeed, as courts have pointed out, Defendants' argument makes no sense "because, naturally, 'for a scheme to succeed, it has to be concealed from shareholders.'" *Id.* (quoting *FirstEnergy*, 2022 WL 681320, at *27). The cases Defendants cite are not contrary—they involve secondary actors who had little or no control over disclosure of the scheme or conduct that was, at best, incidental to concealment of material information. In fact,

22

there, none of the defendants' conduct "made it necessary or inevitable" that the material information concealed by the scheme would remain concealed. *Stoneridge*, 552 U.S. at 161, 164 (refusing to expand Section 10(b) liability to "a new class of defendants"). Here, by contrast, the scheme was perpetrated by Mylan and its highest-ranking executives—precisely the type of defendants that typically are liable under Section 10(b). And their deceptive acts "made it necessary or inevitable" that Mylan's regulatory violations would remain concealed from the public, because they were ***specifically designed*** to do so.[12]

Defendants also argue that Mylan, "at most . . . deceived the FDA—not investors." ECF No. 106 at 18, n.14. But this argument misses the point. Mylan is a manufacturer of pharmaceutical products, and its ability to market and sell drugs—and thus recognize profits for the benefit of investors—is wholly dependent upon its continuing compliance with FDA regulations. ¶ 43. Indeed, through the scheme alleged in the Complaint includes acts of deception and concealment related to interactions with the FDA, the ***fundamental purpose*** of that scheme was to market and sell drugs in a manner that did not comply with the FDA's quality and safety regulations "in the name of juicing manufacturing output and increasing corporate profits." ECF No. 88 at 35.

Furthermore, "CGMP and data integrity compliance is not only essential to consumer protection, ***it is highly material to investors***." ¶ 61. And that makes perfect sense because as Mylan's primary regulator, the FDA is the gatekeeper of Mylan's ability to sell drugs, and thus, to generate profits. When the FDA finally publicly revealed the extent of Mylan's regulatory

---

[12] Defendants' unsupported argument that a security's price cannot become artificially inflated absent an affirmative misrepresentation has no basis in law, economics, or logic. As numerous courts have explained, material omissions have the effect of maintaining a company's stock price at levels that do not reflect undisclosed negative news. *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, 2015 WL 5097883 at *12 n. 8 (D.N.J. Aug. 31, 2015); *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2016 WL 4138613, at *14 (E.D. Pa. Aug. 4, 2016); *see also Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 418 (7th Cir. 2015).

violations and data fraud, Defendants were forced to disclose the material negative financial consequences of their fraudulent scheme, causing investors to suffer massive losses. In other words, Defendants engaged in a "pervasive, top-down scheme to dupe the FDA" in order to prevent investors from learning that Mylan was sacrificing drug quality and safety and enable Mylan to "juic[e] manufacturing output and increasing corporate profits." ECF No. 88 at 35.

Moreover, Defendants' assertion that Mylan's violations of the FDA's quality and safety regulations are not a basis for a scheme claim cannot be squared with *Able Laboratories*, an in-circuit decision that Defendants do not address at all, even though it is discussed at length in the Clarification Motion. ECF No. 95 at 8-10. There, as here, the defendants' "deceptive conduct effectuated the continued manufacturing and distribution of [the company's] products, while concealing its noncompliance with FDA regulations." *In re Able Lab'ys Sec. Litig.*, 2008 WL 1967509, at *21 (D.N.J. Mar. 24, 2008). Defendants' cases are readily distinguishable, as they bear no resemblance to the scheme alleged in the Complaint, which is nearly identical to the actionable scheme at issue in *Able Laboratories*. *See id.*

### 2. The Complaint Adequately Alleges Loss Causation for the Scheme Claim

Defendants argue that the Complaint fails to plead loss causation for the scheme claim for the same reasons it failed to plead loss causation for the misrepresentation claim. ECF No. 106 at 18. This argument rests on the flawed premise that the scheme claim is limited to the January 31, 2019, misrepresentation. It is not. But if even if it were, the Complaint adequately alleges a causal nexus between this misrepresentation and the February and May 2019 disclosures. *See supra* Section II. In any event, the Complaint sufficiently alleges that the relevant truth concealed by Defendants' fraudulent scheme was revealed in part through an additional two corrective disclosures made in June and August 2018. *See supra* at 3-4. Together, these four corrective

disclosures exposed the extent of Defendants' fraudulent scheme, which Defendants previously had concealed, thereby erasing billions in shareholder value. *See supra* at 3-5 (citing ¶¶ 16-19, 330). These allegations plainly plead loss causation under Rule 8(a).

