# Exhibit B

🚩 KeyCite Yellow Flag

Declined to Extend by   Chicago & Vicinity Laborers' District Council Pension Fund v. Amplitude, Inc.,   N.D.Cal.,   January 13, 2025

2024 WL 4053009

**NOT FOR PUBLICATION**

United States District Court, D. New Jersey.

IN RE COINBASE GLOBAL,
INC. SECURITIES LITIGATION

Case No. 2:22-cv-04915 (BRM) (LDW)

|

Signed September 5, 2024

**OPINION**

Martinotti, District Judge

**\*1** Before the Court is a Motion to Dismiss (ECF No. 78) Plaintiffs' Second Amended Consolidated Class Action Complaint [1] ("SAC") (ECF No. 68) pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) filed by Defendants Coinbase Global, Inc. ("Coinbase" or the "Company"), Brian Armstrong ("Armstrong"), Alesia J. Haas ("Haas"), Emilie Choi ("Choi"), Paul Grewal ("Grewal"), Jennifer Jones ("Jones"), Marc Andreessen ("Andreessen"), Frederick Ernest Ehrsam III ("Ehrsam"), Kathryn Haun ("Haun"), Kelly Kramer ("Kramer"), Gokul Rajaram ("Rajaram"), and Fred Wilson ("Wilson") (collectively, "Defendants"). [2] Plaintiffs filed an Opposition (ECF No. 79), and Defendants filed a Reply (ECF No. 80). Having reviewed the parties' submissions filed in connection with the Motion and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause having been shown, Defendants' Motion to Dismiss (ECF No. 78) is **GRANTED IN PART** and **DENIED IN PART**.

**I. BACKGROUND**

**A. Factual Background**

For the purposes of the Motion to Dismiss, the Court accepts the factual allegations in the SAC as true and draws all inferences in the light most favorable to Plaintiffs. See Phillips v. Cnty. of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008). The Court also considers any "document *integral to or explicitly*

*relied* upon in the complaint." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting Shaw v. Digit. Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996)).

This is a federal securities putative class action on behalf of persons and entities that purchased or otherwise acquired: (i) Coinbase common stock from April 14, 2021 through June 5, 2023, inclusive (the "Class Period"), and were damaged thereby; and (ii) Coinbase common stock in or traceable to Coinbase's Registration Statement and/or Prospectus (collectively, the "Offering Materials"). (ECF No. 68 at 1.) Generally, Plaintiffs allege Defendants misrepresented, concealed, and/or omitted significant, material aspects of Coinbase's business during the Class Period which enabled Defendants to reap financial benefits such as cashing out existing shares at inflated values following Coinbase's public listing. [3] (*See generally id.*)

**\*2** Coinbase is a cryptocurrency platform launched in 2012 that enables its customers to buy, sell, and store digital assets. [4] (*Id.* ¶¶ 1, 43.) The platform was originally designed only for Bitcoin, but has exponentially expanded in recent years, and now supports over 240 crypto assets. (*Id.* ¶ 50.) Coinbase generates "substantially all" of its revenue from the transactions fees its retail customers pay to trade crypto assets. (*Id.* ¶¶ 2, 68–69.) During the Class Period, Coinbase's success depended on its ability to increase its customer base and its transaction-fee revenue. (*Id.* ¶¶ 3, 70.) One of the Company's main obstacles to growth was persuading customers that the platform was a safe place to invest. (*Id.* ¶¶ 4, 93.) Many potential customers were deterred by cryptocurrency's unsafe and unregulated reputation, underscored by: (i) customers' losses on other cryptocurrency exchanges due to insolvency or hacking; and (ii) the fact no government entity insures crypto assets against such losses. (*Id.* ¶¶ 4, 94–95.) As a result, Coinbase's ability to grow its customer base was dependent on assuring potential customers that Coinbase could keep assets safe. (*Id.* ¶¶ 4, 93.) Defendants recognized this dependence and repeatedly emphasized Coinbase was a "trusted" place to safely store customer assets. (*Id.* ¶¶ 89, 129.) Analysts thereafter noted Coinbase's advantage as a "trusted platform with a focus on security." (*Id.* ¶ 91.)

On January 28, 2021, Coinbase announced plans to go public through a direct listing (the "Direct Listing"). [5] (*Id.* ¶¶ 5, 72.) Armstrong—a co-founder, the chief executive officer, and chairman of the Company's board—was highly motivated to complete the Direct Listing as doing so would allow him to cash out his shares and entitle him to a compensation

package valued at over $3.7 billion. (*Id.* ¶¶ 6, 81–82.) During this time, Defendants knew investors were focused on the stability and security of Coinbase's transaction fee revenues; therefore, Defendants made numerous representations about Coinbase's ability to generate revenue and the attendant risks to its business in the Offering Materials contemporaneously filed with the Direct Listing. (*Id.* ¶ 9.)

On April 14, 2021, Coinbase "made a rousing debut on Wall Street," with shares opening at $381 per share which was over $100 above its initial reference price. (*Id.* ¶¶ 8, 122–24.) The Executive Defendants and other Coinbase insiders collectively sold over $5 billion in common stock through the Direct Listing. (*Id.* ¶¶ 8, 125–26.) Armstrong, Choi, [6] and Haas [7] made over $290 million, $223 million, and $99 million in sales proceeds, respectively, in the first two days of the Direct Listing. (*Id.* ¶¶ 125, 387.) Armstrong was motivated to keep Coinbase's stock price high as the Company had to maintain certain stock prices for 60 trading days in order for Armstrong to unlock "tranches" of stock options under his compensation plan. (*Id.* ¶¶ 81–84, 386.) On July 8, 2021, Armstrong received the first tranche valued at over $697 million. (*Id.* ¶ 386.) In total, Armstrong, Choi, Haas, and Grewal [8] netted gross proceeds of approximately $323 million, $429 million, $115 million, and $65 million, respectively, from shares sold during the Class Period. (*Id.* ¶ 125.)

### B. Defendants' Alleged Misrepresentations and Omissions [9]

#### 1. The Bankruptcy Risk Statements

**\*3** During the Class Period, Defendants warned investors in a series of disclosures (the "Asset Safety Disclosures") that "[o]ur failure to safeguard and manage our customers' ... assets could adversely impact our business, operating results and financial condition." (*Id.* ¶¶ 96–97, 258–59, 270, 273, 276, 284.) Coinbase acknowledged it faced two risks in safeguarding customers' assets: (i) hacking; and (ii) the "loss or destruction of private keys." (*Id.*) Plaintiffs allege Defendants misleadingly concealed a third risk to the security of customers' assets: risks associated with a potential bankruptcy of Coinbase. (*Id.* ¶¶ 11, 98.) Specifically, in the event Coinbase filed bankruptcy, its customers' assets could become part of the bankruptcy estate rendering those

customers' assets as unsecured credits with little chance of recovering their deposits. (*Id.*)

In 2019, Defendants investigated whether its institutional customers' assets would become part of the Company's estate if the Company became insolvent. (*Id.* ¶¶ 13, 105–09.) Following the investigation, Coinbase submitted a comment letter to the SEC (the "SEC Comment Letter"), which demonstrates Defendants' understanding that the commingling of customers' assets could lead to adverse consequences in the event of a bankruptcy. (*Id.*) Thereafter, Defendants took affirmative steps to mitigate the potential bankruptcy risks to institutional customers' assets by not commingling assets and invoking the protection of the Uniform Commercial Code. (*Id.* ¶¶ 14–16, 112–20.) Plaintiffs allege Defendants knew Coinbase had not taken steps to protect its retail customers; instead, Defendants had increased the risk to customers' assets by commingling those assets with others in an omnibus account. (*Id.*)

On March 24, 2022, the SEC published Staff Accounting Bulletin 121 ("SAB 121"), which provided that there were "significant legal questions surrounding" how customers' crypto assets "would be treated in a court proceeding arising from an adverse events (e.g., fraud, loss, theft, or bankruptcy)." (*Id.* ¶ 131.) The SEC advised "[t]hese risks can have a significant impact on the entity's operations and financial condition." (*Id.*) Further, the SEC recommended that public companies address the potential risks associated with a bankruptcy in public filings. (Defs.' Ex. 23, SAB 121 (ECF No. 78-26 at 4)); *see also* ECF No. 68 ¶ 132.)

Shortly thereafter, on May 10, 2022, Coinbase filed its quarterly Form 10-Q report which revised the Asset Safety Disclosures and disclosed the asset safety risk in compliance with SAB 121. (*Id.* ¶ 231.) As a result of this disclosure, Coinbase's stock price declined more than 26%. [10] (*Id.* ¶ 233.) Plaintiffs allege Defendants knew this asset safety risk was highly material to investors, as evidenced by Coinbase's concession that it was likely customers would find "custodial services more risky," resulting in a "discontinuation or reduction in use of [Coinbase's] platform" if the asset safety risk had been disclosed earlier. (*Id.* ¶¶ 103, 121.) Further, after the Company filed the May 10, 2022 Form 10-Q report, Armstrong conceded that Coinbase: "should have updated our retail terms sooner" to provide retail customers with "the same protections" as institutional customers (*id.* ¶¶ 121, 232); "didn't communicate proactively when this risk disclosure was added," (*id.*); knew that even the "protections" included

for institutional clients "have not been tested in court" and did not guarantee safety (*id.* ¶¶ 101, 111, 232).

### 2. The Proprietary Trading Statements

Prior to the Class Period, the market was concerned Coinbase might engage in proprietary trading of crypto assets—*i.e.*, trading with Coinbase's own money. (*Id.* ¶¶ 17–18.) When asked whether Coinbase did or would proprietarily trade, Defendants issued unequivocal denials in March and December 2021. (*See, e.g.*, *id.* ¶¶ 18, 138–39 (Coinbase "does not proprietarily trade against our clients."); *id.* ¶ 140 ("[W]e do not plan to engage in regular trading of crypto assets."); *id.* ¶¶ 18, 142 (Coinbase "do[es] not engage in proprietary trading."). In various SEC filings during the Class Period, Coinbase disclosed that it purchased crypto as assets as "long-term" investments, and also to "fulfill customer transactions," but did "not plan to engage in regular trading of crypto assets." (*Id.* ¶¶ 294–97, 300–08, 312–15, 325–38.)

**\*4** On September 22, 2022, the Wall Street Journal ("WSJ") published an article (the "WSJ Article" or the "September 22, 2022 WSJ Article") revealing Coinbase's alleged proprietary trading venture which resulted in Coinbase's stock price dropping 6.9%. (*Id.* ¶¶ 32, 241–43; Defs.' Ex. 1, September 22, 2022 WSJ Article (ECF No. 78-4).) The WSJ reported Coinbase formed a proprietary trading unit in July 2021 and hired at least four Wall Street traders with the intent to use the Company's own cash to trade crypto on behalf of clients. [11] (*Id.* ¶ 144.) By early 2022, the proprietary trading unit had built sophisticated trading systems and used those systems to trade $100 million raised through a structured note. (*Id.* ¶ 147.) Although this unit was allegedly profitable for Coinbase, the WSJ detailed that the Company "discouraged" employees "from sharing information about the new trading business or discussing it in internal communications." (*Id.* ¶ 242.) Thereafter, on the same date, Coinbase issued a blog post which provided "Coinbase does not operate a proprietary trading business or act as a market maker." (Defs.' Ex. 6, September 22, 2022 Blog Post (ECF No. 78-9 at 41).) The Company also noted it "does, from time to time, purchase cryptocurrency as principal, including for our corporate treasury and operational purposes. [But] [w]e do not view this as proprietary trading because its purpose is not for Coinbase to benefit from short-term increases in value of the cryptocurrency being traded." (*Id.*; *see also* ECF No. 68 ¶ 244.) Market commentators reacted negatively to the WSJ article and reported that "Coinbase's foray into prop trading could fray the lines of trust between the company's executives and its investors." (*Id.* ¶¶ 32, 245–46.)

