**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| IN RE MYLAN N.V.<br>SECURITIES LITIGATION | Master File No. 2:20-cv-00955-NR |

**DEFENDANTS' RESPONSE TO LEAD PLAINTIFF'S
<u>NOTICE OF SUPPLEMENTAL AUTHORITY</u>**

Defendants submit this response to address the Lead Plaintiff's Response to Defendants Notice of Supplemental Authority and Notice of Supplemental Authority.  ECF No. 118 (the "Response").

On May 9, 2025, Defendants filed a Notice of Supplemental Authority (the "Notice") to apprise the Court of a recent decision, *Eden Alpha CI LLP v. Polished.com Inc.*, 763 F. Supp. 3d 270 (E.D.N.Y. 2025),[1] which is relevant to the issue of scheme liability.  Defendants' Notice consisted of four non-argumentative sentences describing the operative holding in *Eden Alpha* and three bullet points, that were likewise non-argumentative, updating the Court regarding the subsequent appellate history of three decisions cited in Defendants' papers.  *See* ECF No. 117.

On Friday evening, May 16, 2025—i.e., just two business days before the upcoming May 21, 2025 oral argument on Defendants' Motion for Judgment on the Pleadings—Lead Plaintiff

---

[1] At the time of Defendants' Notice, *Eden Alpha* had not been assigned a publication citation in the Federal Supplement.  Accordingly, Defendants provided the Westlaw citation to the document, i.e., --- F. Supp. 3d ---, 2025 WL 296998.  Since the Notice was filed, it has been assigned the citation 763 F. Supp. 3d 270.

filed a multi-page purported "response" to Defendants' Notice and notice of two additional decisions: the September 5, 2024 decision in *In re Coinbase Global, Inc. Securities Litigation*, 2024 WL 4053009 (D.N.J.), and the March 28, 2025 decision in *Oklahoma Firefighters Pension & Retirement System v. Musk*, 2025 WL 951231 (S.D.N.Y.).  Unlike Defendants' Notice, Lead Plaintiff's Response contains extensive argument that, among other things, attempts to distinguish *Eden Alpha* and explain how *Coinbase* and *Musk* bear on this Court's analysis of loss causation and scheme liability, respectively.  *See* Response at 1-4.  In addition, Lead Plaintiff's Response injects arguments regarding authorities already discussed in the parties' papers and attaches an excerpted statement from a Mylan Form 10-K[2] to support Lead Plaintiff's argument that Mylan's "public statements explaining [cGMP regulatory obligations] satisfies the reliance element" of Lead Plaintiff's scheme claim.  *Id.* at 2.

Defendants respectfully submit that Lead Plaintiff's Response is an eleventh-hour attempt to shore up the shortcomings in the operative complaint by citing decisions that could have been brought to the attention of the Court and Defendants well in advance of the oral argument, as opposed to after the close of business on the Friday before.  However, neither the points that Lead Plaintiff attempts to reargue nor the decisions that it cites overcome its pleading failures.  At the outset, the Response's attempt to distinguish the analysis of scheme claims in *Eden Alpha* fails because Lead Plaintiff fails to address *Eden Alpha*'s central holding—i.e., that allegations of fraudulent business practices that do not involve investor-facing conduct are insufficient to plead a securities fraud scheme claim.  *See Eden Alpha*, 763 F. Supp. 3d at 317-18.  As a result, although the court in *Eden Alpha* credited at the pleading stage allegations that the defendant had engaged

---

[2] Lead Plaintiff's Response incorrectly states that it has attached Mylan's 2016 Form 10-K. Response at 2.  The Response actually attaches Mylan's 2017 Form 10-K.

in fraudulent practices such as forging customer and delivery signatures, lying to credit card companies, and employing undocumented workers, the court held that those allegations did not sufficiently plead a scheme claim because those "purported acts of fraud" did "not establish a deceptive scheme to defraud *investors*." *Id.* at 286, 318 (emphasis original).

Lead Plaintiff's new authority regarding scheme liability, *Oklahoma Firefighters Pension & Retirement System v. Musk*, confirms its claims should be dismissed. In *Musk*, the court considered whether private statements between a defendant, an advisor of Elon Musk, and another investment advisor could "amount[] to a deceptive act under the strictures of Rule 10b-5(a) and (c)." 2025 WL 95123, at *14. The court held that such a private communication could not establish the required element of reliance "because Plaintiff has not demonstrated that 'the investing public had knowledge, either actual or presumed, of [the defendant's] deceptive acts.'" *Id.* (quoting *Stoneridge Inv. Partners, LLC v. Sci-Atlanta, Inc.*, 552 U.S. 148, 159 (2008)). To the extent the court permitted the other scheme claims to proceed in the case, it did so because the plaintiff in *Musk* was able to allege a deceptive public-facing cover for the purported fraudulent scheme and a duty to disclose. Specifically, the plaintiff established that the defendants participated in a scheme to hide Elon Musk's amassing of shares of Twitter that was both required to be disclosed in Schedules 13D and 13G and rendered Musk's numerous public statements about Twitter misleading. *Id.* at *4, *14, *18-19.

