IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PUBLIC EMPLOYEES' RETIREMENT
SYSTEM OF MISSISSIPPI,

                Plaintiff,    Civil Action No. 20-955

       vs.

MYLAN N.V., et al.,

                Defendants.

- - -

Transcript of Oral Argument on May 21, 2025, United States
District Court, Pittsburgh, Pennsylvania, before
Honorable Judge J. Nicholas Ranjan, District Judge.

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | Salvatore J. Graziano, Esquire |
| | Katherine M. Sinderson, Esquire |
| | Andrew L. Zivitz, Esquire |
| | Colin J. Callahan, Esquire |
| | |
| For the Defendants: | Nina Fran Locker, Esquire |
| | Evan L. Seite, Esquire |
| | Sheryl S. Bassin, Esquire |
| | William Pietragallo, II |
| | Brian Cuthbertson, Mylan Counsel |
| | Bradley Matta, Mylan Counsel |
| | |
| Court Reporter: | Sharon Siatkowski, RDR, CRR, CRC, CRI |
| | 700 Grant Street, Suite 6260 |
| | Pittsburgh, Pennsylvania 15219 |

Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

2

P R O C E E D I N G S

(10:00 a.m.)

THE COURT:  Good morning, everyone.  You may be seated.  We're here today in the case of In Re: Mylan N.V. Securities Litigation at Case 20-955 for an oral argument on two pending motions.

Why don't we start by having counsel enter their appearances?  I'll begin with counsel for the plaintiff.

MR. GRAZIANO:  Good morning, Your Honor.  This is Salvatore Graziano from Bernstein Litowitz for the Plaintiff, Public Employees' Retirement System, Mississippi.

And because this is a class action, I just wanted to mention that our client representative is on the phone with us as well.

THE COURT:  Okay.  Very good.

MS. SINDERSON:  Good morning, Your Honor.  Katie Sinderson, also from Bernstein Litowitz Berger & Grossman.

THE COURT:  Good morning.

MR. ZIVITZ:  Good morning, Your Honor.  Andy Zivitz from Kessler Topaz Meltzer & Check, also on behalf of Plaintiff.

THE COURT:  Good morning.

MR. CALLAHAN:  Colin Callahan, also on behalf of the Plaintiff, Your Honor.

THE COURT:  Great.  Good morning.  For the

Defendants?

MS. LOCKER:  Good morning, Your Honor.  Nina Locker from Wilson Sonsini Goodrich & Rosati on behalf of the Mylan Defendants.

And with me here today, I'd just like to introduce Brian Cuthbertson, lead of North America Commercial Litigation, and Bradley Matta, who is also senior litigation counsel, from Viatris, which Mylan is now a part of.

THE COURT:  Good morning.

MR. SEITE:  Evan Seite, also from Wilson Sonsini.

THE COURT:  Good morning.

MS. BASSIN:  Good morning.  Sheryl Bassin from Wilson Sonsini for Defendants.

THE COURT:  Good morning.

MR. PIETRAGALLO:  Good morning, Your Honor.  Bill Pietragallo, local counsel for Mylan on this matter.  Nice to be with you.

THE COURT:  Same here.  Good morning, everyone.

So we have two pending motions.  I don't know if counsel conferred at all ahead of time.  I mean, I think we can -- I had a couple of thoughts in terms of the best way to present argument.  One way could be similar to how the motions were briefed.  I can hear first from Plaintiff's counsel as to the Motion for Clarification that deals with the scheme liability claim and then hear a response from the Defendant as

to that claim, and then maybe combined with an argument as to the Motion for Judgment on the pleadings.  And then we can go kind of back and forth in that manner.  The other way to do it would be take the motions separately.  I don't know who all plans to argue the motions, if they're split up, but it doesn't matter to me really how we proceed.  So I'm certainly open to any suggestions here.

MR. GRAZIANO:  Your Honor, we haven't conferred, but your suggestion is exactly how I was prepared to do it.  So that would be fine with us.

THE COURT:  Okay.  Ms. Locker?

MS. LOCKER:  Your Honor, we didn't -- I'm fine to adjust.  Part of our scheme claim relies on -- one of our scheme arguments, of course, relies on our loss causation argument for the 10b-5(b) claim, which is why we dealt with it in one motion.  So it's a -- I don't know how it will work, but I'm willing to adjust and do it however Your Honor wishes.

THE COURT:  Okay.  I think it should work based on what you've said and as I recall from the briefs.  Maybe we'll kick it off and, you know, obviously get an audible here on the fly.

Mr. Graziano, do you want to proceed?

MR. GRAZIANO:  Thank you, Your Honor.  And I do think the arguments are very intertwined and we'll see that today. But I also think getting some clarity of the scheme claim

actually goes a long way to address the loss causation arguments.

THE COURT:  And I guess the first question I had: What exactly do you want me to clarify?  If you had to draft the order for me to sign here, what exactly would it say as to the scheme liability claim?

MR. GRAZIANO:  Sure.  The way the issue was presented to Your Honor last time was that the Defendants made one argument as to why the scheme claim should be dismissed.  And without accepting the premise of their argument, Your Honor rejected their argument because Your Honor found a false statement.  Because they premised their entire argument on the scheme claim should be dismissed because there are no false statements, you denied their Motion to Dismiss the scheme claim because you found one false statement.

But that does not mean that the scheme claim we alleged is entirely redundant of the false statement Your Honor sustained.  And I wanted to take this opportunity to walk Your Honor through the law first, as well as the facts we allege, to make clear that what they are asking Your Honor to hold is legally invalid and also inconsistent with the complaints.

So let me maybe perhaps begin with the fact that in paragraph 345 of our complaint, we allege specifically a plan, scheme, course of conduct that was intended to, throughout the

class period, deceive investors.  And that's in paragraph 345.

In 346, we said that the Defendants employed these schemes and artifices to defraud and engaged in a course of business that operate as a fraud on investors in violation of rule -- of Section 10(b) under Sections (a) and (c).

And this was based on allegations that, over a lengthy period of time -- and I'll just summarize them because I don't think they are part of the issue today.  But over a lengthy period of time, there were improper practices going on in this company driven from the top down, including wrongfully invalidating failed results and testing its compliance, deliberately corrupting data, crashing computers, shredding data and quality control records, altering reports, falsifying evidence, and creating a façade of documents to deceive the FDA.  And the complaint pleads that this scheme took place over the entire class period from February of 2016 through May of 2019.

