**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| IN RE MYLAN, N.V. SECURITIES LITIGATION | Master File No. 2:20-cv-00955-NR<br><br>CLASS ACTION |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
(I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF SETTLEMENT
AND PLAN OF ALLOCATION AND (II) LEAD COUNSEL'S
<u>MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES</u>**

**TABLE OF CONTENTS**

**Page**

I.  PRELIMINARY STATEMENT ...................................................................................1

II.  THE REACTION OF THE SETTLEMENT CLASS SUPPORTS APPROVAL...............2

    A.  The Court-Approved Notice Program Was Robust.................................................2

    B.  The Settlement Class's Reaction Supports Approval of the Settlement and the Plan of Allocation ........................................................................................3

    C.  The Settlement Class's Reaction Supports Approval of the Fee and Expense Application ..........................................................................................4

III.  THE FRANK OBJECTION TO THE MOTION FOR ATTORNEYS' FEES IS WITHOUT MERIT ...................................................................................................5

    A.  Lead Plaintiff's Retainer Agreement with Lead Counsel Has Always Permitted a Fee Request of Up to 25%, and Has Always Been Subject to Further Review and Consent by the Mississippi Attorney General.........................5

    B.  Mr. Frank's Vague Allegations of Improper Conduct Should Be Rejected............8

    C.  The Requested 25% Fee is Reasonable Considering the Recovery for the Settlement Class, the Substantial Risks, and the Stage of the Case.......................10

        1.  The Recovery Obtained Supports the Fee Request....................................10

        2.  The Risks of the Litigation Support the Fee Request ...............................13

        3.  The Stage of the Litigation Supports the Fee Request..............................14

    D.  The 25% Fee Request is Fully Supported by the Substantial Efforts of Plaintiff's Counsel Over the Past Five Years and Plaintiff's Counsel's Resulting Lodestar ...........................................................................................16

        1.  Lead Counsel Provided Adequate Detail of Plaintiff's Counsel's Lodestar to Permit a Lodestar Crosscheck................................................16

        2.  The Inclusion in the Lodestar of Time Spent by In-House Investigators and Other Professionals Was Fully Appropriate.................18

    E.  It Is Appropriate for Lead Counsel to Allocate the Fee Awarded Among Plaintiff's Counsel ...........................................................................................20

F.      Lead Counsel's Request That The 25% Fee Be Calculated Net Of
        Plaintiff's Counsel's Litigation Expenses—But Not Currently Unknown
        Administrative Costs—Is Appropriate ..................................................................22

IV.     CONCLUSION...........................................................................................................24

**TABLE OF AUTHORITIES**

**Page(s)**

Cᴀsᴇs

*Acevedo v. Brightview Landscapes, LLC*,
   2017 WL 4354809 (M.D. Pa. Oct. 2, 2017) ...........................................................................15

*In re Aetna Inc.*,
   2001 WL 20928 (E.D. Pa. Jan. 4, 2001) ................................................................................23

*In re AremisSoft Corp. Sec. Litig.*,
   210 F.R.D. 109 (D.N.J. 2002) ..................................................................................................4

*In re AT & T Corp.*,
   455 F.3d 160 (3d Cir. 2006) ..............................................................................................17, 23

*In re AT&T Corp. Sec. Litig.*,
   2005 WL 6716404 (D.N.J. Apr. 25, 2005) ...............................................................................4

*In re Auto. Refinishing Paint Antitrust Litig.*,
   2008 WL 63269 (E.D. Pa. Jan. 3, 2008) ................................................................................21

*In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*,
   772 F.3d 125 (2d Cir. 2014) ...................................................................................................11

*Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*,
   814 F.3d 132 (2d Cir. 2016) .....................................................................................................9

*Bodnar v. Bank of Am., N.A.*,
   2016 WL 4582084, at *5-6 (E.D. Pa. Aug. 4, 2016) .............................................................15

*Cabrera v. Google LLC*,
   2025 WL 2494429 (N.D. Cal. Aug. 29, 2025) .......................................................................19

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001) ...................................................................................................11

*In re Cendant Corp. Sec. Litig.*,
   404 F.3d 173 (3d Cir. 2005) .......................................................................................20, 21, 22

*Chabot v. Walgreens Boots Alliance, Inc.*,
   2024 WL 3250930 (M.D. Pa. Feb. 7, 2024) ..........................................................................23

*Chludzinski v. NWPA Pizza, Inc.*,
   2022 WL 22887067 (W.D. Pa. Jan. 6, 2022) ...........................................................................3

*In re Citigroup, Inc. Sec. Lit.*,
   965 F. Supp. 2d 369 (2013) ....................................................................................................17

iii

*Clemens v. New York Cent. Mut. Fire Ins. Co.*,
264 F. Supp. 3d 618 (M.D. Pa. 2017) ...................................................................................19

*Destefano v. Zynga, Inc.*,
2016 WL 537946 (N.D. Cal. Feb. 11, 2016) .........................................................................18

*Elec. Welfare Tr. Fund v. United States*,
171 Fed. Cl. 362 (2024) .......................................................................................................19

*In re EQT Corp. Sec. Litig.*,
Case No. 2:19-cv-00754 (W.D. Pa. Sept. 25, 2025) .......................................................17, 23

*Esslinger v. HSBC Bank Nev., N.A.*,
2012 WL 5866074 (E.D. Pa. Nov. 20, 2012) .......................................................................15

*Gelis v. BMW of N. Am., LLC*,
49 F.4th 371 (3d Cir. 2022) .................................................................................................17

*In re High Sulfur Content Gasoline Prods. Liab. Litig.*,
517 F.3d 220 (5th Cir. 2008) ...............................................................................................22

*Howard v. Arconic Inc.*,
2023 WL 12126792 (W.D. Pa. Aug. 9, 2023) .............................................................15, 17, 23

*In re Ikon Off. Sols., Inc., Sec. Litig.*,
194 F.R.D. 166 (E.D. Pa. 2000)...........................................................................................23

*Lan v. Ludrof*,
2008 WL 763763 (W.D. Pa. Mar. 21, 2008) ........................................................................23

*In re Linerboard Antitrust Litig.*,
296 F. Supp. 2d 568 (E.D. Pa. 2003) .....................................................................................3

*In re Lucent Techs., Inc., Sec. Litig.*,
307 F. Supp. 2d 633 (D.N.J. 2004) ........................................................................................4

*McDerment v. Miss. Real Estate Comm'n*,
748 So.2d 114 (Miss. 1999)...................................................................................................7

*McDermid v. Inovio Pharms., Inc.*,
2023 WL 227355 (E.D. Pa. Jan. 18, 2023).............................................................................11

*In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*,
2016 WL 8674608 (D.N.J. Dec. 23, 2016)..............................................................................9

*Milliron v. T-Mobile USA, Inc.*,
423 F. App'x 131 (3d Cir. 2011) ..........................................................................................21

iv

*Missouri v. Jenkins*,
   491 U.S. 274 (1989)..................................................................................................19

*In re Nat'l Football League Players Concussion Injury Litig.*,
   821 F.3d 410 (3d Cir. 2016)........................................................................................3

*In re PETCO Corp. Sec. Litig.*,
   2008 WL 11508458 (S.D. Cal. Sept. 2, 2008)..........................................................19

*Phillips v. Triad Guar. Inc.*,
   2016 WL 2636289 (M.D.N.C. May 9, 2016) ...........................................................19

*In re Processed Egg Prods. Antitrust Litig.*,
   2012 WL 5467530 (E.D. Pa. Nov. 9, 2012) .............................................................22

*In re Prudential Ins. Co. America Sales Practice Litigation Agent Actions*,
   148 F.3d 283 (3d Cir. 1998)................................................................................14, 16

*Redman v. RadioShack*,
   768 F.3d 622 (7th Cir. 2014) ....................................................................................24