### B.    The Scheme Claim Does Not "Bypass" the Requirements of Rule 10b-5(b)

Styled as an "alternative ground" for dismissal, Defendants contend that Plaintiff is "invok[ing] scheme liability to bypass" Rule 10b-5(b). ECF No. 106 at 19-20.[13] This argument, however, is nothing more than a repackaging of Defendants' already-rejected "entirely derivative" argument and therefore is easily rejected. Far from "exclusively" relying on misrepresentations, the Complaint alleges that: (i) Defendants made misrepresentations "and engaged in a scheme to deceive the market," (ii) "Defendants' scheme artificially inflated the price of Mylan stock and operated as a fraud and deceit on the Class," and (iii) "[a]s a result of Defendants' . . . fraudulent course of conduct, Mylan's common stock traded at artificially inflated prices during the Class Period." ¶ 328. The Complaint also provides specific examples of Defendants' deceptive conduct. *See, e.g.*, ¶¶ 86, 93, 109-10, 119-20, 155-56.[14] This language plainly encompasses misrepresentations, which are actionable under Rule 10b-5(b), and deceptive conduct, which is actionable under Rule 10b-5(a) and (c).

### CONCLUSION

For the foregoing reasons, Plaintiff respectfully submits that the Court should grant the Clarification Motion and deny the Rule 12(c) Motion.

---

[13] Defendants' selectively quote loss causation allegations to assert that Plaintiff only advances a theory under Rule 10b-5(b). ECF No. 106 at 19, but as detailed above, the scheme claim is predicated on Defendants' deceptive conduct, which concealed material facts from investors. The allegations cited by Defendants support this theory of liability. *Id.*

[14] Because the Complaint alleges conduct beyond misstatements, Defendants' cases are inapposite. ECF No. 106 at 20.

Dated: August 31, 2023

Respectfully submitted,

*/s/ Andrew L. Zivitz*
Andrew L. Zivitz (PA I.D. # 76554)
David A. Bocian (PA I.D. # 315542)
Nathaniel C. Simon (PA I.D. # 326467)
**KESSLER TOPAZ MELTZER**
**& CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel.: (610) 667-7706
Fax: (610) 667-7056
azivitz@ktmc.com
dbocian@ktmc.com
nsimon@ktmc.com

Jennifer L. Joost (PA I.D. # 204193)
(*Pro Hac Vice* forthcoming)
**KESSLER TOPAZ MELTZER**
**& CHECK, LLP**
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel.: (415) 400-3000
Fax: (415) 400-3001
jjoost@ktmc.com

Salvatore Graziano (admitted Pro Hac Vice)
Katherine M. Sinderson (admitted Pro Hac Vice)
Abe Alexander (admitted Pro Hac Vice)
**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Tel.: (212) 554-1400
Fax: (212) 554-1448
salvatore@blbglaw.com
katiem@blbglaw.com
abe.alexander@blbglaw.com

Caitlin C. Bozman (admitted Pro Hac Vice)
Chloe Jasper (admitted Pro Hac Vice)
**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
2121 Avenue of the Stars, Suite 2575

26

Los Angeles, CA 90067
Tel.: (310) 819-3470
caitlin.bozman@blbglaw.com
chloe.jasper@blbglaw.com

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

John Davidson (admitted Pro Hac Vice)
**DAVIDSON BOWIE, PLLC**
1062 Highland Colony Parkway, Suite 275
Ridgeland, MS 39157
Telephone: (601) 932-0028
jdavidson@dbslawfirm.net

*Additional Counsel for Lead Plaintiff Public
Employees' Retirement System of Mississippi*

Colin Callahan (PA I.D. # 328033)
**FLANNERY GEORGALIS, LLC**
707 Grant Avenue, Suite 2750
Pittsburgh, PA 15219
Telephone: (412) 254-8602
ccallahan@flannerygeorgalis.com

*Liaison Counsel for Lead Plaintiff*

27