### 3. The Regulatory Statements

The final category of Defendants' challenged actions are related to Plaintiffs' claim that Defendants downplayed the likelihood that the SEC would bring an enforcement action. (*Id.* ¶¶ 178, 342, 345, 357.) Plaintiffs allege Defendants continuously and knowingly concealed that Coinbase listed crypto assets from 2019 through 2021 that it knew were likely securities to grow its business and boost revenues. (*Id.* ¶¶ 25, 182–83, 379.) Since 2017, the SEC has made it clear that many crypto assets qualify as securities, and that platforms where these securities trade must register with the SEC to avoid an enforcement action. (*Id.* ¶¶ 154–66, 169–70.) The SEC has brought multiple enforcement actions against companies for failure to register crypto asset securities. (*Id.* ¶¶ 172–76.)

In 2019, Coinbase co-founded the Crypto Rating Council (the "CRC") to create a framework for assessing whether a crypto asset was likely a security. (*Id.* ¶¶ 179–81.) The Company stated that it examined each asset before it was listed to determine whether it was a security. (*Id.*) Additionally, Coinbase told investors that it was rigorously applying the framework and only "permit[ting] trading on our core platform of those crypto assets for which we determine there are reasonably strong arguments to conclude that the crypto asset is not a security." (*Id.* ¶ 188.) Analysts lauded Coinbase's "compliance infrastructure" and called the Company's "rigorous[ ] adher[ence]" "a key differentiating factor." (*Id.* ¶¶ 189–90 (alteration in original).)

By the spring of 2022, the SEC had begun actively investigating Coinbase for securities law violations. (*Id.* ¶ 150.) In July 2022, the SEC and the United States Department of Justice charged a former Coinbase manager with insider trading of crypto securities on Coinbase's platform. (*Id.* ¶ 196.) Thereafter, on July 21, 2022, the Company stated: "Coinbase does not list securities. End of story." (*Id.* ¶ 197.) Coinbase further noted that the Company "has a rigorous process to analyze and review each digital asset—a process that the SEC itself has reviewed.... [W]e remain confident that Coinbase's rigorous review process keeps securities off Coinbase's platform." (*Id.* ¶ 197.)

Four days after Coinbase's denials, Bloomberg News reported that the SEC was investigating whether Coinbase "let Americans trade digital assets that should have been registered as securities." (*Id.* ¶¶ 31, 200, 238.) Coinbase's stock price then declined 21%. (*Id.* ¶ 201.) Defendants responded by assuring investors; Grewal stated that "we are confident that our rigorous diligence process—a process the SEC has already reviewed—keeps securities off our platform." (*Id.* ¶ 202.)

In reality, the SEC had begun to take a "totally different tone," and told Defendants that "we think everything other than Bitcoin is a security." (*Id.* ¶¶ 151, 378.) Defendants met with the SEC over 30 times between June 2022 and March 2023 and provided witnesses for testimony including a witness to testify as to Coinbase's staking services. [12] (*Id.* ¶¶ 209, 378.) Armstrong later conceded that they were aware of the SEC's position by mid-2022. (*Id.*)

 **\*5**  In January 2023, the SEC privately informed Defendants it was pursuing an enforcement investigation against the Company. (*Id.* ¶¶ 209, 378.) Although Defendants knew Coinbase faced "an imminent enforcement action," Defendants continued to minimize the risks of a regulatory action. (*Id.* ¶¶ 209–15.) After the SEC shut down a rival company's staking program, Coinbase claimed its staking services were "fundamentally different" and that "Coinbase's staking services are not securities." (*Id.* ¶¶ 210–15.) On March 22, 2023, Coinbase disclosed it had a received a Wells Notice from the SEC and that the potential securities fraud violations related to a "portion of our listed digital assets" and "our staking service." (*Id.* ¶¶ 33, 219, 247–48.) Based off this news, Coinbase's stock price dropped 14%. (*Id.* ¶¶ 33, 249.)

On June 6, 2023, the SEC filed a complaint (the "SEC Complaint") alleging that Coinbase had made crypto securities available on its platform assets "even where it recognized [they] had the characteristics of securities," and failed to register "with the SEC ... thus evading the disclosure regime that Congress has established for our securities markets." (*Id.* ¶¶ 221–25, 253–54.) The SEC investigation revealed that Coinbase added assets "even where it recognized [they] had the characteristics of securities." (*Id.* ¶¶ 25, 183, 222, 379.) The SEC Complaint detailed Coinbase's conduct in "elevat[ing] its interest in increasing its profits over investors' interests, and over compliance with the law and the regulatory framework that governs the securities markets and was created to protect

investors and the U.S. capital markets." (*Id.* ¶¶ 34, 253, 405.) Thereafter, Coinbase's stock fell over 12%. (*Id.* ¶ 255.)

### C. Allegations Related to Claims Brought Pursuant to the Securities Act of 1933 (the "Securities Act")

In Counts III–V, Plaintiffs bring claims arising under the Securities Act. [13] In these claims, "Plaintiffs assert strict liability and negligence claims." (*Id.* ¶ 437.) Plaintiffs assert the Securities Act Defendants are "statutorily liable under Sections 11 and 12(a)(2) of the Securities Act for the materially inaccurate statements contained in the Offering Materials." (*Id.* ¶ 438.) Plaintiffs submit the claims in Counts III–V "do not sound in fraud, and Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims." (*Id.* ¶ 441.)

On February 25, 2021, Coinbase filed its initial Registration Statement. (*Id.* ¶ 444.) Thereafter, on March 23, 2021, Coinbase filed its final amendment to the Registration Statement. (*Id.*) The Company's Registration Statement was declared effective by the SEC on April 1, 2021. (*Id.* ¶ 445.) The Form S-1 was signed by Armstrong, Haas, Jones, and the Director Defendants. (*Id.*) Shortly thereafter, Coinbase filed its Prospectus with the SEC, incorporating and forming part of the Registration Statement. (*Id.* ¶ 446.) Coinbase stated: "You should read this prospectus and any prospectus supplement before deciding to invest in our Class A common stock." (*Id.* ¶ 447.) The Securities Act Defendants also told investors to rely on the information provided by the Company in the Offering Materials. (*Id.* ¶ 448.) Coinbase registered for the resale of up to 114,850,769 shares of Class A common stock held by registered shareholders. (*Id.* ¶ 449.)

Plaintiffs allege that they "acquired Coinbase common stock pursuant and/or traceable to the Offering Materials." (*Id.* ¶ 518.) Lead Plaintiff specifically alleges it made two purchases totaling 33,696 shares on November 30, 2021, when 74% of the shares outstanding were registered pursuant to the Offering Materials. (*Id.* ¶ 40.) Additional Plaintiffs allege they purchased Coinbase stock on April 14, 2021, the first day of Coinbase's Direct Listing, at prices near the opening price and when 88% of shares outstanding were registered pursuant to the Offering Materials. (*Id.* ¶¶ 41–42.) Collectively, Additional Plaintiffs allege they bought 350 shares of Coinbase common stock. (*Id.*)

 **\*6**  The claims brought pursuant to the Securities Act allege the Offering Materials "contained untrue statements of

material fact, and omitted material facts, about the Company's business and operations, including: (i) substantial, material risks associated with Coinbase's ability to safeguard its customers' crypto assets; and (ii) Coinbase's involvement in proprietary trading of cryptocurrency on its own exchange." (*Id.* ¶ 439; *see also id.* ¶¶ 452–91.) Further, Counts III–V are "are also premised upon the Securities Act Defendants' negligent failure to conduct a reasonable due diligence investigation into the accuracy and completeness of the representations contained in the Offering Materials." (*Id.* ¶ 440.) Plaintiffs also allege the Offering Materials did not disclose information that was required to be disclosed under SEC Regulation S-K. (*Id.* ¶¶ 492–99.)

### D. Procedural History

On July 16, 2021, the original class action complaint was filed in this matter, previously bearing the caption *Patel v. Coinbase Global, Inc. et al.*, Case No. 2:22-cv-04915-BRM-LDW. (ECF No. 1.) The original class action complaint named Coinbase, Armstrong, and Haas as defendants and brought two claims pursuant to the Exchange Act. (*Id.*) On September 27, 2022, another prospective plaintiff filed a class action complaint—naming Choi as an additional defendant—in a separate action entitled *Laffon v. Coinbase Global, Inc. et al.*, Case No. 2:22-cv-05744-BRM-LDW. Thereafter, several Motions for Consolidation, Appointment as Lead Plaintiff, and Approval of Lead Counsel were filed. (ECF Nos. 12, 13, 18, 20, 21, 22.) On December 12, 2022, the Honorable Leda D. Wettre, U.S.M.J. consolidated *Patel* and *Laffon*, appointed Sjunde AP-Fonden as Lead Plaintiff, approved Sjunde AP-Fonden's selection of Lead Counsel and Liaison Counsel, and ordered that Case No. 2:22-cv-04915-BRM-LDW shall constitute the Master File bearing the caption *In re Coinbase Global, Inc. Securities Litigation*. (ECF Nos. 49, 50.)

On February 22, 2023, Plaintiffs filed the Consolidated Class Action Complaint naming Coinbase, Armstrong, Haas, and Choi as defendants and bringing two claims pursuant to the Exchange Act. (ECF No. 59.) Thereafter, on May 10, 2023, Plaintiffs filed the First Amended Consolidated Class Action Complaint ("FAC") raising claims against Defendants. (ECF No. 62.) The FAC brought two claims pursuant to the Exchange Act, and three claims pursuant to the Securities Act of 1933 (the "Securities Act"). (*Id.*)

On July 20, 2023, Plaintiffs filed the 193-page, operative SAC raising claims against Defendants. (ECF No. 68.) Specifically, Plaintiffs bring two causes of action under the Exchange Act (the "Exchange Act Claims"): Count I (Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against Coinbase and the Executive Defendants); and Count II (Violations of Section 20(a) of the Exchange Act Against the Executive Defendants). Plaintiffs also bring three causes of action under the Securities Act (the "Securities Act Claims"): Count III (Violations of Section 11 of the Securities Act Against the Securities Act Defendants); Count IV (Violations of Section 12(a)(2) of the Securities Act Against the Securities Act Defendants); and Count V (Violations of Section 15 of the Securities Against Armstrong, Haas, Jones, and the Director Defendants).

On December 21, 2023, the parties filed the complete briefing related to Defendants' Motion to Dismiss the SAC. [14] (ECF Nos. 78–80.) Defendants' Motion to Dismiss the SAC is docketed as ECF No. 78 with the Brief in Support docketed as ECF No. 78-1, Plaintiffs' Opposition is docketed as ECF No. 79, and Defendants' Reply is docketed as ECF No. 80.

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

**\*7** In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the non-moving party]." *Phillips*, 515 F.3d at 228. "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

This "plausibility standard" requires the complaint to allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.' " *Id.* (citing *Twombly,* 550 U.S. at 556). "[D]etailed factual allegations" are not required, but "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" must be pleaded; it must include "factual enhancement" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citations omitted). In assessing plausibility, the court may not consider any "[f]actual claims and assertions raised by a defendant." *Doe v. Princeton Univ.,* 30 F.4th 335, 345 (3d Cir. 2022).

"Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged —but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). Indeed, after *Iqbal,* conclusory or "bare-bones" allegations will no longer survive a motion to dismiss: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible, "allow[ing] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Supreme Court's ruling in *Iqbal* emphasizes that a plaintiff must show that the allegations of his or her complaints are plausible. *See id.* at 670.