Here, as Defendants have explained, the sole remaining challenged statement—i.e., the statement in a January 2019 *Bloomberg* article that "[a]ny explicit or implicit suggestion that Mylan employees circumvented data and quality systems that jeopardized the quality of the medications we manufacture . . . is simply false"—is the only basis on which Lead Plaintiff can claim either (1) that there was a deceptive public facing cover for the purported fraud on which

3

the investing public could rely; or (2) that Defendants had a duty to disclose purportedly fraudulent interactions with the FDA.  ECF No. 107-11 at 7.  Otherwise, Lead Plaintiff is left only with allegations that Mylan purportedly engaged in fraud in ***private*** interactions with the FDA.[3]  This is not enough, as numerous decisions—including, most notably, Lead Plaintiff's own authority, *In re FirstEnergy Corp. Securities Litigation*—make clear that a securities fraud scheme claim requires "a deceptive public-facing 'cover' that would be reflected in share prices and relied on by investors."  2022 WL 681320, at *26-28 (S.D. Ohio Mar. 7, 2022); Response at 2 (citing same); *see also* ECF No. 106 at 17-19; ECF No. 111 at 13-14 (citing authorities).

Lead Plaintiff essentially concedes this point through its last-minute attempt to insert a new statement into this case that it claims evinces the required public facing cover through the excerpted Form 10-K in the Response.  Response at 2, Exhibit A.  That statement, which is not so much as mentioned in the operative complaint, is nothing more than a straightforward acknowledgement that the FDA requires cGMP compliance—it does not speak to the status of Mylan's compliance with cGMP requirements.  *Id.*; ECF No. 39 ¶¶ 273-276 (challenging different statements in the same Form 10-K).  Most importantly, Lead Plaintiff does not allege that statement is false or misleading, as it must to establish a deceptive public facing cover, nor could it.  In fact, elsewhere in the very same Form 10-K, Mylan warned that it had received notices of non-compliance and that it could receive additional notices in the future.  ECF No. 47-19 at 34; *see also* ECF No. 88 at 22.  In short, other than the sole remaining challenged statement, Lead Plaintiff

---

[3] *See, e.g.*, Response at 2 (explaining that the scheme allegations "depend on specific deceptive conduct such as: (i) retesting out-of-specification drug products, (ii) pre-injecting drug samples to avoid recording failed results; (iii) manipulating test reports; and (iv) bypassing required quality risk assessments,'" none of which constitute public- or investor-facing conduct).

has no allegedly deceptive public-facing cover for the purported scheme that it can point to either in the operative complaint or, apparently, outside of it.

Finally, Lead Plaintiff's reliance on the loss causation analysis in *Coinbase* is likewise inapt because that decision involved precisely the kind of corrective disclosures that are missing here.  Specifically, the plaintiff alleged that Coinbase misleadingly failed to disclose the risk that customer assets would be lost if Coinbase went bankrupt and the truth was revealed when the company subsequently disclosed that risk, resulting in a 26 percent stock decrease.  2024 WL 4053009 at *3-4, *17-18.  The plaintiff also alleged that Coinbase misleadingly suggested to investors that its crypto assets were not securities, and thus that the SEC would not pursue an enforcement action against the company.  *Id.* *4-5.  The plaintiff alleged that the truth regarding those challenged statements was revealed by various disclosures of SEC enforcement activity, including the issuance of a Wells Notice and filing of enforcement actions on the basis that Coinbase's crypto assets were securities, each of which resulted in significant stock declines.  *See id.* at *4-5, *13-14, *18.  Thus, in *Coinbase*, the loss causation analysis was straightforward: corrective disclosures expressly revealed the allegedly undisclosed truth that was concealed by prior misstatements.

There are no parallels to this action.  Here, Lead Plaintiff is expressly relying on a "revelation of truth" theory of loss causation, but the corrective disclosures in February and May 2019 only revealed the continuing scope and impact of the ongoing remediation efforts at Mylan's Morgantown facility.  They said nothing, expressly or impliedly, about purported circumvention of quality and data controls—i.e., the subject matter of the sole remaining challenged statement.  And while the *Coinbase* court did use language that appeared to endorse use of the "general causation principles" that apply in non-typical securities fraud cases, it did not suggest, much less

hold, that a securities class action plaintiff can plead loss causation based on a "revelation of the truth" theory where the corrective disclosures do not reveal the falsity of the alleged misrepresentation.

Dated: May 19, 2025

Respectfully submitted,

By: /s/ *Nina F. Locker*
Nina F. Locker (*pro hac vice*)
Evan L. Seite (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI, P.C.
650 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 493-9300
Facsimile: (650) 493-6811
nlocker@wsgr.com
eseite@wsgr.com

Sheryl Shapiro Bassin (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5899
sbassin@wsgr.com

William Pietragallo, II (PA I.D. # 16413)
PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP
One Oxford Centre, 38th Floor
Pittsburgh, Pennsylvania 15219
Telephone: (412) 263-1818
Facsimile: (412) 263-4200
wp@pietragallo.com

*Counsel for Defendants Mylan N.V., Heather Bresch, Rajiv Malik, and Kenneth Parks*

## CERTIFICATE OF SERVICE

I, Nina F. Locker, attorney for Defendants, hereby certify that on this 19th day of May, 2025, I served a true and correct copy of Defendants' Response to Lead Plaintiff's Notice of Supplemental Authority on all parties and/or their counsel via the Court's ECF electronic filing system.

Dated: May 19, 2025

Respectfully submitted,

By: /s/ *Nina F. Locker*
Nina F. Locker (*pro hac vice*)
Evan L. Seite (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI, P.C.
650 Page Mill Road
Palo Alto, California 94304
Telephone: (650) 493-9300
Facsimile: (650) 493-6811
nlocker@wsgr.com
eseite@wsgr.com

Sheryl Shapiro Bassin (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5899
sbassin@wsgr.com

William Pietragallo, II (PA I.D. # 16413)
PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP
One Oxford Centre, 38th Floor
Pittsburgh, Pennsylvania 15219
Telephone: (412) 263-1818
Facsimile: (412) 263-4200
wp@pietragallo.com

*Counsel for Defendants Mylan N.V., Heather Bresch, Rajiv Malik, and Kenneth Parks*

7