And as I said, when the Court rejected the sole argument the defense made, it rejected their Motion to Dismiss the scheme claim in its entirety.  And I think the moment for clarification now is, what does that mean?  Because they are taking the position that, no, no, no, the scheme claim is limited to the January 31, 2019, statements and there's been no discovery because discovery is stayed.  But in the initial discovery conference, they were refusing to give discovery on

anything but that and told us that statement would be dismissed under loss causation, which we'll argue later today.

But not only did the Defendants disregard our allegations that I very briefly summarized, by arguing that (a) and (c) is entirely redundant of Section B, they're misreading the law and inviting the Court to legal error.

So let's start with the Supreme Court in *Stoneridge* in 2008.  There the Court specifically said that a requirement that you need a specific oral or written statement before there could be liability under Section (a) and (c), it would be erroneous.  And that's a quote, they called it "erroneous."

Then again the Supreme Court, in *Lorenzo* in 2019, explained that 10b-5 has expansive language by design and it is intended to capture fraudulent conduct by somebody who didn't make the statement under the Janus holding of the Court.

So that has been applied -- and I'll just give Your Honor two other courts before I talk about this specific case, but that's been applied since then, including by Judge Salas in the *Cognizant* case, where she found someone engaging in deceptive conduct preceding any misstatement, and when that person wasn't even a maker of the misstatement, would be somebody who could be sued for scheme liability.

And then in *Able Labs*, which is a pharmaceutical case with nearly identical conduct where the defendants allegedly

falsified results, tampered with computer data, forged records, the Court began -- sustained a scheme claim.

Now, the flip side of this is the cases say just making a false statement is not enough for a scheme claim. And we see that, I think, most vividly in the Second Circuit's decision in *SEC vs. Rio Tinto*, where the Second Circuit said, on a specific interlocutory appeal pushed forward by the SEC to test the law, that, no, SEC, we disagree with you. Just making a false statement does not give rise to a scheme. You need something more. And in that case the something more, as a hypothetical from the Second Circuit, was, well, if they lied to the auditors, that was the something more.

So here, in this case, we obviously have the something more, we have a pattern of deception of lying to the FDA. And the first point, I think I've made pretty clearly now, is a scheme is not the same thing as a false statement. It would be legal error to reach that finding.

But the second point they raise is, okay, well, if that's true, you need to show investor reliance. And I want to spend a couple of minutes on that.

But first, let me just summarize where we are with the facts, which is on page 35 of your prior opinion. Your Honor said:  We sufficiently pleaded -- assuming the complaint as true for purposes of the Motion to Dismiss -- a pervasive, top-down scheme to dupe the FDA and ignore regulatory

compliance and best practices in the name of juicing manufacturing output and increasing corporate profits.  So that is the essence of the scheme.  And the question now is, Why aren't they right?  How can we show investor reliance since all of this lying was happening to the FDA as opposed to investors?

And I think that the problem with their argument is, they keep going back to reliance under Rule 10b-5(b), which deals with misstatements or omissions, and we are talking reliance under Rule 10b-5(b)(a) and (c).  And under (a) and (c), what we have is a requirement in the industry for Mylan to comply with good manufacturing practices.  That's a basic requirement in the pharmaceutical industry.  It's expected and understood by investors.  It's something that Mylan regularly publicly discussed including, for example, in its Form 10K and elsewhere.

So the way we view it, a scheme to cheat on that would and did affect the stock price of Mylan's stock because it's trading in an efficient market and investors are inaccurately assuming or believing that this company is in -- is not in a scheme to evade good manufacturing practices compliance.

So why do we say that?  Well, we have some cases we'd like to point to.  First is the *FirstEnergy* case from the Southern District of Ohio where it was a bribery scheme.  And

there the court said, you know, it doesn't really make any sense for liability to exist for a scheme that the defendants would have to make the scheme public because then there would be no scheme, it wouldn't work.

So what that court did was, it says, you know, really what's going on here is you have this public-facing cover. And in our case that public-facing cover would be compliance with CGMP, that's something investors were presuming to be met, that's something that's reflected in their share prices of Mylan, and that's something that would be relied upon by investors in an efficient market.

Another similar recent case on this is the case concerning Elon Musk when he was secretly buying up Twitter shares and refused to file his disclosure statement which he triggered once he had more than five percent of Twitter shares. And again, the court, in a very recent decision from this year, 2025, in the Southern District of New York, said that the failure to file that disclosure document sent a false signal to the market, that there was no such ownership for Mr. Musk to disclose.

And specifically in that case, we could not rely on there being a material omission because the Supreme Court had just done away with that in a case called *Macquarie*, which basically held that the failure to comply with a disclosure rule, such as 13 in that case, doesn't give rise to a private

right of action.  So there was no omission in the Musk case. It was more like the *FirstEnergy* public-facing deception.  And there's a similar case called *Riot Blockchain* with a very similar holding that we cite in our papers.

But, in essence, what we are saying is just the repeated statements by Mylan, whether or not they're false or not, that they had to comply with CGMP, their continued manufacturer of the drugs throughout the class period.  And investors having no reason to suspect they were scheming all along to evade these requirements by very deceptive behavior is enough for investor reliance.

And we also know that the market reaction -- and this is why it ties into loss causation, and I will hold the loss causation argument for after my adversary is done -- but my short point on this is the market reaction on all four of the disclosure dates show the market was misunderstanding what was going on here.  And ultimately, I'll come back and argue why that shows loss causation.

I think with this view of scheme, which we're trying to clarify in our motion, we see the January 31, 2019, statement Your Honor sustained, yes, as a false actual statement.  But we also see it as an effort to continue the scheme.  And in that statement there is a specific denial that Mylan employees were circumventing data and quality systems that were jeopardizing the quality of the medications that it

was manufacturing.  So that is another public-facing cover of the scheme that took place here.

As an alternative point, even though the defendants want to tie scheme claims to misstatements or omissions, I want to identify some omissions Your Honor could consider. But I don't think the proper reading of (a) and (c) liability for reliance purposes requires either an omission or a misstatement.  I think an (a) and (c) claim, in and of itself, doesn't require an actual misstatement, it doesn't require an actual omission.  It is a fraudulent scheme with very broad language that the Supreme Court in *Lorenzo* told us is designed to be broad.  And it has a public-facing deception, as we see here on each of these four very significant market declines when the truth comes out in an efficient market.