*In re Rite Aid Corp. Sec. Litig.*,
   396 F.3d 294 (3d Cir. 2005)..................................................................................4, 16

*Rossini v. PNC Fin. Servs. Grp., Inc.*,
   2020 WL 3481458 (W.D. Pa. June 26, 2020)...........................................................3

*San Antonio Fire & Police Pension Fund v. Dole Food Co.*,
   No. 1:15-cv-1140 (D. Del. June 13, 2017) ..............................................................15

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2019 WL 3001084 (S.D.N.Y. July 10, 2019) ............................................................9

*Sorace v. Wells Fargo Bank, N.A.*,
   2024 WL 643229 (E.D. Pa. Feb. 15, 2024), *aff'd*, 2024 WL 5116797 (3d Cir.
   Dec. 16, 2024)..............................................................................................................4

*In re Stericycle Sec. Litig.*,
   35 F.4th 555 (7th Cir. 2022) ..................................................................................6, 7

*Strougo v. Mallinckrodt Pub. Ltd. Co.*,
   2025 WL 1805498 (D.N.J. Apr. 25, 2025) ..............................................................15

*Wallace v. Powell*,
   2015 WL 9268445 (M.D. Pa. Dec. 21, 2015)...........................................................16

*Wallace v. Powell*,
   301 F.R.D. 144 (M.D. Pa. 2014)..............................................................................21

*In re Wawa, Inc. Data Sec. Litig.*,
　2026 WL 125722 (E.D. Pa. Jan. 13, 2026) ..............................................................21

*In re Wilmington Tr. Sec. Litig.*,
　2018 WL 6046452 (D. Del. Nov. 19, 2018) ...............................................................4

*Woburn Ret. Sys. v. Salix Pharms., Ltd.*,
　2017 WL 3579892 (S.D.N.Y. Aug. 18, 2017).........................................................19

STATUTES

15 U.S.C. 78u-4(a)(7)(B)(ii) ...............................................................................................11

ARIZ. REV. STAT. ANN. § 41-4803(A) (West 2026).........................................................7

MISS. CODE ANN. § 7-5-8 (West 2026) .............................................................................7

UTAH CODE ANN. § 67-5-33(2)(c)(i) (West 2026) ...........................................................7

OTHER AUTHORITIES

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their
　Fee Awards*, 7 J. Empirical Legal Stud. 811, 837-39 (2010) ....................................12

Stephen J. Choi, Jessica Erickson & Adam C. Pritchard, *The Business of
　Securities Class Action Lawyering*, 99 Ind. L.J. 775, 827 fig.13 (2024)..................13

Lead Plaintiff the Public Employees' Retirement System of Mississippi ("MissPERS" or "Lead Plaintiff"), on behalf of itself and the Settlement Class, and Lead Counsel Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") and Kessler Topaz Meltzer & Check, LLP ("KTMC"), respectfully submit this Reply Memorandum of Law in Further Support of: (i) Lead Plaintiff's Motion for Final Approval of Settlement and Plan of Allocation (Dkt. Nos. 156-157); and (ii) Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses (Dkt. Nos. 158-159) (together, the "Motions").[1]

## I.    PRELIMINARY STATEMENT

As detailed in Lead Plaintiff's and Lead Counsel's opening papers (Dkt. Nos. 156-160), the proposed $60 million Settlement is the product of more than five years of vigorous litigation and represents a highly favorable result for the Settlement Class in light of the range of potential recoveries and the significant risks of continued litigation. Following a robust notice program—which included mailing more than 370,000 notices to potential Settlement Class Members and nominees—there were no objections to the Settlement or the Plan of Allocation, and just one objection to the fee motion. In addition, only two individual investors—who collectively purchased just 100 shares during the Class Period—have requested exclusion from the Settlement Class. This overwhelmingly positive reaction further supports finding that the proposed Settlement, Plan of Allocation, and fee request are fair, reasonable, and should be approved.

The sole objection received is directed only at Lead Counsel's attorneys' fees request. *See* Dkt. No. 165 (the "Objection"). The Objection, which is entirely without merit, was filed by Theodore Frank, an individual investor acting *pro se*. Dkt. No. 164. Mr. Frank is a lawyer and the

---

[1] Unless otherwise defined, all capitalized terms herein have the same meanings in the Stipulation and Agreement of Settlement dated February 13, 2026 (Dkt. No. 149-1) (the "Stipulation").

founder of a non-profit legal organization that routinely lodges objections to attorneys' fees requests in class actions nationwide. Dkt. No. 165-1, at ¶¶ 3, 29-30.

Mr. Frank's objection rests on innuendo, not evidence. He claims that Lead Plaintiff originally agreed to an 11% fee cap (false—the retainer agreement has always permitted a fee request of up to 25% and was amended in 2023 to make this irrefutable), suggests there might be a secret side agreement between Lead Plaintiff and Lead Counsel (there is none, as sworn declarations confirm), and alleges that Lead Counsel inflated their lodestar through "no risk" confirmatory discovery (no such discovery occurred). Mr. Frank's remaining arguments disregard Third Circuit law and well-established settlement practices. His objection should be overruled.

## II.    THE REACTION OF THE SETTLEMENT CLASS SUPPORTS APPROVAL

As summarized above, the Settlement Class's reaction has been overwhelmingly positive. There are no objections to the Settlement or Plan of Allocation and only one objection to the fee motion. The objection is addressed in Section III below.

### A.    The Court-Approved Notice Program Was Robust

In accordance with the Court's Preliminary Approval Order, the Claims Administrator, JND Legal Administration ("JND") has mailed 372,218 Postcard Notices and 4,210 Notice Packets to potential Settlement Class Members and their nominees. *See* Supplemental Declaration of Luiggy Segura (the "Suppl. Segura Decl."), attached hereto as Exhibit 1, at ¶ 3.[2]

All of the notices stated that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund and for payment of Litigation Expenses in

---

[2] In addition, JND caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over *PR Newswire* on March 26, 2026. *See* Dkt. No. 160-5 ("Initial Segura Decl."), at ¶ 12. Defendants also provided notice of the Settlement to federal and state officials pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1715(b) ("CAFA"), on February 27, 2026. No objections were raised by these federal and state officials in response to the CAFA notice.

an amount not to exceed $500,000; advised Settlement Class Members that they could object to the Settlement, Plan of Allocation, and/or the fee request, and set forth the May 15, 2026 deadline for doing so. *See* Postcard Notice at 2; Notice ¶¶ 5, 51, 59-60; Summary Notice (Initial Segura Decl. at Exs. 1-3).

On May 1, 2026, 14 days before the objection deadline, Lead Plaintiff and Lead Counsel filed their opening papers in support of the Settlement, Plan of Allocation, and fee and expense request. These papers were available immediately on the public docket (Dkt. Nos. 157-160), and were posted on the case website, www.Mylan2026SecuritiesSettlement.com, the next business day. *See* Suppl. Segura Decl. ¶ 5.

**B.    The Settlement Class's Reaction Supports Approval of the Settlement and the Plan of Allocation**

Not a single Settlement Class Member objected to the Settlement. This strongly supports a finding that the Settlement is fair, reasonable, and adequate. *See, e.g.*, *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 438 (3d Cir. 2016), *as amended* (May 2, 2016) (finding that objections from only approximately 1% of class members weighs in favor of settlement approval); *Chludzinski v. NWPA Pizza, Inc.*, 2022 WL 22887067, at *10 (W.D. Pa. Jan. 6, 2022) ("No class member objected to the settlement. This factor weighs in favor of approval."); *Rossini v. PNC Fin. Servs. Grp., Inc.*, 2020 WL 3481458, at *13 (W.D. Pa. June 26, 2020) ("the lack of any objection . . . supports a presumption of fairness and reasonableness in this case"); *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 578 (E.D. Pa. 2003) ("unanimous approval of the proposed settlement[] by the class members is entitled to nearly dispositive weight in this court's evaluation of the proposed settlement").