**B. Heightened Pleading Standard**

The Private Securities Litigation Reform Act of 1995 (the "PSLRA") provides heightened pleading rules that a plaintiff must satisfy in securities class actions. *Institutional Invs. Grp. v. Avaya, Inc.,* 564 F.3d 242, 252 (3d Cir. 2009). "The PSLRA replaced [Federal Rule of Civil Procedure 9(b)] as the applicable pleading standard in private securities class actions.... Nonetheless, 'Rule 9(b)'s particularity requirement is comparable to and effectively subsumed by the requirements of [15 U.S.C. § 78u–4(b)(1) of] the PSLRA.' " *Rahman v. Kid Brands, Inc.,* 736 F.3d 237, 242 n.3 (3d Cir. 2013) (alteration in original) (quoting *Avaya,* 564 F.3d at 253).

**\*8** Pursuant to Rule 9(b), when alleging fraud, "a party must state with particularity the circumstances constituting fraud

or mistake, although intent, knowledge, and other conditions of a person's mind may be alleged generally." *In re Lipitor Antitrust Litig.,* 868 F.3d 231, 249 (3d Cir. 2017) (quoting Fed. R. Civ. P. 9(b)); *see also United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC,* 812 F.3d 294, 307 (3d Cir. 2016) ("A plaintiff alleging fraud must ... support its allegations 'with all of the essential factual background that would accompany the first paragraph of any newspaper story—that is, the who, what, when, where and how of the events at issue.' ") (quoting *In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 217 (3d Cir. 2002)). Accordingly, "a party must plead [its] claim with enough particularity to place defendants on notice of the 'precise misconduct with which they are charged.' " *United States ex rel. Petras v. Simparel, Inc.,* 857 F.3d 497, 502 (3d Cir. 2017) (quoting *Lum v. Bank of Am.,* 361 F.3d 217, 223–24 (3d Cir. 2004), *abrogated in part on other grounds by Twombly,* 550 U.S. at 557.

Likewise, to properly allege that a defendant made a false or misleading statement under the heightened pleading standard of the PSLRA, a private securities complaint "must: (1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading' ...; and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 321 (2007) (alteration in original) (quoting 15 U.S.C. §§ 78u-4(b)(1), (b)(2)). Therefore, the PSLRA "requires that a complaint state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention to deceive, manipulate, or defraud." *Rahman,* 736 F.3d at 241–42 (citation and internal quotation marks omitted).

"To plead falsity, Rule 9(b) and the PSLRA each demand specificity." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.,* 70 F.4th 668, 680 (3d Cir. 2023). "Although the pleading standards in Rule 9(b) and the PSLRA can be generally reconciled harmoniously for allegations of falsity, the PSLRA's requirements for allegations of *scienter* control over the more lenient standard in Rule 9(b) for mental-state allegations." *Id.* at 681 n.1 (emphasis in original) (citing *Avaya,* 564 F.3d at 253 ("The PSLRA's requirement for pleading scienter ... marks a sharp break with Rule 9(b).")); *Tellabs,* 551 U.S. at 323–24); *compare* Fed. R. Civ. P. 9(b) (permitting "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally"), *with* 15 U.S.C. § 78u-4(b)(2)(A) (requiring a particularized

statement of the "facts giving rise to a strong inference that the defendant acted with the required state of mind").

## III. DECISION

Defendants argue the SAC fails to plead a claim under Section 10(b) of the Exchange Act. (ECF No. 78-1 at 14–42.) Specifically, Defendants submit the SAC fails to allege: a material misstatement or omission (*id.* at 14–31); a strong inference of scienter (*id.* at 32–40); and loss causation (*id.* at 40–42). Defendants also assert the SAC does not sufficiently plead claims under the Securities Act as Plaintiffs lack standing, and in the alternative, Plaintiffs have failed to sufficiently plead required elements for claims under Sections 11 and 12 of the Securities Act. (*Id.* at 42–48.) Defendants conclude by arguing Counts II and V of the SAC should be dismissed because Plaintiffs have not adequately pled predicate claims. (*Id.* at 48.) The Court addresses each argument in turn.

### A. Defendants' Motion to Dismiss Count I of the SAC (Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against Coinbase and the Executive Defendants) [15]

**\*9**  Section 10(b) of the Exchange Act makes it unlawful for any person "to use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5(b) applies this provision and provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 CFR § 240.10b-5(b). "The private right of action under Section 10(b) and Rule 10b–5 ... creates liability for false or misleading statements or omissions of material fact that affect trading on the secondary market." *Burlington Coat Factory,* 114 F.3d at 1417. To state a claim for securities fraud under Section 10(b) and SEC Rule 10b-5, "plaintiffs must allege (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation."*City of Edinburgh Council v. Pfizer, Inc.,* 754 F.3d 159, 167 (3d Cir. 2014) (citations omitted).

### 1. Determinations As to Whether Plaintiffs Have Adequately Alleged Material Misrepresentations or Omissions

Defendants argue the Bankruptcy Risk Statements are not adequately alleged misrepresentations or omissions because: (i) they do not mention bankruptcy, and therefore could not have concealed or misled investors; (ii) "the SAC fails to allege a single fact suggesting any bankruptcy risk, let alone a risk to customer assets in a bankruptcy, existed at the time the challenged statements were made"; and (iii) several statements are non-actionable puffery or opinion. (ECF No. 78-1 at 14–20; *see also* ECF No. 80 at 2–6.) Defendants assert the Proprietary Trading Statements are not actionable because: (i) they are based on the WSJ Article, which was anonymously sourced, and therefore not sufficiently reliable; (ii) the WSJ Article does not contradict any challenged statement; (iii) Plaintiffs failed to allege contemporaneous falsity; and (iv) forward-looking statements are immune under the PSLRA's safe harbor provision. (ECF No. 78-1 at 20–25; *see also* ECF No. 80 at 6–8.) Next, Defendants submit the Regulatory Statements are not actionable false or misleading statements as Defendants: (i) did not have a duty to disclose their alleged understanding of the SEC's actions; (ii) did not misleadingly minimize the risk of the SEC's investigation; and (iii) merely provided nonactionable opinions. (ECF No. 78-1 at 25–31; *see also* ECF No. 80 at 8–11.)

In opposition, Plaintiffs counter the SAC sufficiently alleges materially false and misleading statements. (ECF No. 79 at 13–30.) Plaintiffs assert the Bankruptcy Risk Statements are actionable because: (i) Defendants' statements about asset security created an affirmative duty for Defendants to fully disclose the risk that customers' assets would face in the event of a bankruptcy; (ii) the omission of the risk to customers' assets was material; and (iii) they do not constitute puffery or opinion. (*Id.* at 13–22.) Plaintiffs contend Defendants' arguments as to the Proprietary Trading Statements are misplaced because: (i) the WSJ Article is a proper basis for misleading and false statements; and (ii) the PSLRA's safe harbor provision does not apply. (*Id.* at 22–25.) As to the Regulatory Statements, Plaintiffs submit they are actionable, materially false and misleading statements because: (i) Coinbase listed crypto assets that its own review process determined were likely securities; (ii) the SEC had indicated to Defendants that most assets on the platform were securities; (iii) Defendants admitted that Coinbase faced "an

imminent enforcement action"; (iv) Defendants had a duty to disclose material facts related to the potential SEC action. (*Id.* at 25–30.)

"[A] fact or omission is material only if 'there is a substantial likelihood that it would have been viewed by the reasonable investor as having significantly altered the "total mix" of information' available to the investor." *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) (quoting *Basic Inc. v. Levinson,* 485 U.S. 224, 231–32 (1988)). "[M]ateriality is a mixed question of law and fact, and the delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts are peculiarly for the trier of fact." *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281 n. 11 (3d Cir. 1992), *cert. denied*, 506 U.S. 934 (1992) (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)). Consequently, "[o]nly if the alleged misrepresentations or omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *Id.* (citing *TSC Indus.*, 426 U.S. at 450).

**\*10** "There is no affirmative duty to disclose all material information, but such a duty may arise when a company chooses 'to speak about a material subject to investors.' " *In re Amarin Corp. PLC Sec. Litig.*, No. 21-2071, 2022 WL 2128560, at \*3 (3d Cir. June 14, 2022) (quoting *Edinburgh Council*, 754 F.3d at 174); *see also Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017) ("Once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading."); *In re Bristol-Meyers Squibb Sec. Litig.*, Civ. A. No. 00-1990, 2005 WL 2007004, at \*23 (D.N.J. Aug. 17, 2005) ("[A] defendant may choose silence or speech based on the then-known factual basis, but cannot choose half-truths." (citation omitted)). Notably, "the question of whether disclosure was required is best left to the trier of fact, since whether a prior disclosure is inaccurate, incomplete, or misleading in light of all of the evidence is a mixed question of law and fact." *In re: Enzymotec Sec. Litig.*, Civ. A. No. 14-5556, 2015 WL 8784065, at \*15 (D.N.J. Dec. 15, 2015) (citing *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir. 1997)).

#### i. The Bankruptcy Risk Statements

The Court first addresses the materiality of the concealed bankruptcy risk to customers' assets. Defendants argue Plaintiffs' claims premised upon the Bankruptcy Risk Statements fail because Coinbase was not at risk of bankruptcy. (ECF No. 78-1 at 16–19; ECF No. 80 at 3–5.) Plaintiffs counter that their "claim is not that Coinbase failed to disclose an imminent risk of bankruptcy. Rather, Coinbase and the Executive Defendants failed to disclose that, in the event of a bankruptcy—a common experience among crypto peers—Coinbase's customers were at risk of losing their assets." (ECF No. 79 at 17.) Plaintiffs' framing of this issue is persuasive. To the extent Defendants assert that the risks associated with a bankruptcy are not material, Defendants' position is contradicted by the Company's admissions in the May 10, 2022 Form 10-Q report. In this SEC filing, the Company disclosed the relevant asset safety risks and conceded that this disclosure "may result in customers finding our custodial services more risky and less attractive and any failure to increase our customer base, discontinuation or reduction in use of our platform and products by existing customers as a result could adversely impact our business, operating results, and financial condition." (ECF No. 68 ¶ 231.) In this admission, the Company effectively acknowledged the "substantial likelihood" that the omission of the bankruptcy risk was material to investors. *NAHC,* 306 F.3d at 1330. Further, the materiality of this information was evidenced by the disclosure's significant impact on the market. *See In re Able Labs. Sec. Litig.*, Civ. A. No. 05-2681, 2008 WL 1967509, at \*15 (D.N.J. Mar. 24, 2008) ("[T]he significant decrease in stock price immediately following the disclosure of the adverse information satisfies the Third Circuit's standard for pleading materiality."). Based on the foregoing, the Court finds the Bankruptcy Statements are material.

Plaintiffs have also properly alleged that Coinbase and the Executive Defendants had a duty to disclose the bankruptcy risk to customers' assets. In the Asset Safety Disclosures, Coinbase and the Executive Defendants candidly detailed the need to safeguard customers' assets. (*See* ECF No. 68 ¶¶ 96–97, 258–59, 270, 273, 276, 284.) The Company specified only two risks—hacking and the "loss or destruction of private keys"—in safeguarding customers' assets. (*Id.*) Elsewhere, the Executive Defendants repeatedly emphasized the security that Coinbase offered. (*Id.* ¶¶ 89, 129.) However, Defendants knew they had not taken steps to protect the Company's retail customers' assets from potential bankruptcy risks. (*Id.* ¶¶ 14–16, 112–20.) By placing the safety of customers' assets "in play," through the statements described above, Coinbase

was "bound to speak truthfully" and disclose the risks that its retail customers' assets faced. *Shapiro*, 964 F.2d at 282; *see Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 620 F. Supp. 3d 167, 186 (D.N.J. 2022) ("Defendants may not describe 'a favorable picture' of a material issue 'without including the details that would have presented a complete and less favorable one.' " (quoting *SEB Inv. Mgmt. AB v. Endo Int'l, PLC*, 351 F. Supp. 3d 874, 897 (E.D. Pa. 2018))). In noting that hacking and lost keys were risks to safeguarding customers' assets, Coinbase and the Executive Defendants had a duty to provide the complete picture of known risks to customer' assets.[16] Instead, Coinbase and the Executive Defendants concealed their knowledge of the potential bankruptcy risks to safeguarding customers' assets.[17]

 **\*11**  Additionally, the Court is guided by Item 303 of SEC Regulation S-K which requires disclosure of "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). Defendants correctly note that "Item 303 does not create an 'affirmative duty of disclosure' that, if violated, would 'automatically give rise to a material omission under Rule 10b-5.' " (ECF No. 78-1 at 15 n.3 (citing *Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000)). Notwithstanding, Coinbase and the Executive Defendants' failure to disclose the known uncertainty of the risks that bankruptcy posed to asset safety in violation of Item 303 rendered the Asset Safety Disclosures materially misleading. *See In re Galena Biopharma, Inc. Sec. Litig.*, 336 F. Supp. 3d 378, 392 (D.N.J. 2018) ("[A]n omission in the context of Item 303 can give rise to a Rule 10b-5 claim *if the Item 303 omission renders other statements materially misleading.*" (emphasis in original)); *cf. Oran*, 226 F.3d at 288 ("Because plaintiffs have failed to plead any actionable misrepresentation or omission under [Rule 10b-5], SK-303 cannot provide a basis for liability.")