But, Your Honor, if the Court were focused on misstatements, obviously we have the one that Your Honor sustained on January 31, 2019, I'm not asking Your Honor to reconsider any of the other misstatements Your Honor did not sustain, but I will point out that we had multiple omissions in the complaint that we allege and these were not specifically covered by Your Honor's prior opinion.

I'll identify them by paragraph number.  It is not our position that they are required to be sustained at all.  I did want to identify that this company repeatedly omitted to disclose what was really going on and we allege that in

paragraphs 10, 73, 77, 301, 328, and 341. And in 341, we specifically cite to the Supreme Court's decision in *Affiliated Ute*, which goes back to 1972 where the court analyzed (a) and (c) liability and said that reliance may be presumed in the case of omissions, and otherwise that that would be a misreading of the scope of 10(b) liability.

So that is our clarification motion. Absent, you know, any questions from the Court, I think it's important for Your Honor to consider these are separate rules that trigger liability and it would just be an error to conflate them all into 10b-5(b).

And then the consequences on loss causation, you're going to hear from our adversary, is that the case should be dismissed. And I don't think that was Your Honor's intent in denying their very limited motion claiming that (a) and (c) was completely derivative of (b) when it's just not.

Thank you, Your Honor.

THE COURT: Sure. Before I hear from the defense counsel here, I guess I'm still thinking about, you know, what the order would say here. I mean, I think I get the gist of the motion, which is you don't want your scheme claim to be solely tethered to that January 2019 statement. Is that a fair way of looking at it?

MR. GRAZIANO: Yes.

THE COURT: And one of the reasons you're looking for

clarification, it sounds like, it pertains to potentially the scope of discovery in this case.  Is that right?

MR. GRAZIANO:  Yes, absolutely.

THE COURT:  And I guess what I'm -- I mean, what are the other ramifications, I suppose, you know, if I find that clarification is not necessary here and that the scheme claim is in fact tethered here to this statement -- it's not necessary, you don't have to have a statement -- but the statement is a public-facing disclosure here of deceptive conduct that would provide an independent basis for scheme liability, I'm just trying to think through where you're heading here.  Is it just because you want the scheme to be clarified to be broader because that might affect, you know, the statements on which you rely for loss causation, or maybe walk me through it.  And I apologize if I'm being dense here, but I'm just trying to think about, if I were to grant you relief, how best to frame it, or if it's even, you know, necessary because I did find that you have a scheme claim.

And in my view, discovery here, I can't see it being limited based on what I sustained here.  I mean, the statement is pretty broad in the *Bloomberg* article.  And I would think that discovery would be appropriate.

And I'm recalling the Rule 26 report, I know there was a dispute between the parties, but I don't think there was a dispute at least in that report as to the fact that

discovery would have to get into the underlying, you know, shredding of documents and cutting corners and not following good manufacturing practices.

So a long-winded sort of rambling question there. But I am trying to think about what exactly the relief is and why and how that implicates your position on discovery and other issues here.

MR. GRAZIANO:  Your Honor is intentionally or unintentionally pushing me into the loss causation argument, which I'll try to touch upon lightly.  But I agree, Your Honor did find a scheme claim, Your Honor did deny their Motion to Dismiss the (a) and (c) allegation and count.  But what are the consequences if they are completely tethered to the one statement on January 31, 2019?

Well, first, there are four corrective disclosures in the case.  Two of them took place in 2018; right?  So the first stock price decline was on June 28th of 2018 and the second was August 8, 2018.  So we know, because you're going to be hearing from counsel in a few minutes, that their position is, if the scheme begins with the January 31, 2019, statement, those two declines are out of the case.  And then they will say, so the only possible stock price declines in the case would be in February of 2019 and May of 2019.  But, if the scheme claim is completely tied to the one statement as opposed to being, you know, this broader course of conduct, as

I started my argument, well, then we should examine their one statement.

And their position is the one statement is in fact about manipulations happening in India, not in Morgantown, and the news drops on February 26th of 2019 and May 7, 2019, are all about India, nothing about Morgantown, which we don't agree with and I'll come back to you on. But the point is, it's case over.

So this is a pretty significant issue. And when we realized this problem early on in our initial conference, our position was, no, we have a sustained scheme claim. And they said, no, you don't, and that's what led to the Motion for Clarification.

So what would be most helpful to the parties -- well, it would also helpful to the Plaintiffs if Your Honor agrees with us, that the Court has sustained the scheme claim and has not limited that scheme claim to start with the January 31, 2019, statement. That would be the essence of what we're seeking. And I think that would go a long way to breaking our logjam of getting discovery started in this case.

They, on the other hand would like, I think, but I'll let them speak for themselves, an order from Your Honor clarifying, no, the scheme begins with January 31, 2019, statements. And that, I think, could be case dispositive, as we argue loss causation.

THE COURT:  Thank you.

Ms. Locker, if you want to address both the response on scheme as well as loss causation, I'd appreciate it.

MS. LOCKER:  Yes, Your Honor.  Thank you very much.  I'm going to start with scheme, if I may.

Not to every scheme claim requires a false and misleading statement; this case does.  And this case scheme claim is limited to the sole remaining challenge statement.  And like in the statement case, which I'll get to loss causation in a moment, they also lack of loss causation.

At its core Plaintiff, and Plaintiff said it, Plaintiff's scheme claim is that Mylan concealed from the FDA and investors that it engaged in intentional misconduct in subverting FDA regulatory requirements.  As Plaintiff said, a pattern of lying to the FDA concealed from investors.

But, like the misstatement claim, Plaintiff's scheme claim requires it to plead reliance on a class-wide basis.  I refer the Court to *Stoneridge*.  *Stoneridge* is a scheme claim -- is a scheme case.  It's a United States Supreme Court scheme case.  There are two ways to do so:  The fraud-on-the-market presumption under *Basic* and the omissions-based presumption of Affilated Ute.

To invoke the presumption of reliance under *Basic*:  Plaintiff must show that false information -- false information, and I'm going to address Plaintiff's cases in a

moment -- stemming from the allegedly underlying conduct was communicated to the market such that investors could have relied on the conduct in purchasing shares.