The lack of objections is particularly notable given that sophisticated institutional investors owned the substantial majority of Mylan common stock during the Class Period. Courts recognize

that silence from such investors—who possess the resources and motivation to object to anything unfair—particularly supports approval. *See In re Wilmington Tr. Sec. Litig.*, 2018 WL 6046452, at \*5 (D. Del. Nov. 19, 2018) (lack of objections by institutional investors, who owned significant percentage of securities at issue, "weighs in favor of the settlements"); *In re AT&T Corp. Sec. Litig.*, 2005 WL 6716404, at \*4 (D.N.J. Apr. 25, 2005) (the reaction of the class "weigh[ed] heavily in favor of approval" where "no objections were filed by any institutional investors who had great financial incentive to object").

The uniformly favorable reaction of the Settlement Class likewise supports approval of the Plan of Allocation. *See, e.g.*, *In re Lucent Techs., Inc., Sec. Litig.*, 307 F. Supp. 2d 633, 649 (D.N.J. 2004) ("The favorable reaction of the Class supports approval of the proposed Plan of Allocation. . . . [N]o Class Member has objected to the Plan of Allocation."); *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 127 (D.N.J. 2002) (same).

### C.     The Settlement Class's Reaction Supports Approval of the Fee and Expense Application

The positive reaction of the Settlement Class also supports approval of Lead Counsel's fee and expense request. The absence of objections from institutional investors—who owned the majority of Mylan stock during the Class Period and had both the resources and incentive to object—is particularly significant. *See, e.g.*, *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305 (3d Cir. 2005) ("The class's reaction to the fee request supports approval of the requested fees. Notice of the fee request and the terms of the settlement were mailed to 300,000 class members, and only two objected. We agree with the district court such a low level of objection is a 'rare phenomenon.'"); *Sorace v. Wells Fargo Bank, N.A.*, 2024 WL 643229, at \*12 (E.D. Pa. Feb. 15, 2024) (where there was "only one objection to the fee award" after notice to 22,000 class members, this "factor favors approval" of fee request), *aff'd*, 2024 WL 5116797 (3d Cir. Dec. 16, 2024).

**III.    THE FRANK OBJECTION TO THE MOTION FOR ATTORNEYS' FEES IS WITHOUT MERIT**

    **A.    Lead Plaintiff's Retainer Agreement with Lead Counsel Has Always Permitted a Fee Request of Up to 25%, and Has Always Been Subject to Further Review and Consent by the Mississippi Attorney General**

Mr. Frank erroneously claims that BLB&G and MissPERS agreed at the outset of this case to request a percentage fee of considerably less than 25%—about 11%. *See* Objection at 1, 5-6, 18. Specifically, Mr. Frank contends that the Original Retainer Agreement's fee schedule—which provides for $4.75 million for the first $25 million in recovery plus 5% of any amount above that threshold—should be applied to the ***class-wide*** recovery rather than to MissPERS' ***individual*** share of the recovery, thereby capping fees in this case at approximately $6.5 million. Objection at 1. Based on this mistake, Mr. Frank argues that the current 25% fee request is excessive. ***This argument fails because it rests on a factual premise that is entirely wrong***. The plain language of the retainer agreement—and the parties' contemporaneous understanding—permitted a fee request of up to 25% for any recovery within the range achieved here, which was always subject to the review and consent of the Mississippi Attorney General.

Consistent with Mississippi state law, the retainer agreement entered into by BLB&G and MissPERS on June 24, 2020, at the outset of this case, expressly provided that Lead Counsel could request a fee of up to 25% of the recovery obtained for the class, net of expenses, so long as MissPERS' estimated individual recovery was less than $10 million. Specifically, the Original Retainer Agreement (Dkt. No. 165-9) states that "The Law Firm [BLB&G] shall seek compensation in the form of a percentage of the recovery achieved for the class, net of expenses, and ***the Law Firm shall limit the percentage sought to the percentage corresponding to Mississippi PERS' estimated individual recovery set forth in Exhibit B*** attached hereto." Original Retainer Agreement (Dkt. No. 165-9), at ¶ 5.A (emphasis added). Critically, Exhibit B to the

5

Original Retainer Agreement permits a fee request of 25% for "any recovery up to Ten Million Dollars ($10,000,000)" and expressly clarifies that "[i]n this schedule, 'recovery' refers to the estimated recovery that Mississippi PERS is awarded as its share of the recovery for the class"— not the class-wide recovery. *Id.* at Ex. B.

The Original Retainer Agreement thus permits a 25% fee on a $60 million Settlement, because MissPERS' individual share is less than $10 million (and was always expected to be less than $10 million). This reflects the contemporaneous understanding of both the Mississippi AG's office and BLB&G. *See* Supplemental Declaration of Laken Ryals on Behalf of MissPERS ("Suppl. Ryals Decl."), attached hereto as Exhibit 2, at ¶ 4; Supplemental Joint Declaration of Katherine M. Sinderson and Andrew L. Zivitz ("Suppl. Joint Decl."), attached hereto as Exhibit 3, at ¶ 4. [3] Both parties considered that a 25% fee could be appropriate given the substantial risks and significant efforts any recovery would require—an understanding directly relevant to the weight an *ex ante* fee agreement should be accorded. *See* Suppl. Ryals Decl. ¶ 4; Suppl. Joint Decl. ¶ 4.

The fee grid's statutory foundation confirms that the percentage-fee caps apply only to MissPERS' share of recovery, not the class-wide recovery. The fee grid included in Exhibit B of the Original Retainer Agreement is based on a Mississippi state statute governing contingency fees

---

[3] Mr. Frank *concedes* that the different fee percentage tiers "arguably only applies to fees on MissPERS' own individual recovery." Objection at 6 n.2. However, he argues that reading the sliding scale this way would be inconsistent with MissPERS' fiduciary duties because attorneys' fees would be based on MissPERS' own recovery rather than the class-wide recovery. *See id.* (citing *In re Stericycle Sec. Litig.*, 35 F.4th 555, 561-62 (7th Cir. 2022)). But the scenario Mr. Frank hypothesizes—where MissPERS' share could have been large enough to reach higher tiers of the fee schedule and reduce Lead Counsel's fee request—was not possible. Even if the Class was awarded 100 cents on the dollar post-trial, MissPERS' maximum possible individual recovery attributable to the alleged fraud would be below $10 million. Indeed, MissPERS' recognized loss under the Plan of Allocation is only $7.9 million—and this figure reflects the *maximum* recovery MissPERS could receive even if the Class recovered the entire $5.1 billion in non-disaggregated damages (which, as discussed below, was not realistic). Thus, from the outset of this Action, the only relevant recovery tier cap from Exhibit B was the 25% fee cap under Mississippi state law.

for outside counsel hired by the Mississippi Attorney General—engagements that typically arise outside the class action context. *See* MISS. CODE ANN. § 7-5-8 (West 2026). This Mississippi statute is modeled on a provision that has been adopted by several other states, including states whose statutes explicitly codify the Mississippi Attorney General's interpretation that the statutory percentage-fee "caps" apply solely to the state's share of recovery in class action cases—not to the recovery of the class as a whole. *See, e.g.*, ARIZ. REV. STAT. ANN. § 41-4803(A) (West 2026) (similar contingency fee caps apply solely to the "state's portion of the recovery"); UTAH CODE ANN. § 67-5-33(2)(c)(i) (West 2026) (statutory contingency fee caps "apply only with respect to the state's share of any judgment, settlement amount, or common fund"). The Mississippi Attorney General's interpretation of the statute it administers is entitled to "great deference." *See, e.g., McDerment v. Miss. Real Estate Comm'n*, 748 So.2d 114, 118 (Miss. 1999) (noting "great deference" is accorded an "agency's 'construction of . . . the statutes under which it operates'").