The Court concludes this section by addressing Defendants' argument that several of the Bankruptcy Risk Statements are non-actionable puffery and opinion. (*See* ECF No. 78-1 at 19–20; *see also* ECF No. 80 at 6.) The statements that Defendants argue are puffery and opinion each tout the trust that customers have in Coinbase due to its ability to safely secure customers' crypto assets. (*See* ECF No. 68 ¶¶ 268, 279, 281–82, 289–90.) "[V]ague and general statements of optimism 'constitute no more than "puffery" and are understood by reasonable investors as such.' " *In re*

*Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999) (quoting *Burlington Coat Factory*, 114 F.3d at 1428 n.14). "A statement is considered puffery only when it is immaterial." *Enzymotec*, 2015 WL 8784065, at \*14. An opinion "is misleading if it: (i) was not sincerely believed when made; (ii) contains an expressly embedded, untrue factual assertion; or (iii) reasonably implies untrue facts and omits appropriate qualifying language." *City of Warren Police*, 70 F.4th at 686.

The Court finds that the subject statements here, to the extent they highlight Coinbase's alleged ability to safely store customers' assets, are actionable as they contain "embedded" falsities and concern a central part of Coinbase's business. *See id.*; *see also W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, Civ. A. No. 13-6731, 2015 WL 3755218, at \*13 (E.D. Pa. June 16, 2015) ("Far from being a vague statement of intention or optimism, fraudulent comments regarding ... a fundamental aspect of [defendant's] business are of vital importance to investors."). However, to the extent the subject statements emphasize customers' trust in Coinbase, the Court finds these portions to be non-actionable puffery and opinion. *See Advanta Corp.*, 180 F.3d at 538; *City of Warren Police*, 70 F.4th at 686 ("An opinion statement ... is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.").

Accordingly, the portion of Defendants' Motion seeking to dismiss Count I, to the extent it is premised upon the Bankruptcy Statements that tout customers' trust in the Company, is **GRANTED**, as these assertions constitute puffery and opinion. The remaining portions of Defendants' Motion to Dismiss Count I for failure to properly allege that the Bankruptcy Risk Statement are actionable, material misrepresentations and omissions are **DENIED**.

#### ii. The Proprietary Trading Statements

The theory of recovery generally alleged in the Proprietary Trading Statements is that Defendants materially misrepresented and/or omitted the fact that they were engaged in proprietary trading. It is undisputed that Plaintiffs' allegations as to the existence of Coinbase's proprietary trading venture explicitly rely upon the September 22, 2022 WSJ Article, *see Burlington Coat Factory*, 114 F.3d at 1426, which describes its sources with phrases such as "people close to the matter" and "people at the company." (ECF No. 78-4 at 1.)

**\*12** To satisfy the heightened pleading standard in a securities-fraud case, "media sources must be sufficiently detailed to indicate [ ] their reliability and be based on an independent investigative effort." *In re Mylan N.V. Sec. Litig.*, Civ. A. No. 20-955, 2023 WL 3539371, at \*6 (W.D. Pa. May 18, 2023) (alteration in original) (quoting *In re Loewen Grp. Inc. Sec. Litig.*, Civ. A. No. 98-6740, 2004 WL 1853137, at \*6 (E.D. Pa. Aug. 18, 2004)); *seeIn re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008) ("[N]ewspaper articles should be credited only to the extent that other factual allegations would be—if they are sufficiently particular and detailed to indicate their reliability. Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel." (citation and internal quotation marks omitted)). Generally, when considering confidential witness allegations, it is proper to "evaluat[e] the 'detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia.' " *Avaya*, 564 F.3d at 263 (quoting *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 147 (3d Cir. 2004)).

Although the WSJ Article provides alleged details as to the background of the formation of Coinbase's proprietary trading unit and a specific trade that was executed (ECF No. 68 ¶¶ 144, 147; ECF No. 78-4 at 1–3), the Court finds that the WSJ Article, and by extension, the dependent allegations contained in the SAC do not satisfy the heightened pleading standard. In *MylanN.V.*, the district court found that allegations reliant upon both an anonymously sourced book and Bloomberg articles met the pleading standard because: the authors' reporting was detailed and derived from comprehensive "independent investigative efforts"; the "unnamed witnesses [were] described with enough particularity to give the Court confidence that the information they provided was reliable"; and "most of the allegations from the [operative] complaint that borrow from the [book] relate to reporting that could be plausibly corroborated by a review of documents examined by [the book's author] and the authors of the Bloomberg articles." 2023 WL 3539371, at \*8. Conversely, the WSJ Article here does not provide corroborative sources, sufficient detail about the confidential sources, or any indication that it is based on independent investigative efforts. In fact, the WSJ Article does not provide any additional information, such as the sources' job titles or the bases of the sources' knowledge.

Courts have rejected similar claims based on unsubstantiated, anonymous sources. *See, e.g.*, *In re Vale S.A. Sec. Litig.*, Civ. A. No. 15-cv-9539, 2017 WL 1102666, at \*27 (S.D.N.Y. Mar. 23, 2017) (dismissing securities fraud claims that "relie[d] on 'unattributed' statements in the [WSJ] ... for failure to satisfy the Fed. R. Civ. P. 9(b) pleading standard" because the newspaper article relied upon an "unidentified" employee as its source and neither the article nor the complaint provided further information about the source); *see alsoChan v. New Oriental Educ. & Tech. Grp. Inc.*, Civ. A. No. 16-9279, 2019 WL 2865452, at \*7 (D.N.J. July 3, 2019) (finding the subject "article [did] not meet the heightened particularity required of claims under Section 10(b) and Rule 10b-5" as the article was "devoid of [relevant] information," and did not provide "the who, what, when, where, and how"); *cf.Loewen Grp.*, 2004 WL 1853137, at \*6 (applying the heightened pleading standard associated with claims under the PSLRA and declining to consider allegations from an unnamed source where plaintiffs did not provide "sufficient information about the source," as Plaintiffs did "not say for whom the source worked or in what capacity").

Therefore, the Court finds Plaintiffs have not adequately pled that the Proprietary Trading Statements are material misstatements and omissions because the WSJ Article does not provide the sufficient level of detail required by the heightened pleading standard and does not indicate an independent investigative effort. Accordingly, the portion of Defendants' Motion to Dismiss Count I, to the extent it is premised upon the Proprietary Trading Statements, is **GRANTED**. [18] Because the Court finds Plaintiffs have not adequately alleged material misrepresentations and omissions in the Proprietary Trading Statements, the Court will not address the remaining issues and arguments related to the Proprietary Trading Statements and Count I. *SeeChan*, 2019 WL 2865452, at \*7 n.6 ("In view of the amended complaint's failure to adequately plead material misrepresentations or scienter, the Court need not reach whether loss causation is sufficiently pleaded."); *Vale S.A.*, 2017 W.L. 1102666, at \*27 ("Because the speaker of the statements quoted in the Wall Street Journal is not identified, these allegations must be dismissed, before even arriving at Defendants' loss causation arguments on this point.").

### iii. <u>The Regulatory Statements</u>

**\*13** Next, the Court addresses the parties' arguments related to the Regulatory Statements. Defendants' primary

argument is that they did not have a duty to disclose their alleged understanding of the SEC's actions. (ECF No. 78-1 at 26–29.) In this category of the Challenged Statements, Plaintiffs allege Coinbase and the Executive Defendants misrepresented and omitted that Coinbase listed crypto assets that were likely securities from 2019 through 2021 thereby concealing the likelihood of a SEC enforcement action. (ECF No. 68 ¶¶ 25, 178, 182–83, 342, 345, 357, 379.) Plaintiffs allege Defendants told investors in 2022 that "Coinbase does not list securities. End of story." (*Id.* ¶ 343); *see also id.* ¶ 348 ("[T]he company does not list securities."). Grewal, speaking on behalf of Coinbase, assured investors that "Coinbase has a rigorous process to analyze and review each digital asset before making it available on our exchange—a process that the SEC itself has reviewed." (*Id.* ¶ 343.) Previously, Defendants had stated Coinbase only listed assets "for which we determine there are reasonably strong arguments to conclude that the crypto asset is not a security." (*Id.* ¶ 188.) Defendants further represented: "[w]e are confident that our rigorous diligence process ... keeps securities off our platform." (*Id.* ¶ 346.)

The Court finds Plaintiffs have adequately alleged that Defendants misleadingly described a favorable picture of the improbability that the SEC would file an enforcement action by repeatedly emphasizing that the crypto assets they listed were not securities. Although "disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing," *City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (citations and internal quotation mark omitted), Defendants still had an obligation to "include the details that would have presented a complete and less favorable one." *Becton*, 620 F. Supp. 3d at 186; *see also Williams*, 869 F.3d at 241 ("Once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading."). The Regulatory Statements are misleading as Plaintiffs allege Coinbase decided to list crypto assets from late 2019 through 2021, that its own review process determined had "high 'risk' scores," and thus were likely to be securities." (ECF No. 68 ¶¶ 25, 182–83, 379; *see also id.* ¶ 182.) Further, a subset of the statements were misleading in that Defendants concealed that the SEC had indicated to Defendants by mid-2022 that most crypto assets on Coinbase's platform were likely securities. (*Id.* ¶¶ 151, 378.) Therefore, the Court finds that Plaintiffs have adequately pled Defendants had a duty to disclose material facts related to the likelihood that the crypto

assets listed were securities and, as a result, the likelihood that the SEC would file an enforcement action. *Cf. Becton*, 620 F. Supp. 3d at 187 ("The fact that the FDA had not issued a formal warning letter ... does not mean that the [defendant] was free to issue misleading statements that failed to recognize the serious, immediate, and known risks posed by a near-certain enforcement action."); *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 350 (E.D. Pa. 2014) ("[W]hen the FDA tells a company about problems with a product, and the company nonetheless continues to make confident predictions about a product, courts have inferred scienter and falsity.") (quoting *In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 811 (C.D. Cal. 2011)). [19]

**\*14** To the extent Defendants claim they did not have a duty to "speculate" as to the SEC's actions (ECF No. 78 at 26–29), the Court finds this argument is misplaced as Plaintiffs' claim is better qualified as seeking recourse for the misleading nature of the Regulatory Statements in concealing "that the Company had listed assets that its own internal process had flagged as likely securities, and that the SEC had told it that most assets it listed were likely securities, thus increasing the risk that the SEC would bring an enforcement action." (ECF No. 79 at 28 n.16.) Further, this argument is contradicted by Plaintiffs' allegations that Defendants knew Coinbase faced "an imminent enforcement action," yet continued to minimize the risks of a regulatory action. (ECF No. 68 ¶¶ 209–15.)

Accordingly, the portion of Defendants' Motion to Dismiss Count I, to the extent it is premised upon the Regulatory Statements, is **DENIED**.