We have *Basic* for that, yes, a 10b-5(b) case; *Stoneridge*, a scheme case; and the Third Circuit decision in *DVI*, a scheme case. Not the district court decision, Third Circuit decision in *DVI*. There must be false information.

So the most straight -- and I can give the Court, I will, jump sites: *Basic* at 241 to 242, *Stoneridge* at 158, and DVI at 648 to 49. The law could not be more clear. The most straightforward way for Plaintiff to invoke the basic presumption of reliance is, of course, to point to their sole remaining statement, the January 2019 denial. Under that approach, the market would be presumed to rely on that adequately alleged false statement. And the reliance element would be satisfied, at least at this stage of the proceedings.

The problem for Plaintiffs, I'll get to this later, is that relying on the sole remaining challenge statement is that there's no loss causation. And because loss causation is an essential element of a scheme claim, the scheme claim would fail. And we refer the Court to *Takata* v. *Riot Blockchain*, which is cited in our papers. It's a District of New Jersey 2020 decision, and it dismisses a scheme claim for the lack of loss causation for failure to have a corrective disclosure with respect to the alleged deceptive conduct. So loss

causation is obviously an essential element of a scheme claim.

So as a result, we heard from Plaintiffs saying, omission, omission, omission.  They've gone to great lengths here and in their opposition to characterize the case as one based on omissions in order to try to invoke the presumption of reliance under *Affiliated Ute*.  And you'll see throughout their papers this characterization.

And the reason for this is that every court of appeal to have addressed the issue, including the Third Circuit, has held that Affiliated -- the *Affiliated Ute* presumption of reliance is not applied unless the case is characterized as one primarily involving omissions.  And for the Third Circuit case on that, it's *Johnson* v. *HBO Film Management*, which we cite in our papers.

But because an omission is not actionable, absent a duty to disclose -- let me repeat that, it's critical -- absent a duty to disclose, there's -- an omission is not actionable, plaintiff concedes, as it must, that for *Affiliated Ute* to apply, there must be a duty to disclose in the first place.  And that concession the Court can find on page 1 of Plaintiff's opposition brief and at page 21.  Quote -- they're talking about Supreme Court precedent -- *Affiliated Ute* applies because the market is presumed to rely on undisclosed information defendants had a duty to disclose.

The concession is not surprising, Your Honor, because

the Supreme Court itself has twice held, twice held, that the *Affiliated Ute* presumption requires both a material omission and a duty to disclose.  The Court can find that and I refer the Court to both *Affiliated Ute* itself and *Stoneridge*.  Very clear.

So here there's one remaining challenge statement: There are no other statements to which Plaintiff can point to to establish a duty to disclose.  The other statements the court held that Plaintiff challenged were not adequately pled to be false or misleading.

We, therefore, respectfully submit that, for reliance, the Court's analysis under *Affiliated Ute* is easy. This case doesn't present the mixed case of omissions and, you know, affirmatively false statements where the courts are grappling with whether to characterize it as primarily an omissions case or an affirmatively positive case.  Here we have one remaining challenge statement.  The Court found it to be actionable as an affirmatively false statement, that's the Court's opinion at page 33.  So *Affiliated Ute* doesn't apply, and you have only *Basic*.

So the Plaintiff -- I'm willing to rely on *Basic* because it leads you down the road of the one remaining challenge statement and the loss causation problem, and unable to rely on *Affiliated Ute*.  The Plaintiff seems to suggests, and I think it's more clear now, that they can state a scheme

claim solely on the conduct alleged, the alleged misconduct, the manipulation of drug tests, the testing into compliance. However, this is not an FDA compliance case.  Plaintiff has no standing to enforce FDA regs.  It's a securities fraud case. So unless Mylan conveyed false information to the market -- false information to the market -- there's no investor deception.

I would refer the Court to the District of New Jersey's discussion -- yes, this is a scheme case -- in *SEC v. Lucent* out of 2009.  It's cited in our papers, *SEC v. Lucent,* in very apt language:  Deception at a minimum has to involve an act that gives the victim a false impression. If -- and this is a quote:  If the investing public has no knowledge that an issuer committed an act because the entity has not conveyed any information about that act, or withheld pertinent information that would make a public statement about that act misleading, there has been no deception because no false impression was created.

And that's why when you look at the scheme cases, Your Honor, they require that a plaintiff attempting to pursue a scheme claim alleged that the scheme resulted in false or misleading information being conveyed to the market on which investors rely.

And I'm going to do a little bit long list here, forgive me:  *Stoneridge;* Third Circuit decision in *DVI.*  And

this is all cited in our briefs and I'm happy to give jump cites.  If that makes it easier for the Court, I can give jump cites.

THE COURT:  That's fine.

MS. LOCKER:  *Eastman Kodak* out of the Southern -- Western District of New York; *Galena Biopharma*, cited by Plaintiffs, District of Oregon; *Turquoise Hills*, Southern District of New York; *FirstEnergy* itself, which I'm going to address in a moment, Your Honor, out of the Southern District of Ohio; and *AAC Holdings*, the Middle District of Tennessee. As you see, we've scoured the country because there's not as many scheme claims.

So here the alleged conduct that Mylan -- that Mylan's alleged violations of the FDA regulations, standing alone, that conduct didn't convey anything to the market.

The one case I urge the Court to review is *Stichting v. Merck*.  We cite it in our papers.  It's a 2012 opinion from the District of New Jersey.  It is on all fours.  Fraud purposes, the case involved virtually indistinguishable allegations of FDA violations as a predicate for a scheme claim.

The allegedly deceptive conduct consisted of intentionally designing clinical trials to minimize the risk that safety issues relating to a drug called Vioxx would be revealed, would not -- you know, would be revealed,

manipulating clinical trial data, submission of incomplete data to the FDA, submission of false documents to the FDA.  So we've got alleged misconduct.

The Court held, and I quote:  The complaint of fraud on investors results not from the underlying conduct itself, e.g., manipulation of test data, the design of studies to obscure safety issues, et cetera, but rather from defendants' ultimate communication of materially misleading information about Vioxx to the public.  The predicate conduct itself does not constitute a deceptive device, (a) and (c), separate and apart from the misrepresentations about the safety profile Vioxx.

Well, the same conclusion applies here.  Mylan's alleged compliance-related misconduct does not itself constitute a deceptive device separate and apart from the compliance-related statements Plaintiff challenged in its statements.  You need reliance.  You need information, false or misleading conveyed to the market, on which investors can rely.