On July 21, 2023, while this Action was pending, BLB&G and MissPERS, at MissPERS' request, amended the retainer agreement to clarify the operation of the fee grid. This amendment was prompted in part by a prior objection and appeal brought by Mr. Frank himself in *Stericycle*, 35 F.4th 555, in which he advanced the same incorrect interpretation of the retainer agreement that he raises here. Accordingly, MissPERS revised its agreement to further clarify—but not alter— the intent of the provision. *See* Suppl. Ryals Decl. ¶ 5. Notably, this clarification was part of a general update in which MissPERS amended all of its securities class action fee retainers in active cases, not just this case. *Id*. The revised and currently applicable retainer now reads:

> The Law Firm shall be entitled to request Court approval of a contingency fee that will in no event exceed 25% of the total recovery achieved for the class, net of expenses, and will be consistent with Section 7-5-8(2) Miss. Code Ann. as it applies to the individual pro rata recovery achieved for Mississippi PERS.

Dkt. No. 165-10 ("Revised Retainer Agreement") at Ex. B. Because the plain language and the

7

parties' shared understanding of the Original Retainer Agreement already provided that counsel could request up to 25% of the total recovery (so long as, consistent with MISS. CODE ANN. § 7-5-8, MissPERS' individual share of the recovery did not exceed $10 million), the Revised Retainer Agreement merely clarified the meaning of the provision—it did not increase the permissible attorneys' fee request. *See* Suppl. Ryals Decl. ¶ 5.

Importantly, while both the Original and Revised Retainer Agreements provided that 25% would be the maximum fee request, they also required that "[a]ny fee that the Law Firm wishes to request shall be subject to the consent of the Mississippi AG and the approval of the Court." Dkt. No. 165-9, ¶ 5.A; Dkt. No. 165-10, ¶ 5.A. That additional layer of review and consent occurred here. After the $60 million Settlement was reached (with the active participation and oversight by the Mississippi OAG's office), Lead Counsel submitted a memorandum to the Mississippi OAG requesting permission to seek a 25% fee consistent with the retainer agreements. The Mississippi OAG approved that request only after independently considering the result achieved, the efforts of Plaintiff's Counsel, and the substantial risks of the case. *See* Suppl. Ryals Decl. ¶¶ 6-7.

In short, Mr. Frank's argument that the fee should be reduced because MissPERS and BLB&G had previously agreed to a lower fee is based on an incorrect premise. The agreement between MissPERS and BLB&G has always contemplated a potential fee request of up to 25%, and MissPERS—through the Mississippi OAG—reviewed and approved the appropriateness of the 25% fee request at the conclusion of the litigation.

**B.    Mr. Frank's Vague Allegations of Improper Conduct Should Be Rejected**

Mr. Frank's objection includes vague and unfounded allegations of improper conduct by Lead Counsel and MissPERS. *See* Objection at 8-9. These allegations are baseless. MissPERS and Lead Counsel have faithfully discharged all of their fiduciary duties and have served as adequate representatives of the Class throughout more than five years of litigation. There are no "side

agreements" of any kind between MissPERS and Lead Counsel—and Mr. Frank offers no evidence to suggest otherwise. *See* Suppl. Ryals Decl. ¶ 9; Suppl. Joint Decl. ¶ 6. MissPERS will receive ***no benefit*** from Lead Counsel or any other person in connection with this litigation other than (a) its *pro rata* share of the Settlement as provided under the Plan of Allocation to be approved by the Court, and (b) any award the Court may allow to reimburse MissPERS for the time devoted to the Action by its attorneys at the Mississippi OAG. *See* Suppl. Ryals Decl. ¶ 9.

There is nothing improper—or even remotely suggestive of improper conduct—in the publicly disclosed and First-Amendment-protected political donations made by Lead Counsel and their partners to various political candidates. Campaign donations play no role whatsoever in MissPERS' selection of counsel or conduct of securities litigation. To the contrary, "MissPERS and the OAG have never decided to participate in a case or select a law firm to represent it in a particular action based on political contributions." Suppl. Ryals Decl. ¶ 10.[4]

MissPERS' counsel selection process was objective and merit-based: a panel of nationally recognized law firms specializing in securities and shareholder litigation monitors MissPERS' investment portfolio and alerts MissPERS and the OAG to losses potentially caused by securities fraud. *Id.* ¶¶ 12-14. The OAG has established an extensive evaluation process for securities matters, which is formalized in a MissPERS policy. *Id.* ¶ 12. Under this process, any member of the monitoring panel that wishes to propose a case for MissPERS' consideration must provide an

---

[4] Mr. Frank's insinuations drawn from the voluntarily dismissed *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132 (2d Cir. 2016), are meritless. Mr. Bernstein himself withdrew his allegations after acknowledging they faced "insurmountable factual and legal challenges," and every court to consider these arguments has rejected them outright, including in *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *9 (S.D.N.Y. July 10, 2019) and *In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*, 2016 WL 8674608, at *2 (D.N.J. Dec. 23, 2016). Unlike the Bernstein scenario, all firms sharing in the fee award here have been fully disclosed to the Court, and MissPERS' merits-based counsel-selection process demonstrates that political contributions played no role in this litigation.

outside counsel proposal form that outlines their experience in the field and merits of the case. *Id.* ¶ 14. The OAG then reviews all proposals and meets with each proposing firm. Finally, the OAG makes a determination if the matter is appropriate for MissPERS' active involvement and, if so, the OAG then selects which firm to retain based on the substance of their proposals. *Id.* ¶¶ 13-14. Campaign contributions by BLB&G and KTMC to the Mississippi Attorney General "did not have any influence whatsoever on any aspect of this litigation, settlement, or request for final approval and request for attorneys' fees." *Id.* ¶ 19. Mr. Frank's insinuations to the contrary are nothing more than speculation, unsupported by any evidence in the record.

**C.    The Requested 25% Fee is Reasonable Considering the Recovery for the Settlement Class, the Substantial Risks, and the Stage of the Case**

Mr. Frank also contends that the 25% fee request is too high because of the "minimal recovery" for the Settlement Class (Objection at 2, 13-14), "the relatively low risk" of the litigation (*id.* at 14-15), and the "relatively early stage of settlement" (*id.* at 14, 15-17). As set forth below, each of these arguments is contradicted by the record.

**1.    The Recovery Obtained Supports the Fee Request**

The $60 million Settlement represents a remarkable ***70%*** recovery of the most realistic damages scenario following this Court's Motion to Dismiss ruling—which sustained only a single misstatement, yielding $86 million in Class-wide damages. Lead Plaintiff's damages expert, Chad Coffman, submitted an extensive declaration pursuant to this Court's Order (Dkt. No. 160-4) detailing these calculations. Mr. Frank does not engage with Mr. Coffman's analysis at all.

Mr. Frank's contention that the $60 million Settlement represents merely "a penny on the dollar" of a supposed $5.1 billion in maximum losses (Objection at 13-14) rests on two fundamental errors: (1) an unrealistic assessment of the case's likely scope following the Court's pleadings decisions, and (2) a confusion between losses (***all*** stock price declines following news)

10

and compensable damages (losses actually attributable to the alleged fraud). Both errors are fatal to his argument.[5]

*First*, as Lead Plaintiff explained in its opening papers, the Court sustained only a single false statement in January 2019, leaving the Class with a four-month Class Period and only two of four alleged corrective disclosures. This ruling dramatically reduced the potential maximum damages from the misstatement claim. While Lead Plaintiff salvaged a "scheme" claim that it argued covered the entire alleged three-year Class Period, the Court reserved judgment on that theory, stating it would decide the scope of the scheme claim only "after discovery and potentially at summary judgment." Dkt. No. 123, at 17; *see also* Dkt. No. 160 ("Joint Decl."), ¶¶ 54, 62. Accordingly, the $86 million in disaggregated damages for the sustained misstatement claim is the most appropriate benchmark against which to measure the $60 million Settlement.