### 2. Plaintiffs Have Sufficiently Alleged Scienter

Defendants also argue the SAC does not sufficiently allege a strong inference of scienter. (ECF No. 78-1 at 32–40.) Specifically, Defendants assert Plaintiffs fail to allege: (i) Defendants' motive; (ii) conscious misbehavior or recklessness; and (iii) circumstantial evidence of fraud. (*Id.*) In opposition, Plaintiffs counter the SAC adequately alleges Defendants' scienter because: (i) "Defendants knew, or at the very least were reckless to disregard, information indicating that Coinbase's customers were at risk of asset loss in the event of bankruptcy"; (ii) Defendants knew Coinbase listed crypto assets that were likely securities; and (iii) the SAC provides particularized allegations that Defendants were motivated to artificially inflate Coinbase's stock. (ECF No. 79 at 30–41.) In reply, Defendants reiterate Plaintiffs

did not adequately plead scienter because Plaintiffs fail to allege Defendants' motive to commit fraud, and conscious misbehavior or recklessness. (ECF No. 80 at 11–15.) As to motive, Defendants assert, "no facts suggest that the timing of the 10b5-1 plans was linked to any attempt to increase Coinbase's stock price 'immediately before the scheduled sales,' ... to the contrary, the trading plans caused Defendants to sell at some of the lowest prices of the putative class period." (*Id.* at 12) (quoting *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 309 (2d Cir. 2015).) [20]

**\*15** To satisfy the particularity requirement of the PSLRA, the plaintiff must plead "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Scienter, "the intent to deceive, manipulate, or defraud either knowingly or recklessly," is the required state of mind. *PAMCAH-UA Loc. 675 Pension Fund v. BT Grp. PLC*, No. 20-2106, 2021 WL 3415060, at \*1 (3d Cir. Aug. 5, 2021) (citations omitted); *see also Tellabs*, 551 U.S. at 319 (noting scienter is "a mental state embracing intent to deceive, manipulate, or defraud (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). "The inquiry ... is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323 (emphasis in original). To survive a motion to dismiss, plaintiffs must plead facts that allow "a reasonable person [to] deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Id.* at 324. "The inference ... need not be irrefutable, *i.e.*, of the smoking gun genre, or even the most plausible of competing inferences." *Id.*

"In the Third Circuit, '[s]cienter may be established by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior and supported by evidence of motive and opportunity to commit fraud.' " *Roofer's Pension Fund v. Papa*, Civ. A. No. 16-2805, 2018 WL 3601229, at \*16 (D.N.J. 2018) (quoting *In re Anadigics, Inc., Sec. Litig.*, Civ. A. No. 08-5572, 2011 WL 4594845, at \*32 (D. NJ. Sept 30, 2011), *aff'd*, 484 F. App'x 742 (3d Cir. 2012)). "Demonstrating that a defendant had a motive, such as personal financial gain, to commit a securities fraud violation is a 'relevant consideration' that 'may weigh heavily in favor of a scienter inference[.]' " *Hertz Glob. Holdings*, 905 F.3d at 119 (quoting *Tellabs*, 551 U.S. at 325); *see also Rahman*, 736 F.3d 237, 246 (3d Cir. 2013) ("Though it is not necessary to plead motive to establish that a defendant acted with scienter, its presence can be persuasive when

concluding a holistic review of the evidence."). However, "motive and opportunity" do not "serve as an independent route to [establishing] scienter." *Avaya*, 564 F.3d at 277. "[A] plaintiff properly pleads scienter by alleging facts that 'constitute circumstantial evidence of either reckless or conscious behavior.' " *Gold v. Ford Motor Co.*, 577 F. App'x 120, 123 (3d Cir. 2014) (quoting *Avaya*, 564 F.3d at 276–77). A plaintiff relying upon circumstantial evidence to support a strong inference of scienter "must sufficiently plead 'defendants' knowledge of facts or access to information contradicting their public statements ... [i.e., that] defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Roofer's Pension Fund*, 2018 WL 3601229, at \*18 (quoting *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001)).

### 1. Plaintiffs Have Adequately Alleged Defendants Made the Bankruptcy Risk Statements with Scienter

Plaintiffs have adequately set forth allegations that constitute circumstantial evidence by alleging Defendants' reckless and conscious actions in making the Bankruptcy Risk Statements. Plaintiffs allege the following: (i) Defendants submitted the SEC Comment Letter demonstrating Defendants' understanding that the commingling of customers' assets could lead to adverse consequences in the event of a bankruptcy (ECF No. 68 ¶¶ 13, 105–09); (ii) Defendants took affirmative steps to mitigate the potential bankruptcy risks to institutional customers' assets (*id.* ¶¶ 14–16, 112–20); (iii) Armstrong eventually conceded that Defendants "should have updated our retail terms sooner" to provide retail customers with "the same protections" as institutional customers (*id.* ¶¶ 121, 232). Based on these allegations, the Court finds Plaintiffs have alleged reckless and/or conscious behavior that supports a strong inference of scienter as plaintiffs "have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Campbell Soup*, 145 F. Supp. 2d at 699 (quoting *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)). Further, Plaintiffs have established a strong inference of scienter by alleging "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Id.* (quoting *Novak*, 216 F.3d at 308).

**\*16** Additionally, Plaintiffs' allegations—that retail fees make up a substantial portion of Coinbase's revenue and that Defendants acknowledged asset security was vital to

their efforts in retaining retail clients—are further persuasive here. *See Avaya*, 564 F.3d at 268 (acknowledging that "since competition, pricing policies, and pricing concessions are 'core matters' of central importance to [defendant] and its principal executives, a 'core operations inference' supports scienter"); *see also In re Allergan Generic Drug Pricing Sec. Litig.*, Civ. A. No. 16-9449, 2019 WL 3562134, at *12 (D.N.J. Aug. 6, 2019) (finding scienter was supported when challenged statements were on a subject that constituted a "substantial portion" of the defendant's revenue); *In re Cell Pathways, Inc., Sec. Litig.*, Civ. A. No. 99-725, 2000 WL 805221, at *7 (E.D. Pa. June 20, 2000) (finding "where the alleged fraud relates to the core business of the company, knowledge of the fraud may be imputed to the individual defendants" (citation omitted)).

### 2. Plaintiffs Have Adequately Alleged the Regulatory Statements Were Made with Scienter

Relevant to the Regulatory Statements, Plaintiffs allege: Coinbase co-founded the CRC (ECF No. 68 ¶¶ 179–81); Defendants knew that Coinbase listed crypto assets which were likely securities (*id.* ¶¶ 25, 182–83, 379); Defendants knowingly downplayed the likelihood that the SEC would bring an enforcement action (*id.* ¶¶ 178, 342, 345, 357); the SEC told Defendants that "we think everything other than Bitcoin is a security" (*id.* ¶¶ 151, 378); Armstrong conceded Defendants were aware of the SEC's position by mid-2022 (*id.* ¶¶ 209, 378); despite Defendants knowledge of "an imminent enforcement action," they continued to minimize the risks of a regulatory action (*id.* ¶¶ 209–215). Accordingly, the Court also finds Plaintiffs have adequately alleged Defendants actions support a strong inference of scienter as plaintiffs "have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Campbell Soup*, 145 F. Supp. 2d at 699; *cf. Frater*, 996 F. Supp. 2d at 350 ("When the FDA tells a company about problems with a product, and the company nonetheless continues to make confident predictions about a product, courts have inferred scienter and falsity.").

### 3. Plaintiffs' Allegations that Defendants Were Financially Motivated to Artificially Inflate Coinbase's Stock Further Support a Strong Inference of Scienter

The Court also finds Plaintiffs' allegations as to Armstrong's financial motivations further support a finding that Plaintiffs

have sufficiently alleged the Bankruptcy Risk and Regulatory Statements were made with scienter. (*See, e.g.*, ECF No. 68 ¶¶ 6, 81–82 (alleging Armstrong was highly motivated to complete a successful Direct Listing as doing so would entitle him to a compensation package valued at over $3.7 billion) [21]; *id.* ¶¶ 81–84, 386 (noting Armstrong was also entitled to "tranches" of stock options if the Company maintained stock prices following the Direct Listing). [22] Additionally, stock sales that are "unusual in scope or timing ... may support an inference of scienter." *Advanta Corp.*, 180 F.3d at 540 (citing *Burlington Coat Factory*, 114 F.3d at 1424; *Shaw*, 82 F.3d at 1224). Here, in the first two days that Coinbase's stock was listed, the Executive Defendants sold over 1.6 million shares netting gross proceeds over $600 million. (ECF No. 68 ¶ 125.) During the Class Period, the Executive Defendants sold over 2.8 million shares of Coinbase netting gross proceeds of nearly one billion dollars. (*Id.*)

**\*17** Based on the foregoing, the Court finds Plaintiffs' additional evidence of scienter contributes to a finding of scienter. While these individual allegations may not give rise to an inference of scienter on their own, "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs, Inc.*, 551 U.S. at 323 (emphasis in original). Accordingly, the Court finds Plaintiffs have adequately alleged scienter. Defendants' Motion to Dismiss Count I for failure to allege scienter is **DENIED**.

### 3. Plaintiffs Have Properly Alleged Loss Causation

Defendants assert the SAC fails to allege loss causation "because Plaintiffs do not allege any corrective disclosure of a previously concealed truth that caused Coinbase's stock price to decline." (ECF No. 78-1 at 40 (citation and internal quotation marks omitted); *see also* ECF No. 80 at 16.) In opposition, Plaintiffs counter the SAC adequately alleges loss causation. (ECF No. 79 at 41–44.)

"Under the PSLRA, a plaintiff asserting a claim under Section 10(b) bears the burden of proving 'loss causation,' *i.e.*, 'that the act or omission of the defendant ... caused the loss for which the plaintiff seeks to recover damages.' " *Takata v. Riot Blockchain, Inc.*, Civ. A. No. 18-02293, 2020 WL 2079375, at *17 (D.N.J. Apr. 30, 2020) (quoting 15 U.S.C. § 78u-4(b)(4)). "Allegations of loss causation are not subject to the heightened pleading requirements of Rule 9(b) and the PSLRA: all that is required is that plaintiff

provide 'some indication of the loss and the causal connection that the plaintiff has in mind,' consistent with Rule 8(a)." *Dudley v. Haub*, Civ. A. No. 11-05196, 2013 WL 1845519, at \*18 (D.N.J. Apr. 30, 2013) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). The Third Circuit applies a "practical approach [to loss causation], in effect applying general causation principles." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 426 (3d Cir. 2007) (quoting *EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 884 (3d Cir. 2000)). Thus, "to show that a misrepresentation or omission proximately caused an economic loss," a plaintiff need only to allege "the misrepresentation [or omission] touches upon the reasons for the investment's decline in value." *Id.* at 428 (quoting *Huddleston v. Herman & MacLean*, 640 F.2d 534, 549 (5th Cir. 1981), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375 (1983)).

Importantly, "[t]he issue of loss causation is usually not resolved on a motion to dismiss." *Dudley*, 2013 WL 1845519, at \*18 (citing *EP Medsystems*, 235 F.3d at 884 ("Whether the plaintiff has proven [loss] causation is usually reserved for the trier of fact.")); *see Gross v. GFI Grp., Inc.*, 162 F. Supp. 3d 263, 269 (S.D.N.Y. 2016) ("[Plaintiff]'s burden to plead loss causation is 'not a heavy one,' and when it is unclear whether the plaintiff's losses were caused by the fraud or some other intervening event, 'the chain of causation is ... not to be decided on a Rule 12(b)(6) motion to dismiss.' " (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015))).

Here, Plaintiffs have sufficiently set forth a causal link between the Bankruptcy Risk Statements and their alleged losses by alleging Coinbase's May 10, 2022 Form 10-Q report, which belatedly disclosed the previously concealed asset safety risks posed by a bankruptcy, caused Coinbase's stock price to drop more than 26%. [23] (ECF No. 68 ¶¶ 231, 233.) Similarly, Plaintiffs have plausibly alleged a causal link between the Regulatory Statements and their alleged losses by alleging multiple stock price drops were connected to the misleading nature of the Regulatory Statements. (*See id.* ¶¶ 197, 200–01, 219, 238, 247–49, 253–55.)