I'd like to pause for a moment to discuss *In Re: Able* which Plaintiffs rely on heavily.

So in that case, the Court upheld the scheme claim based on allegations of wrongful conduct, similar to that alleged here.  That case involved multiple misrepresentations, including compliance with CGMP, and no loss causation issues.

It's not a decision of great clarity, forgive me, Your Honor, I hesitate to say that.  But that decision was issued four years before *Stichting v. Merck* by a different judge in the District of New Jersey.  And however, unlike *Merck*, the *In Re: Able* court did not do any analysis whatsoever about whether defendants' acts vis-à-vis the FDA constituted deceptive acts designed to defraud investors, whether there was sufficient reliance, separate and apart from the misrepresentations that the Court upheld.

And to the extent that *In Re: Able* can be read as endorsing a scheme claim based solely on the underlying conduct separate from the many actionable misrepresentations, it can't be reconciled with *Stichting* v. *Merck*.  And we would submit, Your Honor, that given the lack of analysis, it shouldn't be given much weight.

At least in Plaintiff's opposition, it appears as if Plaintiffs concede a tacit admission that it needs one or more statements that allege conveyed false or misleading information to the market because they describe their scheme more than 17 times -- I actually counted -- more than 17 times as a scheme to conceal from investors Mylan's repeated violations of the FDA's quality and safety regulations.

Well, why is that a concession?  Because concealment, that is a failure to disclose, is not actionable absent a duty to disclose.  This is a bedrock principle of securities laws.

I refer the Court to *Basic* and *Winer*.  And the only basis for a duty to disclose in this case, because we don't have insider trading, we don't have a regulatory requirement of disclosure, is a false or misleading statement.  And that's why Your Honor was correct in its Motion to Dismiss order, that this case is dependent upon a false and misleading statement, the sole remaining statement.

I'll get to loss causation in a moment.  I just want to say a few words, if I may, about *FirstEnergy* and Musk, Your Honor.

So Plaintiff is now saying, well, they only have to point generally to Mylan's known CGMP regulatory obligations and some public statements that don't need to be false and misleading explaining the importance of CGMP to the company.  But again, that completely ignores reliance.  *Basic*, you need false and misleading statements.  *Affiliated Ute*, here you need a duty to disclose where it's only based on a false or misleading statement.  The law could not be more clear.  So you can't just wave your arms and point to some general obligations and some statements that aren't false and misleading.

So let me turn to *FirstEnergy*.  I think Plaintiff said *FirstEnergy* stood for the proposition -- forgive me, Your Honor -- is that kind of any deceptive public-facing cover will do to establish reliance.  *FirstEnergy* does not support

that proposition.

In addressing the defendants -- there were two types of defendants in *FirstEnergy*, Your Honor.  And *FirstEnergy* involved an entire bribery and corruption scheme that led to some legislation.  In addressing the defendants who made statements to the market -- because there were two sets, a group that makes statements to the market and a group that didn't.  In addressing the reliance for the defendants who did make statements to the market, and I quote, at page 26: *Basic's* fraud-on-the-market theory applies here because the Court found that defendants made material misrepresentations in their public statements.

I mean, I can go on.  The Court goes on and says: The misrepresentations had a purported role in the alleged scheme.  They sold the cover.  The misrepresentations is that deceptive facing -- public-facing cover.  And therefore, provided the basis for reliance.  The misrepresentations, of course, sold the cover that the bailout was legitimate as opposed to the product of the scheme.

With respect to the nonspeaking defendants, Your Honor, the Court held that reliance was satisfied -- and this is at page 28 -- because of its finding that *FirstEnergy* created misleading information, referring back -- that is, these defendants didn't speak but their company made misleading statements to the market.  And the Court refers

back to the sections where it said, I held that plaintiffs adequately allege false or misleading statements.

So Musk and *FirstEnergy* do not stand for the proposition that you can have this general obligation and some nonfalse or misleading statements.

I don't believe Plaintiffs have pointed the Court to a single decision upholding a scheme claim absent some form of deceptive public-facing cover.  Established through a misrepresentation, either by the defendants or -- and these are unusual cases but they exist -- false and misleading statements made by a third party that the Court held the defendants made, caused to make that statement.  And I can explain those cases if the Court wants but they're not necessarily relevant.

Again, where we started, which is they challenged statements regarding our regulatory -- Mylan's regulatory compliance efforts, only one was found to be false or misleading.  And that is the only basis on which Plaintiff can claim is a public-facing cover of reliance.

And I'm going to get to loss causation in a moment. I don't -- I just want to say one other comment, Your Honor, because I don't want this to fall through the cracks.  There is a separate basis for dismissal of the scheme claim and I just want to touch upon it very briefly.

As we showed in our papers, the Courts uniformly hold

that where the scheme to defraud is based on alleged fraudulent misstatements, the claim should be brought as a 10b-5(b) claim, not a 10b-5(a) and (c) claim.  And here, it's certainly our position that the only way Plaintiff has alleged that the scheme defrauded investors is through the statements challenged in its complaint.

I want to refer the Court to two cases, but we cite many.  *Stichting v. Merck*, again, the District of New Jersey, 2012, the Court dismissed the scheme liability claim.  That was the -- remember that was the false clinical trials and fake FDA documents because of the drug.  The Court dismissed the scheme liability claim and held that plaintiff's claim could only proceed under the misstatement claim -- and there was one under 10b-5(b) because Merck's alleged misconduct, falsification and clinical trial data, et cetera, did not constitute a fraud on investors separate and apart from the allegedly false statements regarding the drug.  So it was a false statement case.

Similar, I refer the Court to the district court decision in *ServiceMaster* which we cite in our papers.  It's out of the Western District of Tennessee.  That case involved an alleged scheme to intentionally provide inadequate termite protection and to induce customers to cancel lifetime protection.  There was an alleged scheme for that.  And the Court rejected the notion that this consumer-facing conduct,

consumer-facing conduct, which was alleged to violate consumer protection laws, constituted a fraud on investors.

So as a result, the Court said, the fraud on investors actually arose from defendants' statements to the market which the allegedly underlying conduct rendered false and misleading.  So the Court therefore concluded there's no meaningful distinction between plaintiff's misrepresentation theory and plaintiff's scheme theory.  It's the same here.