---

[5] Mr. Frank's passing comment that "the class notice violates the law by failing to provide the mandatory disclosure of the complaint's alleged maximum damages" (Objection at 13) is also without merit. The PSLRA provides that, "If the parties do not agree on the average amount of damages per share that would be recoverable if the plaintiff prevailed on each claim alleged under this chapter, [the settlement notice must include] a statement from each settling party concerning the issue or issues on which the parties disagree." 15 U.S.C. 78u-4(a)(7)(B)(ii). This is precisely what the Notice includes. Notice ¶ 4 (Dkt. No. 160-5, at 13) ("The Parties do not agree on the average amount of damages per share that would be recoverable if Lead Plaintiff were to prevail in the Action. Among other things, Defendants expressly deny that Lead Plaintiff has asserted any valid claims as to any of them, and expressly deny any and all allegations of fault, liability, wrongdoing, or damages whatsoever."); *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 247 (3d Cir. 2001) ("The court found that the Settlement Notice contained a statement of the damages issues on which the parties disagree and that this statement was sufficient."); *McDermid v. Inovio Pharms., Inc.*, 2023 WL 227355, at *10 (E.D. Pa. Jan. 18, 2023) (finding that "[n]either Rule 23 nor the PSLRA requires" the disclosure of the maximum damages that could be recovered at trial in the notice; "In compliance with the PSLRA, the notice informed the class that 'the parties do not agree on the amount of recoverable damages if Plaintiffs were to prevail on each of the claims.'"); *In re Bank of Am. Corp. Sec., Derivative & ERISA Litig.*, 772 F.3d 125, 134 (2d Cir. 2014) ("Having identified in the notice of the settlement the particulars of their differences, the parties complied with the requirements of 15 U.S.C. § 78u–4(a)(7)(B)(ii), and they were under no obligation to identify the average amount of damages per share.").

***Second***, Mr. Frank's assumption that the Class could achieve a $5.1 billion recovery reflects a fundamental misunderstanding of the securities laws. Even setting aside the challenges in establishing a three-year Class Period, securities fraud plaintiffs must prove loss causation. As stated in Lead Plaintiff's final approval motion, the $5.1 billion figure "is not a realistic measure of achievable recovery" because it effectively assumes that the entire abnormal stock price decline is attributable to the alleged fraud—without disaggregating non-fraud-related declines. Given the breadth of unrelated information released on the alleged corrective disclosure dates, this assumption is untenable.[6] If Lead Plaintiff ultimately proved the full scope of the scheme claim for the three-year period ***and*** prevailed on all disputed issues, the maximum disaggregated damages—the stock price decline actually attributable to disclosure of the fraud—would be approximately $1.55 billion, and the Settlement represents 4% of the amount.

Moreover, Mr. Frank's own cited authorities confirm that a 25% fee for a $60 million settlement is squarely within the mainstream. One study he cites found median fees of 24.9% for settlements between $30 million and $72.5 million. *See* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 837-39 (2010).

---

[6] *See* Joint Decl. ¶ 67 ("The theoretical maximum damages here, based on the full amount of the abnormal stock price declines on each of the four corrective disclosure dates and the scheme claim, totaled approximately $5.1 billion. ***However, this figure is not a realistic measure of achievable recovery***. It assumes Lead Plaintiff would prevail on every liability issue, including highly contested claims that were subject to significant risk of dismissal or adverse rulings. More importantly, it does not account for the substantial portion of the stock price decline attributable to confounding information unrelated to the alleged fraud—a deduction that would be required at trial") (emphasis added); Dkt. No. 160-4 ("Coffman Decl."), ¶ 47 ("At the high end, assuming the full Class Period beginning February 16, 2016 with no disaggregation to account for non-fraud information, the Settlement Class's maximum damages would be approximately $5.1 billion. It is imperative to note that the high-end figure assumes: (i) Lead Plaintiff's success in establishing liability and loss causation for all of the misstatements sustained by the Court and for the Corrective Disclosure Events; (ii) ***there is no impact of confounding information on any of the Corrective Disclosure Events***, and (iii) that all damaged investors submit timely and valid claims.") (emphasis added).

Another found average fees of 23.7% in securities settlements averaging $47.18 million. *See* Stephen J. Choi, Jessica Erickson & Adam C. Pritchard, *The Business of Securities Class Action Lawyering*, 99 Ind. L.J. 775, 827 fig.13 (2024). Far from supporting Mr. Frank's objection, these authorities demonstrate that the requested fee is reasonable.

### 2. The Risks of the Litigation Support the Fee Request

Mr. Frank makes the remarkable claims that "[t]he risk to litigate this securities class action case against Mylan . . . has always been rather low" and that the "heavy lifting" in this case was performed by third parties such as the FDA, whistleblowers, and journalists rather than Lead Counsel. Objection at 14-15. As the Court knows from its oversight of this Action over the past five years, these claims are far from accurate. From the outset, this has always been a very high-risk case. There were no restatements or other admissions by Defendants of any falsity in their public statements, and there were no parallel investigations or enforcement actions by the SEC or DOJ that could help bolster the claims. Not a single other investor sought to lead this Action, demonstrating that the securities bar recognized that this was a high-risk case.

While certain information about Mylan's violations of Current Good Manufacturing Practices and other quality control problems was publicly revealed at the end of the Class Period, those revelations were only the seed of the case. It required extensive investigation by Lead Counsel and their investigators to establish the robust allegations in the Complaint concerning the extent of the quality control and related issues at Mylan and Defendants' prior statements and knowledge regarding those problems—investigation necessary to allow Lead Plaintiff to credibly assert claims of securities fraud. Indeed, the significant risks in this Action of establishing falsity and scienter were borne out when the Court dismissed all but *one* of the dozens of alleged misstatements at the motion to dismiss stage. In short, this is not a low-risk case or one that had an outcome predetermined by the efforts of anyone other than Plaintiff's Counsel.

In this respect, the cases cited by Mr. Frank are easily distinguishable. For example, in *In re Prudential Ins. Co. America Sales Practice Litigation Agent Actions*, 148 F.3d 283 (3d Cir. 1998), the Third Circuit remanded a fee award for further consideration because the fee represented a 5.1 multiplier and the settlement was largely the result of the work of a multistate task force of insurance regulators, rather than class counsel. *Id.* at 337-40. Here, there was no such comparable regulatory activity. Indeed, no government agency took any action concerning Mylan's alleged misstatements to investors here.

### 3. The Stage of the Litigation Supports the Fee Request

The case has been vigorously litigated for five years, with more than 9,000 hours dedicated by counsel. The stage of the litigation fully supports the 25% fee and the modest 2.03 multiplier. Over more than five years of litigation, Plaintiff's Counsel: (a) conducted an extensive investigation into the claims, including interviewing over 400 potential witnesses and performing a thorough review of publicly available information; (b) drafted a detailed 129-page Complaint based on this extensive factual investigation; (c) opposed and defeated in part Defendants' Motion to Dismiss through detailed briefing and oral argument; (d) fully briefed and argued two additional pleading-stage motions, including a Motion to Clarify and an opposition to Defendants' Motion for Judgment on the Pleadings; (e) briefed Lead Plaintiff's opposition to Defendants' Motion to Certify a question for interlocutory appeal; (f) worked with experts in FDA regulation, loss causation, and damages; (g) conducted pre-mediation discovery, including the review of tens of thousands of pages produced by Mylan; and (h) participated in vigorous arm's-length negotiations, which included the preparation and exchange of detailed mediation statements and a full-day mediation session. *See* Joint Decl. ¶¶ 5, 18-46.