**\*18** Further, as Plaintiffs need only "provide some indication of the loss and the causal connection," *Dura Pharms.*, 544 U.S. at 347, the Court finds Plaintiffs have sufficiently alleged a causal link by generally alleging the Bankruptcy Risk Statements and Regulatory Trading Statements artificially inflated prices and by specifically alleging a causal link between the reveals of the concealed,

material information and the Company's stock price drops. *See Jones v. Intelli-Check*, 274 F. Supp. 2d 615, 635–36 (D.N.J. 2003) (holding plaintiffs adequately pled causation where plaintiffs relied on generalized allegations); *see also EP Medsystems*, 235 F.3d at 885 ("Although ... the allegation that it 'sustained substantial financial losses as a direct result of the aforementioned misrepresentations and omissions on the part of [defendant company]' could have more specifically connected the misrepresentation to the alleged loss, *i.e.*, investment in a company with little prospects, when we draw all reasonable inferences in plaintiff's favor, we conclude that [plaintiff] has adequately alleged loss causation."); *In re iAnthus Cap. Holdings, Inc. Sec. Litig.*, Civ. A. No. 20-3135, 2022 WL 4539119, at \*20 (S.D.N.Y. Sept. 28, 2022) (finding allegations sufficiently pled loss causation because the allegations were "more than simply pleading inflated prices," instead the allegations "put defendants on notice of the loss to the class and the causal connection lead plaintiff has in mind"). Accordingly, Defendants' Motion to Dismiss Count I of the SAC for failure to adequately allege loss causation is **DENIED**.

To summarize the holdings from Section III.A., Defendants' Motion to Dismiss Count I is **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motion to Dismiss Count I, to the extent it is premised upon the Proprietary Trading Statements and the Bankruptcy Statements that tout customers' trust in the Company, is **GRANTED**. The remaining portions of Defendants' Motion to Dismiss Count I are **DENIED**.

### B. Defendants' Motion to Dismiss Count II of the SAC (Violations of Section 20(a) of the Exchange Act Against the Executive Defendants)

Defendants assert Plaintiffs' claims for control person liability under Sections 20(a) of the Exchange Act should be dismissed because Plaintiffs fail to plead an underlying violation of Section 10(b). (ECF No. 78-1 at 48; ECF No. 80 at 18.) To state a claim under Section 20(a) of the Exchange Act, the plaintiff must allege: "(1) an underlying violation by the company; and (2) circumstances establishing defendant's control over the company's actions." *Intelli-Check, Inc.*, 274 F. Supp. 2d at 645. Liability under Section 20(a) "is derivative of an underlying violation of Section 10(b) by the controlled person." *Rahman*, 736 F.3d at 247 (quoting *Avaya*, 564 F.3d at 252). "Thus, for a controlling person to be liable, the person over whom control was exercised must have committed a primary violation of the securities laws." *In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 280

(D.N.J. 2007) (citations omitted). Here, the Court has held that Plaintiffs have sufficiently pled underlying violations of Section 10(b) against the Executive Defendants in Count I of the SAC premised upon the Bankruptcy Risk Statements [24] and the Regulatory Statements. Accordingly, Defendants' Motion to Dismiss Count II of the SAC is **DENIED**.

### C. Defendants' Motion to Dismiss Count III (Violations of Section 11 of the Securities Act Against the Securities Act Defendants)

Defendants assert Plaintiffs' claims under Section 11 of the Securities Act should be dismissed for lack of standing because Plaintiffs have not adequately pled that they purchased Coinbase shares traceable to the Company's Registration Statement. (ECF No. 78-1 at 43–45; ECF No. 80 at 16–17.) Additionally, Defendants argue Plaintiffs fail to adequately plead the required elements of a Section 11 claim. (ECF No. 78-1 at 46–47; ECF No. 80 at 17–18.) In opposition, Plaintiffs argue they have adequately pled claims under Section 11 of the Securities Act because they have pled standing and the required elements. (ECF No. 79 at 44–47.) As to standing, Plaintiffs submit they have plausibly alleged that they purchased Coinbase stock traceable to the misleading Offering Materials. (*Id.* at 44–46.)

### 1. Section 11 Standing [25]

**\*19** Under Section 11 of the Securities Act, standing is available to purchasers "who acquired securities issued 'pursuant to' or 'traceable to' the specific offering documents that are alleged to be false or misleading." *De Vito v. Liquid Holdings Grp., Inc.*, Civ. A. No. 15-6969, 2018 WL 6891832, at \*15 (quoting *Suprema Specialties*, 438 F.3d at 274 n.7); *see also Slack Techs., LLC v. Pirani*, 598 U.S. 759, 770 (2023) (holding Section 11 requires "a plaintiff to plead and prove that he purchased shares traceable to the allegedly defective registration statement"). [26] Notably, "[t]he pleading requirement for Section 11 standing is satisfied by general allegations that plaintiff purchased pursuant to or traceable to [a] false registration statement." *Alta Partners, LLC v. Forge Glob. Holdings, Inc.*, Civ. A. No. 23-2647, 2024 WL 1116682, at \*7 (S.D.N.Y. Mar. 13, 2024) (quoting *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 373 (S.D.N.Y. 2011)); citing *City of Omaha Police and Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 403 (S.D.N.Y. 2020) ("[Plaintiff] alleges that it purchased [defendant's] stock pursuant or traceable to the offerings....

This is enough to confer standing at this stage to assert a [Section] 11 claim.").

In the SAC, Plaintiffs allege they "acquired Coinbase common stock pursuant and/or traceable to the Offering Materials." [27] (*Id.* ¶ 518.) Additional Plaintiffs [28] specifically allege: they purchased Coinbase stock on April 14, 2021, the first day of Coinbase's Direct Listing, at prices near the opening price (*id.* ¶¶ 41–43); and 88% of shares outstanding were registered pursuant to the Offering Materials when they purchased the Company's stock (*id.*). Lead Plaintiff alleges it purchased the Company's stock on November 30, 2021, when 74% of the shares outstanding were registered pursuant to the Offering Materials. (*Id.* ¶ 40.)

The Court finds Plaintiffs have plausibly alleged that they purchased shares pursuant and/or traceable to the Offering Materials. *See Alta Partners*, 2024 WL 1116682, at \*7 (finding sufficient allegations where plaintiff merely alleged it purchased subject assets that were "issued pursuant to or traceable to" the registration statement); *Lozada*, 2024 WL 68571, at \*16 n.21 (same); *In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 866 (S.D. Ohio 2016), *aff'd sub nom. on other grounds, IBEW Loc. No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017) (finding Plaintiffs had standing where plaintiffs alleged they purchased shares on the first day of the defendant company's secondary offering at prices near the opening price, "and that 1,7500,000 [sic] shares were sold in the [secondary offering] in comparison to the pre-existing public float of 2,023,000 shares"); *see also In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 496 (S.D.N.Y. 2004) (collecting cases stating the rule that "at least one named plaintiff must have standing to pursue each claim alleged" for a class action suit); *but see Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 492 n.6, 494 (5th Cir. 2005) (disagreeing with appellants' argument that standing under Section 11 can be established "by proffering nothing more than statistics indicating a high mathematical probability, based on the number of shares purchased by each individual and the number of [public offering] shares in the market, that at least some of their shares were issued pursuant to the challenged registration statement"). Accordingly, Defendants' Motion to Dismiss Count III for lack of standing is **DENIED**.

### 2. Plaintiffs Have Sufficiently Alleged Section 11 Claims

**\*20** Under Section 11 of the Securities Act, an individual that has acquired the relevant security may bring a private action for damages "if [the] registration statement, as of its effective date: (1) 'contained an untrue statement of material fact'; (2) 'omitted to state a material fact required to be stated therein'; or (3) omitted to state a material fact 'necessary to make the statements therein not misleading.'" *Cal. Pub. Emps.' Ret. Sys.*, 394 F.3d at 167 (quoting 15 U.S.C. § 77k(a)). "As the Supreme Court has explained, Section 11 'was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering.'" *Suprema Specialties*, 438 F.3d at 269 (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82 (1983) (footnote omitted)). Indeed, "Section 11 is a 'virtually absolute liability provision[ ], which do[es] not require plaintiffs to allege that defendants possessed any scienter.'" *Id.* (quoting *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274 n.7 (3d Cir. 2004)).

Defendants argue the Court should apply Rule 9(b)'s heightened pleading standard because "a core theory of fraud permeate[s] the entire" complaint. [29] (ECF No. 78-1 at 46 (quoting *Cal. Pub. Emps.' Ret. Sys.*, 394 F.3d at 167).) The Court disagrees. The Third Circuit's decision in *Suprema Specialties* is instructive here. In *SupremaSpecialties*, the Third Circuit applied its prior decision in *Cal. Pub. Emps.' Ret. Sys* and held that the district court erroneously found plaintiffs' Section 11 and Section 12(a)(2) claims were sounded in fraud. 438 F.3d at 269–74. The lead class plaintiff in that case "described its suit as arising out of a 'massive fraud' at [the defendant company], stemming in particular from the allegedly material misrepresentations in the registration statements" that the defendant company filed in connection with a public offering. *Id.* at 270. Further, the lead class plaintiff "prefaced its Section 11 and Section 12(a)(2) count with an explicit disclaimer—'[t]his claim is not based on and does not sound in fraud'—prior to setting for the factual allegations that support each claim for relief." *Id.* at 271 (alteration in original). The Third Circuit distinguished *Cal. Pub. Emps.' Ret. Sys.* and *Shapiro*, and held:

> We now hold that where, as here, individual defendants are accused in separate claims of the same complaint of having violated Section 11, Section 12(a)(2), and Section 10(b), the Securities Act claims do not sound in fraud if ordinary negligence is expressly pled in connection with those claims. In such a case, the fraud allegations cannot be said to "contaminate" the Section 11 and Section 12(a)

> (2) claims if the allegations are pled separately. We applied Rule 9(b) to the Section 11 and Section 12(a)(2) claims in *Shapiro* because "plaintiffs did not allege ordinary negligence" and we could "see no way to construct a negligence cause of action." *Shapiro*, 964 F.2d at 288. Here, ordinary negligence is alleged in the Section 11 and Section 12(a)(2) claims, and those claims are pled separately from the Section 10(b) fraud claims against the same defendants. That is enough to avoid triggering Rule 9(b). A contrary result would effectively preclude plaintiffs from filing suit under Section 11 and Section 12(a)(2) as well as Section 10(b)(5). There is no suggestion that Congress intended such an incongruous approach.

*Id.* at 272–73.

**\*21** Plaintiffs correctly contend that "the conduct pled for the Securities Act [C]laims is [ ] similar to the core theory of fraud pled for the Exchange Act [C]laims." (ECF No. 78-1 at 46 n.15 (citing ECF No. 68).) However, even where "a core theory of fraud permeates," this aspect alone is not dispositive. *SeeSuprema Specialties*, 438 F.3d at 272–273. Instead, as noted above, "Securities Act claims do not sound in fraud if ordinary negligence is expressly pled in connection with those claims." *Id.* at 272. In this matter, Plaintiffs do not provide extensive ordinary negligence allegations, but they do expressly plead ordinary negligence by alleging the Securities Act Defendants did not exercise reasonable care. (*See* ECF No. 68 ¶ 440 ("The Securities Act Claims against the Securities Act Defendants are also premised upon the Securities Act Defendants' negligent failure to conduct a reasonable due diligence investigation into the accuracy and completeness of the representations contained in the Offering Materials. Had the Securities Act Defendants not acted negligently, and had they conducted reasonable due diligence investigations before the Direct Listing, they would have uncovered that the Offering Materials contained untrue statements of fact and omitted material facts.").)