This case certainly concerns Mylan's alleged violations of FDA -- you know, of FDA regulations.  But the fraud on investors didn't result from the underlying conduct, but rather from the allegedly false and misleading statements. Plaintiff is not allowed under the cases to repackage its misstatement claim as a scheme claim.  And as Your Honor may know, the courts say that simply circumvents the heightened pleading requirements of the PSLRA in Rule 9(b) with respect to 10b-5(b) claims, we can't do it.  And for that additional reason, the scheme claim should be dismissed.

Should I sit and wait for loss causation, Your Honor?

THE COURT:  If you need a break.  No.  If you can, why don't we handle the loss causations?  I think it sort of dovetails nicely with the argument on scheme here.

MS. LOCKER:  Thank you, Your Honor.  So there's no disagreement that the 10b-5(b) claim is limited to the one remaining challenge statement, the denial in the *Bloomberg*

article.

There should also be no disagreement, Your Honor, that the only relevant theory of loss causation in the case is the revelation of the truth theory, which requires Plaintiff to plead a corrective disclosure.  This is the only theory Plaintiff has pleaded in the amended complaint.  And plaintiff actually concedes in its opposition that this is the theory on which it's proceeding.

I would refer the Court to the amended complaint at paragraphs 331 to 332 and Plaintiff's opposition at 1, 2, and 8.

At the end of the Third Circuit's test set forth in *McCabe*:  To allege a corrective disclosure, Plaintiff must allege that Mylan's stock price declined when information disclosed to the market corrected the challenge statement.  And here it's regarding circumvention.  That is information disclosed to the market revealed the falsity -- some aspect of the falsity of the challenge statement.

The district courts in this circuit have consistently applied this test, and I'm going to get to those in a moment.  And with respect to -- there's just a legion of them and we cite them in our papers.

With respect to the two alleged corrective disclosures, the February 26, 2019, announcement, right, corrective disclosure has to come after the challenge

statement.  So we've got two corrective disclosures:  The February 26, 2019, announcement of financial results for fiscal year 2018 and the May 7, 2019, announcement of financial results for Q1.  There's no dispute that neither says anything about circumvention of data or quality systems, not a word.  And those announcements simply disclose the continuing impact of ongoing remediation and restructuring.  It talked about additional product discontinuations, additional expenses, and additional sales declines in North America.

So under controlling Third Circuit precedent, these announcements were not corrected.  They didn't reveal the falsity of the challenge statement regarding circumvention, and that should be the end of the analysis.

So what does Plaintiffs say?  Well, first Plaintiff says, but the stock dropped -- the stock price dropped in response to the February and May 2019 announcements.  But that, of course, doesn't meet the pleadings' burden.  Plaintiff has to allege that the stock dropped not because of the new information -- there was new information -- but not because of the new information in the announcements, but because the information revealed the falsity of defendants' prior misstatements.  And we don't have that here.

So what else do Plaintiffs say?  They say, well, what we call the scope and impact argument.  The disclosures -- the

announcements disclose the scope and impact.  They say, you engaged in fraudulent data practices, and as a result, you were forced to do the remediation program.  So Plaintiffs say, therefore, the only plausible inference from the February and May announcements, which disclosed the ongoing scope and impact of the remediation, is that -- the only inference is that it corrected the January 31 statement denying the circumvention.

But this argument fails for three reasons:

One, as we explained in the papers, remediation can occur whenever there's something that needs to be addressed for any reason.  And an inference of fraudulent -- therefore, an inference of fraudulent data practices or some other kind of intentional misconduct is not the only inference that one can draw from an announcement of ongoing remediation.

Second, more importantly, the inference that the Plaintiffs are asking this Court to draw is really beside the point.  The case law in the Third Circuit is clear:  That Plaintiff must allege that the market, not Plaintiffs, the market actually inferred that Mylan circumvented data and quality systems from the alleged corrective disclosures at the time the corrective disclosures were made.

And I refer the Court, just by example, to three cases:  *PharmaNet* -- we cite all of this -- District of New Jersey at 561 to 62; the district court decision in *DVI*,

not the Third Circuit, the district court decision in *DVI* at 6 and 24; and *In Re: Urban*, the Eastern District of Pennsylvania at 655 to 57.  And here, Plaintiffs have offered no analyst commentary or other facts to even suggest that the market interpreted the alleged corrective disclosures in February and May as revealing anything about circumvention.

So let's assume that the Court were to assume that circumvention was the only reasonable inference and that Plaintiff doesn't need to show that the market, you know, interpreted it that way.  We think those are wrong assumptions but let's assume that.  The scope and argument would still fail.  And that's because the only new information that Plaintiff can and, in fact, does claim that the February and May announcements disclose was the ongoing impact of already disclosed remediation and restructuring.  There's no other new information that Plaintiff points to.

And the law -- there's really no cases in the Third Circuit, but the law says:  The disclosure of the ongoing impact of already disclosed issues doesn't establish loss causation.  Such a disclosure doesn't provide new information correcting a prior misstatement as a matter of law.

And I would refer the Court to the two key cases, although there are more, *Fitbit*, out of the Northern District of California and Dalberth v. Xerox, which we cite in our papers.  And I am sorry, I apologize, I can't remember where

it's out of.  And here, as the Court's opinion noted:  Mylan made numerous significant disclosures regarding the remediation long before February and May of 2019.  It received the 483, it had implemented an extensive remediation and restructuring program that would involve a reduction of workforce, a discontinuation of products.  The program would continue -- had had and would continue to have a significantly negative impact on productions levels, product supply, operations.  The company had already experienced a decline in North American sales.  They received a warning letter.  They didn't expect any new product launches in 2019.  They expected additional costs.  They couldn't reasonably estimate the cost.

I mean, these are quite robust and they certainly serve the basis.  I mean, they were certainly robust and transparent with respect to the ongoing remediation.  So the scope and impact argument doesn't work, which brings us back to Plaintiff has failed to allege loss causation for the sole remaining statement.

THE COURT:  Can I ask you, in terms of the last argument, what the January 2019 statement, actionable statement, does that helps to sanitize or alter any preexisting information that was in the market?  In other words, you know, there was information out there about the warning letters and the Morgantown remediation.  You have an

actionable statement that says, you know, all these insinuations -- well, I note the parties characterize this a little bit differently, but let's just say the statement says, hey, all these insinuations about cutting corners and everything, totally false.  And then there's this alleged corrective disclosure which might refer to some information that had been out there previously with respect to Morgantown.  But does the statement itself almost reset expectations, I suppose, such that anything that could have been previously disclosed information wouldn't be -- it's not old information anymore?  I don't know if that question makes sense in this context.