These significant efforts and the stage of the case fully support the requested 25% fee. Contrary to Mr. Frank's arguments (Objection at 15-17), fee awards of 25% and higher—and

14

multipliers comparable to that sought here—are commonly awarded in class action settlements

that settled at comparable stages of litigation. *See, e.g.*:

- *Howard v. Arconic Inc.*, No. 2:17-cv-01057-MRH, Final Approval Brief, at 4-5, 10 (W.D. Pa. July 5, 2023), Dkt. No. 235 (Ex. 7A), and 2023 WL 12126792, at *1 (W.D. Pa. Aug. 9, 2023) (awarding **33.33%** of **$74 million** settlement, representing a **3.54** multiplier, where "formal discovery [was] in its nascent stages" and document production had not yet begun);

- *Strougo v. Mallinckrodt Pub. Ltd. Co.*, No. 3:20-cv-10100-RK (TJB), Fee Brief at 14-15 (D.N.J. Mar. 11, 2025), Dkt. No. 158-1 (Ex. 7B), and 2025 WL 1805498, at *1 (D.N.J. Apr. 25, 2025) (awarding **33.33%** of **$46 million** settlement, representing a **2.9** multiplier, where document discovery was underway but merits depositions had not begun);

- *San Antonio Fire & Police Pension Fund v. Dole Food Co.*, No. 1:15-cv-1140-LPS, Fee Brief at 2, 10-11 (D. Del. June 13, 2017), Dkt. No. 93 (Ex. 7C), and Fee Order at 2 (D. Del. July 18, 2017), Dkt. No. 100 (Ex. 7D) (awarding **25%** of **$74 million** settlement, representing a **2.17** multiplier, where settlement was reached after document discovery began but before depositions);

- *Acevedo v. Brightview Landscapes, LLC*, 2017 WL 4354809, at *17 (M.D. Pa. Oct. 2, 2017) (awarding **31.67%** in fees on $4.77 million settlement where "the parties did not engage in formal discovery");

- *Bodnar v. Bank of Am., N.A.*, No. 14-cv-3224, Fee Brief at 11 (E.D. Pa. July 5, 2016), Dkt. No. 84-1 (Ex. 7E), and 2016 WL 4582084, at *5-6 (E.D. Pa. Aug. 4, 2016) (awarding **33%** of $27.5 million settlement, representing a **4.69 multiplier**, where class counsel had reviewed "tens of thousands of pages" of discovery—comparable to this case—and took five depositions);

- *Esslinger v. HSBC Bank Nev., N.A.*, 2012 WL 5866074, at **6, 8, 12-16 (E.D. Pa. Nov. 20, 2012) (awarding **30%** of a $23.5 million settlement representing a **1.7** multiplier where "no formal discovery [had] occurred" and the motion to dismiss was still pending).[7]

Moreover, this Action was resolved prior to formal discovery in large part because the

Court—correctly assessing that the Parties had a well-developed understanding of the relevant

---

[7] As noted above on pages 12-13, Mr. Frank's own cited authorities confirm that 25% fee awards are commonly granted for settlements of this size. *See* Objection at 15-16.

issues as a result of their extended pleadings briefing—required the Parties to select an ADR process shortly after resolution of the Motion to Dismiss and stayed discovery during the pendency of the Parties' ongoing motion practice. *See* Dkt. Nos. 90, 101. Under these circumstances, a 25% fee award—which is generally considered the "benchmark" percentage fee award, *see Wallace v. Powell*, 2015 WL 9268445, at \*19 (M.D. Pa. Dec. 21, 2015) ("Many courts, including several in the Third Circuit, have considered 25% to be the 'benchmark' figure for attorney fee awards in class action lawsuits.")—is fully appropriate given the stage of this case.

      **D.**      **The 25% Fee Request is Fully Supported by the Substantial Efforts of Plaintiff's Counsel Over the Past Five Years and Plaintiff's Counsel's Resulting Lodestar**

Mr. Frank also argues that the fee should be reduced because (a) Plaintiff's Counsel failed to provide adequate details in support of their lodestar, including with respect to (nonexistent) "confirmatory" discovery, and (b) non-attorney professionals such as investigators should not have been included in counsel's lodestar. Objection at 9-12. These objections can be quickly rejected.

      **1.**      **Lead Counsel Provided Adequate Detail of Plaintiff's Counsel's Lodestar to Permit a Lodestar Crosscheck**

Lead Counsel's fee motion included a sworn 40-page declaration with a detailed narrative description of the work that Plaintiff's Counsel performed, together with summaries of the hours, hourly rates, and lodestar devoted to the Action by each attorney and other professional. *See* Dkt. Nos. 160, 160-6, 160-7, 160-8, 160-9, 160-10.

This level of detail was more than sufficient for purposes of conducting a lodestar crosscheck of the requested fee under Third Circuit law. *See Rite Aid*, 396 F.3d at 306-07 (in administering the lodestar crosscheck, "district courts may rely on summaries submitted by the attorneys and need not review actual billing records"); *Prudential*, 148 F.3d at 342 (finding no abuse of discretion where district court "reli[ed] on time summaries, rather than detailed time

16

records"); *see also In re AT & T Corp.*, 455 F.3d 160, 169 n.6 (3d Cir. 2006) ("District judges have the authority to request time sheets, subject to their sound discretion whether or not to do so."). Fees in securities class actions in this District and elsewhere are routinely approved following review of lodestar summaries comparable to those submitted here. *See, e.g.*,

- *In re EQT Corp. Sec. Litig.*, Case No. 2:19-cv-00754-RJC, Fee Lodestar Charts (W.D. Pa. Sept. 25, 2025), Dkt. Nos. 557-6, 557-7, 557-8 (Ex. 7F), and Fee Order (W.D. Pa. Nov. 4, 2025), Dkt. No. 566 (Ex. 7G) (awarding 28% fee on $165 million settlement following lodestar crosscheck with comparable detail);

- *Howard v. Arconic Inc.*, No. 2:17-cv-01057-MRH, Fee Lodestar Charts (W.D. Pa. July 5, 2023), Dkt. Nos. 236-5, 236-6, 236-7, 236-8 (Ex. 7H), and 2023 WL 12126792, at *1 (W.D. Pa. Aug. 9, 2023) (awarding 33.33% fee on $74 million settlement, representing a 3.54 multiplier, following lodestar crosscheck with comparable detail).

*Gelis v. BMW of N. Am., LLC*, 49 F.4th 371 (3d Cir. 2022), on which Mr. Frank relies in arguing that Lead Counsel's fee submissions were insufficient, is inapplicable because the court in that case was awarding fees under the lodestar method pursuant to a federal fee-shifting statute, *id.* at 379-80, rather than simply applying a lodestar crosscheck to a percentage fee award. *See Rite Aid*, 396 F.3d at 306-07.

Nonetheless, for avoidance of any doubt, Lead Counsel are submitting with this memorandum a further breakdown of their hours and lodestar incurred at each stage of the litigation. *See* Suppl. Joint Decl. ¶¶ 8-9. As this breakdown confirms, Lead Counsel conducted no "confirmatory discovery" in this Action, and only a small percentage (less than 2%) of their overall lodestar was incurred after the agreement in principle to settle the Action was reached, all of which was dedicated to settlement-related work. *Id.* ¶¶ 8-10.[8] If the Court would find it helpful to receive

---

[8] For this reason, *In re Citigroup, Inc. Sec. Lit.,* 965 F. Supp. 2d 369 (2013), where counsel included $7.5 million in lodestar for non-settlement work, such as document review and discovery-related tasks, *after* the parties reached a settlement agreement in principle, is entirely inapplicable.

any further detail or to review Plaintiff's Counsel's detailed daily time records, Lead Counsel are prepared to provide them.