Further, just like the lead class plaintiffs in *Suprema Specialties*, Plaintiffs expressly pled negligence in the opening paragraphs of the Securities Act Claims. (*See* ECF No. 68 ¶ 437 ("Plaintiffs assert strict liability and negligence claims."); *id.* ¶ 441 (noting the claims in Counts III–V "do not sound in fraud, and Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims").) Additionally, Plaintiffs clearly separated their claims under the Exchange Act and the Securities Act, and did not incorporate allegations from the Exchange Act Claims into the Securities Act Claims.

(*See generally id.*) Although this may represent "artful" pleading, *see Suprema Specialties*, 438 F.3d at 273, the Court finds the disclaimers and the structure of the SAC along with the express allegation(s) of ordinary negligence support a finding that the SAC's pleading of the Securities claim does not trigger the heightened pleading standard. *See In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354, 364 (D.N.J. 1999) ("Unlike the complaint in *Shapiro*, this complaint does not incorporate allegations of scienter and fraud into the § 11 claim. Rather, here the § 11 claim is [pled] before any of the other claims. Although the plaintiffs have [pled] that certain defendants acted fraudulently in violation of § 10(b), the § 11 claim is limited to negligence.").

The Court, therefore, applies the liberal notice requirements of Federal Rule of Civil Procedure 8 to Plaintiffs' Securities Act Claims. *See Suprema Specialties*, 438 F.3d at 270 ("Where a plaintiff's Section 11 or Section 12(a)(2) claims are not grounded in allegations of fraud, the liberal notice pleading requirements of Rule 8 apply." (citing *Adams Golf*, 381 F.3d at 273 n.5).) Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Applying this liberal pleading standard, the Court finds Plaintiffs have sufficiently alleged claims under Section 11.[30] (*See* ECF No. 68 ¶¶ 452–91.) Accordingly, Defendants' Motion to Dismiss Count III is **DENIED**.

### D. Defendants' Motion to Dismiss Count IV (Violations of Section 12(a)(2) of the Securities Act Against the Securities Act Defendants)

**\*22** Defendants contend Count IV should be dismissed as Plaintiffs fail to properly plead standing. (ECF No. 78-1 at 45–46.) Defendants submit: (i) the tracing requirement for Section 11 claims also applies to Section 12; (ii) because Plaintiffs cannot satisfy the tracing requirement, *i.e.*, that they purchased registered shares, they cannot establish standing as "there is no obligation to distribute a prospectus for transactions in unregistered shares," (*id.* at 45); and (iii) "as an aftermarket purchaser, Lead Plaintiff lacks standing because it did not purchase registered shares from a person who sold 'by means of' the prospectus" (*id.*) (quoting 15 U.S.C. § 77l(a)(2)). (ECF No. 78-1 at 45–46; *see also* ECF No. 80 at 17.) Alternatively, Defendants argue Plaintiffs have not sufficiently pled a Section 12 claim. (ECF No. 78-1 at 47–48; ECF No. 80 at 18.) Defendants assert: (i) Plaintiffs' Section 12 claim is based on the same, inadequately alleged misstatements as their Section 11 claim; (ii) "Plaintiffs fail to allege that either Coinbase or any of the Securities Act

Defendants are 'statutory sellers.' " (*Id.*) (quoting *Pinter v. Dahl*, 486 U.S. 622 (1988)).

In opposition, Plaintiffs submit they have adequately pled Section 12 standing. (ECF No. 79 at 46–47.) Specifically, Plaintiffs assert "Defendants erroneously claim that Section 12 applies only to registered shares.... Section 12(a)(2) extends to any share offered or sold by means of a misleading prospectus, regardless of whether the share is registered." (*Id.* at 46 (citations omitted).) Plaintiffs further argue the SAC sufficiently alleges the required elements of a Section 12 claim. (*Id.* at 48.)

### 1. Section 12 Standing[31]

"Section 12(a)(2) claims concern the purchase of securities pursuant to a materially false or misleading prospectus or oral communication." *Suprema Specialties*, 438 F.3d at 276 n.7. Section 12 liability "cannot attach unless there is an obligation to distribute the prospectus in the first place (or unless there is an exemption)." *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 571 (1995).

The Court is not persuaded by Defendants' argument that Section 12 applies only to registered shares. (*See* ECF No. 79 at 46 (citing Thomas Lee Hazen, *Federal Securities Law* § III.E.2.a n.308 (4th ed.) ("Although not expressly contained in the statute, the Supreme Court has 'read' a public offering limitation into actions under § 12(a)(2). *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995). Although the Court has thus limited § 12(a)(2) to public offerings, it is not limited to registered offerings."); *In re Gap Stores Sec. Litig.*, 79 F.R.D. 283, 306 (N.D. Cal. 1978) (holding Section 12(a)(2) "applies to the sale of all securities, registered and unregistered")).)

Based on the reasoning detailed above, *supra* Section III.C.1., the Court finds Additional Plaintiffs have sufficiently alleged standing under Section 12(a)(2) by alleging they purchased Coinbase shares pursuant and/or traceable to the Prospectus (*see* ECF No. 68 ¶¶ 41, 42). *Cf. Suprema Specialties*, 438 F.3d at 276 n.7 (accepting "as true plaintiffs' allegations that they made their stock purchases in or traceable to the [defendant company's] public offerings" for a Section 12(a)(2) claim where there was an issue of whether plaintiffs' stock purchases came from the secondary market). Accordingly, Defendants' Motion to Dismiss Count IV for lack of standing is **DENIED**.

### 2. Additional Plaintiffs Have Sufficiently Alleged a Section 12 Claim

Section 12(a)(2) establishes civil liability for any person [32] who "offers or sells" a security "by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77*l*(a)(2). A plaintiff must adequately allege a defendant is a "seller." *See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 716 (3d Cir. 1996). The Third Circuit has held that a seller, under Section 12(a)(2), "may be one who passes title to the buyer for value (a direct seller) or one 'who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner' (a solicitor seller)." *Id.* (quoting *Pinter v. Dahl*, 486 U.S. 622, 643 (1988)).

**\*23** Here, Additional Plaintiffs provide the following allegations: Jones and the Director Defendants "participated in the review, approval, and making of the statements in the Offering Materials," (ECF No. 68 ¶¶ 428–34); Armstrong, Haas, Jones, and the Director Defendants signed the Registration Statement (ECF No. 68 ¶¶ 428–34, 445); Armstrong, Haas, Jones, Andreessen, Ehrsam, Haun, and Wilson sold a substantial amounts of shares (*id.* ¶¶ 428–31, 434, 451); Armstrong, Haas, Jones, and the Director Defendants were financially motivated (*id.* ¶¶ 74, 81, 428–31, 434, 451); "[t]he Securities Act Defendants were sellers, offerors, and/or solicitors of purchasers of the Company's common stock offered pursuant to the Direct Listing. The Offering Materials were used to induce investors, such as [Additional Plaintiffs] ... to purchase in Coinbase's common stock in the Direct Listing," (*id.* ¶ 524); "[t]he Securities Act Defendants' acts of solicitation included participating in the preparation of the false and misleading Offering Materials. Thus, the Securities Act Defendants solicited [Additional Plaintiffs] ... to buy Coinbase common stock," (*id.* ¶ 525).

Applying the liberal pleading standard under Rule 8, *supra* Section III.C.2., the Court finds Additional Plaintiffs have adequately alleged the Securities Act Defendants constitute sellers under Section 12(a)(2) of the Securities Act. *See Westinghouse*, 90 F.3d at 717 ("Taken in the light most favorable to plaintiffs, however, the complaint does allege that the [company] defendants 'solicited plaintiffs' to purchase [the company's] securities and that in so doing

they were motivated by a desire to serve their own financial interests. Contrary to the district court's statement, these are factual allegations—allegations plaintiffs will have to prove—and not bare legal conclusions."); *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 637 (3d Cir. 1989) ("It cannot be said at this juncture that plaintiffs can prove no set of facts that would entitle them to relief." (citations omitted)); "*In re Measurement Specialties, Inc.*, Civ. A. No. 02-1071, 2003 WL 27398420, at \*12 (D.N.J. Sept. 29, 2003) (finding the complaint sufficiently alleged defendants were sellers where "an inference can be drawn from the totality of the circumstances alleged in the complaint," even though the complaint did not "expressly allege that defendants solicited plaintiff to purchase stock," and did not "include a specific allegation that defendants 'directly and actively participated in the solicitation of the immediate sale,' " (quoting *Westinghouse*, 90 F.3d at 717 n.19)).

Accordingly, Defendants' Motion to Dismiss Count IV is **DENIED**.

### E. Defendants' Motion to Dismiss Count V (Violations of Section 15 of the Securities Act Against Armstrong, Haas, Jones, and the Director Defendants)

Defendants assert Plaintiffs' claims for control person liability under Section 15 of the Securities Act should be dismissed because Plaintiffs fail to plead an underlying violation under Section 11 of the Securities Act. (ECF No. 78-1 at 48; ECF No. 80 at 18.) To state a claim under Section 15 of the Securities Act, "the plaintiff must allege (1) a primary violation of the federal securities laws by a controlled person or entity; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful way a culpable participant in the primary violation." *Carmack v. Amaya Inc.*, 258 F. Supp. 3d 454, 466 (D.N.J. 2017) (quoting *Dutton v. Harris Stratex Networks, Inc.*, 370 F.R.D. 171, 178 (D. Del. 2010)).

The Court has held Plaintiffs sufficiently pled underlying violations of Section 11 and Section 12(a)(2) against Armstrong, Haas, Jones, and the Director Defendants. Accordingly, Defendants' Motion to Dismiss Count V of the SAC is **DENIED**. *See In re Schering-Plough Corp./Enhance Sec. Litig.*, Civ. A. No. 08-397, 2009 WL 2855457, at \*7 (D.N.J. Sept. 2, 2009) (denying motion to dismiss Section 15 claim because the complaint adequately alleged the individual defendant "committed primary violations of Sections 11 and 12(a)(2) of the Securities Act").

## IV. CONCLUSION

**\*24**  For the reasons set forth above, Defendants' Motion to Dismiss (ECF No. 78) is **GRANTED IN PART** and **DENIED IN PART**. Defendants' Motion to Dismiss Count I of the SAC, to the extent it is premised upon the Proprietary Trading Statements and the Bankruptcy Statements that tout customers' trust in the Company, is **GRANTED**. The remaining portions of Defendants' Motion to Dismiss are **DENIED**. Plaintiffs may, within thirty (30) days of the date of this Opinion, file a third amended consolidated class action complaint curing the deficiencies addressed herein.[33] Defendants may respond to the third amended consolidated class action complaint, if filed, as appropriate and consistent with applicable federal and local rules. An appropriate Order follows.

### All Citations

Slip Copy, 2024 WL 4053009, Fed. Sec. L. Rep. P 101,922

---

## Footnotes

1    Lead Plaintiff Sjunde AP-Fonden ("Lead Plaintiff") and Additional Plaintiffs Ryan R. Firth and Zvia Steinmetz (collectively, "Additional Plaintiffs") bring this putative class action on behalf of themselves, a proposed class, and a proposed subclass. (ECF No. 68.) Lead Plaintiff is a Swedish public pension fund with over $100 billion in assets under management. (*Id.* ¶ 40.)

2    Defendants Armstrong, Haas, Choi, and Grewal are collectively hereinafter referred to as the "Executive Defendants." Defendants Andreessen, Ehrsam, Haun, Kramer, Rajaram, and Wilson are collectively hereinafter referred to as the "Director Defendants." Defendants Coinbase, Armstrong, Haas, Jones, and the Director Defendants are collectively hereinafter referred to as the "Securities Act Defendants."