MS. LOCKER:  That question certainly makes sense.  And we think the answer to that is no, Your Honor.  And the reason is, the statement denying circumvention, put aside the fact that it related to Nashik, that statement said nothing about remediation and restructuring at all.  And therefore, certainly did not walk back all of the disclosures that Mylan had previously made about the ongoing remediation and restructuring.  And there's certainly no market commentary suggesting that it did.  So that's number one.

And then, before I sit down, I just want to -- two quick comments.  One, I want to cite a case, and this is relating to Plaintiff's most -- its Friday night filing -- I call it the Friday night filing -- submission.  I urge the

Court to read the district court decision out of New Jersey, it's 2018, in *De Vito*.  *De Vito* v. Liquid Holdings, we cite it in our brief.  It has a very good description of how in analyzing loss causation the Third Circuit distinguishes between fraud-on-the-market cases, such as ours, where a plaintiff alleges a defendant made a misrepresentation and artificially inflated the stock price of a publicly-traded security, okay, and the courts call that the typical 10b-5(b) case, and what they call nontypical 10b-5(b) cases, i.e., fraud in private transactions.

And after doing this entire analysis, the *De Vito* court concluded, to establish -- quote, To establish loss causation, in a typical 10b-5 case a plaintiff must show that its losses are related specifically to the market's discovery -- the market's discovery -- of the misrepresentation and the corresponding decrease in price due to that misrepresentation.

Of course, Plaintiffs cited *Coinbase* which suggested that you can just apply general causation principles.  But, one, the Court didn't hold that a plaintiff who's proceeding on the revelation theory, the revelation of the truth theory of loss causation, doesn't need to allege a corrective disclosure.

*Coinbase* had clear corrective disclosures, very clear corrective disclosures for both the bankruptcy statement and the SEC regulatory statements.  And it certainly didn't

abrogate *McCabe* or *De Vito*.  I mean, *Coinbase* didn't abrogate those decisions.

So with that, Your Honor, I will sit.  Thank you very much, Your Honor.

THE COURT:  All right.  Thank you.

Mr. Graziano.

MR. GRAZIANO:  Your Honor, just a brief response to scheme liability.  So I think we heard over and over again this morning that to have a scheme claim, you need an omission or a misstatement.  And I think we just have to go back to Rule 10b-5(b) and read it.  And what you see in Rule 10b-5 is the words "omission" and "misstatement" only took place in one section, which is 10b-5(b).  If you read 10b-5(a) and 10b-5(c), you will not see those words.  So it is basically reading those two sections of the rule out of the rule.

And secondly, if that were true, which I don't think is consistent with *Lorenzo*, what would the ramifications of that be?  I mean, fraud would be rampant, and there would be no liability based on what Mylan's counsel just argued.  And I think it is just a misunderstanding to go back to *Basic*, which does many things:  It establishes a fraud-on-the-market presumption, which doesn't go away in our case, but it also does so in a 10b-5(b) case and it talks about a misstatement because that was the issue there.  *Affiliated Ute* does something similar with an omission.

But we can't look at those cases that we're looking at, those specific issues that they had, and extinguish liability under Rule 10b-5(a) and (c).  We can look, since *Lorenzo*, at more recent cases, such as the Elon Musk case where the Court said, No, there's a false signal.  He didn't make a statement that he was complying with Section 13.  He didn't make an omission.  An omission would not be actionable under Macquarie.  What he did was he presented a false signal by his deceptive behavior.  *FirstEnergy*, those defendants didn't speak, they didn't make statements, but there was a public-facing false cover.

So the way we see it, Your Honor, is if you violate 10b-5(a) and (c), which is your holding in the last opinion, that plus a public-facing cover, or deception, is enough.  And we have that here because everyone knew, and Mylan said over and over again, that they had to comply with CGMP.  Mylan didn't say we've been scheming and defrauding the FDA the whole class period because then the fraud would not have been successful.

So that's the disconnect between the two of us.  That's the fundamental clarification we seek.  We think their view of the law would mean that (a) and (c) is basically read out of the rule entirely, and all you could have is liability for misstatements and omissions, which are only in 10b-5(b).

Now, going to loss causation.  It does affect loss

causation because if the breadth of our scheme is the entire class period, all four of the declines are loss causation dates.  If, however, we are having a case that's limited to one statement on January 31, 2019, we concede that if that's the entire case, both as a misstatement and as a scheme, loss causation could only be in February and May of 2019.  And the issue there is, what is the nature and breadth of the statement being made to *Bloomberg* on January 31, 2019?

We see that statement, consistent with Your Honor's reading of it in the prior order which I'll reference in a moment, as a blanket denial, company wide, that:  All of their medications, right, all of their facilities are made under stringent processes, procedures, and rigorous testing designed to ensure that they meet the highest standards for quality, safety, and efficacy.  Any explicit or implicit suggestion that Mylan employees circumvented data and quality systems that jeopardized the quality of the medications we manufacture -- for time pressures or any other reason -- is simply false.

So we see that as a broad denial that affects not just the plant in India but all of their operations.  And in this same article, their flagship plant in Morgantown was referenced repeatedly.

If, however, Your Honor agrees with them, that the denial on January 31, 2019, was just about India, then, as I said before, we would have no case left because the two

remaining corrective disclosure dates in February and May of 2019 are only referring to Morgantown.

And in terms of Your Honor's prior analysis, on May 18 of 2023, there were five separate times in Your Honor's decision that Your Honor read the denial as applying to all of Mylan's plants, not just the one in India.

So, first, in analyzing falsity.  Your Honor held that this was a statement responding to allegations of CGMP and data integrity failures at Mylan's plants, pleural, and that was a quote.  And that was from page 30 of your opinion, and it was also on page 5 of your opinion.

Second, Your Honor analyzed the scienter in that opinion.  And in terms of scienter for the January 31, 2019, statement, at pages 33 and 35 of your opinion, Your Honor read the statement as a then-existing fact.  And Your Honor wrote that:  Mylan's senior management team allegedly knew it was false (or at least materially misleading) given the corporation's recent history of compliance issues at several of its flagship manufacturing facilities.  So there again you're talking about several of its facilities.