### 2. The Inclusion in the Lodestar of Time Spent by In-House Investigators and Other Professionals Was Fully Appropriate

The inclusion in Plaintiff's Counsel's lodestar of time spent by in-house investigators and certain other non-lawyer professionals is entirely appropriate and standard. The extensive work of the investigators—working closely with the firms' attorneys—was critical to developing the factual allegations in the Complaint necessary to satisfy the heightened pleading standards of the PSLRA. Lead Counsel's investigators cast a wide net, interviewing over 400 former employees, to obtain testimony from the eight former employees whose accounts were included in the Complaint to support Lead Plaintiff's claims. In sustaining certain of Lead Plaintiff's claims following the motion to dismiss, the Court specifically found the former employees' statements to be reliable (Dkt. No. 88, at 7-9) and sustained the sole alleged misstatement largely on the strength of those employees' accounts. *Id.* at 30 ("The amended complaint alleges in detail—largely through accounts of former employees—the clear circumvention of quality controls at Mylan to cut corners for time pressure and in a way that jeopardized the quality of the medications."). In short, the investigators' work was instrumental to the outcome achieved for the Settlement Class. Importantly, this investigator time was entirely at risk—just like attorney time. Lead Counsel prosecuted this case on a fully contingent basis, and in cases where Lead Counsel does not obtain a recovery for the class, that investigator time (and the substantial investment it represents) is never compensated.

The investigators were full-time, in-house employees—not outside contractors—and thus do not represent a "profit center" for the firm as Mr. Frank alleges. *See* Suppl. Joint Decl. ¶ 7. Courts routinely include in-house investigators in the lodestar. *See, e.g.*, *Destefano v. Zynga, Inc.*,

18

2016 WL 537946, at *19 (N.D. Cal. Feb. 11, 2016); *see also Cabrera v. Google LLC*, 2025 WL 2494429, at *9 (N.D. Cal. Aug. 29, 2025); *Elec. Welfare Tr. Fund v. United States*, 171 Fed. Cl. 362, 388 (2024); *Woburn Ret. Sys. v. Salix Pharms., Ltd.*, 2017 WL 3579892, at *5 (S.D.N.Y. Aug. 18, 2017); *Phillips v. Triad Guar. Inc.*, 2016 WL 2636289, at *5 (M.D.N.C. May 9, 2016); *In re PETCO Corp. Sec. Litig.*, 2008 WL 11508458, at *4 (S.D. Cal. Sept. 2, 2008). In his Objection, Mr. Frank cites *no* case excluding in-house investigator time from the lodestar crosscheck.[9]

For the avoidance of doubt, Plaintiff's Counsel's lodestar does *not* include any of the time devoted to this Action by secretarial and administrative staff, copy room clerks, IT staff, or any others who performed clerical, administrative, or support roles. *Cf. Clemens v. New York Cent. Mut. Fire Ins. Co.*, 264 F. Supp. 3d 618, 638 (M.D. Pa. 2017) (excluding time spent on administrative tasks from lodestar). And while Mr. Frank complains that "nearly one third" of Plaintiff's Counsel's time is non-attorney investigator time (Objection at 12), this time translates to only 20% of Plaintiff's Counsel's lodestar given the investigators' lower hourly rates. Even if the Court were to remove investigator time from its lodestar analysis—and Mr. Frank has provided no reason to do so—Plaintiff's Counsel's lodestar multiplier would still be 2.5, well within the range of reasonable multipliers.

Moreover, while Plaintiff's Counsel's lodestar only reflects time expended through March 31, 2026, Lead Counsel will continue to perform work on behalf of the Settlement Class for which

---

[9] Moreover, Mr. Frank's citation to *Missouri v. Jenkins*, 491 U.S. 274 (1989) does not support his argument. *Jenkins* held that under a civil-rights fee-shifting statute, 42 U.S.C. 1988, it was appropriate to include paralegals' time in the fee, as that was consistent with the practice in the legal community. *Id*. at 285-89. The distinction between purely legal and "investigation" work that the Supreme Court drew in *Jenkins* related only to the assessment of the appropriate rate to be applied to that time. Here, consistent with *Jenkins*, investigators have been billed at a substantially lower rate than comparably experienced attorneys.

they will receive no additional compensation. This includes overseeing the claims administration process, resolving claim disputes and deficiencies, preparing for and attending the final approval hearing, responding to any appeals, and supervising the distribution of the Net Settlement Fund to Authorized Claimants. These post-settlement activities typically require significant attorney time, yet Lead Counsel's fee request does not account for this additional work.

### E. It Is Appropriate for Lead Counsel to Allocate the Fee Awarded Among Plaintiff's Counsel

As is standard in class action fee motions under Rule 23(h), Lead Counsel request that the Court award an overall fee (of 25% of the Settlement Fund) and that Lead Counsel "allocate the attorneys' fees awarded amongst Plaintiffs' Counsel in a manner which they, in good faith, believe reflects the contributions of such counsel to the institution, prosecution, and settlement of the Action." Dkt. No. 549 ("Stipulation"), ¶ 17; Dkt. No. 163 ("[Proposed] Fee Order"), ¶ 4. This approach is fully consistent with the PSLRA's fundamental design, which vests primary authority over class counsel—including counsel selection, supervision, and compensation—in the lead plaintiff rather than the court. *See In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 199 (3d Cir. 2005) ("The paramount goal . . . is to give the lead plaintiff, not the court, authority over class counsel.").[10]

Citing only inapposite out-of-Circuit authority, Mr. Frank contends that permitting Lead Plaintiff or Lead Counsel to allocate the total fee award somehow violates Federal Rule of Civil Procedure 23(h). *See* Objection at 7. However, the text of that rule ("In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by

---

[10] Plaintiff's Counsel are Lead Counsel BLB&G and KTMC; Flannery Georgalis, LLC, liaison counsel for Lead Plaintiff and the Settlement Class; and Davidson Bowie, PLLC, additional counsel for Lead Plaintiff MissPERS.

the parties' agreement") provides no support for Mr. Frank's claim. To the contrary, in the PSLRA context, the Third Circuit has made clear that "the lead plaintiff is the client, and the attorney-client relationship is, in the first instance, the relationship between lead counsel and lead plaintiff." *Cendant*, 404 F.3d at 198. As a result, "the PSLRA lead plaintiff is the decisionmaker for the class, deciding which lawyers will represent the class and how they will be paid." *Id.*

Courts in this Circuit have repeatedly held that Lead Counsel may be permitted to allocate a fee among counsel entitled to share in the award. *See, e.g.*, *In re Wawa, Inc. Data Sec. Litig.*, 2026 WL 125722, at *2 (E.D. Pa. Jan. 13, 2026) ("Class Counsel are responsible for allocating and distributing attorneys' fees and expenses among counsel for FI Plaintiffs."); *Wallace v. Powell*, 301 F.R.D. 144, 168 (M.D. Pa. 2014) ("Co-Lead Counsel will . . . be permitted to distribute the fee award to those attorneys who assisted in creation of the Settlement fund"); *In re Auto. Refinishing Paint Antitrust Litig.*, 2008 WL 63269, at *7 (E.D. Pa. Jan. 3, 2008) ("Courts generally approve joint fee applications which request a single aggregate fee award with allocations to specific firms to be determined by Co-Lead Counsel, who are most familiar with the work done by each firm and each firm's overall contribution to the litigation."); *see also Milliron v. T-Mobile USA, Inc.*, 423 F. App'x 131, 134 (3d Cir. 2011) ("Generally, a district court may rely on lead counsel to distribute attorneys' fees among those involved.").