3    In Counts III–V, Plaintiffs allege the Securities Act Defendants acted negligently. (*See generally id.*)

4    Digital assets, or "crypto assets," "are umbrella terms for any asset built using blockchain technology. A blockchain is a secure digital ledger or peer-to-peer database that maintains a record of all transactions that occur on the network." (*Id.* ¶ 51.)

5    In a direct listing, an alternative to an initial public offering ("IPO"), the shareholders of the company sell existing shares of the company directly to the public. (*Id.* ¶¶ 5, 73.) A traditional IPO usually includes a "lock-up" period which restricts insiders from selling until a certain time period has passed, whereas in a direct listing, the company's board of directors decides whether to enforce a lock-up period on the company's insiders. (*Id.* ¶ 74.) Here, members of Coinbase's management petitioned the Company's board of directors to remove any lock-up restrictions, and ultimately, the Company's board of directors elected to proceed with no lock-up period. (*Id.*)

6    Choi served as Coinbase's Chief Operating Officer ("COO") and President throughout the Class Period. Choi has served as the Company's COO since June 2019, and as the Company's President since November 2020. (ECF No. 46.)

7    Haas has served as Coinbase's Chief Financial Officer since April 2018, and was a signatory to the Company's filings submitted to the U.S. Securities Exchange Commission (the "SEC") during the Class Period. (*Id.* ¶ 45.)

8    Grewal served as Coinbase's Chief Legal Officer from July 2020 through the end of Class Period. (*Id.* ¶ 47.) Grewal did not sell any shares during the first two days of the Direct Listing. (*Id.* ¶ 125.)

9    Plaintiffs' allegations challenging Defendants' actions pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") can be effectively grouped into three categories of Coinbase's failure to disclose, misrepresent, and/or misleadingly conceal: the potential loss of customers' assets in the event of a bankruptcy; Coinbase's engagement in proprietary trading; and regulatory risks associated with Coinbase's business. These three categories detailed below form the basis of Plaintiffs' request for relief. The Court will hereinafter refer to these three categories as the "Bankruptcy Risk Statements", the "Proprietary Trading Statements"; and the "Regulatory Statements." They will be collectively referred to as the "Challenged Statements." Defendants provided an Appendix which listed 81 challenged statements from the SAC and grouped them into similar categories. (ECF No. 78-2.) The Court reviewed each of the challenged statements, but only provides summaries of these categories.

10   Analysts attributed the decline to the updated Asset Safety Disclosures. (*Id.* ¶¶ 234–37.)

11   Based on the WSJ Article, Plaintiffs allege Haas took part in the creation of the proprietary trading unit. (*Id.* ¶¶ 144, 242.)

12   In a "staking program," crypto asset owners agree to lock up their holdings to obtain a reward or earn interest, similar to a certificate of deposit. (*Id.* ¶ 23 n.1.) In Coinbase's staking program, "crypto owners transfer their assets to Coinbase which pools and subsequently 'stakes' the assets for rewards. The Company takes a commission based on the rewards a customer receives, generally between 15% and 35%." (*Id.*)

13   Count IV is only raised by Additional Plaintiffs. (*Id.* ¶ 523.)

14   By Letter Order dated September 20, 2023, Judge Wettre granted the parties' request for a 20% extension of the page limits under Local Civil Rule 7.2. (ECF No. 70.) The parties requested extensions in light of the SAC "which is 193 pages in 12-point font, and its complexity." (*Id.*)

15   Although all of the Defendants are not named as the applicable group of defendants for this claim, the parties' briefing exclusively referred to either individual defendants or Defendants as a whole. The Court will therefore interchangeably refer to the applicable group of defendants as "Defendants," or this count's actual named defendants. For example, the Court will at times use "Defendants," as the parties did, or "Coinbase and the Executive Defendants."

16   Defendants' argument, that bankruptcy courts have found that customers' crypto assets are not part of a cryptocurrency platform's estate, is misguided. (*See* ECF No. 78-1 at 18–19.) The legal landscape that has played out following the period when the Bankruptcy Risk Statements were made is not relevant to the Court's analysis.

17   Armstrong's admissions following the May 10, 2022 Form 10-Q report are illuminating. (*See* ECF No. 68 ¶¶ 121, 232 (conceding that Coinbase: "should have updated our retail terms sooner" to provide retail customers with "the same protections" as institutional customers; and "didn't communicate proactively when this risk disclosure was added").

18   The Court notes Defendants identified another basis that warrants dismissal of Plaintiffs' claims premised upon a subset of the Proprietary Trading Statements. Plaintiffs did not raise allegations as to when the plans for Coinbase's proprietary trading venture were supposedly made. Therefore, Plaintiffs did not adequately allege the point at which the Proprietary Trading Statements actually were false. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) ("[W]ithout contemporaneous falsity, there can be no fraud." (citation omitted).) As Defendants state, "a test trade made at some point in 2022 cannot show contemporaneous falsity for any statements that came before it including all of the 2021 statements." (ECF No. 78-1 at 24.)

Additionally, the Court is not swayed by Defendants' argument that the Regulatory Statements did not misleadingly minimize the potential of an SEC investigation. Although Defendants warned of "regulatory uncertainty" (ECF No. 68 ¶ 205), generic warnings of a risk do "not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014). As to Defendants' contention that a portion of the Regulatory Statements—statements promoting Coinbase's review process and providing that the Company does not list securities—are nonactionable opinions, the Court disagrees and finds these statements are actionable as they did not "fairly align[ ] with the information in [their] possession." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015); *see also City of Warren Police*, 70 F.4th at 686; *W. Palm Beach Police*, 2015 WL 3755218, at *13.

In their reply brief, Defendants raise arguments that Plaintiffs' allegations are improper group pleading as "Plaintiffs must allege with particularity on a defendant-by-defendant and statement-by-statement basis that the challenged statements were made with deliberate recklessness," and "Plaintiffs cannot allege 'corporate scienter.' " (*Id.* at 11–12) (citing *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 337 (3d Cir. 2007); *In re Great Atl. & P. Tea Co., Inc. Sec. Litig.*, 103 F. App'x 465, 469 (3d Cir. 2004); *In re Hertz Glob. Holdings, Inc. Secs. Litig.*, Civ. A. No. 13-7050, 2017 WL 1536223, at *23 (D.N.J. Apr. 27, 2017), *aff'd sub nom., In re Hertz Glob. Holdings*, 905 F.3d 106 (3d Cir. 2018)). The Court did not consider these arguments because Defendants improperly raised them for the first time in their reply brief. *See Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 202–03 (3d Cir. 2004) ("[A]n issue is waived unless a party raises it in its opening brief, and for those purposes a passing reference to an issue will not suffice to bring that issue before this court."); *see also Dana Transp. v. Ableco Fin.*, Civ. A. No. 04-2781, 2005 WL 2000152, at *6 (D.N.J. Aug. 17, 2005) (holding that it is axiomatic in federal practice that arguments raised for the first time in a reply brief should be disregarded). Defendants' arguments can be re-raised, if applicable, in a motion to dismiss Plaintiffs' amended pleading.

Plaintiffs also allege Armstrong's base salary was just $1 million (*id.* ¶ 84). *Cf. In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006) (noting that a factor relevant to inferring scienter is "whether the profits were substantial relative to the seller's ordinary compensation" (citing *Burlington Coat Factory*, 114 F.3d at 1423)).

*See No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) (finding particularized allegations of scienter as executives were "motivated to inflate [the company]'s financial results and stock prices because their eligibility for stock options and executive bonuses were based principally on the company's financial performance").

The Court is not persuaded by Defendants' argument that the risks to customers' assets associated with a bankruptcy had "already been disclosed" prior to May 10, 2022. (ECF No. 78-1 at 40–41; *see also* ECF No. 80 at 16.) The Court agrees with Plaintiff's framing of this issue and finds that dismissal is not warranted on this basis. (*See* ECF No. 79 at 42 n.25 (quoting *Roofer's Pension Fund*, 2018 WL 3601229, at *9 ("[T]he truth on the market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint.").

As held above, *supra* Section III.A.1.i., the Bankruptcy Statements that touted customers' trust in the Company are not actionable misstatements as these assertions constitute puffery and opinion.

The parties frame their arguments as related to the issue of Plaintiffs' "standing" under Section 11 and Section 12 of the Securities Act, but the arguments may be "more properly characterized as arguments about the scope of the cause of action because they do not, as standing does, go to this Court's subject matter jurisdiction." *Lozada v. TaskUs, Inc.*, Civ. A. No. 22-1479, 2024 WL 68571, at *15 n.19 (S.D.N.Y. Jan. 5, 2024) (citing *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016)) ("[A] plaintiff must have a cause of action under the applicable statute. This was formerly called statutory

Fed. Sec. L. Rep. P 101,922

standing." (internal quotation marks omitted)). Notwithstanding, the Court will utilize the same terminology the parties used in their briefing.

In *Slack*, the United States Supreme Court did not specify what allegations would be adequate to pleading standing. *See id.*

To the extent this is an issue of standing, "the court must accept as true all material allegations set forth in plaintiffs' complaint and must construe those facts in favor of the plaintiffs." *Mariana v. Fisher*, 338 F.3d 189, 205 (3d Cir. 2003) (citation omitted).

*See Hevesi v. Citigroup Inc.*, 366 F.3d 70, 83 (2d Cir. 2004) ("[T]he PSLRA does not in any way prohibit the addition of named plaintiffs to aid the lead plaintiff in representing a class.").

The parties submitted limited arguments on this issue. (*See* ECF No. 78-1 at 46; ECF No. 79 at 47; ECF No. 79 at 17.) Therefore, the Court attempts to succinctly address this issue. *Cf. United States v. Hoffecker*, 530 F.3d 137, 163 (3d Cir. 2008) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim. Especially not when the brief presents a passel of other arguments, as [defendant]'s did. Judges are not like pigs, hunting for truffles buried in briefs." (alteration in original) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991))).

The parties relied in large part upon their arguments detailed above, *supra* Section III.A; therefore, the Court does not make lengthy findings here. (ECF No. 78-1 at 46 ("Plaintiffs' allegations fail to show that Defendants made any material false statements, *see supra* Section I.A., and therefore should be dismissed for the same reasons as the Exchange Act [C]laims." (citations omitted)); ECF No. 79 at 47 ("[F]or the reasons set forth in Sections I.A.1–3 *supra*, the Complaint pleads that Defendants made material statements under either standard."); ECF No. 80 at 18 ("[U]nder either Rule 8 or 9(b), Plaintiffs fail to plead falsity. *Supra* Section I.A.").) Even if the Court applied Rule 9(b)'s heightened pleading standard, Plaintiffs' claims premised upon the Securities Act Defendants' omission of risks associated with Coinbase's ability to safeguard its customers' crypto assets would survive. *See supra* Section III.A.1.i. As to the Proprietary Trading Statements, the Court held Plaintiffs' relevant allegations did not satisfy the heightened pleading standard applicable for Section 10(b) claims under the Exchange. *See supra* Section III.A.1.ii. However, the parties did not address whether Plaintiffs' allegations that the Offering Materials omitted material facts as to Coinbase's involvement in proprietary trading of cryptocurrency on its own exchange adequately support the Securities Act Claims under the liberal pleading standard of Rule 8. Therefore, the Court does not address this theory of recovery here.

As Count IV is raised by Additional Plaintiffs, the Court limits its analysis to whether Additional Plaintiffs have standing. (ECF No. 68 ¶ 523.)

The Securities Act's definition of "person" includes "a corporation." 15 U.S.C. § 77b(a)(2).

Plaintiffs request leave to amend. (ECF No. 79 at 48.) Federal Rule of Civil Procedure 15(a) allows a party to amend its pleadings after obtaining the Court's leave or the written consent of its adversary. Under this liberal rule, the Court must "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). This lenient standard ensures that "a particular claim will be decided on the merits rather than on technicalities." *Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990) (citation omitted). Given that this is the first motion to dismiss the Court has addressed, the Court will permit Plaintiffs leave to file a third amended consolidated class action complaint.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.