And then, the last time this comes up is on page 37 of your opinion where you talked about the January 31, 2019, statement as misrepresenting the state of compliance at Morgantown.  And the scope of that statement, if that's all we're left with, is the first question we have to answer

because if it's just India, as I said, we have no case left. But if it is all of the company's facilities, it's read as a broad blanket denial of any impropriety anywhere, including where 85 percent of the company's drugs are manufactured, which is Morgantown, then we can turn to loss causation and understand that loss causation is simply proximate cause. A recent decision from this courthouse, *Howard vs. Arconic*, 2021 WL 2561895, makes that clear. It's just a test for proximate cause. And it's not correct to say we've pled ourselves into one theory.

The same paragraph that my adversary cited, Your Honor, paragraph 332 of the complaint, talks about the adverse consequences of what was going on here being entirely foreseeable. And they were, Your Honor, because when Mylan had fixed the numerous issues that had been going on with rushing products to market, ignoring safety and compliance and testing, as Your Honor had said yourself in your opinion, what are the consequences of that? What are the consequences in this case is, to do it right, Mylan had to spend a lot of money. To do it right, Mylan had to drastically scale back the amount of drugs they were pumping out of Morgantown.

And that is loss causation because the market is hearing that things are so much worse than their denial in fact of January 31, 2019, as Your Honor referenced a few moments ago. They are saying that nothing like this has

happened.  Well, that's a reset because they're being -- investors are being told -- and that's a false statement -- that things are not nearly as bad as *Bloomberg* is reporting.

And then what do investors find out?  Well, first, they find out on February 26, 2019, the first corrective disclosure after the January 31 statement, that this company had to discontinue a shocking 250 different SKUs for products at Morgantown;

That they would have no new products there for the foreseeable future;

That they would have to lower their results and their projections; and

That they would have to now spend over $258 million to fix this mess.  This mess which was the fraud that had been going on over the whole class period, the scheme.

And what happens, Your Honor, there is a 15 percent stock decline on that news.  That is loss causation.  That's a foreseeable result of cheating and pushing things through without regard to FDA rules.

The second thing that happens is on May 7, 2019, and now the company suddenly is reporting a loss.  So it's not even earning income anymore.  It's losing income, or reporting loss, I should say.  The cost to fix things has gone up.  And now the stock price goes down by 24 percent.  These things that happened to the company when it finally has to do things

right and fix its mess are loss causation.

And we have a case that I think is very on point, which is the *Guam v. Invacare* case, 2014 WL 4064256, where the cost to remediate that situation for FDA compliance for the same as this one and the delays for new products were revealed and the Court held it as loss causation.

So I think, you know, the fundamental issues for us today should not be proximate cause because proximate cause seems obvious in this case.  The fundamental issue should be, what is the scope of (a) and (c) liability, if it exists at all according to my adversary.  And then, secondly, what is the company denying on January 31, 2019.  Are they just talking about India?  Or, as Your Honor held in your prior decision, are they talking about all of their facilities, which would make logical sense.  I mean, it would be strange for a company to deny any impropriety in one facility and then say nothing about everywhere else.

So that's our response, Your Honor.  Thank you.

THE COURT:  Thank you.  Appreciate it.

Ms. Locker, any rebuttal?

MS. LOCKER:  Very briefly, Your Honor.  So with respect to scheme liability, all I'd say is that Plaintiffs are asking for a whole new standard for reliance for a scheme that does not exist in the law.

With respect to loss causation, I'll be very brief on

Nashik.  But the quote that Plaintiffs gave you included a portion that was not spoken by the spokesperson.  But putting that aside, we do think that the Court should probably interpret the statement as limited to Nashik, but that's not necessary to conclude that there is no loss causation.

With respect to *Howard v. Arconic,* I'm going to quote from the Court:  The Plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the securities price, unquote. Corrective disclosures insufficient where they did not reveal the falsity or misleading nature of these misrepresentations.

*Invacare*, which Plaintiff also invoked and we discussed in our reply papers, if I recall correctly, Your Honor, there were clear corrective disclosures.  The Court held that the prior misrepresentations had been corrected. And the misrepresentations were compliance with CGMP, receipt of a warning letter that did not -- I'm sorry, not CGMP compliant.  Forgive me, Your Honor.  Receipt of a warning letter that was limited to documentation issues that would not impact production and that the company had met all the FDA guidelines.

The corrective disclosures that the Court held corrected those misstatements were:

An audit committee investigation, an announcement of the audit committee investigation looking into misconduct

linked to FDA compliance;

The warning letter itself which showed, obviously, that it wasn't limited to a documentation issue, it raised safety issues;

Systemic improvements company wide showing that the company had not fixed the FDA's concerns; and

I think there was also a shutdown of production which showed that in fact production was limited.

I'm not getting it perfect, Your Honor, I'm sorry, I can't find it in my notes, but it's very close.

So on that, I think I would just close with, there is no dispute that the corrective disclosures here said nothing about circumvention.  There is no dispute that plaintiff has not and obviously apparently cannot submit market commentary linking the corrective disclosures to circumvention.  The corrective disclosures were not corrective.  They didn't reveal the falsity of the challenge statement.  And that, therefore, this case should be dismissed on loss causation grounds.  That's the misstatement claim.

Because of *Basic* and *Affiliated Ute*, the same is true for the scheme claim.  And there's an alternative basis for the scheme claim because it's a relabeling or recharacterization of a false and misleading statement.

THE COURT:  Okay.  All right.  Thank you, appreciate it.  Thank you, everyone.

I will order a copy of this transcript with the costs to be split between the parties.  So if counsel can confer with the court reporter, I'd appreciate it.

I'll take these motions under advisement.

Anything else while I have everybody here? Plaintiff's side?

MR. GRAZIANO:  We have nothing else.  Thank you, Your Honor.

THE COURT:  Thank you.  From defense?

MS. LOCKER:  No.  Thank you, Your Honor, very much.

THE COURT:  Appreciate it.  Take care, everyone.

(Proceedings concluded at 11:10 a.m.)

- - -

**C E R T I F I C A T E**

I, SHARON SIATKOWSKI, RDR, CRR, CRC, CRI, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


\s\ Sharon Siatkowski          May 23, 2025
SHARON SIATKOWSKI, RDR, CRR, CRC, CRI    Date of Certification
    Official Court Reporter