Courts find that allocation of fees in this manner is rational and appropriate because counsel "are most familiar with the work done by each firm and each firm's overall contribution to the litigation," and this process "conserves the time and resources of the courts." *Wallace*, 301 F.R.D. at 168 (citing *In re Processed Egg Prods. Antitrust Litig.*, 2012 WL 5467530, at *7 (E.D. Pa. Nov. 9, 2012)); *see also Auto. Refinishing Paint*, 2008 WL 63269, at *7 ("Co–Lead Counsel have directed this case from its inception and are best able to assess the weight and merit of each

21

counsel's contribution"). The Fifth Circuit's decision in *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220 (5th Cir. 2008), on which Mr. Frank relies, is factually inapposite. In that non-PSLRA case, there was no unitary Court-appointed Lead Plaintiff and Lead Counsel who had been placed in charge of prosecuting the litigation. Instead, there were thirty-two separate law firms that performed case-related work. *Id*. at 224.

While the Court retains discretion to allocate fees itself, doing so is unnecessary here, where a sophisticated institutional Lead Plaintiff has undertaken that responsibility. The PSLRA "attempts to implement a market approach by leaving the selection of counsel in the hands of a unitary, experienced, and sophisticated consumer" like MissPERS. *Cendant*, 404 F.3d at 193. There is nothing improper—and everything consistent with the PSLRA's design—in awarding a lump sum and permitting Co-Lead Counsel, subject to Lead Plaintiff's supervision, to allocate the total award between themselves and to local and liaison counsel, based on the relative contributions of the Plaintiff's Counsel firms.

### F. Lead Counsel's Request That The 25% Fee Be Calculated Net Of Plaintiff's Counsel's Litigation Expenses—But Not Currently Unknown Administrative Costs—Is Appropriate

Lead Counsel request, consistent with the terms of the retainer agreement negotiated by MissPERS, that the 25% fee award be calculated net of the Litigation Expenses awarded by the Court, including Plaintiff's Counsel's out-of-pocket litigation expenses and any PSLRA award to Lead Plaintiff. Notably, MissPERS negotiated this net-of-expenses fee structure in its retainer agreement—a term that benefits the Settlement Class and that courts do not require. If Litigation Expenses are awarded in the amount requested, the fee would total $14,912,511.

Mr. Frank argues that any fee award is required to be calculated net of not only those litigation expenses, but *also* the costs of providing notice and administering the Settlement. *See* Objection at 18. This is not the law. Courts in this Circuit routinely award percentage fees based

on the gross settlement amount—not net of any expenses at all. *See, e.g.*, *In re AT & T Corp.*, 455 F.3d 160, 163 (3d Cir. 2006) (affirming percentage fee award based on gross settlement fund); *EQT Corp.*, No. 2:19-cv-00754-RJC, slip op. at 2 (Ex. 7G) (awarding 28% of $167.5 million gross settlement amount); *Arconic*, 2023 WL 12126792, at *1 (awarding 33.3% of gross $74 million settlement amount); *Chabot v. Walgreens Boots Alliance, Inc.*, 2024 WL 3250930, at *1 (M.D. Pa. Feb. 7, 2024) (awarding 30% of gross $192.5 million settlement); *see also Lan v. Ludrof*, 2008 WL 763763, at *24 (W.D. Pa. Mar. 21, 2008) (rejecting objector's argument that 25% fee be awarded net of expenses and finding that "25% of the gross Settlement Fund is reasonably modest and well within the range that courts have awarded"). Lead Counsel's request to calculate the fee net of litigation expenses thus goes *further* than required under Third Circuit law and reflects MissPERS' active engagement and adequacy as Lead Plaintiff.

Even in cases where courts in this Circuit have exercised discretion to award percentage fees net of expenses, they have deducted only counsel's litigation expenses—not notice and administration costs. *See*, *e.g.*, *In re Aetna Inc.*, 2001 WL 20928, at *14 (E.D. Pa. Jan. 4, 2001); *In re Ikon Off. Sols., Inc., Sec. Litig.*, 194 F.R.D. 166, 193 (E.D. Pa. 2000). That is precisely what Lead Counsel have requested here.

Calculating the fee net of notice and administration costs is also impractical because those costs are not yet known. These costs depend on the number of claims received and any contingencies that may arise during claims processing. Claims in this Action are not due until July 10, 2026, and the claims administration process will continue for more months as late claims are received, deficiencies are addressed, and approved claims are finalized. The $500,000 figure Mr. Frank cites is not an estimate of total notice and administration costs; it is simply the amount that, by agreement between Lead Plaintiff and Defendants, can be paid from the Settlement Fund

"without further approval from Defendants or further order of the Court." Stipulation (Dkt. No. 149-1), at ¶ 14. Actual costs may be higher—or they may be lower.

Mr. Frank's reliance on *Redman v. RadioShack*, 768 F.3d 622, 630 (7th Cir. 2014), is misplaced. *Redman* involved a coupon settlement where the ultimate gross recovery for the class was uncertain because it depended on future coupon redemptions, and the defendants had separately agreed to pay a fixed amount of attorneys' fees and to cover all notice and administration costs. *Id.* Here, by contrast, Lead Counsel have achieved a fully funded, non-reversionary $60 million cash fund from which attorneys' fees, litigation expenses, and notice and administration costs will all be paid before a *pro rata* distribution to Settlement Class Members. The circumstances could not be more different.

## IV.    CONCLUSION

For the foregoing reasons, and the additional points and authorities set forth in their opening papers, Lead Plaintiff and Lead Counsel respectfully request that the Court approve the Settlement, the Plan of Allocation, and the request for attorneys' fees and Litigation Expenses. Updated copies of the (i) proposed Judgment Approving Class Action Settlement, (ii) proposed Order Approving Plan of Allocation of Net Settlement Fund, and (iii) proposed Order Awarding Attorneys' Fees and Litigation Expenses are attached hereto as Exhibits 4, 5, and 6. A compendium of true and correct copies of unpublished opinions and other unpublished authority cited in this Reply Memorandum is attached hereto as Exhibit 7.

Dated: June 4, 2026

Respectfully submitted,

**BERNSTEIN LITOWITZ BERGER &
 GROSSMANN LLP**

By: */s Katherine M. Sinderson*
Katherine M. Sinderson (admitted *Pro Hac Vice*)
Salvatore J. Graziano (admitted *Pro Hac Vice*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Email: katiem@blbglaw.com
        salvatore@blbglaw.com

**KESSLER TOPAZ MELTZER
 & CHECK, LLP**

By: */s Andrew L. Zivitz*
Andrew L. Zivitz (PA I.D. # 76554) (*Pro Hac Vice*)
David A. Bocian (PA I.D. # 315542) (*Pro Hac Vice*)
Nathaniel C. Simon (PA I.D. # 326467)
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
Email: azivitz@ktmc.com
        dbocian@ktmc.com
        nsimon@ktmc.com

Jennifer L. Joost (PA I.D. # 204193) (*Pro Hac Vice*)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001
Email: jjoost@ktmc.com

*Lead Counsel for Lead Plaintiff
and the Settlement Class*

25

**DAVIDSON BOWIE, PLLC**
John Davidson (admitted *Pro Hac Vice)*
1062 Highland Colony Parkway, Suite 275
Ridgeland, MS 39157
Telephone: (601) 932-0028
Email: jdavidson@dbslawfirm.net

*Additional Counsel for Lead Plaintiff*

**FLANNERY GEORGALIS, LLC**
Colin Callahan (PA I.D. # 328033)
436 Seventh Avenue
Pittsburgh, PA 15219
Telephone: (412) 254-8602
Email: ccallahan@flannerygeorgalis.com

*Liaison Counsel for Lead Plaintiff*
*and the Settlement Class*

26

## CERTIFICATE OF SERVICE

I, Katherine M. Sinderson, hereby certify that on June 4, 2026, I caused a true and correct copy of the foregoing to be filed electronically with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's CM/ECF automated filing system.

*/s/ Katherine M. Sinderson*
Katherine M. Sinderson
